UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SAGINAW CHIPPEWA INDIAN
TRIBE OF MICHIGAN AND ITS
WELFARE BENEFIT PLAN,

      Plaintiffs,

v.

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

      Defendant.

Case No. 16-cv-_____

Honorable _____

---

## AMENDED COMPLAINT

Plaintiffs, Saginaw Chippewa Indian Tribe of Michigan ("SCIT") and its Welfare Benefit Plan (hereafter referred to as the "Plan"), by and through their counsel, Varnum LLP, hereby state as their Amended Complaint against Defendant Blue Cross Blue Shield of Michigan ("BCBSM") as follows:

## NATURE OF ACTION

1.    SCIT entrusted BCBSM to administer its self-insured employee benefit Plan.  Pursuant to their contract, Plaintiffs sent large sums of money to BCBSM, which BCBSM was supposed to use to pay employee health care claims. Since July 5, 2007, Plaintiffs should have been paying no more than Medicare-Like Rates ("MLR") for all levels of care furnished by Medicare-participating

hospitals for claims authorized by Plaintiffs' carrying out of a Contract Health Service ("CHS") program.

2.      Plaintiffs recently learned that, contrary to their contract and numerous specific claims reports, BCBSM skimmed additional administrative fees from the Plan assets SCIT provided on behalf of the Plan to pay claims. Also, BCBSM has been collecting more than the Plan is required to pay for MLR-eligible claims and has paid Medicare-participating hospitals amounts in excess of MLR payment rates for MLR-eligible claims.  BCBSM's misappropriation of Plan assets is a clear violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*.  In fact, as explained below, BCBSM's scheme has already been adjudicated by the United States Court of Appeals for the Sixth Circuit as fraudulent and unlawful.  Plaintiffs bring this suit to recover the misappropriated funds and obtain all other relief to which they are entitled.

## **PARTIES, JURISDICTION AND VENUE**

3.      SCIT is a federally recognized Indian tribe, pursuant to 25 U.S.C. 1300k, with its Tribal Government headquarters in Mt. Pleasant, Michigan.

4.      Of the approximately 3,728 Tribal members, approximately 1,998 live within the 5-county service area (consisting of Isabella, Clare, Midland, Arenac and Missaukee counties) under which SCIT is authorized under Indian Self-Determination and Educational Assistance Act ("ISDEAA"), Pub. L. No. 93-638,

as amended, 25 U.S.C. § 450 *et seq.*, to carry out a CHS program of the Indian Health Services, 25 U.S.C. § 1601 *et seq.* ("IHS").

5.     The ISDEAA authorizes the Tribe (and other tribal organizations and tribes) to assume responsibility to provide programs, functions, services, and activities ("PFSAs") that the Secretary of the Interior would otherwise be obligated to provide.  In return, the Secretary provides the Tribe with funding under Section 106(a) of the ISDEAA:  (1) "program" funds, the amount the Secretary would have provided for the PFSAs had the IHS retained responsibility for them.  *See* 25 U.S.C. § 450 j-1(a)(1), sometimes called the "Secretarial amount" or the "106(a)(1) amount."

6.     SCIT has approximately 3,326 acres of land held by the United States in trust for its benefit under 25 U.S.C. § 465, and approximately 710 acres of land is held by the federal government in restricted status for individual tribe members.

7.     SCIT has created an ERISA-governed benefit plan (the "Plan").  SCIT and the Plan are hereafter collectively referred to as "Plaintiffs."[1]

---

[1] In *Soaring Eagle Casino & Resort v. N.L.R.B.*, 791 F.3d 648 (6th Cir. 2015) ("*SCIT v. NLRB*"), the Sixth Circuit Court of Appeals ruled that the SCIT's casinos are subject to the National Labor Relations Act ("NLRA") due to precedent established at the Sixth Circuit in *N.L.R.B. v. Little River Band of Ottawa Indians Tribal Government*, 788 F.3d 537 (6th Cir. 2015) ("*NLRB v. LRBOI*"). SCIT is petitioning the United States Supreme Court  for a writ of certiorari.  According to the Sixth Circuit, the NLRA is a statute of general applicability and thus, pursuant to the precedent established in *NLRB v. LRBOI*, the Court held that the general statute applied to SCIT's casinos.

8.      During all relevant times, BCBSM was a Michigan non-profit health care corporation organized under the Nonprofit Health Care Corporation Reform Act, MCL 550.1101, *et seq* (the "Nonprofit Health Care Act").

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1362, and 29 U.S.C. § 1132, because Plaintiffs' claims arise under ERISA and because SCIT is a federally recognized Indian tribe.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because BCBSM resides in the Eastern District of Michigan.  Venue is also proper pursuant to 29 U.S.C. § 1132(e)(2).

## GENERAL ALLEGATIONS

---

The present case is plainly distinguishable from *NLRB v. LRBOI* and *SCIT v. NLRB*. In amending the "governmental exception" to ERISA in 2006, Congress *expressly* abrogated tribal sovereignty over the regulation of tribal self-insured employee benefit plans that do not meet the "governmental exception," providing that ERISA applies to such plans.  29 U.S.C. §1002(32).  This is in direct contrast to *NLRB v. LRBOI* and *SCIT v. NLRB*, which involved the applicability of the NLRA, which lacks any express statutory language evidencing congressional intent to regulate Indian tribes.  *See NLRB*, 788 F.3d at 556 ("all agree that the [NLRA], the exclusive basis for the [NLRB's] exercise of jurisdiction in this case, is silent as to Indian tribes")(McKeague, J., dissenting); *compare Michigan v. Bay Mills Indian Cmty.*, ___ U.S. ___, 134 S. Ct. 2024, 2031-32 (2014)(enforcing the "enduring principle of Indian law" that Congress must "unequivocally express" its intent to limit tribal sovereignty).

Accordingly, this Court can hold that ERISA applies to the Plan without adopting the Sixth Circuit's holding in *SCIT v. NLRB* or *NLRB v. LRBOI*.

11.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

12.     SCIT provides health care benefits to over 4,315 employees (not including numerous SCIT employees who are covered under the insurance policy of a spouse or parent who is also a SCIT employee), including employees of the Soaring Eagle Casino and Resort and Saganing Eagles Landing Casino, through the Plan.  Approximately 356 of SCIT's employees are Tribal members, approximately 121 of which have chosen to enroll in the Plan, and some of SCIT's employees work for either the Soaring Eagle Casino Resort or the Saganing Eagles Landing Casino in activities that are, at least in part, commercial in nature.

13.     Rather than buy health insurance to cover employee health care claims under the Plan, during the relevant time period SCIT has opted to self-insure.  As such, SCIT paid the actual employee health care costs covered by the Plan, up to a large threshold.  SCIT bought "stop loss" insurance to cover claims that exceeded that threshold.

## A.     2013:  First "Hidden Fees" Trial (*Hi-Lex v. BCBSM*) Results in a Judgment Against BCBSM for 100% of Hidden Fees.

