UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE
OF MICHIGAN, el al.,

                Plaintiffs,                      Case No. 16-cv-10317

v.                                         Honorable Thomas L. Ludington

BLUE CROSS BLUE SHIELD OF MICHIGAN,

                Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT, GRANTING IN PART
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
DENYING AS MOOT MOTIONS IN LIMINE**

On January 29, 2016, Plaintiffs Saginaw Chippewa Indian Tribe of Michigan and the Welfare Benefit Plan ("Plaintiffs" or "the Tribe") brought suit against Blue Cross Blue Shield of Michigan ("BCBSM"). Plaintiffs' suit takes issue with BCBSM's management of Plaintiffs' "self-insured employee benefit Plan." Am. Compl. at 1, ECF No. 7. The Counts which remain involve allegations that BCBSM charged Plaintiffs hidden fees. *See* ECF No. 22. On April 10, 2017, the parties filed cross motions for partial summary judgment on the remaining Counts. *See* ECF No. 79, 81. The motions frame two issues: whether both of the Tribe's two benefit plans are subject to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001(b), *et seq.*, and whether the fees collected for BCBSM's Physician Group Incentive Program ("PGIP") violated BCBSM's fiduciary duties. For the reasons stated below, both motions for partial summary judgment will be granted in part.

**I.**

The Tribe "is a federally recognized Indian tribe, pursuant to 25 U.S.C. [§] 1300k, with its Tribal Government headquarters in Mt. Pleasant, Michigan." Am. Compl. ¶ 3, ECF No. 7. BCBSM is a large health insurance provider. BCBSM has provided insurance for the Tribe since the 1990s. Sprague Decl. at 2, ECF No. 81, Ex. 12.

**A.**

This action is one of many that has been brought against BCBSM alleging that BCBSM breached its fiduciary duty by charging its clients "hidden fees." In *Hi-Lex Controls Inc. et. al v. BCBSM*, 2013 WL 2285453, No. 11–12557 (E.D. Mich. May 23, 2013), Plaintiff Hi-Lex Inc. brought suit on a "hidden fees" theory. After a bench trial, Judge Roberts entered judgment for Hi-Lex. In the findings of fact, Judge Roberts explained that, to regain financial stability, BCBSM started charging various fees to self-funded customers in the early 1990s. After receiving extensive complaints from customers, the fees were replaced with a "'hidden' administrative fee buried in marked-up hospital claims." *Id.* at 8. These charges were invisible to the consumer and were never disclosed. BCBSM had "complete discretion to determine the amount of the Disputed Fees, as well as which of its customers paid them." *Id.* at 11. As a result of the hidden nature of the fees, the savings from using BCBSM as an administrator appeared greater to customers than they truly were. Judge Roberts found that BCBSM was an ERISA fiduciary and that BCBSM violated its fiduciary duties through fraudulent concealment and self-dealing. On appeal, Judge Robert's decision was affirmed. *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014).The *Hi-Lex* decision has been treated as conclusively establishing BCBSM's liability as an ERISA fiduciary for charging the hidden fees.

**B.**

The Tribe has two separate health insurance group policies associated with BCBSM. In the 1990s, the Tribe purchased a comprehensive health care benefits plan from BCBSM for its employees. Sprague Decl. at 2. This arrangement was fully-insured, meaning the Tribe paid a premium to BCBSM for coverage and BCBSM in return had sole responsibility for paying claims from the plan's participants.  That Group was identified as Group No. 52885. *Id.* When first created, Group No. 52885 was limited to Tribal employees, and the members of the group included individuals who were not members of the Tribe. *Id.*

In 2002, the Tribe decided to provide health insurance coverage for all members of the Tribe. Sprague Decl. at 2. Rather than purchasing a fully-insured plan, like the plan for Tribe employees, the Tribe chose a self-funded plan. This meant that instead of paying insurance to BCBSM in return for coverage, the Tribe directly paid the cost of health care benefits and paid BCBSM a fee for administering the program.[1] To initiate the program, the Tribe and BCBSM entered into an Administrative Services Contract ("ASC"). *See* Employee Plan Sch. A, ECF No. 81, Ex. 16. The ASC identified the group for tribal members as Group No. 61672. BCBSM asserts that, during the timeframe in question, the Member Plan contained between 91% and 95% non-employee members. *See* Anal. Mem. Plan Part., ECF No. 91, Ex. 2 (finding that the number of non-employee members in the member plan ranged from 1858 to 2152 and the number of employee member participants ranged from 100 to 218).

In 2004, the Tribe's contract with BCBSM for the fully-insured employee plan expired. Sprague Decl. at 3. Instead of renewing the fully-insured plan, the Tribe opted to convert the

---

[1] Self-funded programs allow for employers to customize benefits and often lower costs. But because the employer also assumes direct liability for claims, the employer bears the financial risk of an extraordinarily high claim. To mitigate that risk, employers utilizing a self-funded plan can purchase "stop loss insurance" from BCBSM. Stop loss insurance caps the total liability an employer funding an employee health care plan is exposed to.

Employee Plan to a self-funded arrangement by signing an ASC. *Id.* The group continued to be identified as Group No. 52885. *See* Member Plan Sch. A, ECF No. 79, Ex. 6.

Both the Employee Plan and the Member Plan have existed during the entire timeframe in question. Besides having different group numbers, both plans were assigned different BCBSM customer numbers. *See* Plan Profiles, ECF Nos. 79, Ex. 11, 12. The two plans were created by different ASCs, have their own Enrollment and Coverage Agreements, and issue separate Quarterly and Annual Settlements. *See* Member Plan Enrollment Agreement, ECF No. 79, Ex. 15; Employee Plan Enrollment Agreement, ECF No. 79, Ex. 16; Sample Quarterly and Annual Settlements, ECF No. 79, Ex. 17–20. The Tribe purchased different levels of stop-loss insurance for each plan. *See* Employee Plan Sch. A at 3 & Member Plan Sch. A at 3. Both plans had different eligibility requirements, benefits, co-pays, and deductibles. *See* Sprague Dep. at 12, 17–18, ECF No. 79, Ex. 4; Rangi Dep. at 118–19, ECF No. 79, Ex. 13; Pelcher Dep. at 11, ECF No. 79, Ex. 14. The two plans were negotiated, reviewed, and renewed separately by the Tribe. *See* Sprague Dep. at 19, 86, 151, Luke Dep. at 114, ECF No. 79, Ex. 4, Harvey Dep. at 105, ECF No. 79, Ex. 10.

The two groups are also funded from different sources. The Member Plan was originally funded by the Tribe's Government Trust and is currently funded by the Gaming Trust. Reger Dep. at 11, ECF No. 79, Ex. 21. When in use, the Government Trust funded all government programs aimed at tribal members and was financed by revenues from the Tribe's casino. *Id.* at 12. The Gaming Trust is also "generated from the revenue from the resort." *Id.* at 16. As explained by a tribe employer, "[i]t's the cash excess of flow in regards to depreciation." *Id.* Interest on that money is used, among other things, to pay for the Member Plan expenses. *Id.* The Employee Plan, by contrast, is funded by the Fringe Trust, which is used for employee expenses.