14.     The "Hidden Fees" claims in this case are nearly identical (factually and legally) to *Hi-Lex Controls, Inc., v. BCBSM*, No. 11-cv-12557 (E.D. Mich.), the first Hidden Fees case to proceed through trial.  Following a nine day bench trial in the *Hi-Lex* case, the Honorable Victoria A. Roberts issued Findings of Fact

and Conclusions of Law that were sixty-three pages long (the "*Hi-Lex* FFCL"), awarding the *Hi-Lex* plaintiffs 100% of the claimed Hidden Fees, pre-judgment interest back to 1994, and attorneys' fees.

15.    While *Hi-Lex* was the first Hidden Fees case to go to trial, it was not the first such case in this Court.  The original Hidden Fees case is *Pipefitters Local 636 Insurance Fund v. BCBSM*, No. 04-73400 (E.D. Mich.), which was filed on September 1, 2004.  On July 18, 2013, the Sixth Circuit Court of Appeals issued its unanimous, published opinion in *Pipefitters* holding that BCBSM was an ERISA fiduciary and that BCBSM violated ERISA by charging the very same fee at issue here to its self-insured, Administrative Service Contract ("ASC") customers. *Pipefitters Local 636 Insurance Fund v. BCBSM*, 654 F.3d 618 (6th Cir. 2011).

16.    Following the decision in *Pipefitters*, on May 14, 2014, the Sixth Circuit Court of Appeals issued its unanimous, published opinion in *Hi-Lex*, affirming this Court's decision.  *Hi-Lex Controls, Inc. v. BCBSM*, 751 F.3d 740 (6th Cir. 2014), *cert. denied* 83 U.S.L.W. 3109 (Oct. 20, 2014).  The Sixth Circuit in *Hi-Lex* relied heavily on its prior decision in *Pipefitters*, noting that *Hi-Lex* "involves the same ASC, same defendant, and same allegations" as its decision in *Pipefitters*.  *Id.* at 750.

17.    Because this case is identical to *Hi-Lex* in all material respects, where appropriate, Plaintiffs will refer to the *Hi-Lex* FFCL and the *Hi-Lex* Opinion.

**B.**    **SCIT Contracted with BCBSM to Administer Its Self-Insured Plan.**

18.    The framework for the relationship between SCIT and BCBSM was contained in the ASC. The ASC was a boilerplate document drafted by BCBSM, and it set forth the purported rights and responsibilities of each party with regard to BCBSM's administration of the Plan.

19.    ASCs' between SCIT and BCBSM were executed by the parties and effective on March 1, 2002 for members of the SCIT and March 1, 2004 for employees of the SCIT. BCBSM is in possession of the ASCs' between SCIT and BCBSM.

20.    Pursuant to the ASCs', and upon information and belief before that time as well, BCBSM agreed to administer the Plan by paying covered employee health care claims on behalf of the Plan, using money provided to it by SCIT.

21.    The obligations of the parties were outlined in the ASC: The parties agreed that BCBSM would process and pay, and SCIT would reimburse BCBSM for all Amounts Billed related to Enrollees' claims.

22.    "Amounts Billed" is defined in the ASC as the amount SCIT owes in accordance with BCBSM's standard operating procedures for payment of Enrollees' claims.

23.    "Enrollees" are defined in the ASC as Employees and dependents of Employees who are eligible and enrolled for Coverage.

24.   In exchange for its services, BCBSM was entitled to an administrative fee.

25.   The ASC did not contain any pricing terms.  Rather, the specific fees to be paid by SCIT in exchange for the administrative services provided by BCBSM were enumerated in a "Schedule A."  Together, the ASC and Schedule A formed the parties' contract.

26.   The ASC was renewed year after year by the parties.

**C.    Plaintiffs Provided BCBSM With Plan Assets, Which Were Controlled by BCBSM and Supposed to be Used to Pay Covered Employee Claims.**

27.   Under each ASC that was in place, Plaintiffs were required to prepay the pro rata cost of estimated Amounts Billed for that quarter, the pro rata cost of the estimated administrative charge for that contract year, and the amount BCBSM determined was necessary to maintain the prospective hospital reimbursement funding for that contract year.

28.   The specific prepay amounts to be paid by Plaintiffs were dictated by the Schedule A's.

29.   Under each ASC that was in place, BCBSM was required to provide Plaintiffs with "a detailed settlement showing Amounts Billed to and owed by SCIT during the prior available Quarter including any surplus or deficit amounts."

30.     The quarterly settlements were used to adjust the future prepay amounts upward or downward depending on whether employee health care claims were higher or lower than what SCIT had previously prepaid.

31.     Pursuant to the terms of each ASC that was in place, as renewed, SCIT sent the required prepayments to a BCBSM-owned bank account, on a periodic basis.

32.     The prepayments sent to BCBSM's bank account were "Plan Assets" as defined by ERISA.  *Hi-Lex* FFCL, at ¶¶ 5, 6, & 180; *Hi-Lex,* 751 F.3d at 745-46.

33.     BCBSM had complete authority and control over the bank account and the Plan Assets sent to it by SCIT.

34.     BCBSM (1) exercised discretionary authority and control with respect to management of the Plan; (2) exercised authority and control with respect to management and disposition of Plan Assets; or (3) had discretionary authority and responsibility in the administration of the Plan.  *Hi-Lex* FFCL, at ¶¶ 180-82; *Hi-Lex*, 751 F.3d at 744-47.

**D.      BCBSM Illegally Skimmed Additional Administrative Compensation From the Plan Assets Entrusted to It.**

35.     Plaintiffs have recently learned that starting in 1994, BCBSM implemented a scheme to secretly obtain more administrative compensation than it was entitled to.

36.    The scheme is outlined in the *Hi-Lex* case and also in an internal BCBSM memo obtained from that litigation.  *See* **Exhibit 1**.

37.    The catalyst for BCBSM's scheme is that in 1987 and 1988, BCBSM was in poor financial shape.  *Hi-Lex* FFCL, ¶ 9.

38.    BCBSM started charging self-funded customers subsidies and surcharges:  the "Plan-Wide Viability Surcharge," "Other Than Group Subsidy," and "Group Retiree Surcharge."  *Id.* at ¶ 10.

39.    The customer response to the new fees was resoundingly negative.  *Id.* at ¶ 11.  BCBSM received "tremendous complaints from customers," in part stemming from the fact that "[t]he billing of these amounts to customers was an add-on to the bill, ***highlighted for all to see.***"  *Id.*

40.    BCBSM could not convince its customers that the subsidies and surcharges were fair.  *Id.* at ¶ 12.

41.    The charges were so unpopular that, in 1989 alone, BCBSM lost 225,000 members.  *Id.* at ¶ 13.

42.    Many other customers refused to pay the fees.  *Id*. at ¶ 14.

43.    According to BCBSM, the fees made it a "challenge to maintain customer relationships."  *Id.* at ¶ 16.  By disclosing the fees, BCBSM was "its own worst enemy."  *Id.*

**E.**    **1993-1994: BCBSM's Plan to Hide Fees**

44.    In 1993, a simple solution to the problem was proposed.  Executives

suggested replacing the disclosed fees with hidden fees buried in marked-up

hospital claims (the "Hidden Fees").  *Id*. at ¶ 17.