*Id.* at 9, 17.[2] The two plans are funded from different trusts expressly because one is for employees of the Tribe and the other is for members of the Tribe. *Id.* at 17.

Despite these differences between the plans, both the Tribe and BCBSM treated the plans identically in a number of ways. Both groups were primarily administered for the Tribe by the same person: Connie Sprague. Sprague Dep. at 9. Sprague treated the two plans as one for most administrative purposes. *See id.* at 12–16, 151. When the Tribe sought bids for medical coverage, it solicited bids for the two groups simultaneously. *Id.* at 42–43. BCBSM's account representatives and managers always conducted meetings with the Tribe and executed documents regarding the groups at the same time. Cronkright Dep. at 26–27, 55–57, ECF No. 81, Ex. 13; Luke Dep. at 43–44; Harvey Dep. at 94. Cameron Cronkright, BCBSM's account representative for the Tribe, testified that he never remembered a meeting where only one of the plans was discussed. Cronkright Dep. at 57–58.

It is undisputed that, like in the multitude of other similar cases that have been brought against BCBSM, the company included hidden administrative fees in its charges to the Tribe. BCBSM agrees that, between 2004 and 2012, the Tribe paid approximately $13 million in hidden administrative fees: $5,035,145 for Group 61672 and $8,426,278 for Group 52885. Def. Am. Resp. Inter. at 4, ECF No. 81, Ex. 5.

**B.**

The Tribe also argues that BCBSM breached its fiduciary duty through its operation of the Physician Group Incentive Program (PGIP). BCBSM negotiates reimbursement arrangements with healthcare providers, thus creating a "network" of providers. As a large-scale purchaser of health-care coverage, BCBSM has leverage to negotiate favorable rates with providers. *See DeLuca v. Blue Cross Blue Shield of Michigan*, 628 F.3d 743, 747 (6th Cir. 2010).

---

[2] The record does not clearly explain why the Fringe Trust is identified as such or how it originated.

BCBSM customers that purchase self-funded plans are thus purchasing, among other things, the right to access the network of reimbursement arrangements that BCBSM has negotiated. Physician reimbursement arrangements are governed by the Participating Provider Agreement, which contains a Fee Schedule. Simmer 30(b)(6) Dep. at 49, ECF No. 79, Ex. 23.

BCBSM reviews the fees that in-network physicians receive every year and issues a fee update to the Fee Schedule. *Id.* at 14–15. The fee update process starts with "analyzing information relevant to the decision as to how much that update should be." *Id.* at 16. Factors assessed include the market rate for physician payments, inflation, and performance. *Id.* Historically, the fee update applied to all physicians equally. But, in the years prior to 2005, BCBSM began receiving significant customer feedback challenging the "across-the-board fee increases to providers [that were] not delivering as much value to customers as they needed." *Id.* at 13–14. BCBSM's solution, in 2005, was to create PGIP.

As BCBSM describes PGIP, the program was meant to create performance incentives for physicians. Rather than applying the fee update across the board, PGIP diverted a portion of the money collected via the fee update into a separate fund. *Id.* at 18. That fund was then distributed to participating providers based on their performance in meeting certain objectives and benchmarks promulgated by BCBSM. *See* PGIP Manual 2007 at 2, ECF No. 79, Ex. 33. Initiatives which BCBSM and participating providers have collaborated on include: increasing use of less-expensive generic drugs, reducing unnecessary use of radiology services, improving communication with and access for patients, and more. *See id.* at App. A, i–ii. Providers who opt into the program receive a participation reward "intended to support infrastructure development and catalyze system transformation" as the provider seeks to implement certain PGIP initiatives. *Id.* at 13. They are also eligible to receive a "performance reward" which rewards success for

"achieving measurable goals." *Id.* at 14. Payment distributions typically occur several times per year. *Id.* at 15.

According to BCBSM's employees and records, PGIP is funded through a portion of the yearly fee update. Simmer 30(b)(6) Dep. at 15–16. When first initiated, .5% of the funds collected as a result of the yearly fee update were allocated to the PGIP pool. Over the years, that percentage has grown. Today, 5% of the fee update is allocated for PGIP. *Id.* Essentially, this means providers who do not receive PGIP payments receive a lower fee schedule update than providers who receive PGIP rewards for effective and efficient healthcare. BCBSM asserts that neither the manner in which the fee update is calculated nor the approximate level of the yearly fee increase has changed since PGIP's advent. *Id.* at 16. Thus, PGIP, as explained by BCBSM, does not represent an *increase* in the fees paid by BCBSM customers to providers (other than the yearly fee update which BCBSM customers have always been subject to). Rather, PGIP simply involves a performance-based reallocation of existing provider payments.

BCBSM pays all the money collected for PGIP to participating providers; no money is retained by BCBSM for administrative purposes. *Id.* at 22. *See also* Julian Decl., ECF No. 79, Ex. 32. "Payment for performance" programs, like PGIP, have received praise by public policy analysts. *See* Barnes Article, ECF No. 79, Ex. 29. And PGIP has been singled out as a successful and effective initiative. *See* J. Healthcare Mgmt. Art., ECF No. 79, Ex. 36. Successful PGIP programs typically produce generalized savings and efficiencies that cannot be easily calculated. Simmer Dep. at 26, ECF No. 79, Ex. 37. But estimates have placed the customer savings realized solely from the PGIP generic prescription drug initiative at over $800 million. *Id. See also* PGIP 2007 Manual at 4.

When PGIP was first created, BCBSM circulated a letter internally discussing the newly implemented program. *See* Jan. 3, 2005, Letter, ECF No. 81, Ex. 26. The letter explained that another letter would be sent to self-funded customers describing PGIP. The internal letter described the program's operation and discussed how it was being funded. BCBSM explained that "[a] small portion (0.5%) of the 2004 physician fee update will be used to fund the pilot program. BCBSM will direct that 0.5 percent of the update to a fund which will be used to pay the incentive." *Id.* at 2. The letter further provided an example of the funding process:

- Services rendered – Approved amount with fee update is $100[;] – Approved amount with the added incentive is $100.50.

- Provider will be paid $100

- 50 cents will be put in the incentive pool

- Member copay and EOB will only show the $100.

*Id.* (formatting changed slightly for clarity).

The letter explained that the process would be streamlined in the future by automatically setting aside the incentive amount. *Id.* But for 2005, the incentive amount would be taken out of the annual professional claims costs of the customer, not directly through payments to the providers. *Id.* BCBSM explains that this workaround was necessary because, in 2005, the BCBSM claims system was not yet capable of automatically processing the PGIP allocation. Nieman 30(b)(6) Dep. at 30, ECF No. 81, Ex. 28. Thus, for 2005 only, the PGIP incentive payments were collected at the end of the year from customers, instead of automatically during the year. *Id.* at 30, 32, 34.[3]

---

[3] Testimony of a BCBSM employee indicates that the fee increase for 2005 was .5% lower than it otherwise would have been in order to reflect the fact that the PGIP allocation was being taken at the end of the year, instead of automatically as part of the physician payments. Nieman 30(b)(6) Dep. at 31.