> This solution offered several advantages to BCBSM:
>
> Reflecting certain BCBSM business costs in hospital claim costs will
> provide long-term relief to the problems detailed above and will also
> satisfy short-term objectives of enhancing customer relationships
> while cutting operational costs.   Inclusion of these costs in our
> hospital claim costs is actually more reflective of the actual savings
> passed on to customers as it will now include the hospital savings net
> of the costs incurred to provide these savings.  This will also improve
> our operations efficiencies since mass mailings for subsidy amount
> changes will no longer be necessary.  ***Changes to these costs will be
> inherent in the system and no longer visible to the customer.  The
> same argument applies to risk charges and provider related
> expenses***.

*Id.* at ¶ 19 (emphasis added).   BCBSM's senior management approved this

proposal.  *Id.* at ¶ 22.

45.    The program was known as "retention reallocation."  *Id.*; *Hi-Lex,* 751

F.3d at 743.

46.    The term "retention" refers to money BCBSM retains, as opposed to

money used to pay medical claims.  *Hi-Lex* FFCL, at ¶ 26.

47.    The scheme worked as follows:   regardless of what BCBSM was

required to pay a hospital, BCBSM reported a larger charge that was passed on to

the customer. *Hi-Lex*, 751 F.3d at 743. BCBSM kept the additional amount as hidden administrative compensation:

| | |
|---|---|
| Actual Claim Paid to Hospital: | $6,000 |
| Add-On For Hidden Fees Kept by BCBSM: | <u>$810</u> |
| Hospital Claim Reported to Plaintiff: | $6,810 |

*Id.*

48.    But BCBSM did not stop there. It also shifted the cost associated with maintaining its network (internally known as "Network Access Fee") to the Hidden Fees. *Hi-Lex* FFCL, at ¶ 25.

49.    Previously, BCBSM had included the Network Access Fee in the disclosed administrative fee. *Id.* at ¶ 12.

50.    This scheme offered several advantages to BCBSM, one being the Hidden Fees (per a BCBSM executive summary) would be "inherent in the system and ***no longer visible to the customer***." *Id.* at ¶ 19.

51.    Not only did the subsidies and surcharges disappear from customer bills, but BCBSM was able to lower its disclosed administrative fee (by shifting the "Network Access Fee"), giving the illusion that it was more cost competitive, without actually giving up any revenue.

52.     Collectively then, the Hidden Fees consisted of four components.  The "Other Than Group" subsidy, "Contingency/Risk" surcharge, the "Retiree" surcharge, and the "Network Access" fee.  *Id.* at ¶¶ 25 & 27.

53.     This hidden administrative compensation was in addition to the disclosed "Administrative Fee" described in each Schedule A.

54.     This program went into effect in October 1993.  *Id.* at ¶ 22.

55.     The Hidden Fees were determined unilaterally by BCBSM.  *Id.* at ¶ 31; *Hi-Lex*, 751 F.3d at 750.

56.     BCBSM's cost accountants and actuaries decided how much to recoup through the Hidden Fees and how much hospital claims had to be marked up to reach that goal.  *Hi-Lex* FFCL, at ¶ 31; *Hi-Lex*, 750 F.3d at 750.

57.     Internal BCBSM documents confirm that it had complete discretion in setting the amount of the Hidden Fees, as well as which customers paid them.  *Hi-Lex* FFCL, at ¶ 33; *Hi-Lex,* 750 F.3d at 750.

58.     BCBSM changed the Hidden Fees at its whim or waived them entirely for customers who discovered them.

## F.     <u>1994-Present: BCBSM Employed a Bevy of Artifices to Hide the Fees</u>

59.     Following the implementation of "retention reallocation," BCBSM went to great lengths to ensure that the Hidden Fees were not disclosed and would remain invisible to its customers.  *Hi-Lex* FFCL, at ¶ 35.

13

### 1. __Form 5500 Certifications__

60.    Each year, BCBSM provided customers (including Plaintiffs) with a certification to complete their Form 5500, which is filed with the U.S. Department of Labor.  *Id.* at ¶ 66; *Hi-Lex,* 751 F.3d at 746.

61.    The Department of Labor, Internal Revenue Service, and Pension Benefit Guaranty Corporation developed Form 5500's to satisfy annual reporting requirements under ERISA and the IRS Code.  *Hi-Lex* FFCL, at ¶ 67.

62.    BCBSM carefully crafted its Form 5500 certification to hide the Hidden Fees.  *Id.* at ¶ 76.

63.    Portions of the Hidden Fees should have been, *but were not*, reported in one or more of the lines on the worksheet.  *Id.* at ¶ 73; *Hi-Lex,* 751 F.3d at 748 n. 11.

64.    For example, the "OTG subsidy," was a subsidy BCBSM claimed was mandated by the State of Michigan.  *Hi-Lex* FFCL, at ¶ 25(c).

65.    BCBSM should have reported the amount of the OTG subsidy on Line 9(c)(i)(D) of the Form 5500 certification, titled "OTHER EXPENSES (MANDATED SUBSIDY)."  *Id.* at ¶ 69.

66.    But BCBSM consistently reported zero for this item, even though it took and kept millions of dollars from its self-funded customers.  *Id.* at ¶ 71.

67.     The same is true of the "Contingency/Risk" surcharge used to improve BCBSM's reserves.  *Id.* at ¶ 25(b).

68.     BCBSM should have reported this fee on Line 9(c)(i)(F), titled "RISK AND CONTINGENCY."  *Id.* at ¶ 69.

69.     BCBSM consistently reported "Not Applicable" for this item, despite taking millions of dollars in contingency.  *Id.* at ¶ 71.

70.     None of the other components of the Hidden Fees were reported by BCBSM in the proper locations on the certification.  *Id.*; *Hi-Lex,* 751 F.3d at 748 n. 11.

71.     There were, however, lines for "Administration" (Line 9(c)(i)(B)) and "Other Retention" (Line 9(c)(i)(G)) on the certification.  *Hi-Lex* FFCL, at ¶ 71.

72.     Of the amounts retained by BCBSM, the only ones disclosed to Plaintiffs in the Form 5500 certification were the disclosed Administrative Fee and stop-loss fee.

73.     A reader reviewing the Form 5500 certifications could not determine whether any Hidden Fees were charged or in what amount.  *Hi-Lex* FFCL, at ¶ 72; *Hi-Lex*, 751 F.3d at 748.