In their motion for summary judgment, Plaintiffs make much of the following email sent by Cindy Garofali, a Senior Underwriter for BCBSM, in response to a question regarding whether self-funded customers were required to pay the PGIP incentive fee:

> PGIP is an amount for physician incentive added into the amount due on the claim and as such should be charged to the group. These monies are pooled and are ultimately paid out only to those providers who participate in the program and meet certain requirements. Thus the PGIP amount on an individual claim would not be included in the amount paid to the provider (just like ASC access fee on the Local side is not part of the amount paid to the provider, but is still the group's liability).

Garofali 2007 Email, ECF No. 82, Ex. 24.

Plaintiffs did not depose Ms. Garofali or otherwise investigate the claims in her email. Ms. Garofali has submitted a declaration asserting that her job duties never included working on or with PGIP. Garofali Dep. at 2, ECF No. 91, Ex. 38. She denies that she is an authority of PGIP or even that she has personal knowledge of its operation. *Id.*

## II.

Both parties have moved for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.

The motions for summary judgment primarily contest two issues: whether the Tribe's two plans are governed by ERISA and whether BCBSM's PGIP program violates BCBSM's fiduciary duty to the Tribe. The issues will be addressed in turn, beginning with the threshold question of whether ERISA is applicable to the healthcare plans at issue.

### A.

If BCBSM is an ERISA fiduciary for the Tribe, then BCBSM's liability for the hidden fees is uncontested. But BCBSM argues that the Member Plan, unlike the Employee Plan, is not covered by ERISA. For its part, the Tribe argues that the Employee Plan and Member Plan are simply two benefit groups within a single ERISA plan. The question of whether the Employee Plan and Member Plan should be construed as a single plan is a threshold inquiry and will be conducted first. Afterwards, the issue of whether ERISA governs the Member Plan will be analyzed.

### 1.

The Tribe first argues that the Employee Plan and Member Plan should be viewed as multiple coverage options within one ERISA plan as opposed to two separate ERISA plans. The Tribe admits that none of the plan documents identified either plan as covered by ERISA. But that is not determinative: "[e]mployers can establish ERISA plans 'rather easily.'" *Int'l Res., Inc. v. N.Y. Life Ins. Co.*, 950 F.2d 294, 297 (6th Cir. 1991) (quoting *Credit Managers Ass'n of Southern California v. Kennesaw Life and Accident Ins. Co.*, 809 F.2d 617, 625 (9th Cir. 1987)).

In fact, ERISA specifically allows an ERISA plan to be established simply "through the purchase of insurance." *Id.* (quoting § 1002(1)).

In the Sixth Circuit, there is a "strong presumption that the filing of only one ERISA plan document indicates that the employer intended to create only one ERISA plan." *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 605 (6th Cir. 2007).[4] To overcome the "presumption that the employee health benefits offered by an employer constitute a single ERISA plan," the employer must show through the plan documents "that such benefits are provided and operated under separate plans." *Id.* at 606. Several factors are relevant: "(1) whether each plan had a different ERISA identification number; (2) whether the language of the plan documents indicated that the employer intended to establish multiple plans; and (3) whether the plans shared the same administrator or trust." *Id.* at 605 (citing *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir.1996)).

Here, the circumstances surrounding the creation of the Employee Plan and Member Plan demonstrate that they were intended to be two separate plans, only one of which was intended to provide coverage for employees. The Tribe relies upon *Loren* in its argument that the two plans are a single ERISA plan, but neither the reasoning nor the factual background of *Loren* support that rationale. First, the *Loren* Court discussed the fact that "if an employer intends to create multiple plans it has the ability to do so by filing multiple plan documents." 505 F.3d at 605. The decision further approvingly cited the Tenth Circuit's conclusion that "separate plan documents create separate plans." *Id.* (citing *Chiles*, 95 F.3d at 1511). Unlike the employer in *Loren*, the

---

[4] The Tribe spends significant time in its briefing arguing that the Court should defer to regulatory guidance on the issue of whether all medical care benefits made available by an employer should be considered to constitute a single group health plan. *See* Notice of Proposed Rulemaking for Health Coverage Portability: Tolling Certain Time Periods and Interaction With the Family and Medical Leave Act Under HIPAA Titles I and IV, 69 FR 78800-01; 26 C.F.R. § 54.4980B-2.A-6. These regulations establish a "default rule": "[A]ll medical care benefits made available by an employer or employee organization (including a board of trustees of a multiemployer trust) are generally considered to constitute one group health plan. 69 FR 78800-01. The analytical framework provided in the regulations is thus substantially similar to the analysis in *Loren*.

Tribe never executed ERISA plan documents. Rather, the Tribe simply signed two ASCs with BCBSM. Where no formal ERISA plan documents were ever prepared, it is unclear that the *Loren* presumption regarding the number of ERISA plans established applies. Even if it does, the fact that the Tribe specifically signed two different contracts at different times that contained different provisions suggests that the two plans were not intended to be alternative coverage options.

The Tribe argues that "the two-ASC structure was developed at BCBSM's insistence, for its own administrative ease." Pl. Mot. Summ. J. at 12, ECF No. 81. But the record does not support that assertion. In his deposition, Cameron Cronkright explained that separate ASCs were used because the benefits provided in the two programs were different and because "there wasn't an employee/employer relationship with the tribal members." Cronkright Dep. at 31–34. Two ASCs were also necessary because both plans had a different stop-loss insurance level. Harvey 30(b)(6) Dep. at 26–27. The Tribe has provided no evidence that it would have preferred or that it sought a single ASC. And Mr. Cronkright indicated that the Tribe did not express a preference when asked. Cronkright Dep. at 33. There is no evidence to suggest the Tribe signed two ASCs with the intention of creating a single plan with multiple coverage options.

Given the separate plan documents, there is no reason to presume that the Tribe intended to create a single plan. If anything, the reasoning in *Loren* suggests that a presumption of multiple plans would be appropriate.[5] Admittedly, the regulatory guidance cited in footnote 3 provides a "default rule" that all benefit plans provided by an employer should be construed as a

---

[5] The Tribe attempts to argue that the ACSs have no bearing on the Tribe's intent to maintain more than one ERISA plan, citing *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 817 (7th Cir. 2002). *Fritcher* involved the question of whether an ASC was a "plan document" such that a plan participant could rely upon its terms in alleging denial of benefits under a plan. Because the employee was not a party to the ASC, the ASC would not afford employees the ability to inform themselves of their rights and obligations. *Id.* But here, the ASCs are legally enforceable agreements between the Tribe and BCBSM. As such, they provide direct and highly probative evidence of the Tribe's intent in creating the Employee Plan and Member Plan.

single plan. The "default rule" applies to employers and employee organizations and does not address entities, like the Tribe, that may not be acting in their capacity as an employer. But even if a presumption of a single plan were imposed, the factors[6] provided in *Loren* demonstrate the independence of the two plans. Because there were no formal ERISA plan documents, neither plan has an ERISA identification number. To the extent the plans have other identifying numbers, they are distinct.[7] No language in either ASC mentions the other contract or otherwise suggests a connection or relationship between the two plans. In fact, the only factor which suggests a single ERISA plan is the fact that Connie Sprague administered both.