74.     As a result, Plaintiffs were misled into believing that BCBSM retained far less administrative compensation than it, in fact, actually retained.  *Id.*

### 2. **Quarterly Settlements**

75.     BCBSM sent Plaintiffs quarterly reports containing details about the plan's performance. *Id.* at ¶ 39.

76.     The reports did not show the amount—or even the existence—of the Hidden Fees. *Hi-Lex* FFCL, at ¶¶ 40-44.

77.     BCBSM carefully crafted false quarterly reports to make it appear to customers like Plaintiffs that (1) the claims paid to providers (e.g. hospitals) were higher than they actually were and (2) they were paying far less to BCBSM for administrative fees than they actually were. *Id.*

78.     BCBSM accomplished this by reporting the Hidden Fees as hospital claims on the line for "TOTAL CLAIMS EXPENSE" rather than as administrative fees on the line for "TOTAL ADMINISTRATIVE FEE EXPENSE." *Id.*

79.     BCBSM did this even though it has admitted that the Hidden Fees were "administrative compensation." *Id.* at ¶ 47.

### 3. **Renewal Documents**

80.      BCBSM provided misleading claims data in the "Provider Contract Savings Report" at the time of contract renewal. *Id.* at ¶¶ 51-55.

81.     The report hid the Hidden Fees in numerous ways:

- Overstating the amount paid to healthcare providers on Plaintiffs' behalf (by including the Hidden Fees kept by BCBSM);

- Understating the amount of discounts offered by providers (by excluding the Hidden Fees kept by BCBSM); and

- Overstating the amount of "claims expenses passed on to your group" (by including Hidden Fees kept by BCBSM).  *Id.*

82.    Also, BCBSM misrepresented that its reported "Administrative Fee is all-inclusive."  *Id.* at ¶ 56; *Hi-Lex*, 751 F.3d at 749.

83.    The amount BCBSM reported as the Administrative Fee did not include the Hidden Fees, which were additional (hidden) administrative compensation.  *Hi-Lex* FFCL, at ¶ 57.

### 4.    Annual Settlements

84.    Each year, BCBSM sent Plaintiffs an annual settlement.  This report included a section titled "Administrative Fee Settlement"; however, BCBSM did not include the Hidden Fees in that section.  *Hi-Lex* FFCL, at ¶ 62.

85.    Instead, BCBSM reported only the administrative fee that was reflected in each Schedule A.  *Id.* at ¶ 60.

86.    The annual settlement also reported "Actual Claims Paid by BCBSM."  *Id.* at ¶ 61-62.

87.    Despite the use of the terms "actual" and "paid," the actual claims amount was increased to include the Hidden Fees kept by BCBSM.  *Id.* at ¶¶ 61-65.

88.     BCBSM knew this was false and misleading because the Hidden Fees were administrative compensation kept by BCBSM, not benefit claims paid to a healthcare provider.  *Id.* at ¶ 62.

89.     Reading the statement, it would be impossible for a BCBSM customer to determine whether Hidden Fees were charged, or in what amount.  *Id.* at ¶ 64.

90.     An underwriter for BCBSM admitted that, through this practice, BCBSM "would be overstating [the] true cost of [a] claim."  *Id.* at ¶ 63.

**G.     2004-2007: BCBSM Debated Whether to Disclose the Hidden Fees**

91.     Starting around 2004, BCBSM executives raised concerns about the lack of disclosure surrounding the Hidden Fees, leading to an internal debate.  *Id.* at ¶ 120.

92.     A snapshot of this debate was captured in a 2004 email between BCBSM employees:  "If we want to counter that perception [that we hide fees] and retain our credibility, we must be willing to disclose all our fees and stand behind them."  *Id.* at ¶ 122.

93.     The BCBSM new-business sales staff opposed disclosure because, by revealing its true compensation to customers, the resulting administrative fees would be too high and BCBSM could not compete.  *Id.* at ¶ 123.

94.     BCBSM's true intentions are shown by the evolution of a proposed renewal exhibit that starts with a numeric disclosure of the Hidden Fees and is

watered down over time to the point where all line items for Hidden Fees and any monetary reference are removed. *Id.* at ¶ 125.

95.   BCBSM senior underwriter Ken Krisan was responsible for coming up with a strategy for "disclosing" the Hidden Fees without customers actually noticing. *Id.* at ¶ 126.

96.   His own emails confirm that actual disclosure of the Hidden Fees was not BCBSM's intent:

- "I think there is a need [to] ***downplay*** this [Hidden Fees] with respect to the outside world … [corporate communications] may be helpful in developing some internal training materials or job aids that puts the proper 'spin' on what we want to say." *Id.* at ¶ 126 (emphasis in FFCL).

- "We want to keep this a little on the ***understated*** side so we don't want to include this in any mass communications. ***In many cases this is not going to [be] good news***." *Id.* at ¶ 126 (emphasis in FFCL).

- "[B]ecause we want to ***downplay*** the release of this information, it was decided that Agents and Customers should not receive any written materials." *Id.* at ¶ 126 (emphasis in FFCL).

- "The [Hidden] Fee portion of the discussion is intended to be ***downplayed*** to the customer. … There is no plan to provide anything to customers or agents on this topic." *Id.* at ¶ 126 (emphasis in FFCL).

- "We want to stay away from identifying what is in the fee." *Id.* at ¶ 126.

## H. BCBSM Investigation Showed That ASC Customers Did Not Know About the Hidden Fees

97.     In 2007, BCBSM internally investigated whether any customers knew they were paying Hidden Fees. *Id.* at ¶¶ 133-35.

98.     The results were startling.  BCBSM's own employees reported that a staggering 83% of self-insured ASC customers with January renewals did not know about the fees.  *See id*; *Hi-Lex,* 751 F.3d at 750.

99.     The results of BCBSM's formal investigation were consistent with anecdotal accounts from BCBSM employees:

- Ken Krisan, Director of Middle Group Underwriting:  "The [Value of Blue] report will identify the [Hidden] Fee which for most groups is something new." *Id.* at ¶ 136.

- Kenneth Bluhm, Director of Financial Accounting:  "[N]ot all ASC groups are aware of BCBSM's [Hidden Fees]." *Id.* at ¶ 136.

- James Bobak, Manager of Large Group Underwriting:  "I know many of the smaller [groups] aren't aware [of hidden fees]." *Id.* at ¶ 136.

- Christine Farah, Vice President of Sales:   "I agree that there is overwhelming confusion on [hidden] fees internally (and externally)." *Id.* at ¶ 136.

- Ken Krisan:  "[I]t is not certain [some accounts] were aware of the [hidden] fees when entering into the arrangement."  *Id.* at ¶ 136.

100.   Plaintiffs now believe that BCBSM charged them Hidden Fees from the date when the first ASC went into effect.  In fact, Plaintiffs have obtained a letter written by BCBSM wherein BCBSM admitted that the Hidden Fees "have been in place for Local ASC groups since 1994."  *See* **Exhibit 2**.  To the extent BCBSM charged Plaintiffs Hidden Fees prior to 2002, Plaintiffs also seek recovery related to those prior years.

## I.   BCBSM Violated the ASC and Schedule A's by Charging the Hidden Fees.

101.   Plaintiffs never agreed to pay the Hidden Fees, and the purported disclosures in the contract documents were false and misleading.  *Hi-Lex*, 751 F.3d at 748.