At a more fundamental level, the two plans must be viewed as separate because the Tribe clearly intended them to be separate plans, not multiple coverage options. The Employee Plan was created over ten years before the Member Plan. By definition, the Employee Plan is limited to employees of the tribe, which includes some individuals who are not members of the Tribe. Conversely, the Member Plan is limited to members of the Tribe, not all of who are employees of the Tribe. Thus, both plans have distinct eligibility standards: some members of the Employee Plan are ineligible for the Member Plan and vice versa. The fact that the Tribe purposefully created two plans that do not have interchangeable eligibility requirements suggests that they are not simply "multiple coverage options."

Likewise, it is important that the plans were apparently created by the Tribe acting in different capacities. The current situation is distinct from scenarios where a traditional employer

---

[6] Those factors are: "(1) whether each plan had a different ERISA identification number; (2) whether the language of the plan documents indicated that the employer intended to establish multiple plans; and (3) whether the plans shared the same administrator or trust." *Loren*, 505 F.3d at 605.

[7] Both parties cite documents prepared in 2017 which purportedly "formalize the existence of only one Plan." *See* Sprague Decl. at 2, ECF No. 97, Ex. 1. These documents were prepared after the time frame at issue in this suit. Accordingly, they are of limited relevance. Although the new documents do identify only one "Health Plan" and provide a single plan number, different documents for each plan have been prepared and the plans are still separately identified by "Member Plan" and "Employee Plan." *See* Employee Plan and Member Plan General Information 2017, ECF No. 97, Exs. 2 & 3. Given the ex post facto nature of their creation and the equivocal evidence of intent contained therein, they do not change the Court's analysis.

creates multiple medical care benefit plans for its employees, shareholders, and/or owners. A company that offers medical benefits will, by definition, provide them only to individuals affiliated with the company *in its capacity as an employer*. The Tribe, however, is not just an employer. The Tribe's original (and arguably predominant) identity is as a sovereign. The Employee Plan was created by the Tribe in its capacity as an employer, while the Member Plan seems to have been created by the Tribe in its capacity as a sovereign.[8] It would be absurd to conclude that, every time the Tribe acts, it does so in its capacity as an employer. But that is the logical conclusion of the Tribe's argument. This fundamental difference between the Tribe and traditional employers is crucial to the determination that the Employer Plan and Member Plan are distinct. The circumstances surrounding the creation of the two plans strongly suggest they were created for different purposes and in different capacities, meaning they should not be construed as a single plan for purposes of ERISA.

As a final matter, the fact that the Tribe created an ERISA plan (the Employee Plan) does not convert the Member Plan into an ERISA plan. *See Slamen v. Paul Revere Life Ins. Co.*, 166 F.3d 1102, 1105 (11th Cir. 1999) ("'[N]on-ERISA benefits do not fall within ERISA's reach merely because they are included in a multibenefit plan along with ERISA benefits.'") (quoting *Kemp v. IBM Corp.*, 109 F.3d 708 (11th Cir. 1997)). *See also Zeiger v. Zeiger*, 131 F.3d 150 (9th Cir. 1997) ("A non-ERISA plan is not converted into an ERISA plan merely because the employer also sponsors a separate benefits plan subject to ERISA."); *Robertson v. Alexander Grant & Co.*, 798 F.2d 868, 871 (5th Cir. 1986) (rejecting the argument that ERISA should govern a plan covering only partners because ERISA applied to another plan that covered non-

---

[8] This is not to say that, as a sovereign Native American Tribe, the Tribe cannot create a plan covered by ERISA. Rather, Native American Tribes can create ERISA plans, subject to one safe-harbor not applicable here, assuming they meet the statutory requirements. *See Band v. Blue Cross Blue Shield of Michigan*, 183 F. Supp. 3d 835, 840 (E.D. Mich. 2016). As discussed below, the Member Plan does not meet those requirements because it was not created for the purpose of providing coverage to employees.

partner employees because "the plans, however similar, are two separate plans"); *Prudential Ins. Co. v. Thomason*, 865 F. Supp. 762, 767 (D. Utah 1994) ("An insurance plan is either an ERISA plan based on its own terms and circumstances, or it is not. *Shaw* recognized that fact. The existence of a separate insurance plan, regardless of who administers it, has no bearing on the determination."). *But see Peterson v. Am. Life & Health Ins. Co.*, 48 F.3d 404, 407 (9th Cir. 1995) (finding that ERISA governed a plan because the plan had originally been created as a component of an employee benefit program that was covered by ERISA and only later separated).

## 2.

Having established that the Member Plan and Employer Plan should be analyzed separately, the question then becomes whether ERISA governs the plans. ERISA was enacted to "protect . . . the interests of participants in employee benefit plans." 29 U.S.C. § 1001(b). Pursuant to 29 U.S.C. § 1003(a), ERISA applies "to any employee benefit plan if it is established or maintained":

(1) by any employer engaged in commerce or in any industry or activity affecting commerce; or

(2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or

(3) by both.

*Id.*

ERISA goes on to define "employee benefit plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." *Id.* at § 1002(3). The term "employee welfare benefit plan" was then defined:

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, *to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries*, through the purchase of insurance or otherwise. . . .

*Id.* at § 1002(1) (emphasis added).

ERISA defines "participant" as "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan . . . ." *Id.* at § 1002(7).

This winding path of definitions obscures as much as it reveals. But, as explained by the Eleventh Circuit, the "gist" of these definitions "is that a plan, fund, or program falls within the ambit of ERISA only if the plan, fund, or program covers ERISA participants because of their employee status in an employment relationship, and an employer or employee organization is the person that establishes or maintains the plan, fund, or program." *Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir. 1982). The Sixth Circuit has promulgated the following three-part test for determining whether a plan is an ERISA plan: (1) whether the "safe harbor" regulations established by the Department of Labor exempt the plan from ERISA, (2) whether "'from the surrounding circumstances a reasonable person [could] ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits,'" and (3) whether the employer established or maintained the plan "with the intent of providing benefits to its employees." *Thompson v. Am. Home Assur. Co.*, 95 F.3d 429, 435 (6th Cir. 1996) (quoting *Int'l Resources, Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 297 (6th Cir. 1991)).

All parties agree that, assuming the two plans are construed separately under ERISA, the Employer Plan is governed by ERISA and BCBSM is liable for the hidden fees paid by the Tribe for that plan. The plan was created by an employer, the Tribe, for the purpose of providing an

- 16 -

employee welfare benefit plan to its employees. The parties agree that the Tribe paid $8,426,278 in hidden administrative fees for Group 52885, the Employer Plan. *See* Pl. Mot. Summ. J. at 4; Def. Am. Resp. Inter. at 4. Judgment in that amount will be entered for the Tribe.