### 1.   The Schedule A's Are Misleading

102.   BCBSM previously argued that it was allowed to assess the Hidden Fees because of an amorphous "disclosure" included in some Schedule A's.  For the year 2005, for example, the  so-called "disclosure" read:

> Your hospital claims cost reflects certain charges for provider network access, contingency, and other subsidies as appropriate.

103.   This sentence is false and misleading, and did not disclose the Hidden Fees (*Hi-Lex* 751 F.3d at 748):

- The first page of that Schedule A has a heading entitled "Administrative Charge."   It was under this heading that BCBSM's administrative compensation was to be disclosed.   Plaintiffs expected all fees paid to BCBSM to be included in this section of the Schedule A.   The Hidden Fees were "administrative compensation" and were not noted.   *Hi-Lex* FFCL, at ¶ 140; *Hi-Lex*, 751 F.3d at 747.

- The sentence omits the critical fact – that Plaintiffs would be paying these fees as additional administrative compensation to BCBSM.   *Id.* Just the opposite, the language stated that the identified items would be "reflected" in the "hospital claims cost."   "Hospital claims cost" is the cost paid ***to*** hospitals for services rendered.   Thus, the "disclosure" represented that the amounts "ordered by the Insurance Commissioner" would be ***paid to*** the hospitals.   In reality, the fees were ***not*** included in the claims paid to the hospitals – they were additional administrative compensation ***retained by BCBSM***.   *Hi-Lex* FFCL, at ¶ 140.

104.   BCBSM itself recognized that its contracts were confusing and that its "customers probably don't completely understand the Access Fees."   *Id.* at ¶ 141.

## 2.    Each ASC Was Misleading

105.    BCBSM also previously argued that each ASC disclosed the Hidden

Fees, but the Court of Appeals concluded that this cited language was "opaque and

misleading" (*Hi-Lex*, 751 F.3d at 748):

> The Provider Network Fee, contingency, and any cost transfer
> subsidies or surcharges ordered by the State Insurance Commissioner
> as authorized pursuant to 1980 P.A. 350 will be reflected in the
> hospital claims cost contained in Amounts Billed.

106.    The placement of this language was carefully chosen by BCBSM.

Each ASC that has been in effect has contained a heading called "Financial

Responsibilities," under which it says the customer will "pay BCBSM the total of

the following amounts…."    The "following amounts" are then identified in a

***numbered list*** of specific obligations (*e.g.*, administrative fees, late fees, and

interest).

107.    ***Not one of the nine enumerated obligations includes Plaintiffs***

***paying Hidden Fees***.  *Hi-Lex* FFCL, at ¶ 143.

108.    By not including Hidden Fees in the enumerated list of financial

obligations of the customer, BCBSM effectively represented that the Hidden Fees

were NOT something to be paid by the customer to BCBSM.  *Id.*

109.    Next, the "disclosure" represented the fees as "ordered by the State

Insurance Commissioner."  *Id.* at ¶ 144; *Hi-Lex*, 751 F.3d at 748.

23

110.   This was a misrepresentation in three respects: (1) it is untrue; the Insurance Commissioner never ordered any BCBSM customers to pay these fees, nor would the Insurance Commissioner have had that authority in the first place (*Hi-Lex,* 751 F.3d at 748 ); (2) by characterizing the fees as something "ordered" by state government, BCBSM represented that these were NOT any kind of compensation for it, but rather some kind of fee imposed by the State, although, these Hidden Fees were kept by BCBSM as additional administrative compensation; and (3) BCBSM disavowed any claim that it was ordered to collect the OTG subsidy from Plaintiffs in a brief to the Sixth Circuit.  *Hi-Lex* FFCL, at ¶ 144.

111.   This language also refers to "Amounts Billed."  "Amounts Billed" is defined as "the amount the Group owes in accordance with BCBSM's standard operating procedures *for payment of Enrollees' claims*."  *Id.* at ¶ 145.

112.    The definition of "Amounts Billed" does not include fees paid to BCBSM.  *Id.*; *Hi-Lex*, 751 F.3d at 748.

113.   Additionally, each ASC, at Art. IV, B1 "Scheduled Payments," identifies seven payments to be made pursuant to the Schedule A.  None of the seven include the Hidden Fees.  Further, by itemizing payments "listed in Schedule A," BCBSM represented that there were <u>no</u> other payments, and consequently,

Plaintiffs would not have understood the subject language in the Schedule A to be referring to more fees. *Hi-Lex* FFCL, at ¶ 146.

114.   Further, even to the extent that the contract documents provide some hint about additional fees, those documents describe only what *might* happen in the future. *Hi-Lex*, 751 F.3d at 748.

115.   Every year, however, Plaintiffs received DOL 5500 certification sheets from BCBSM which purported to show the administrative compensation that BCBSM was *actually* receiving.   *Id.* The 5500 Forms, though, falsely indicated that BCBSM was not retaining any administrative compensation beyond that clearly delineated in each ASC and the Schedule As.  *Id*.

116.   BCBSM's strategy of secrecy worked as planned and Plaintiffs were unaware that they had been charged Hidden Fees since the beginning of the ASC arrangement.

117.   Plaintiffs were not on actual or constructive notice that BCBSM was charging the Hidden Fees, despite the exercise of reasonable diligence on their part.

118.   Moreover, the Sixth Circuit already has held that a similarly situated, hypothetically diligent plaintiff would not have discovered BCBSM's Hidden Fees scheme. *Hi-Lex*, 751 F.3d at 749-50.

119.   In fact, "BCBSM committed fraud by knowingly misrepresenting and omitting information about the [Hidden] Fees in contract documents. *Id.* at 748.

## J.   BCBSM Engages in a Similar Illegal Scheme by Overstating Physician/Professional Claims

120.   An extensive factual record of BCBSM's wrong doing with regard to illegal mark-ups of hospital claims has been developed in the *Hi-Lex* case.

121.   During the *Hi-Lex* litigation, Plaintiffs learned of another illegal scheme:   BCBSM intentionally overstated physician/professional claims as part of a program known as the Physicians Group Incentive Program ("PGIP").

122.   Under the PGIP, BCBSM added a fee, internally called "Physician Incentive," to the amount charged by a professional, resulting in an increased charge to Plaintiffs.   These additional fees were not reported to Plaintiffs at all. Rather, they were secretly buried within the amounts reported as professional claims expense.

123.   In other words, BCBSM took portions of Plaintiffs' ERISA Plan Assets that were supposed to be used to pay the professionals that provided services to covered beneficiaries, and instead BCBSM used those funds for its own benefit and at its own discretion.

124.   The amounts collected as PGIP payments were not paid to professionals that provided services to Plaintiffs, and BCBSM has not otherwise explained how it used those payments.