The issue is whether, as a separate plan, the Member Plan is also governed by ERISA. BCBSM does not argue that any "safe harbor" regulations exempt the Member Plan from ERISA. And a reasonable person could easily ascertain all relevant details of the Member Plan from the plan documents and the Tribe's records. The question, then, is whether the employer established the Member Plan with the intent of providing benefits to its employees. Because the Member Plan was created for the purpose of providing coverage to tribal members, the answer is no.

### i.

BCBSM argues that an insurance plan is covered by ERISA *only* if it is created for the purpose of covering employees. The Tribe argues that a plan is covered by ERISA so long as at least one employee is covered by the plan. The relevant legal authority best supports the conclusion that both propositions are correct: a plan must be created for the purpose of covering employees, but assuming that is so and at least one employee is covered, it is not necessarily exempted from ERISA simply because it also covers non-employees.

To begin with, the plain statutory language of ERISA makes clear that the purpose for which the "welfare plan" was created is determinative. If the definitions provided above are interpreted together, ERISA applies only to "employee benefit plans," which include "employee welfare benefit plan[s]." 29 U.S.C. § 1003(a); § 1002(3). And a plan is an "employee welfare benefit plan" only if it was "established or is maintained for the purpose of providing for its participants or their beneficiaries." *Id.* at § 1002(1). ERISA defines "participant" as "any

- 17 -

employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan . . . ." *Id.* at § 1002(7).

The Tribe appears to acknowledge that the Member Plan was created with the purpose of covering at least some non-employees. But the Tribe asserts that the Member Plan is nevertheless covered by ERISA because a number of Tribe employees participate in the Member Plan and because the non-employee members "fall squarely within the types of persons courts have found to be non-employee 'participants.'" Pl. Resp. Br. at 21, ECF No. 92.

The Tribe's arguments depends heavily upon the following guidance from the Department of Labor:

> [T]he term "employee benefit plan" shall not include any plan, fund or program, other than an apprenticeship or other training program, under which no employees are participants covered under the plan. . . . For example, a so-called "Keogh" or "H.R. 10" plan under which only partners or only a sole proprietor are participants covered under the plan will not be covered under title I. However, a Keogh plan under which one or more common law employees, in addition to the self-employed individuals, are participants covered under the plan, will be covered under title I.

29 C.F.R. § 2510.3-3(b).

The Tribe also relies upon a number of cases which confirm that, providing at least one employee is included in the plan, non-employees may also participate in the plan without disqualifying it for ERISA protection. *See Santino v. Provident Life & Acc. Ins. Co.*, 276 F.3d 772, 776 (6th Cir. 2001) (concluding that a shareholder is an ERISA "employee" and "participant" such that his inclusion in a plan did not except it from ERISA coverage); *House v. Am. United Life Ins. Co.*, 499 F.3d 443, 450–52 (5th Cir. 2007) (holding that "[a]n owner of a business is not considered an "employee" for purposes of determining the existence of an ERISA plan," but that once an ERISA plan is established, partners are "participants" assuming their

coverage is "part of a comprehensive employee welfare benefit plan covering both partners and employees"); *Peterson v. Am. Life & Health Ins. Co.*, 48 F.3d 404, 408 (9th Cir. 1995) (holding that a plan which covered "partners" and traditional employees was an ERISA plan and that the partner had standing to enforce ERISA); *Madonia v. Blue Cross & Blue Shield of Virginia*, 11 F.3d 444, 450 (4th Cir. 1993) (explaining that, "once the existence of a[n ERISA] plan has been established, a non-employee "shareholder" can be considered a "participant" in the employee welfare benefit plan).

But in all of the cases the Tribe identifies, the non-employees were covered as part of a broader (and clearly established) ERISA plan that included employees and/or the non-participant members of the plan had some relationship to the employer or employee beneficiary association premised on its status as an employer. Here, the Member Plan and Employee Plan are separate and were never combined. Further, the Tribal Plan was created for tribal members that *did not* have an employment relationship with the Tribe.

A number of cases have established a predicate to the question of whether a non-employee can participate in a plan without exempting it from ERISA: whether membership in the plan is based on the employment relationship. If not, then ERISA's protections do not apply to any participant in the plan. *See Slamen v. Paul Revere Life Ins. Co.*, 166 F.3d 1102, 1105 (11th Cir. 1999) (explaining that the "first policy covers Slamen's employees as well as himself, while the second policy only covers Slamen and was not designed to benefit Slamen's employees," and so the second policy is not covered by ERISA); *Sarraf v. Standard Ins. Co.*, 102 F.3d 991, 993 (9th Cir. 1996) (defining "employee organization" under ERISA by looking to whether the organization limited its membership to employees, or allowed "employers, self-employed individuals, or independent contractors" to join); *Donovan v. Dillingham*, 688 F.2d

1367, 1371 (11th Cir. 1982) ("[A] plan, fund, or program falls within the ambit of ERISA only if the plan, fund, or program covers ERISA participants because of their employee status in an employment relationship, and an employer or employee organization is the person that establishes or maintains the plan, fund, or program. Thus, plans, funds, or programs under which no union members, employees or former employees participate are not employee welfare benefit plans under Title I of ERISA."); *Brown v. Metro. Life Ins. Co.*, 836 F. Supp. 2d 501, 504 (W.D. Ky. 2011) (explaining that the plan was not provided by an "employee organization" as defined in ERISA because membership was open to "any and all individuals, []regardless of their employee status"); *Prudential Ins. Co. v. Thomason*, 865 F. Supp. 762, 767 (D. Utah 1994) (holding that ERISA did not cover the disability plan because "the plan must be 'part of an employment relationship'" and the plan at issue was not) (quoting *Peckham v. Gem State Mut. of Utah*, 964 F.2d 1043, 1049 (10th Cir. 1992)); *McCaslin v. Blue Cross & Blue Shield of Alabama*, 779 F. Supp. 1312, 1318 (N.D. Ala. 1991) (holding that an organization was not an "employee organization" under ERISA because the members of the organization lack "sufficient commonality of interest in the employee-employer relationship"); *Bell v. Employee Sec. Ben. Ass'n*, 437 F. Supp. 382, 393 (D. Kan. 1977) (explaining that a plan was not governed by ERISA because the organization that created the plan did not "act directly as, or indirectly for the benefit of, the employer of the individual who" purchased the plan and because membership in the organization was not based on employment status").