125.  The PGIP was directly contrary to the parties' self-funded arrangement, under which Plaintiffs were to pay the actual amount of healthcare claims incurred under the Plan, plus an administrative fee to BCBSM to compensate it for its administrative services.  To the extent BCBSM had physician incentives, or other programs, those were  provided by BCBSM in exchange for the administrative fee.  Those were  not costs to be separately (and certainly not secretly) recovered from Plaintiffs.

126.  The PGIP was not disclosed in the ASC, nor in Plaintiffs' Schedule A's.

127.  When confronted with these allegations, BCBSM responded that it was allowed to assess the PGIP because of an amorphous "disclosure" included in some Schedule A's.  For the year 2007, the so-called "disclosure" read:

> The Group acknowledges that BCBSM or a Blue Cross and Blue Shield Plan may have compensation arrangements with providers in which the provider is subject to performance or risk-based compensation, including but not limited to withholds, bonuses, incentive payments, provider credits and member management fees. Often the compensation amount is determined after the medical services has been performed and after the Group has been invoiced.

This "disclosure" said nothing about BCBSM retaining a portion of Plaintiffs' ERISA Plan Assets in an amount unilaterally determined by it, and then paying out those monies (if at all) to professionals unilaterally determined as deserving by BCBSM.  Instead, it referred to "BCBSM" having compensation arrangements

27

with providers, which at best suggests that BCBSM would be compensating the providers out of its own pocket.

128.   Further, nothing in the alleged disclosures explained how much the PGIP would be or how it would be calculated.

129.   Likewise, nothing in the Schedule A's indicated that Plaintiffs agreed to pay the PGIP.  In fact, BCBSM's charging of the PGIP was inconsistent with the ASC, which specifically identified SCIT's payment obligations, none of which included paying the PGIP.

130.   The so-called "disclosures" of the PGIP were, at best, ambiguous and misleading, and like the Hidden Fees disclosures, were similarly "opaque."

131.   In fact, it is clear that the PGIP scheme is nearly identical to the Hidden Fees scheme.  And like the Hidden Fees scheme, the PGIP scheme violates ERISA because, among other things, BCBSM unilaterally determined the PGIP payments, secretly took these payments from Plaintiffs, and then mis-reported its use of Plan Assets.

132.   Further, to the extent BCBSM used Plaintiffs' Plan Assets to its benefit, that also constitutes illegal self-dealing under ERISA.

133.   Consequently, all of the above-described fees, charges, subsidies and surcharges, including the PGIP and Physician Incentive, are hereafter collectively referred to as "Hidden Fees."

**K.**   **BCBSM Fails to Limit Plan Payments on MLR-Eligible Claims to Medicare-Like Rates and Fails to Inform Plaintiffs That They Are Not Paying Medicare-Like Rates.**

134.   Since July 5, 2007, federal law has provided that Medicare-participating hospitals must accept as payment in full, for all levels of care furnished, no more than "Medicare-Like Rates" ("MLR"), as outlined in federal regulations, for services authorized by a Tribe or Tribal organization carrying out a CHS program of the IHS.   *See e.g.* 42 C.F.R. § 136.30; 42 U.S.C. § 1395 cc(a)(i)(U).

135.   BCBSM was aware of the federal laws governing MLR.

136.   BCBSM failed to ensure that Plaintiffs paid no more than MLR for MLR-eligible services, instead using Plan assets to pay standard contractual rates on services that were eligible for lower MLR payment rates.

137.   All conditions precedent to Plaintiffs' MLR claims have occurred or been performed.

138.   Alternatively, it was BCBSM's fiduciary obligation to ensure that all conditions precedent to Plaintiffs' claims being eligible for lower MLR payment rates were met, and/or to inform Plaintiffs of any conditions precedent to Plaintiffs' claims being MLR-eligible that were not being met.

139.   As a result, since July 5, 2007, Plaintiffs have been overpaying for services eligible for lower MLR payment rates.

29

140.   Plaintiffs did not discover that BCBSM had failed to ensure that Plaintiffs were paying no more than MLR for MLR-eligible services until 2015.

141.   Moreover, Plaintiffs expect that this issue caused BCBSM to overcharge Plaintiffs for stop loss insurance coverage.  The cost of stop loss insurance from BCBSM is based on the actuarial risk of loss and the anticipated costs to cover the loss.  Upon information and belief, BCBSM calculated Plaintiffs' anticipated cost based on standard contractual rates, not the lower MLR payment rates, resulting in a higher stop loss premium being charged to Plaintiffs.

## COUNT I
## BREACH OF FIDUCIARY DUTY – ERISA

142.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

143.   BCBSM was a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) with respect to the Plan because (1) it exercised discretionary authority and control over management of the Plan; (2) it exercised authority and control over management and disposition of Plan Assets (*Hi-Lex* FFCL, at ¶ 182; *Hi-Lex*, 751 F.3d at 744-47; or (3) it had discretionary authority and responsibility in the administration of the Plan.

144.   SCIT is a fiduciary because it exercised discretionary authority and control over management of the Plan.

145.  As a fiduciary, BCBSM was required to, among other things, discharge its duties solely in the interest of the employees and beneficiaries of the Plan, preserve Plan Assets, fully disclose its actions and any compensation it was taking for its services, avoid making false or misleading statements, and abide by any statutory obligations or restrictions imposed on it.

146.  BCBSM breached its fiduciary duties by, among other things:

(a)  Charging the Hidden Fees;

(b)  Failing to disclose the Hidden Fees;

(c)  Submitting false and misleading quarterly settlement statements and annual summaries;

(d)  Submitting false and misleading Form 5500 reports;

(e)  Paying excess claim amounts to Medicare-participating hospitals for services authorized by a tribe or tribal organization carrying out a CHS program;

(f)  Failing to inform Plaintiffs that they were paying amounts in excess of MLR for claims to Medicare-participating hospitals for services authorized by a tribe or tribal organization carrying out a CHS program;

(g)  Violating the Non-Profit Health Care Act,;

(h)  Violating the Health Care False Claims Act, MCL 752.1001 *et seq.*;

(i)  Overcharging stop loss premiums; and

(j)  Otherwise engaging in a pattern of conduct designed to mislead, confuse, deceive and otherwise trick Plaintiffs into paying more for its services than Plaintiffs were obligated to pay;

147.    BCBSM's breach of its fiduciary duty has proximately caused substantial damages to Plaintiffs.

148.    BCBSM fraudulently concealed that it was charging the Hidden Fees, the amount of those fees, and that it was otherwise violating its legal obligations to Plaintiffs.  *Hi-Lex* FFCL, at ¶¶ 233-49; *Hi-Lex*, 751 F.3d at 748-50.

149.    Plaintiffs did not discover the full extent of BCBSM's wrongful conduct until learning of the pending Hidden Fees litigation, but no earlier than 2014, and, in the case of BCBSM's failure to pay no more than MLR for MLR-eligible claims, until 2015.

<u>COUNT II</u>
<u>PROHIBITED TRANSACTION UNDER ERISA</u>

150.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

151.    BCBSM is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) and a "party in interest" pursuant to 29 U.S.C. § 1002(14).