One line of cases merits additional discussion. In *Wisconsin Educ. Ass'n Ins. Trust* ("WEAIT") *v. Iowa State Bd. of Pub. Instruction*, the Eighth Circuit analyzed the meaning of "participant" in the context of "employee welfare benefit plan." 804 F.2d 1059, 1062 (8th Cir. 1986). In *WEAIT*, the benefit plan at issue was maintained "only by an employee organization

(i.e. labor unions; no employer [was] affiliated with WEAIT." *Id.* According to the Eighth Circuit, the question presented was whether § 1002(7) of ERISA "creates a dichotomy between the meaning of 'participant' as it applies to employer-maintained plans and as it applies to employee organization-maintained plans." *Id.* WEAIT was arguing that § 1002(7) was satisfied if an employee organization provides "benefits either to its members or to the non-member employees of an employer unaffiliated with the plan." *Id.* at 1063. The Eighth Circuit rejected that argument, explaining that the words "'employee or former employee' act only upon the phrase 'of an employer,' while the words 'member or former member' apply only to the phrase 'of an employee organization'" in § 1002(7).[9] The *WEAIT* Court explained that: "The definition of an employee welfare benefit plan is grounded on the premise that the entity that maintains the plan and the individuals that benefit from the plan are tied by a common economic or representation interest, unrelated to the provision of benefits." *Id.* Because approximately 30% of the members of the benefits plan were not "members of a union" that sponsored WEAIT, there was not a common interest and the benefit plan was not covered by ERISA. *Id.* at 1060, 1065.

In *NARDA, Inc. v. Rhode Island Hosp. Trust Nat. Bank*, the court discussed *WEAIT* in detail. 744 F. Supp. 685, 689 (D. Md. 1990). The *NARDA* Court explained that "for a plan to be covered by ERISA, it is essential that its participants enjoy the benefits of the plan by reason of their employment relationship." But because 30% of the members of the benefit plan "were not NARDA members," "membership was not limited to an employment relationship [and so] the plan [was] not a plan covered by ERISA." *Id.* at 688–689. The *NARDA* Court addressed the

---

[9] Section 1002(7) of ERISA states:

The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

argument that its rationale would mean "that any time a participant in a plan fails to satisfy the definition of a participant under ERISA, the plan loses the protection of ERISA." *Id.* at 689. According to the court, that was not the case: "The distinction to be made is between a plan designed by its terms to include persons not defined as participants and a properly designed plan that, through faulty implementation, in fact includes persons not defined as participants." *Id.* After concluding that benefits were mistakenly extended to persons not defined as participants, the court found that ERISA applied to the plan at issue. *Id.* at 690. *See also Cooley v. Protective Life Ins. Co.*, 815 F. Supp. 189, 192 (S.D. Miss. 1993) (holding that because "the plan allows nonmembers of [the labor union] to participate in the plan, . . . the arrangement at issue here does not likely qualify as an 'employee welfare benefit plan' under ERISA") (citing *Wisconsin Educ. Ass'n Ins. Trust*, 804 F.2d 1059 (8th Cir.1986)).

**ii.**

When the legal landscape is viewed as a whole, it becomes clear that the Member Plan is not governed by ERISA. Because the Employee Plan and Member Plan are separate plans (for the reasons stated above), the Tribe must demonstrate that the Member Plan was created to provide insurance benefits to employees of the Tribe. But the circumstances surrounding the creation of that plan make clear that it was not created for the purpose of providing healthcare benefits to employees of the Tribe. The Tribe had, years before, established a separate plan which provided healthcare benefits to its employees. That plan was created via separate documents and continued to exist after the Member Plan was created. Importantly, the Member Plan's eligibility requirements intentionally exclude some employees of the Tribe. And although some tribal employees have opted to take advantage of the Member Plan, most have remained members of the Employee Plan, indicating that the Employee Plan was not rendered redundant

by the Member Plan. The only reasonable conclusion is that the Member Plan must have been created to provide healthcare coverage to non-employee members. Although some tribal employees who are also members of the Tribe have opted into the Member Plan, their coverage is clearly unrelated to the employment relationship.

For the same reason, the creation of the Member Plan had nothing to do with the Tribe's status as an employer. Rather, it was accomplished in the Tribe's capacity as a sovereign. Similarly to the plans at issue in *Brown* and *Prudential*, eligibility for the Member Plan was premised, by definition, on membership in the tribe, not employment with the Tribe. *See Brown*, 836 F. Supp. 2d at 504 (explaining that the plan was not provided by an "employee organization" as defined in ERISA because membership was offer to "any and all individuals, []regardless of their employee status"); *Prudential Ins. Co.*, 865 F. Supp. at 767 (holding that ERISA did not cover the disability plan because "the plan must be 'part of an employment relationship'" and the plan at issue was not).

The Tribe attempts to distinguish *Brown* by asserting that the plan at issue in *Brown* was maintained by an "employee organization" instead of an "employer" like the Tribe. But that distinction is not determinative. The statutory language of ERISA states that a plan is an "employee welfare benefit plan," and thus covered by ERISA, only if it was established or is maintained for the purpose of providing for its participants or their beneficiaries." 29 U.S.C. at § 1002(1). Accordingly, both employers and employee organizations can create employee welfare benefit plans, but in either case the plan must be created to benefit "participants," which are defined as a "employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan . . . ." *Id.* at § 1002(7). The Tribe is not an employee organization,

- 23 -

see § 1002(4), but that only underscores the necessity of showing that the Member Plan was created to benefit employees or former employees. The Tribe has not identified any evidence which would support that conclusion.

The weakness of the Tribe's argument is demonstrated by its attempt to distinguish *WEAIT*. The Tribe first points out that *WEAIT* did not involve an employer-sponsored benefit plan, which is correct. But the Tribe then relies on *WEAIT*'s discussion of the need for "a common economic or representation interest" to argue that all members of the Tribe share economic interests sufficient to make the Member Plan subject to ERISA. *See* 804 F.2d at 1063 ("The definition of an employee welfare benefit plan is grounded on the premise that the entity that maintains the plan and the individuals that benefit from the plan are tied by a common economic or representation interest, unrelated to the provision of benefits. An employee depends on his employer; a union member relies on his union."). Read in context, *WEAIT* clearly supports the self-evident point that, in the context of an employer-sponsored plan, the common economic interest required to establish an ERISA plan is *the employment relationship*. Here, that interest is missing.

The Tribe's efforts to distinguish the line of cases which hold that ERISA applies only if the benefit plan was created as part of an "employment relationship" fall short. First, the Tribe cites a single letter written by the Department of Labor in 1985 for the proposition that the intent of the employer is irrelevant. *See* U.S. Dep't Labor Letter 1985, ECF No. 94, Ex. 23 (1985 WL 544567 (P.W.B.A.). The letter was written in response to a question regarding whether ERISA applied to a joint and survivor annuity benefits plan. *Id.* In opining that the arrangement appeared to constitute an "employee pension benefit plan" within the meaning of ERISA, the Department noted that "the status of an arrangement as an employee benefit plan subject to Title I coverage is

not affected by the fact that the arrangement [was]. . . not intended by the employer-plan sponsor to be an employee benefit plan for purposes of Title I coverage." *Id.* at 2. This single sentence, in the pension benefit plan context, cannot bear the weight which the Tribe places upon it. The Tribe's proffered interpretation is entirely at odds with the clear language of § 1002(1): a plan is an "employee welfare benefit plan" only if it was "established or is maintained for the purpose of providing for its participants or their beneficiaries." The most reasonable interpretation of the letter from the Department of Labor appears to be that "employee benefit plans" will be identified through a practical analysis of the purpose and operation of the program, not a formalistic inquiry.