152.    As a fiduciary and party in interest, BCBSM was prohibited from engaging in certain transactions as set forth in 29 U.S.C. § 1106.

153.    BCBSM's conduct with respect to the Hidden Fees was a prohibited transaction because, among other things, (a) it constituted a transfer to, or use by or for the benefit of, BCBSM of Plan Assets, and (b) BCBSM dealt with Plan Assets

in its own interest and for its own account.  *See Hi-Lex* FFCL, at ¶ 201; *Hi-Lex,* 751 F.3d at 750-51.

154.   BCBSM's violation of 29 U.S.C. § 1106 has proximately caused substantial damages to Plaintiffs.

155.   BCBSM fraudulently concealed that it was charging the Hidden Fees, the amount of those fees, and that it was otherwise violating its legal obligations to Plaintiffs.  *Hi-Lex* FFCL, at ¶¶ 233-49; *Hi-Lex*, 751 F.3d at 748-50.

156.   Plaintiffs did not discover the full extent of BCBSM's wrongful conduct until learning of the pending Hidden Fees litigation, but no earlier than 2014.

<u>**COUNT III**</u>
<u>**VIOLATION OF THE NONPROFIT HEALTH CARE ACT**</u>

157.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

158.   BCBSM was a non-profit health care corporation governed by the Nonprofit Health Care Act.

159.   Pursuant to the Nonprofit Health Care Act, BCBSM was required to comply with the following:

(2) Relative to actual administrative costs, fees for administrative services only and cost-plus arrangements shall be set in a manner that precludes cost transfers between subscribers subject to either of these arrangements and other subscribers of the health care corporation. Administrative costs for these arrangements shall be determined in

accordance with the administrative costs allocation methodology and definitions filed and approved under part 6, and shall be expressed clearly and accurately in the contracts establishing the arrangements, as a percentage of costs rather than charges.

M.C.L. § 550.1211(2).

160. The Nonprofit Health Care Act also prohibited BCBSM from distributing inaccurate or misleading statements concerning its services:

> (2) In order to induce a person to contract or to continue to contract with the health care corporation for the provision of health care benefits or administrative or other services offered by the corporation; to induce a person to lapse, forfeit, or surrender a certificate issued by the health care corporation; or to induce a person to secure or terminate coverage with another health care corporation, insurer, health maintenance organization, or other person, a health care corporation shall not, directly or indirectly:
>
> > (d) Make, issue, or circulate, or cause to be made, issued, or circulated, any estimate, illustration, circular, or statement misrepresenting the terms of a certificate or contract for administrative or other services, the benefits thereunder, or the true nature thereof.

M.C.L. § 550.1402(2)(d).

161. BCBSM, through its conduct alleged in this Complaint, violated its statutory obligations under the Nonprofit Health Care Act.

162. BCBSM's statutory violations have proximately caused substantial damages to Plaintiffs.

163. BCBSM fraudulently concealed the foregoing wrongful conduct.

164.   Plaintiffs did not discover the full extent of BCBSM's violations of the Nonprofit Health Care Act until 2015.

**COUNT IV**
**HEALTH CARE FALSE CLAIMS ACT**

165.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

166.   Plaintiffs are health care insurers as defined by M.C.L. § 752.1009.

167.   Plaintiffs reimbursed BCBSM for health care services it paid on behalf of SCIT's employees, citizens, and dependents.

168.   The amount charged by BCBSM for paying the claims was false because the actual claims were less than the amount charged by BCBSM, and because Plaintiffs were not required to pay more than MLR for MLR-eligible claims.  The amount charged by BCBSM for stop loss insurance and administrative compensation also was false because they were based on false claims amounts.

169.   BCBSM kept for itself the difference between what it charged Plaintiffs as claims cost and what it actually paid in claims, as well as the inflated stop loss and administrative fees.

170.   In doing so, BCBSM knowingly presented or caused to be presented claims which contained one or more false statements in violation of M.C.L. § 752.1009.

171.   BCBSM is therefore liable to Plaintiffs for the full amount of the payments made pursuant to M.C.L. § 752.1009.

172.   BCBSM fraudulently concealed the foregoing wrongful conduct.

173.   Plaintiffs did not discover the full extent of BCBSM's violation of M.C.L. § 752.1009 until 2015.

<u>COUNT V</u>
<u>BREACH OF CONTRACT, AND ALTERNATIVELY, COVENANT
OF GOOD FAITH AND FAIR DEALING</u>

174.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

175.   The ASC and Schedule A's are enforceable, binding contracts between Plaintiffs and BCBSM.  The Plan is an intended third-party beneficiary of the contracts.

176.   BCBSM breached the contracts by (1) charging Hidden Fees not allowed under the ASC and Schedule A's, (2) not reporting or otherwise disclosing the actual claims paid and administrative compensation it received, (3) overcharging administrative and stop loss fees, and (4) submitting false and misleading quarterly and annual settlement statements.

177.   BCBSM's breach of the contracts has proximately caused substantial damages to Plaintiffs.

178.   Alternatively, to the extent the Court finds the contracts allowed BCBSM to charge Hidden Fees, the amount charged by BCBSM is not set forth in the contracts and was instead unilaterally determined by BCBSM without disclosure to, or agreement with, Plaintiffs.

179.   To the extent the contracts allowed BCBSM to exercise its discretion as to the amount of the Hidden Fees, BCBSM had a duty to exercise that discretion in good faith and in a manner which dealt fairly with Plaintiffs and was consistent with the parties' objective, reasonable expectations.

180.   BCBSM breached its duty of good faith and fair dealing by, among other things:

> (a)   Charging Hidden Fees unilaterally, secretly, and in bad faith,
>
> (b)   Setting an arbitrary and excessive fee,
>
> (c)   Failing to disclose or report the Hidden Fees,
>
> (d)   Submitting false and misleading quarterly settlements, annual settlements, and Form 5500's,
>
> (e)   Violating Michigan and federal law, and
>
> (f)   Otherwise acting in a manner that was in its best interests alone and not fair to Plaintiffs.

181.   BCBSM fraudulently concealed its breaches of contract and breaches of the duties of good faith and fair dealing from Plaintiffs.

182.    Plaintiffs did not discover the full extent of BCBSM's breaches of contract and breaches of duty of good faith and fair dealing until 2015.

<u>COUNT VI</u>
<u>BREACH OF COMMON LAW FIDUCIARY DUTY</u>

183.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

184.    BCBSM was in a fiduciary relationship with Plaintiffs because, among other things, it was reposed with trust and confidence by Plaintiffs under the ASC and was also entrusted with monies provided to it by Plaintiffs.

185.    As a fiduciary, BCBSM was required to, among other things, conduct itself in the best interests of Plaintiffs, as well as the employees, citizens, and beneficiaries of Plaintiffs, and fully disclose its actions and any compensation it was taking for its administrative services.