The Tribe's remaining arguments are meritless because they do not address the threshold question: whether an ERISA plan was created in the first place. It may be true that, assuming an ERISA plan has been created and includes employees, the inclusion of a number of non-employee participants does not necessarily remove the plan from ERISA's protections. *See, e.g., Santino*, 276 F.3d at 775; *Madonia*, 11 F.3d at 450. When the existence of an ERISA plan is not in dispute, employers should not be permitted to circumvent ERISA's protections by including a small number of non-employees (especially when those non-employees are affiliated with the company, like as owners or shareholders). But this is not a scenario where the manifest purpose of the plan was to cover employees and a number of non-employees have been incidentally covered. Rather, the opposite has occurred here. The Tribe set out to create a healthcare plan for the purpose of covering non-employees, meaning ERISA was never implicated in the first place. The vast majority of participants in the Member Plan are not Tribe employees. Any inclusion of employees in the Member Plan was unrelated to their employment relationship with the Tribe. Where the purpose of and eligibility for a benefits plan is not premised on employment status,

ERISA does not apply. *See also Bell v. Employee Sec. Ben. Ass'n*, 437 F. Supp. 382, 395 (D. Kan. 1977).[10]

To summarize, the circumstances surrounding the creation and administration of the Employee Plan and Member Plan demonstrate that they were not intended to be a single plan. Rather, they were created at different times, via different contracts, with different eligibility requirements, and for different purposes. As such, the question of whether they are subject to ERISA must be conducted separately. The Employee Plan is clearly an ERISA Plan. But, because the Member Plan was not created for the purpose of providing healthcare coverage to employees, it is not. Judgment will be entered for the Tribe regarding the hidden fees paid via the Employee Plan. Judgment will be entered for BCBSM for all of the Tribe's ERISA claims involving the Member Plan.

### B.

The remaining issue is whether BCBSM's operation of PGIP violated BCBSM's fiduciary duty to the Tribe. For a number of reasons, BCBSM's creation and administration of PGIP did not violate its fiduciary duty.

ERISA provides that "fiduciaries shall discharge their duties with respect to a plan 'solely in the interest of the participants and beneficiaries.'" *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000) (quoting) 29 U.S.C. § 1104(a)(1)). That language requires the fiduciary to act "'for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii)

---

[10] *Bell v. Employee Sec. Ben. Ass'n* offers additional insight on this issue. In that case, the court explained that the Department of Labor has previously offered guidance regarding the definition of "employees' beneficiary associations": "Where membership in an organization is based solely on national origin, geography, religious affiliation, or fraternal, civic, or social purposes, etc. and the employment status of the members is irrelevant, such organizations would not be employees' beneficiary associations." 315.100 Criteria for Distinguishing Employees Beneficiary Associations. Although that definition applied to the statute that ERISA replaced, Congress adopted the same statutory definition for employee organizations in ERISA. *Bell*, 427 F. Supp. at 395. The *Bell* Court explained that principles of statutory construction would thus suggest that Congress intended organizations whose membership was based on national origin, and not employment status, to be excluded from ERISA. *Id.*

defraying reasonable expenses of administering the plan.'" *Id.* (quoting § 1194(a)(1)(A)). But an ERISA fiduciary sometimes does not act in its capacity as a fiduciary. *Id.* at 225. Thus, the threshold question in cases charging breach of an ERISA fiduciary duty is "whether the person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Id.* at 226.

In the Sixth Circuit, the test for determining whether an employer is acting in its fiduciary capacity is as follows: courts are directed to "examine the conduct at issue to determine whether it constitutes 'management' or 'administration' of the plan, giving rise to fiduciary concerns, or 'merely [a] 'business decision[ ]' that ha[s] an effect on an ERISA plan' not subject to fiduciary standards." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000) (quoting *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir.1998)).

In *DeLuca v. Blue Cross Blue Shield of Michigan*, the action subject to complaint was "BCBSM's negotiation of rates." 628 F.3d 743, 748 (6th Cir. 2010). The Sixth Circuit summarized BCBSM's actions as follows:

> Prior to 2004, the rates paid by BCBSM's traditional and PPO plans were lower than the HMO rates for many health-care providers. Beginning around 2004, in an effort to increase the HMO's competitiveness and to simplify pricing structures, BCBSM negotiated a series of letters of understanding with various hospitals that altered these preexisting rate agreements. Typically, these agreements were structured to equalize the rates paid by the HMO with those paid by the PPO plan. BCBSM agreed to make the rate adjustments budget-neutral for the health-care providers by increasing the PPO and traditional plan rates to make up for the decrease in the HMO rates. Some of these rate adjustments were retroactive to the beginning of the year in which they were negotiated.

*Id.* at 745–746.

The *DeLuca* Court concluded that BCBSM was not acting as a fiduciary when it negotiated the rate changes "because those business dealings were not directly associated with the benefits plan at issue here but were generally applicable to a broad range of health-care consumers." *Id.* at

747. As such, the rate negotiations were "clearly . . . 'a business decision that has an effect on an ERISA plan not subject to fiduciary standards.'" *Id.* (quoting *Sengpiel*, 156 F.3d at 665).

Here, the Tribe misconstrues the operation of PGIP. When properly understood, the lack of an ERISA violation in the operation of the program becomes clear. Every year, since long before PGIP was started, BCBSM has issued a "fee adjustment" to the Fee Schedule which governs payments to providers within the BCBSM network. BCBSM asserts that the adjustment is based on factors like the market rate for physician payments, inflation, and performance. The Tribe has offered no evidence which contradicts that assertion.

Also uncontested is the fact that PGIP was originally created in response to customer concerns over rising payments to physicians. Customers wanted more efficient healthcare in exchange for increased payments, and so BCBSM created PGIP. According to BCBSM, PGIP is funded by allocating a portion of the yearly fee increase to the program. Importantly, BCBSM contends that the criteria for determining the level of the increase has not changed and PGIP has no effect on that determination. The Tribe has identified no contradictory evidence. Thus, the Tribe cannot argue that PGIP represents an additional payment or fee which it would not be required to pay if PGIP was not in existence. Rather, PGIP is funded by an internal reallocation of fees which would have been collected anyway. Rather than simply giving providers the full yearly fee increase, PGIP operates as a means of incentivizing providers to justify the fee increase through more efficient performance.

And the Tribe further provides no evidence to contradict BCBSM's assertion that all money collected for PGIP is eventually paid to participants of the program. Unlike the hidden

access fees at issue in *Hi-Lex* and here, BCBSM never received any financial benefit from the PGIP fund.[11]

Against this background, the Tribe's assertion that PGIP violates BCBSM's fiduciary duty is puzzling. The Tribe concedes that BCBSM does not owe it fiduciary obligations when "dealing with physicians and deciding how to pay them." Pl. Resp. Br. at 26. But the Tribe argues that PGIP violated BCBSM's fiduciary duties because "BCBSM unilaterally charged Plaintiffs additional amounts when processing Plaintiffs' professional claims, to which Plaintiffs did not agree, about which Plaintiffs were not told, and about which BCBSM lied to Plaintiffs." *Id.* at 27. This concession properly frames the factual predicate that the Tribe would have to show to establish an ERISA fiduciary violation. But the record does not corroborate the Tribe's assertion. Simply put, the Tribe has not established that it was charged additional amounts *because of* PGIP, as opposed to because of the yearly fee increase (which the Tribe does not challenge).