186.    BCBSM breached its fiduciary duty by, among other things:

(a)    Charging the Hidden Fees;

(b)    Failing to disclose the Hidden Fees;

(c)    Failing to ensure that the Plan paid no more than MLR for MLR-eligible claims;

(d)    Overcharging stop loss premiums;

(e)    Overcharging administrative compensation;

(f)    Submitting false and misleading quarterly and annual settlement statements;

(g)     Submitting false and misleading Form 5500's;

(h)     Violating the Nonprofit Health Care Act;

(i)     Violating the Health Care False Claims Act; and

(j)     Otherwise engaging in a pattern of conduct designed to mislead, confuse, deceive and otherwise trick Plaintiffs into paying more for its services than Plaintiffs agreed to pay.

187.   As a proximate result of BCBSM's wrongful conduct, Plaintiffs have incurred substantial damages and BCBSM has been unjustly enriched.

188.   BCBSM fraudulently concealed the foregoing wrongful conduct.

189.   Plaintiffs did not discover the full extent of BCBSM's breaches of fiduciary duties until learning of the pending Hidden Fees litigation, but no earlier than 2014, or in the case of failing to ensure that the Plan only paid MLR for MLR-eligible claims, until 2015.

## COUNT VII
## CONVERSION

190.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

191.   As set forth above, BCBSM was in a position of trust and confidence with respect to Plaintiffs and their Plan Assets.

192.   Plaintiffs delivered specific monetary funds to BCBSM, which were to be used to pay appropriate employee health care claims.

193.   BCBSM had an obligation to return funds not used to pay employee health care claims or other obligations properly due under the ASC and Schedule A's.

194.   BCBSM used its position of trust and confidence to wrongfully divert some of the funds to its own use, inapposite of its contractual and fiduciary obligations.

195.   BCBSM's charging of Hidden Fees, overstated stop loss fees, and inflated administrative fees, as well as its retention of those fees and refusal to return them, constitutes wrongful dominion and control over property of Plaintiffs.

196.   BCBSM's has refused to return all funds wrongfully obtained by it.

197.   As a proximate result of BCBSM's acts, Plaintiffs have incurred substantial damages.  In addition, Plaintiffs are entitled to treble damages pursuant to M.C.L. § 600.2919a, as well as interest, costs, and attorneys' fees.

198.   BCBSM fraudulently concealed the fact that it converted Plan Assets to its own use.

199.   Plaintiffs did not discover the full extent of BCBSM's conversion until learning of the pending Hidden Fees litigation, but no earlier than 2014.

## COUNT VIII
## FRAUD / MISREPRESENTATION

200.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

40

201.   BCBSM made material representations of fact to Plaintiffs, namely that it was charging a smaller administrative service fee than it was charging, that it was using Plan Assets to pay claims when it fact it was using a portion of those assets to pay Hidden Fees.

202.   The representations made by BCBSM were false when made.

203.   BCBSM knew that its representations were false when made, or at the very least, it made those representations recklessly and returned inflated stop loss and administrative fees.

204.   Alternatively, even if BCBSM did not knowingly or recklessly make the representations, it is nonetheless liable for innocent misrepresentation because BCBSM benefited from the false representations.

205.   BCBSM made the representations with the intention of inducing Plaintiffs' reliance and, in fact, Plaintiffs did reasonably rely upon the representations made by BCBSM.

206.   Plaintiffs have suffered substantial damages as a result of the misrepresentations made by BCBSM.

207.   BCBSM fraudulently concealed the foregoing wrongful conduct.

208.   Plaintiffs did not discover the full extent of BCBSM's fraud/misrepresentation until learning of the pending Hidden Fees litigation, but no earlier than 2014.

## COUNT IX
## SILENT FRAUD

209.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

210.   BCBSM was in a fiduciary relationship with Plaintiffs, and as such, had a duty of loyalty and honesty and was otherwise obligated to disclose any and all material facts regarding the self-insured program the parties were contracting for.

211.   BCBSM charged Plaintiffs Hidden Fees by skimming for itself Plan Assets that were supposed to be used to pay claims.

212.   BCBSM also paid more than MLR for hospital claims incurred by SCIT members that were eligible for MLR payment rates, and retained inflated stop loss and administrative fees.

213.   BCBSM had an affirmative duty to disclose that (1) it was charging Hidden Fees, (2) the methodology for determining those fees, (3) the amount of those fees, and (4) that it was no paying MLR for MLR-eligible claims.

214.   BCBSM did not disclose the foregoing, despite its duty to do so.

215.   BCBSM intended to induce Plaintiffs to rely upon the nondisclosure, and in fact, Plaintiffs did rely upon that nondisclosure.

216.   Plaintiffs suffered substantial damages as a result.

217.   BCBSM fraudulently concealed the foregoing wrongful conduct.

42

218.   Plaintiffs did not discover the full extent of BCBSM's fraud until learning of the pending Hidden Fees litigation, but no earlier than 2014, and in the case of BCBSM's failure to pay no more than MLR for MLR-eligible claims, until 2015.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court to enter judgment in their favor and against BCBSM as follows:

A.   Ordering BCBSM to provide a full and complete accounting of all Hidden Fees received by it from Plaintiffs and of all amounts paid in excess of MLR for MLR-eligible claims (including stoploss premiums and administrative fees);

B.   Declaring that BCBSM breached its fiduciary duty and otherwise violated Michigan and federal law by (1) charging the Hidden Fees, (2) failing to pay no more than MLR for MLR-eligible claims and charging inflated fees, (3) failing to disclose or report the Hidden Fees or that it was paying more than MLR for MLR-eligible claims, and (4) submitting false and misleading quarterly settlements, annual settlements and Form 5500's, and otherwise acting through a pattern of deception;

C.      Awarding restitution to Plaintiffs of the Hidden Fees, any amounts paid that were more than MLR for MLR-eligible claims, and amounts paid in excess of the $35 per contract per month cap;

D.      Awarding damages to Plaintiffs for amounts paid in excess of the administrative fee cap;

E.      Awarding treble damages and attorneys' fees pursuant to M.C.L. § 600.2919a;

F.      Awarding monetary damages in the full amount of claims submitted by BCBSM to Plaintiffs pursuant to M.C.L. § 752.1009;

G.      Awarding monetary damages, costs, interest and attorneys' fees (including statutory attorneys' fees under ERISA) to the fullest extent of the law; and

H.      Awarding all other relief to which Plaintiffs may be entitled.


VARNUM LLP
Attorneys for Plaintiffs

Date: February 3, 2016      By:      _____/s/ Perrin Rynders_____
                                    Perrin Rynders (P38221)
                                    Bryan R. Walters (P58050)
                                    Aaron M. Phelps (P64790)
                                    Kyle P. Konwinski (P76257)
                                    Business Address & Telephone:
                                    Bridgewater Place, PO Box 352
                                    Grand Rapids, MI  49501-0352
                                    Phone:  (616) 336-6000
                                    Fax:  (616) 336-7000

prynders@varnumlaw.com
brwalters@varnumlaw.com
amphelps@varnumlaw.com
kpkonwinski@varnumlaw.com

10066724_1.DOC