The Tribe asserts that "PGIP was designed for self-funded customers to pay hidden fees to support BCBSM's own program." Pl. Mot. Summ. J. at 14. The record is unclear regarding the extent to which the details of PGIP were disclosed to BCBSM's customers, *see* Jan. 3, 2005, Letter, ECF No. 79, Ex. 26 (an internal letter describing PGIP which indicates that another letter presumably including similar if not identical information will be sent to BCBSM customers). But PGIP was funded via a reallocation of a portion of the fee increase that would have been collected anyway. Thus, PGIP simply represented an (arguably) more efficient way to incentivize good healthcare practices by providers, not an additional or increased fee.

---

[11] The Tribe vaguely argues that BCBSM collected "fees" for PGIP from self-funded customers to fund PGIP. But the Tribe does not dispute that PGIP was funded via fee increases that would have occurred anyway. The Tribe does not argue the yearly fee increases constitute violations of BCBSM's fiduciary duty. And the Tribe also does not contest BSBSM's contention that all self-funded customers, including the Tribe, have received financial savings from the program.

The cases which the Tribe cite in support of its argument involve fiduciaries that fraudulently collected funds from the plaintiffs for the fiduciary's financial benefit. *See Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740, 743 (6th Cir. 2014) (holding that BCBSM violated its fiduciary duty by secretly adding an "administrative fee" that was retained by BCBSM to hospital claims by self-funded clients); *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan*, 722 F.3d 861, 866 (6th Cir. 2013) (finding that BCBSM violated its fiduciary duty when it secretly collected funds from its customers to pay fees that BCBSM owed to the State of Michigan). The PGIP payment was not an additional charge added to the yearly fee update, and, more importantly, none of the funds collected were retained by BCBSM. The Tribe is thus effectively challenging BCBSM's negotiation and administration of a performance-based rewards program with its in-network physicians. That kind of challenge to provider-side payment rates was rejected in *DeLuca*.

The Tribe makes much of the fact that the amount of the PGIP allocation was not publically disclosed. But the Tribe does not explain why BCBSM was required to disclose that amount. The existence of PGIP has always been public, as has the amount of the Fee Schedule and yearly fee update. The Tribe has not shown that BCBSM was required, as a fiduciary, to disclose the details of how it administered PGIP.[12]

The Tribe also argues that BCBSM's yearly and quarterly reports "falsely represented to the Tribe that all of the money collected for the payment of physician claims was actually used to pay claims for physicians providing medical services to the Tribe's enrollees." *Id.* at 17. But BCBSM employees contend that all of the funds collected for PGIP were, indeed, ultimately paid to providers, and the Tribe has provided no reason to doubt those assertions. *See* Simmer

---

[12] And, regardless, the record suggests that the amount of the PGIP allocation was made public at least occasionally. *See* Jan. 3, 2005, Letter, ECF No. 79, Ex. 26.

30(b)(6) Dep. at 22; Julian Decl. at 1. Thus, the Tribe has not established that BCBSM kept a portion of the funds allocated to PGIP for itself. And given the fact that the Tribe does not contest that it received financial benefits from the PGIP program, the record is insufficient to establish a breach of fiduciary duty.

As a final matter, the Tribe misrepresents two aspects of the record. First, the Tribe contends that the January 3, 2005, letter establishes that PGIP is an additional charge that is added to physician claims and hidden from customers. That is not so. The letter in question explains that, for 2005, the PGIP funding would be collected at the end of the year, via a deduction from the yearly refund check provided to self-funded customers, as opposed to automatically via the claims processing system. The language of the January 3, 2005, letter does suggest that the PGIP payment was *added onto* the yearly fee update, as opposed to contained within it. But the record clarifies that, for 2005, the amount of the fee update was reduced by the amount of the PGIP payment. *See* Nieman 30(b)(6) Dep. at 31. The PGIP payment was then collected at the end of the year, meaning BCBSM customers paid the same amount they would have if the PGIP payment had been collected automatically. *Id.* In combination with the uncontested testimony that the yearly fee update was calculated independently of PGIP, the record as a whole indicates that the PGIP payment was *not* added to physician claims. Rather, it was a reallocation of physician payments that would have been paid by BCBSM customers regardless.

Second, the Tribe references an email sent by Cindy Garofali, reproduced in Section I. *See* Garofali 2007 Email, ECF No. 82, Ex. 24. The language of the email, read in isolation, analogizes the PGIP payments to the hidden access fee payments which BCBSM has admitted liability for. But Ms. Garofali has submitted a declaration indicating that she was not an expert

on PGIP and was thus speaking without direct knowledge of the program. When the remainder of the record is considered, it becomes clear that Ms. Garofali misstated the true nature of the PGIP payments because of unfamiliarity with the program.[13]

Ultimately, the key distinguishing factor between PGIP and all other examples of fiduciary breaches that the Tribe analogizes to is this: BCBSM did not receive a financial benefit from PGIP, and so there was no self-dealing. In fact, it seems likely that PGIP actually resulted in a reduction in the Tribe's overall healthcare expenses. The Tribe's claims related to PGIP will be dismissed.

## IV.

Accordingly, it is **ORDERED** that Plaintiffs' Motion for Partial Summary Judgment, ECF No. 81, is **GRANTED in part.**

It is further **ORDERED** that Defendant's Motion for Partial Summary Judgment, ECF No. 79, is **GRANTED in part.**

It is further **ORDERED** that the pending Motions in Limine, ECF Nos. 109, 110, are **DENIED as moot.**

It is further **ORDERED** that Count One and Count Two are **DISMISSED with prejudice** to the extent they allege claims related to payment of hidden access fees for the Member Plan or the Physicians Group Incentive Program.

It is further **ORDERED** that, in accordance with Federal Rules of Civil Procedure 54, 56, and 58, on Count One and Count Two of Plaintiff's Amended Complaint against Defendants as

---

[13] The Tribe also faults BCBSM for not keeping the money collected for PGIP in a separate "reward pool." It appears that BCBSM simply keeps track of the money collected for PGIP without sequestering that money independently from BCBSM's general bank account. *See* Julian Dep. at 10–11, 22–23, 67, 84. But because BCBSM collected the payments in accordance with its fiduciary duties and ultimately paid out all money collected for PGIP to physicians, the commingling of funds is irrelevant.

they relate to payment of hidden access fees for the Employee Plan, judgment is entered in favor

of Plaintiffs and against the Defendant in the amount of **$8,426,278.**

 

Dated: July 14, 2017                                    s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on July 14, 2017.

                                       s/Kelly Winslow
                                       KELLY WINSLOW, Case Manager