SAGINAW CHIPPEWA INDIAN TRIBE
OF MICHIGAN, el al.,

        Plaintiffs,                  Case No. 16-cv-10317

v.                                    Honorable Thomas L. Ludington

BLUE CROSS BLUE SHIELD OF MICHIGAN,

        Defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION FOR ATTORNEY FEES, GRANTING IN PART PLAINTIFFS'S MOTION FOR ATTORNEY FEES, AND GRANTING IN PART MOTION TO REVIEW TAXED BILL OF COSTS

On January 29, 2016, Plaintiffs Saginaw Chippewa Indian Tribe of Michigan and the Welfare Benefit Plan ("Plaintiffs" or "the Tribe") brought suit against Blue Cross Blue Shield of Michigan ("BCBSM"). Plaintiffs' suit took issue with BCBSM's management of Plaintiffs' "self-insured employee benefit Plan." Am. Compl. at 1, ECF No. 7. On April 10, 2017, the parties filed cross motions for partial summary judgment on the remaining claims. *See* ECF No. 79, 81. Both Defendant's and Plaintiffs' motions for partial summary judgment were granted in part. ECF No. 112. Now, both parties have filed motions for attorney fees and costs. ECF Nos. 118, 119. BCBSM has also filed a motion, ECF No. 123, seeking review of the taxed bill of costs issued against it, ECF No. 120. BCBSM seeks an award of attorney fees and costs in the amount of $1,588,720.31 and $17,734.83, respectively. BCBSM also seeks sanctions against the Tribe in the amount of $493,055 in fees and $8,658.54 in costs. The Tribe seeks an award of $1,179,721.13 in fees and nontaxable costs. For the reasons that follow, BCBSM's motion for attorney fees and costs will be denied, the Tribe's motion for attorney fees and costs will be granted in part, and BCBSM's motion for review of the bill of costs will be granted in part.

## I.

The procedural history and underlying facts were summarized in the July 14, 2017, opinion and order. ECF No 112. That summary will be adopted as if restated in full in this order. For clarity, several relevant facts will be repeated here.

## A.

This action is one of many that has been brought against BCBSM alleging that BCBSM breached its fiduciary duty by charging its clients "hidden fees." In *Hi-Lex Controls Inc. et. al v. BCBSM*, 2013 WL 2285453, No. 11–12557 (E.D. Mich. May 23, 2013), Plaintiff Hi-Lex Inc. brought suit on a "hidden fees" theory. After a bench trial, United States District Judge Roberts entered judgment for Hi-Lex. In the findings of fact, Judge Roberts explained that, to regain financial stability, BCBSM started charging various fees to self-funded customers in the early 1990s. After receiving extensive complaints from customers, the fees were replaced with a "'hidden' administrative fee buried in marked-up hospital claims." *Id.* at 8. These charges were invisible to the consumer and were never disclosed. BCBSM had "complete discretion to determine the amount of the Disputed Fees, as well as which of its customers paid them." *Id.* at 11. As a result of the hidden nature of the fees, the savings from using BCBSM as an administrator appeared greater to customers than they truly were. Judge Roberts found that BCBSM was an ERISA fiduciary and that BCBSM violated its fiduciary duties through fraudulent concealment and self-dealing. On appeal, Judge Robert's decision was affirmed. *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014). The *Hi-Lex* decision has been treated as establishing BCBSM's liability as an ERISA fiduciary for charging the hidden fees.

## B.

Typically, BCBSM has settled post-*Hi-Lex* cases alleging that BCBSM charged hidden fees. This suit proceeded to the summary judgment stage, however, because the Tribe has two health insurance group policies associated with BCBSM. Specifically, the Tribe has a health insurance policy for its employees (which includes some individuals who are not members of the Tribe), and a health insurance policy for its members (a group which excludes some employees of the Tribe). At summary judgment, the parties disputed whether the two policies should be construed as a single plan or two separate plans and, relatedly, whether the two policies were both covered by ERISA.[1]

Both the Tribe and BCBSM agreed that, if the plans were considered separately under ERISA, "the Employer Plan is governed by ERISA and BCBSM is liable for the hidden fees paid for the Tribe for that plan." July 14, 2017, Op. & Order at 16. In response to the Tribe's argument that the two benefit policies should be construed as alternative coverage options, not separate plans, BCBSM did briefly argue that such a holding would mean ERISA did not cover the (combined) plan. But that argument was not the focus of the briefing on the motions for summary judgment. The Court concluded that both plans should be analyzed separately under ERISA. Accordingly, and because BCBSM admitted to charging hidden fees under the Employee Plan, judgment on those uncontested claims was entered for the Tribe. *Id.* at 17.

The contested issues in the motions for summary judgment were three-fold. First, the parties disputed whether the two policies were a single plan with multiple coverage options or two separate plans. As already explained, the Court found that the two policies represented two separate plans. The second issue was whether the Member Plan, considered on its own, was covered by

---

[1] At the motion to dismiss stage, BCBSM prevailed in achieving dismissal of the Tribe's claim that BCBSM "violated its fiduciary duty to Plaintiff by not paying [Medicare-Like Rates] for certain health services procured by Plan members." August 3, 2016, Op. & Order at 1, ECF No. 22.

ERISA. The Court concluded that "the Member Plan must have been created to provide healthcare coverage to non-employee members" and thus did not qualify as an ERISA plan. *Id.* at 23. Third, the parties disputed whether BCBSM's operation of its Physician Group Incentive Program (PGIP) violated BCBSM's fiduciary duties. By way of summary explanation, the PGIP was a program wherein BCBSM reallocated payments to specific providers that would have otherwise been shared among all providers, thus creating performance incentives. After finding that "[t]he Tribe is . . . effectively challenging BCBSM's negotiation and administration of a performance-based rewards program with its in-network physicians," the Court held that BCBSM's operation of PGIP did not violate its fiduciary duties. *Id.* at 30.

Accordingly, the Court granted both motions for summary judgment in part. Judgment was entered for the Tribe on its access fee claims related to the Employee Plan. Judgment was granted for BCBSM on the Tribe's claims related to the Member Plan and PGIP.

Now, both BCBSM and the Tribe have moved for an award of attorney fees. ECF No. 118, 119. Plaintiffs and Defendant both assert that they achieved substantial success on the merits and thus that the opposing party should cover their fees and costs. BCBSM has also requested review of the Taxed Bill of Costs issued by the Clerk's Office directing BCBSM to pay $5,248.75 of the Tribe's deposition costs. ECF No. 123.

## II.

Both BCBSM and the Tribe seek an award of fees and costs, relying upon 29 U.S.C. § 1132(g). Pursuant to § 1132(g), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." The party seeking fees need not be a "'prevailing party' to be eligible for an attorney's fees award." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010). Rather, they must simply achieve "some success on the merits." *Id.* at 256. Importantly,

there is "no presumption as to whether attorney fees will be awarded." *Foltice v. Guardsman Prod., Inc.*, 98 F.3d 933, 936 (6th Cir. 1996). One purpose of awarding attorney fees is to punish bad faith litigants, but punishment is not the only legitimate purpose. *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1304 (6th Cir. 1991). Rather, "[t]he authorization was intended to enable pension claimants to obtain competent counsel and to distribute the economic burden of litigation in a fair manner." *Ford v. N.Y. Cent. Teamsters Pension Fund*, 506 F. Supp. 180, 182 (W.D.N.Y. 1980). When determining whether to award fees, courts consider the following five factors:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*Sec'y of Dep't of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985).

"The *King* factors—as they have been dubbed in this Circuit—are not statutory and thus should be viewed flexibly, with no one factor being "'necessarily dispositive.'" *Geiger v. Pfizer, Inc.*, 549 F. App'x 335, 338 (6th Cir. 2013) (quoting *Foltice*, 98 F.3d at 937.

## III.

BCBSM contends that it obtained "some success on the merits" because it prevailed in defending against the Tribe's claims regarding the Member Plan, PGIP, and the Medicare-like Rates. *Hardt*, 560 U.S. at 256. The Tribe argues that it achieved some success on the merits because it obtained an $8.5 million judgment on its claims involving the Employee Plan.

The initial question is whether either party has achieved "some" success on the merits. That standard requires a showing of more than "trivial success on the merits, or purely procedural victories." *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 688 n.9 (1983). But a district court has discretion to award attorney fees "if the court can fairly call the outcome of the litigation some

success on the merits without conducting a 'lengthy inquir[y] into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'" *Hardt*, 560 U.S. at 255 (quoting *Ruckelshaus*, 463 U.S. at 688 n.9).

Here, both parties can fairly be said to have achieved partial success. The Tribe obtained an $8.5 million dollar judgment, while BCBSM successfully defended against claims of liability for access fee payments made by the Member Plan, for the PGIP program, and for the failure to pay Medicare-like rates.[2] It is unclear whether BCBSM is arguing that the Tribe did not achieve even "some" success on the merits. BCBSM devotes significant portions of its briefing to the assertion that liability for the claim on which the Tribe prevailed, access fee payments for the Employee Plan, was uncontested by BCBSM. However, in the "Argument" section of its response brief, BCBSM simply argues that the Tribe is not entitled to attorney fees when the *King* factors are considered. *See* Def. Resp. Pl. Mot. at 14, ECF No. 125. The only issue which the Tribe prevailed upon was not meaningfully contested at summary judgment. For that reason, the success achieved by the Tribe was modest. The Tribe did, nevertheless, receive a substantial judgment on part of its claims. The Supreme Court has instructed lower courts to not engage in a "lengthy inquiry" into whether some success was achieved. Given that admonition, an $8.5 judgment on a largely uncontested claim is sufficient to constitute "some success on the merits."

**A.**

BCBSM's motion for attorney fees will be considered first. As an initial matter, the Tribe argues that "this Court has no authority to award attorneys' fees and costs to BCBSM related to claims raised by the Member Group" because the Court held that "ERISA does not apply to any claim raised by the Member Group." Pl. Resp. Def. Mot. at 15, ECF No. 124. That proposition is

---

[2] The Tribe does not contest the BCBSM obtained some success on the merits. They simply argue that the *King* factors do not justify an attorney fee award. *See* Pl. Resp. Br. at 2, ECF No. 124.

incorrect. *See Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 441 (6th Cir. 2006) (holding that the district court had authority to impose attorney fees against the plaintiff even though the district court concluded that the plaintiff was "ineligible to recover benefits under an ERISA cause of action"). *See also Credit Managers Ass'n of S. California v. Kennesaw Life & Acc. Ins. Co.*, 25 F.3d 743, 747 (9th Cir. 1994) ("[I]t would be unjust to permit CMA to insulate itself from liability for attorney's fees simply because it failed to produce sufficient evidence to prevail on its claims.").

The Tribe further argues that attorney fees are rarely rewarded for prevailing Defendants in ERISA actions. In support of that proposition, the Tribe cites several cases from other Courts of Appeal. *See Toussaint v. JJ Weiser, Inc.*, 648 F.3d 108, 111 (2d Cir. 2011) ("'[T]he five factors very frequently suggest that attorney's fees should not be charged against ERISA plaintiffs.'") (quoting *Salovaara v. Eckert*, 222 F.3d 19, 28 (2d Cir. 2000)); *Marquardt v. N. Am. Car Corp.*, 652 F.2d 715, 720–21 (7th Cir. 1981) ("Although the five factors used as guidelines above do not explicitly differentiate between plaintiffs and defendants, consideration of these factors will seldom dictate an assessment of attorneys' fees against ERISA plaintiffs."); *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 258 (1st Cir. 1986) (noting that the factors governing ERISA attorney fee awards are biased towards a "prevailing plaintiff more strongly than a prevailing defendant" but noting that defendants are not barred from receiving attorney fees); *Operating Engineers Pension Tr. v. Gilliam*, 737 F.2d 1501, 1506 (9th Cir. 1984) (explaining that the relevant "factors very frequently suggest that attorney's fees should not be charged against ERISA plaintiffs").

Neither party has identified Sixth Circuit authority which expressly considers this issue. But, as BCBSM points out, the Sixth Circuit has affirmed awards of attorney fees against ERISA

plaintiffs. *See Moore*, 458 F.3d at 445–46. In *Moore*, the Sixth Circuit considered the *King* factors and concluded that the district court did not abuse its discretion by awarding attorney fees to the defendant. The *Moore* opinion emphasized that "[t]he district court need not determine that the entire matter was pursued in bad faith to find some level of culpability on the part of Plaintiff for the unnecessary scope of litigation." *Id.* at 445. Similarly, the Sixth Circuit explained, approvingly, that the district court's "objective was not to deter plaintiffs from bringing colorable claims for benefits, but from unnecessarily expanding the scope and complexity of litigation." *Id.* at 446. *But see Huizinga v. Genzink Steel Supply & Welding Co.*, 984 F. Supp. 2d 741, 745 (W.D. Mich. 2013) (explaining that fee awards are often unwarranted for ERISA defendants and declining to grant the defendant's motion for fees after consideration of the *King* factors).

*Moore* makes clear that the *King* factors govern regardless of the party moving for attorney fees. As other courts of appeal have observed, the relevant factors will often weigh against imposing attorney fees on a non-prevailing ERISA plaintiff. These cases do not suggest that the *King* factors are inapplicable. Rather, the best approach is to consider the policies and protections that ERISA was meant to effectuate while reviewing the *King* factors.

### 1.

The first factor to consider is the "degree of the opposing party's culpability or bad faith." *King*, 775 F.2d at 669. BCBSM contends that the Tribe unnecessarily expanded the scope and complexity of the litigation, citing *Moore*, 458 F.3d at 446, by asserting "their meritless argument that there was just one ERISA-governed plan sponsored by the Tribe." Def. Mot. Fees at 13. BCBSM argues that there was "clear legal authority" which demonstrated the frivolity of that position. *Id.* The company additionally asserts that the Tribe demonstrated bad faith behavior when they "baseless[ly] deni[ed]" BCBSM's requests for admissions seeking to establish that the Tribe

had two plans with BCBSM. *Id.* BCBSM similarly faults the Tribe for refusing to admit that it had two separate plans during early mediation sessions and thus preventing an expeditious settlement. Finally, BCBSM argues that the Tribe's PGIP claim was manifestly foreclosed by controlling Sixth Circuit authority.

While considering these arguments, it must be remembered that "the course of litigation is rarely predictable." *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 422 (1978). "Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Id.* at 701. Accordingly, "the mere fact that an action is without merit does not amount to bad faith." *BDT Prod., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 753 (6th Cir. 2010).

The Tribe's assertion that ERISA applied to both the Member and Employee Plans, though ultimately unpersuasive, was not made in bad faith. The questions of law implicated by the Tribe's argument were complex. The Court's analysis of ERISA's application to the Member Plan spanned over fifteen pages in the July 14, 2017, Op. & Order. *See id.* at 10–26. After the applicable statutory definitions and judicial interpretations were summarized and parsed, the Court concluded that ERISA's protections did not cover the Member Plan. But that conclusion was based, in large part, on the Tribe's dual role as employer and sovereign. Native American Tribes are not for-profit businesses, and that difference was determinative here. Accordingly, there was a significant factual and legal distinction between the present case and the other access fee cases which BCBSM is currently defending. BCBSM makes much of the Court's "strong language" rejecting the Tribe's "one plan" argument. Def. Mot. Fees at 14. But the focus on the Court's conclusions, as opposed to the depth of its *analysis*, is unhelpful *post hoc* reasoning. *See Christiansburg*, 434 U.S. at 421–22 ("[A] district court [must] resist the understandable temptation to engage in *post hoc* reasoning

by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation"). After the work of reviewing and interpreting the relevant legal authority is completed, the application to a particular case will often be evident. A party did not necessarily litigate in bad faith simply because, in retrospect, the ultimate resolution was not a close question. BCBSM is correct that the Tribe's claim was questionable from the outset, but, especially given the complex legal and factual issues involved, the company has not shown that the Tribe brought the Member Plan claims in bad faith.

For similar reasons, BCBSM's assertion that the Tribe denied certain requests for admission in bad faith is not convincing. BCBSM argues that the Tribe refused to admit "incontrovertible" facts, like that "there is no requirement that a participant be a current or former 'employee' of Plaintiff Saginaw Chippewa Indian Tribe of Michigan . . . to participate in the welfare benefit plan associated with . . . Group Number 61672. Pl. Resp. Def. Sec. RTA at 7, ECF No. 118, Ex. I. In the Tribe's response, it denied the request

> because the request is premised on the false assumption that the enrollees in Group Number 61672 are participants in a plan that is different than the plan that is associated with the enrollees of Group Number 52885. . . . [I]n that sense, some participants are required to be an employee to be a part of the welfare benefit plan, and thus the request is denied.

*Id.*

The other requests for admission which BCBSM identifies likewise sought resolution of legally determinative factual issues. As explained above, the Tribe's factual and legal arguments regarding the significance of the two plans it maintained with BCBSM were rejected. But the distinctions

and arguments the Tribe relied upon were not so manifestly meritless as to constitute bad faith, culpable behavior.[3]

Because the Tribe's argument, at summary judgment, that the Member Plan was covered by ERISA was not made in bad faith, the Tribe cannot be faulted for refusing to settle at "two early mediation sessions." Def. Mot. Fees at 14. Indeed, BCBSM seems to imply that this case, like most access fees cases BCBSM is defending, should have been settled. But BCBSM can hardly assert an entitlement to settlement, especially because this case involved facts which differentiated it from other access fee cases.

The Tribe's arguments regarding its PGIP claim came closest to evidencing bad faith. Both the complaint and the Tribe's briefing at the summary judgment stage advanced an understanding of PGIP which was unsupported by the evidence presented. In dismissing the Tribe's PGIP claim, the Court explained that "the Tribe misconstrues the operation of PGIP." July 14, 2017, Op. & Order at 28. At summary judgment, BCBSM presented unrefuted evidence that PGIP was funded "by an internal reallocation of fees which would have been collected [from customers like the Tribe] anyway." *Id.* For that reason, the Court found that "the Tribe's assertion that PGIP violates BCBSM's fiduciary duty is puzzling."

Importantly, the Tribe's *allegations* framing its PGIP claim were not legally deficient. As recognized in the July 14, 2017, opinion and order, the Tribe's allegations "properly frame[d] the factual predicate that the Tribe would have to show to establish an ERISA fiduciary violation." *Id.* at 29. But the Tribe could not corroborate those assertions with evidence. The Tribe primarily relied upon two pieces of evidence in advancing its PGIP claim. A January 3, 2005, letter prepared

---

[3] For these reasons, BCBSM is not entitled to Federal Rule of Civil Procedure 37(c)(2) sanctions. The Tribe denied the requests for admission because BCBSM was seeking admissions regarding determinative factual issues that were unresolved. *See* Rule 37(c)(2)(C) & (D).

by BCBSM did "suggest that the PGIP payment was *added onto* the yearly fee update, as opposed to contained within it." *Id.* at 31 (emphasis in original). Because deposition testimony clarified that, "for 2005, the amount of the fee update was reduced by the amount of the PGIP payment," the letter was insufficient to demonstrate a genuine issue of material fact. The Tribe also referenced an email drafted by an employee which analogized the PGIP payments to the hidden access fee payments which BCBSM has admitted liability for. The employee later clarified that she had no direct knowledge of the program (and the Tribe declined to depose her). Given the dearth of any other supporting evidence in the record, the Court dismissed the Tribe's PGIP claim.

However, the Court's opinion and order dismissing the Tribe's PGIP claim was the first instance, in any of the many cases currently being brought against BCBSM, where the PGIP claim was considered on its merits at summary judgment. In *Moore*, the Sixth Circuit affirmed an award of attorney fees against an ERISA plaintiff. In so holding, the Court noted that "Plaintiff unnecessarily prolonged litigation by filing unreliable briefs and pursuing arguments *even after their rejection by the court*." 458 F.3d at 445 (emphasis added). In this instance, the Tribe's PGIP claim had not been previously rejected by this or any other court. The Tribe was entitled to judicial consideration of its PGIP claim, despite the tenuous factual support for the claim. Accordingly, the Tribe did not act in bad faith when it sought adjudication of whether genuine issues of material fact existed.

Given the barebones evidentiary support for the Tribe's PGIP claim, the Tribe's decision to advance that claim through summary judgment approached the bounds of good faith advocacy. That said, the Tribe was advancing a colorable legal theory and, although it fell short of identifying sufficient supporting evidence to demonstrate a genuine issue of material fact, the Tribe did proffer *some* supporting evidence. The Tribe's "one plan" argument, similarly, was colorable. The Tribe

did not act culpably or in bad faith while litigating this suit. The legal and factual support for the Tribe's claims, however, was limited, and so this factor does not strongly weigh against a fee award.

**2.**

The second factor to consider is whether the Tribe has the ability to satisfy an attorney fees award. The Tribe does not contest that it has the financial resources to satisfy an award, but alleges that an award is "not an appropriate use of plan assets" because all assets of the Plaintiff Welfare Benefit Plan should be used "for the exclusive benefit of plan participants and beneficiaries." Pl. Resp. Mot. Fees at 6, ECF No. 124 (citing 29 U.S.C. § 1103(c)).[4] At this stage, an exhaustive inquiry into whether the Benefit Plan can be required to use plan assets to satisfy a fee award is unnecessary. Both parties agree that the Plaintiffs possess significant financial resources. This factor weighs in favor of a fee award.

**3.**

Third, the Court must consider "the deterrent effect of an award on other persons under similar circumstances." *King*, 775 F.2d at 669. BCBSM argues that "[a]n award of attorney's fees may dissuade other potential Access Fee plaintiffs from overreaching in an attempt to inflate their damages beyond what is recoverable under *Hi-Lex*." Def. Mot. Fees at 15. In response, the Tribe contends that "BCBSM's position would chill potential plaintiffs from thoroughly analyzing transactions with BCBSM to determine BCBSM's culpability on a case by case basis." Pl. Resp. Mot. Fees at 7.

If the Tribe had litigated its claims in a bad faith attempt to unnecessarily prolong and expand the litigation, this factor would weigh in favor of an award of fees. But, as explained above,

---

[4] Plaintiffs contend that Plaintiff Saginaw Chippewa Indian Tribe of Michigan is "a Plaintiff in merely a fiduciary capacity for the other Plaintiff." *Id.*

the Tribe did not litigate in bad faith. It must be repeated that this lawsuit involved several factual and legal issues which were not implicated or resolved in *Hi-Lex*. First, the plaintiff in this case is a sovereign Native American Tribe which maintained two plans with BCBSM. As a sovereign entity, the Tribe was dissimilarly situated from other access fee plaintiffs. The *Hi-Lex* decision did not involve a multi-plan scenario involving a Native American Tribe. Likewise, the *Hi-Lex* decision did not consider whether BCBSM should be liable for its operation of PGIP. Given these unresolved issues, the Tribe has not engaged in an unreasonable attempt to overreach and unjustifiably expand the scope of litigation. To the contrary, the Tribe sought resolution of novel issues which *Hi-Lex* neither considered nor foreclosed.

The "deterrent effect of a fee award . . . is likely to have more significance in a case where the defendant is highly culpable." *Foltice v. Guardsman Prod., Inc.*, 98 F.3d 933, 937 (6th Cir. 1996). A fee award may be warranted if it deters the plaintiff from "unnecessarily expanding the scope of complexity of litigation." *Moore*, 458 F.3d at 446. But courts must take care not to "deter plaintiffs from bringing colorable claims for benefits." *Id. See also Gibbs v. Gibbs*, 210 F.3d 491, 505 (5th Cir. 2000) (explaining the deterrence factor should not be used as a sword to discourage beneficiaries from pursuing a claim," but should rather be used "as a shield . . . to encourage beneficiaries to assert their rights without fear of being responsible for the fees and costs of their opponent's attorneys if they failed to prevail"); *Salovaara v. Eckert*, 222 F.3d 19, 31 (2d Cir. 2000) ("[W]here, as in this case, an ERISA plaintiff has pursued a colorable (albeit unsuccessful) claim, the third *Chambless* factor likely is not merely neutral, but weighs strongly against granting fees to the prevailing defendant."); *Mahoney v. J.J. Weiser & Co.,* 646 F. Supp. 2d 582, 586 (S.D.N.Y. 2009)*, aff'd sub nom. Toussaint v. JJ Weiser, Inc*., 648 F.3d 108 (2d Cir. 2011) ("[G]iven ERISA's policy of protecting plan beneficiaries, colorable claims pursued in good faith, even if ultimately

unsuccessful, should not be discouraged by awards of attorney's fees to prevailing defendants."). Indeed, ERISA plaintiffs are already deterred from advancing nonmeritorious suits because they must pay their own costs and fees if they do not prevail. *See Marquardt v. N. Am. Car Corp.*, 652 F.2d 715, 721 (7th Cir. 1981) ("[I]t generally is sufficient that plaintiff bears his own attorneys' fees and costs to deter institution of a frivolous or baseless suit.").

The Tribe's claims here were sufficiently colorable that deterrence would run counter to ERISA's underlying policies. Indeed, some perspective is necessary. This lawsuit is one of many which has been brought against BCBSM in recent months. These lawsuits all center on a core allegation: that BCBSM violated its fiduciary duty by charging hidden access fees to customers. After *Hi-Lex*, BCBSM has generally ceased defending those accusations (at least at summary judgment). Given BCBSM's concession that it violated its fiduciary duties in one area, the Tribe can hardly be faulted for advancing claims which allege that BCBSM violated its fiduciary duties in other areas. The third factor weighs strongly against a fee award.

**4.**

The fourth factor to consider is "whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA" *King*, 775 F.2d at 669. BCBSM argues, correctly, that this factor is largely inapplicable. *See Firestone Tire & Rubber Co. v. Neusser*, 810 F.2d 550, 557 (6th Cir. 1987) (holding that "the city clearly was not attempting to confer a common benefit upon plans' participants" and further indicating that the third and fourth *King* factors are more relevant to motions for a fee award brought by plaintiffs). If anything, this factor weighs against a fee award. Prior to the July 14, 2017, opinion and order, the claim that BCBSM violated its fiduciary duties by operating PGIP had not been considered by any court at the summary judgment stage. The

parties agree that many PGIP claims have been brought by various plaintiffs against BCBSM. To the extent the Tribe's decision to fully litigate the PGIP claim here has clarified the meritoriousness of PGIP claims in other similar lawsuits, the Tribe helped resolve an outstanding question regarding ERISA. Considered from this perspective, the Tribe's decision to litigate a broader universe of issues in this case arguably narrowed the universe of claims pending against BCBSM generally. [5] This factor weighs against a fee award.

**5.**

The final consideration is the relative merit of the parties' positions. This factor is closely related to the first factor (the opposing party's bad faith or culpability). BCBSM must show that the Tribe's positions were "more devoid of merit than that of [a typical] losing litigant." *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1304 (6th Cir. 1991), abrogated on other grounds by *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015). If the case involved an "important, complex issue of first impression," then the fifth factor weighs against a grant of attorney fees. *Firestone*, 810 F.3d at 557.

BCBSM correctly asserts that all contested issues at summary judgment were resolved in its favor. But, as explained throughout this opinion, the Tribe's claims were colorable, particularly because some of the legal issues implicated by the Tribe's suit were complex and distinct from those litigated in *Hi-Lex*. For substantially the same reasons that the first *King* factor does not weigh in favor of a fee award, the fifth favor does support an award.

**6.**

To summarize, only the second factor unequivocally supports a fee award. The first and fifth factors are relatively neutral. The fourth factor weighs against a fee award, though not

---

[5] It is worth noting that, to the Court's knowledge, all access fees plaintiffs, including the Tribe, are represented by the same law firm. BCBSM and Plaintiff's counsel, then, are waging a war on many fronts, not just this one.

strongly. The third factor, however, strongly favors the Tribe. Although there is no per se rule against awarding fees to prevailing defendants in ERISA cases, this is not one of the rare cases where doing so would be appropriate. ERISA was established to protect beneficiaries, not insurance providers. *See Gibbs*, 210 F.3d at 505. In the absence of clearly abusive and unwarranted litigation strategies, a fee award for defendants is typically unwarranted. Consideration of the five *King* factors demonstrates that BCBSM's motion for attorney fees must be denied.

## B.

The Tribe has filed a motion for attorney fees and costs seeking compensation for hours billed regarding the Employee Plan's hidden fees claim (on which it prevailed). However, the Tribe admits that "[t]o the extent that an event related to *both* Hidden Fees charged to the Employee Group and other issues, those costs and fees are included in this motion because the event would have occurred regardless." Pl. Mot. Fees at 16, ECF No. 119 (emphasis in original). After consideration of the *King* factors, the Tribe is entitled to a partial fee award.

## 1.

The first consideration is whether BCBSM has acted culpably or with bad faith. In arguing that this factor weighs in favor of a fee award, the Tribe focuses on BCBSM's behavior in charging the hidden access fees. BCBSM, however, argues that this factor does not support a fee award because BCBSM "acted in good faith to settle the portion of the case for which it knew it was liable." Def. Resp. Mot. Fees at 15, ECF No. 125. Although courts sometimes consider whether the opposing party litigated in bad faith while weighing the first *King* factor, that approach is most applicable when a *defendant* seeks a fee award. *See Moore*, 458 F.3d at 446. Typically, the first factor analysis focuses on the plan administrator's underlying behavior which gave rise to the ERISA plaintiff's claim. *See Moon v. Unum Provident Corp.*, 461 F.3d 639, 643 (6th Cir. 2006)

(explaining that the plan administrator had arbitrarily and capriciously denied benefits and thus that the defendant had engaged in culpable conduct). BCBSM's argument regarding its willingness to settle the access fees claims regarding the Employee Plan is most relevant to the fifth factor, which considers the relative merit of the parties' positions during the litigation.

After the proper scope of inquiry is defined, it becomes clear that BCBSM acted culpably and in bad faith when it charged hidden administrative fees to customers. In *Hi-Lex*, Judge Roberts expressly found that BCBSM "engaged in fraud and concealment to hide its violations . . . [and] exhibited bad faith that precludes imputation for the purpose of its statute of limitations defense or otherwise." *Hi-Lex Controls Inc.*, 2013 WL 2285453, at *30. These findings of fact were affirmed on appeal, and BCBSM does not now contend that Judge Roberts mischaracterized the nature of the violations or that the access fees were handled differently with the Tribe. In this litigation, BCBSM has not contested that it charged hidden access fees to the Employee Plan or that the Tribe would prevail on claims premised on those fees. BCBSM thus acted in bad faith, and the first *King* factor weighs in favor of a fee award.

### 2.

The second factor likewise weighs in favor of a fee award. BCBSM is a large corporation which has significant financial resources. *See Moon*, 461 F.3d at 644.

### 3.

Analysis of the third *King* factor focuses on whether a fee award would deter the offending party and similarly situated defendants from acting as the opposing party did. *See Gaeth v. Hartford Life Ins. Co.*, 538 F.3d 524, 531 (6th Cir. 2008). The Sixth Circuit has explained that the "deterrent effect of a fee award . . . is likely to have more significance in a case where the defendant

is highly culpable." *Foltice*, 98 F.3d at 937 (6th Cir. 1996). On the other hand, when the opposing party merely made "[h]onest mistakes," a fee award will have minimal benefit as a deterrent. *Id.*

As explained above, Judge Roberts found that BCBSM's decision to charge hidden access fees was more than an honest mistake. BCBSM was found to have fraudulently concealed a program whereby it charged customers for administrative fees without their knowledge. That behavior should be deterred. BCBSM argues that a fee award would not operate as a deterrent in this matter because "[a]ny deterrent effect related to the charging of Access Fees by BCBSM and other [insurance providers] stems from the result in *Hi-Lex*. . . . This case adds nothing to that analysis and creates no new precedent or deterrent effect." Def. Resp. Mot. Fees at 16.

BCBSM has identified no authority which supports its assertion that an adverse judgment in a related case operates as an adequate deterrent to bad faith conduct in a separate lawsuit involving a different plaintiff.[6] This argument conflates notice with deterrence. BCBSM appears to suggest that, once an insurer has been informed of the error of their ways, fee awards for similar conduct serve no purpose. But most successful ERISA plaintiffs will not be advancing a novel legal theory which redefines the obligations of ERISA fiduciaries. Rather, many ERISA plaintiffs will simply be alleging that the defendant improperly denied their claim for disability benefits. *See, e.g., Moon*, 461 F.3d at 643. In determining whether a fee award will have a deterrent effect, the Sixth Circuit focuses on the culpability of the defendant's behavior, not the novelty of the claim. To be sure, if the plaintiff prevails on a novel claim, then the defendant's conduct was likely not highly culpable because the defendant may not have been on notice of their obligations prior to the lawsuit.

---

[6] Importantly, Judge Roberts did not actually award attorney fees in *Hi-Lex*. Hi-Lex filed a motion for fees, but consideration of that motion was stayed during the appellate proceedings. After all appeals were exhausted, the parties submitted a stipulated proposed order dismissing the suit with prejudice. Case No. 2:11-cv-12557, ECF No. 311.

But this is not such a case. In *Hi-Lex*, BCBSM was found liable for charging hidden administrative fees to customers (a practice instituted after BCBSM tried to publically charge the fees and received significant customer criticism). The circumstances of the practice indicated that BCBSM was increasing fee collection from customers while purposefully concealing the fees in question. This was manifestly bad faith conduct. BCBSM cannot reasonably argue that it was unaware that this fraudulent self-dealing violated its fiduciary duties. Accordingly, a fee award is likely to operate as a valuable deterrent. *See Foltice*, 98 F.3d at 937.

BCBSM's argument that *Hi-Lex* renders a fee award in this case redundant also overlooks another factor. *Hi-Lex* resolved only the claims by Hi-Lex Controls Inc., not any other potential plaintiff. At the same time, the *Hi-Lex* decision strongly suggested that BCBSM had violated its fiduciary duties to many of its customers. Accordingly, to vindicate their rights, those customers must bring suit against BCBSM. And BCBSM's practice appears to be to conduct discovery in access fee cases before settling the claims. In this suit, at least, BCBSM sought discovery related to a potential statute of limitations defense of the access fee claims. *See* Feb. 3, 2017 Letter, at 2, ECF No. 128, Ex. B. Discovery is expensive. Customers seeking to recover damages for BCBSM's breach of its fiduciary duty must thus expend a nontrivial amount of resources in advancing their claim.

BCBSM cannot be faulted for reviewing claims made by potential access fee plaintiffs and requiring substantiation of their entitlement to relief before admitting liability. But BCBSM's misconduct is what necessitated initiation of litigation in the first place, and plaintiffs with manifestly meritorious claims should not be required to bear the full cost of vindication. For that

reason, *Hi-Lex* cannot operate as an adequate deterrent for the full scope of BCBSM's conduct, especially because no fee award was entered in that case.[7]

    *Hi-Lex* established BCBSM's liability for the hidden access fees and compensated Hi-Lex Controls, Inc., for its expenses in bringing suit. But the *Hi-Lex* award did not consider the additional costs imposed by BCBSM's wrongful conduct: the litigation expenses other plaintiffs would incur in bringing demonstrably meritorious claims. The scope of BCBSM's wrongdoing, and not just the culpability revealed in *Hi-Lex*, is a proper consideration when determining whether a fee award would provide additional deterrent value. ERISA was intended to protect beneficiaries from the expenses that prevailing claims inevitably involve. *See Gibbs*, 210 F.3d at 505; *Ford*, 506 F. Supp. at 182. Given the limited scope of the *Hi-Lex* decision, a fee award in this matter would provide additional deterrent value. The third factor weighs in favor of a fee award.

**4.**

    The fourth factor to consider is whether the Tribe conferred a common benefit on all participants or resolved significant legal questions. Because the Tribe is only seeking an award of fees related to its litigation of the access fees paid by the Employee Plan, only those claims are relevant. BCBSM's liability for the access fees paid by the Employee Plan was not contested in this suit. Rather, both parties agreed that, assuming the two plans were considered separately, BCBSM was liable for the fees paid by the Employee Plan. The claims on which the Tribe prevailed were thus completely derivative of those in *Hi-Lex*. The fourth factor weighs against a fee award.

**5.**

---

[7] The third *King* factor necessarily establishes that an adverse judgment is not an adequate deterrent in all cases, especially when the judgment arises out of bad faith conduct. BCBSM's argument appears to be that *no* fee award is justified in any access fees case because BCBSM was found liable for the underlying conduct. That assertion cannot be true because it would render the third *King* factor essentially superfluous.

The final consideration is the relative merit of the parties' positions. At summary judgment, both parties agreed that BCBSM was liable for charging access fees related to the Employee Plan, assuming that plan was considered separately from the Member Plan. Because the parties asserted the same argument, the relative merit of their positions was identical.

The Tribe faults BCBSM for denying liability in its answer and for refusing to stipulate to liability regarding the Employee Plan early in the litigation. Defendants commonly proffer blanket denials in their answers even when they intend to settle. And, given the Tribe's insistence that the Member Plan and Employee Plan should be considered as a single plan for ERISA purposes, BCBSM's decision to withhold settlement on that claim until the scope of ERISA's applicability had been resolved was reasonable. In other words, a review of the whole record and particularly of the Tribe's litigation strategies makes clear that the Employee Plan access fees claims were not settled because the Tribe sought recovery of damages for access fees paid by the Member Plan. The Tribe did not prevail on that issue, and thus cannot condemn BCBSM for refusing to settle a related claim. The fifth factor is largely neutral. At best, it weighs slightly against a fee award.

**6.**

In short, three of the five *King* factors support a fee award. The remaining two factors do not weigh heavily against an award. Accordingly, the Tribe's motion for fees and costs will be granted. However, given the limited nature of the Tribe's success and the fact that, at summary judgment, the claims on which the Tribe prevailed were uncontested, the Tribe is not entitled to the full amount it seeks. The lodestar analysis will be conducted, below, after BCBSM's motion for review of taxed costs is considered.

**C.**

After judgment was entered for the Tribe and against BCBSM in the amount of $8,426,278, the Clerk of Court taxed costs in favor of the Tribe in the amount of $5,738.35. ECF No. 120. In the bill of costs, the Tribe requested $5,548.40 in fees attributable to depositions. The clerk taxed $5,248.75 in deposition costs, declining to tax "[c]ourt reporter fees as to witness Brandy Pelcher . . . [because] her corresponding deposition transcript was used only by the defendant in support of its motion for partial summary judgment and not by the prevailing plaintiff." ECF No. 120 at 2. Now, BCBSM has filed a motion for review of the taxed costs. BCBSM emphasizes that the Tribe prevailed only on their claim for access fees related to the Employee Plan and did not rely on any depositions in support of that claim. Accordingly, BCBSM argues that costs related to depositions the Tribe conducted on issues on which it did not prevail should be disallowed.

Federal Rule of Civil Procedure 54(d)(1) provides that "costs—other than attorney's fees—should be allowed to the prevailing party." The Rule further provides that "[t]he clerk may tax costs on 14 days' notice" and that, upon a timely motion, "the court may review the clerk's action." *Id.* Pursuant to 28 U.S.C. § 1920(2), "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case" may be taxed as costs. "Necessity is determined as of the time of taking, and the fact that a deposition is not actually used at trial is not controlling." *Sales v. Marshall*, 873 F.2d 115, 120 (6th Cir. 1989). To repeat: "[A] deposition does not have to be used as evidence to be taxed as an expense." *Baker v. First Tennessee Bank Nat. Ass'n*, 142 F.3d 431 (6th Cir. 1998).

Thirteen depositions are currently at issue. Of those depositions, nine involved deponents which BCBSM had listed as trial witnesses in their pretrial disclosures. *See* Def. Not. Pretrial. Discl., ECF No. 105. That notice of trial witnesses was filed less than a month before the Court granted partial summary judgment for both parties (and after the motions for summary judgment

had been fully briefed). The Tribe also asserts (and BCBSM does not contest) that eight of the thirteen depositions, including the remaining deponents which BCBSM did not identify as trial witnesses, were initiated by BCBSM.

Since BCBSM either initiated or relied upon the depositions in question, the company cannot reasonably argue that the depositions were irrelevant to the claims resolved at summary judgment. *See Irani v. Palmetto Health*, No. 3:14-CV-3577-CMC, 2016 WL 3922329, at *3 (D.S.C. July 21, 2016) ("Having been the party who noticed these depositions, Plaintiff cannot . . . argue the depositions themselves were unnecessary."); *Kaimowitz v. Howard*, 547 F. Supp. 1345, 1353 (E.D. Mich. 1982), aff'd, 751 F.2d 385 (6th Cir. 1984) (finding that there was "a reasonable need" for the defendants to depose individuals listed as witnesses by the plaintiff).

Accordingly, even though the challenged depositions were not relied upon by the Tribe in support of its Employee Plan claims, the depositions were arguably necessary at the time they were conducted. BCBSM contends that, even if that is true, the depositions were not necessary to prepare for the only claim on which the Tribe prevailed. When a party obtains only partial success in an action, courts sometimes "reduce the size of the prevailing party's award to reflect the partial success." 10 Charles Alan Wright and Arthur R. Miller, *Award of Costs to Prevailing Party*, Fed. Prac. & Proc. Juris. § 2667 (3d ed.). *See also United States v. Terminal Transp. Co.*, 653 F.2d 1016, 1021 (5th Cir. 1981) (affirming the taxation of only one-half of costs because the plaintiffs were only partially successful); *Pierce v. Cty. of Orange*, 905 F. Supp. 2d 1017, 1049 (C.D. Cal. 2012) (reducing costs taxed by 15% because of partial success); *Armstead v. Starkville Mun. Separate Sch. Dist.*, 395 F. Supp. 304, 312 (N.D. Miss. 1975) (reducing costs taxed by twenty-five percent because of partial success).

Three categories of claims were addressed at summary judgment. The Tribe prevailed only on the first category of claims, which were related to the access fees paid by the Employee Plan. BCBSM's liability for those claims was essentially uncontested, and the Tribe did not rely on deposition testimony in its briefing on these claims. The Tribe did not prevail on its remaining claims (Member Plan access fee claims and the PGIP claim). BCBSM does not specifically identify the subject of each depositions (and independent verification would require a significant outlay of time). The Tribe argues that the depositions were all necessary because BCBSM noticed the depositions "without identifying specific claim or claims to which the deposition was to pertain." Pl. Resp. Br. Review Costs at 7, ECF No. 129. For that reason, the Tribe was required to participate in the depositions to protect its interests in all three claims. The assertion that the depositions included relevant information regarding all three claims is reasonable. In the absence of specific, contradictory information, the Court will reduce the Tribe's taxable costs by two-thirds (to account for the Tribe's partial success).

When the Tribe's deposition costs ($5,248.75) are multiplied by .34, the resulting sum is $1,784.58. The Tribe also asserts costs of $489.60 which BCBSM does not contest. BCBSM's motion for review of the taxed costs will be granted in part, and BCBSM will be directed to pay taxed costs of $2,274.18 to the Tribe.

## IV.

Because the Tribe is entitled to a fee award of some amount, the only remaining question is what a reasonable award would be given the circumstances. The Tribe seeks compensation for 2,673 billed hours (that is, more than 66 work weeks), totaling in a requested award of $1,179,721.13.

The starting point in determining the reasonableness of attorneys' fees is the "lodestar" method. *Wayne v. Vill. of Sebring*, 36 F.3d 517, 531 (6th Cir. 1994). Under this method, a reasonable rate is calculated by multiplying "the number of hours reasonably expended" by "a reasonable hourly rate." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)) (internal quotation marks omitted). "Next, the resulting sum should be adjusted to reflect the result obtained." *Id.* (internal quotation marks omitted). Adjustments may be made "to reflect relevant considerations peculiar to the subject litigation." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000).

The last step in the lodestar analysis is determining if any reductions to the lodestar figure are warranted. The Sixth Circuit has incorporated the twelve factors set forth by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), as a starting point for determining if adjusting the lodestar figure is warranted. *Adcock-Ladd*, 227 F.3d at 349.[8] "Accordingly, modifications [to the lodestar] are proper only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts." *Adcock-Ladd*, 227 F.3d at 349-50 (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986)). A district court awarding fees "must provide a clear and concise explanation of its reasons for the fee award." *Wayne*, 36 F.3d at 533 (quoting *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995)).

**A.**

---

[8] "These factors are: (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Reed v. Rhodes*, 179 F.3d 453, 471–72 n.3 (6th Cir. 1999) (citing *Johnson*, 488 F.2d at 717–19).

BCBSM argues that the Tribe's counsel is seeking an unreasonable hourly rate and an unreasonable number of hours. BCBSM also contends that the Tribe's fee award should be reduced because the Tribe prevailed on only one issue, and that issue was essentially uncontested at summary judgment. Those challenges will be addressed in turn. It must be remembered, however, that the "essential goal in [awarding reasonable fees] is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

### 1.

The initial task is to determine the reasonable rate. The firm representing the Tribe is seeking an average hourly rate of $428. In lead counsel Perrin Rynder's declaration, he explains that "the rates for equity partners range from $650 to $510." Rynders Decl. at 5, ECF No. 119, Ex. D. He further indicates that the "rate for non-equity partners is $355" and the "rates for associates range from $340 to $230." *Id.* The billing rate for paralegals ranges from $235 to $155. *Id.*

"To arrive at a reasonable hourly rate, courts use as a guideline the prevailing market rate, defined as the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004). In other words, the appropriate rate "is not necessarily the exact value sought by a particular firm, but is rather the market rate in the venue sufficient to encourage competent representation." *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 618 (6th Cir. 2007).

The parties agree that the 2014 Economics of Law Practice Report provides probative data regarding the prevailing market rate for Michigan attorneys. *See* 2014 Econ. Law. Rep., ECF No 119, Ex. F. Varnum LLP is a large firm with its primary offices in Grand Rapids and Detroit. According to the Economics of Law Practice Report, attorneys in firms of more than 50 people bill at a mean hourly rate of $377, a 75% hourly rate of $475, and a 95% hourly rate of $570. *Id.*

at 5. Similarly, attorneys in firms located in downtown Detroit bill at a mean hourly rate of $304, a 75% hourly rate of $400, and a 95% hourly rate of $550. *Id.* Attorneys in firms located in Grand Rapids bill at a mean hourly rate of $298, a 75% hourly rate of $370, and a 95% hourly rate of $510. *Id.* The Economics of Law Practice Report also provides billing rates for fields of practice. Attorneys practicing civil litigation bill at a mean hourly rate of $290, a 75% hourly rate of $345, and a 95% hourly rate of $500. Attorneys practicing insurance law bill at a mean hourly rate of $236, a 75% hourly rate of $300, and a 95% hourly rate of $455.

BCBSM, first, takes issue with the Tribe's contention that its requested rate is reasonable because the average hourly rate for the hours expended in this matter comes to $428. BCBSM argues that the reasonableness of the rate charged by each individual attorney should be examined separately. In support of that proposition, BCBSM cites two cases where the district court awarded attorney fees in an ERISA suit and analyzed the reasonable hourly rate separately for each attorney. *See Potter v. Blue Cross Blue Shield of Michigan*, 10 F. Supp. 3d 737, 743 (E.D. Mich. 2014); *Van Loo v. Cajun Operating Co.*, No. 14-CV-10604, 2016 WL 6211692, at *3 (E.D. Mich. Oct. 25, 2016).

As explained above, the reasonable hourly rate analysis focuses on the "market rate in the venue sufficient to encourage competent representation," not "necessarily the exact value sought by a particular *firm*." *Gonter*, 510 F.3d at 618 (emphasis added). The "skill and experience" of the attorneys seeking a fee award is thus relevant, but only to enable an accurate calculation of the appropriate market rate. *Geier v. Sundquist*, 372 F.3d at 791. Given this background, BCBSM has not demonstrated why "the attorney's hourly rates must be examined individually." Def. Resp. Mot. Fees at 19 n.9. Complex civil litigation like the present suit is litigated by teams of attorneys. This division of labor enables higher-billing attorneys to delegate some time-intensive tasks to

lower-billing associates and support staff. The cost-saving which results should be encouraged. *See Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 702 F. App'x 408, 415 (6th Cir. 2017) ("Orrick kept the number of hours that those attorneys billed relatively low by using a large number of lower-cost attorneys and support staff. Orrick's average hourly rate, or firm-wide total fee divided by the total hours worked, was $470."). The most relevant consideration, then, appears to be whether the firm-wide rate for the hours billed on a given case was reasonable, not whether the hourly rate of every attorney who participated in the litigation was reasonable in a vacuum.

The averaged rate which Varnum seeks ($428) is between the mean rate ($377) and 75% rate ($475) for attorneys at firms of more than fifty people. Varnum's proposed rate falls between the 75% and 95% of the hourly rates at firms located in Detroit and Grand Rapids. Similarly, Varnum's proposed rate comes closer to the 95% rates for civil litigation ($500) and insurance law ($455) than the 75% rates ($345 and $300, respectively).

The hourly rates for Varnum partners in this litigation (which range from $510 to $650) are thus significantly higher than the 95% rates for comparable attorneys in Michigan. The rates for Varnum associates (which range from $230 to $340), on the other hand, are at or below the mean rate for similar attorneys. Given their experience, reputation, and diligent work in this case, the averaged rate sought by Varnum is not unreasonable. As explained above, however, the aim of this analysis is to identify the market rate sufficient to attract competent counsel. The average rate which Varnum seeks is well above the mean rate for comparable attorneys. At the same time, the scope and complexity of this suits justifies an above average hourly rate. A rate between the mean and 75% rates for comparable attorneys is reasonably calculated to attract competent counsel in cases of this nature. The mean hourly rate for attorneys in firms of more than 50 attorneys is $377,

while the 75% hourly rate for firms in Detroit and Grand Rapids and for attorneys engaging in civil litigation and insurance law ranges from $300 to $400. Those characteristics are most probative here. An hourly rate of $380 will be used here.

**2.**

Next, the Court must determine the reasonable number of hours expended. In its motion for attorney fees, the Tribe contends that it is seeking compensation only for work it did regarding the issue on which it prevailed: the Member Plan's access fee payments. BCBSM argues, first, that Varnum's billing records reveal that it is seeking compensation for work spent solely on claims which were rejected. Second, BCBSM argues that Varnum's is billing for hours spent on work which involved both meritorious and nonmeritorious claims. The company argues that billable hours in the first category should be entirely excluded and that the remaining total of hours should be reduced to reflect the fact that the Tribe prevailed on only one (largely uncontested) claim.

When "the plaintiff's claims for relief . . . involve a common core of facts or [are] based on related legal theories," then "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). But "work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.'" *Id.* (quoting *Davis v. County of Los Angeles*, 8 E.P.D. ¶ 9444, at 5049 (C.D. Cal.1974)).

In their brief and in an attached exhibit, BCBSM identifies a number of billing entries which are clearly related solely to work which Varnum did on nonmeritorious issues.[9] Specifically,

---

[9] Varnum's invoice is 150 pages. BCBSM has submitted a "marked-up" copy of the invoice where it highlights entries which it believes should be excluded from the fee award calculations. Given the number of entries contested, it is unfeasible to individually address each one. The Court has reviewed each contested entry and determined whether it is arguably related to an issue on which the Tribe prevailed. Entries which clearly relate to losing claims will be excluded. To the extent an entry arguably contained work on both meritorious and nonmeritorious issues, that entry has not been excluded. Rather, and as explained below, the overall fee award will be reduced by 75% to reflect the fact that the Tribe prevailed on only one, uncontested, issue.

Varnum's billing records include 40.5 hours related to research for their motion for reconsideration of the August 3, 2016, opinion and order granting BCBSM's motion for dismissal of the MLR claim. *See* Varnum Invoices at 1–25, ECF No. 119, Ex. E. The Tribe argues that it partially prevailed on its motion for reconsideration. And the Court did amend its previous order to clarify that Count One had been dismissed only to the extent it alleged claims related to BCBSM's obligation to pay Medicare-like Rates, and not to the extent it alleged that BCBSM violated its fiduciary duty by charging hidden access fees. That analysis in the order partially granting the motion for reconsideration spanned only five sentences. *See* Oct. 27, Op. & Order at 8, ECF No. 29. And, importantly, that ruling involved essentially the correction of a clerical error (because the substance of the Court's previous opinion had made clear that no access fee claims were being dismissed). The Tribe's challenge to the dismissal of the MLR claim was rejected on its merits. Because all research and essentially all drafting for the motion for reconsideration involved arguments which were squarely rejected, the 40.5 hours spent researching and drafting the motion will be excluded.

Varnum also spent a tremendous amount of time researching and drafting its briefing on the cross motions for summary judgment. After review of the contested invoice entries, the Court has identified 481.47 in hours spent researching and drafting the briefing (that is, more than 12 work weeks). Although the Tribe prevailed on the Employee Plan claim, these hours will be excluded for several reasons. First, the Employee Plan issue was uncontested at summary judgment. Accordingly, neither party devoted meaningful briefing space to the issue. Second, the Tribe did not support its claim for relief regarding the Employee Plan with any deposition testimony or other evidence. The Tribe relied exclusively on *Hi-Lex* and BCBSM's admission of liability. Third, if the Employee Plan claim was the only claim asserted by the Tribe, this suit

would not have proceeded to summary judgment. As with the vast majority of other access fee cases, BCBSM would have settled the suit. Thus, the time and resources expended by both parties at summary judgment is almost solely attributable to the nonmeritorious arguments which the Tribe advanced regarding the Member Plan and PGIP. Because the Tribe should not be compensated for hours spent on those claims, the 481.47 hours spent preparing the briefing on the motions for summary judgment will be excluded.

However, several categories of entries which BCBSM challenges will not be excluded. First, BCBSM challenges time billed by Varnum related to certain depositions. The company contends that these depositions were related solely to issues on which the Tribe lost. But the truth of that assertion cannot be confirmed by review of the invoices or even by review of the briefing on the motions for summary judgment. And the Tribe argues that these depositions provided information which was relevant to all claims. Accordingly, the Court would need to peruse the transcripts of each deposition in question. That expenditure of resources is neither reasonable nor possible (the full transcripts of all contested depositions have not been provided to the Court ).

BCBSM also challenges hours that Varnum billed preparing for Neil Steinkamp's deposition and responding to BCBSM's motion to strike Steinkamp's prejudgment interest rate analysis, ECF No. 72. In the motion, BCBSM argued that Steinkamp's opinion was contrary to law because the interest rate he proposed was higher than the interest rate rejected by the district court in *Hi-Lex*. The Court rejected that argument. BCBSM also argued that Steinkamp's analysis was purely speculative and thus inherently unreliable. The Court also rejected that argument, explaining that "any unreliability in Steinkamp's analysis can be adequately challenged" later, at trial. May 16, 2017, Op. & Order at 13, ECF No. 99. Thus, the Tribe prevailed on this issue.

BCBSM argues that Varnum should not be compensated for these billed hours because it did not ultimately obtain prejudgment interest. But the reason for that is simple. In the Tribe's motion for partial summary judgment, the Tribe did not attach Steinkamp's opinion or brief a request for prejudgment interest. Rather, the Tribe simply sought "[p]artial judgment regarding hidden access fees in the amount of $13,461,423; plus interest and attorneys' fees to be determined later." Pl. Mot. Summ. J. at 24, ECF No. 81. No motion seeking interest was ever filed. Accordingly, the Tribe's entitlement to prejudgment interest was not considered, much less rejected, on its merits. The Tribe is entitled to partial compensation for the hours spent regarding Steinkamp's report because it prevailed in defending the motion to strike, and the issue was not further litigated.

Finally, BCBSM argues that the Tribe should not be compensated for the hours it spent after the Court's July 14, 2017, opinion and order reviewing the opinion and discussing whether to file a motion for reconsideration or file an appeal. No motion for reconsideration was filed, but the Tribe has appealed. ECF No. 114. Given the modest amount of hours invested in reviewing the opinion and because an appeal was, in fact, filed, no hours will be excluded simply because Varnum *might* have spent them researching a motion for reconsideration which it chose not to file.

To summarize, the Tribe seeks compensation for 2,673 hours of work. For the reasons just articulated, 521.97 of those hours will be entirely excluded from the lodestar calculations. The number of hours arguably partially expended on meritorious claims comes to 2,151.03. When that amount is multiplied by the reasonable hourly rate of $380, the initial lodestar sum comes to $817,391.40.

**3.**

Next, the lodestar calculation "should be adjusted to reflect the 'result obtained.'" *Wayne*, 36 F.3d at 531 (quoting *Hensley*, 461 U.S. at 434). To determine if an adjustment is appropriate, two questions arise: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Hensley*, 461 U.S. at 434.

For a number of reasons, a significant downward adjustment is necessary in this case. The Tribe's amended complaint framed four categories of claims. First, the Tribe alleged that "BCBSM breached its fiduciary duty to Plaintiff under [ERISA] when it did not authorize payment of Medicare-like Rates . . . for certain health services." August 3, 2016, Op. & Order at 1. That claim was dismissed at the pleading stage. Second, the Tribe alleged that BCBSM breached its fiduciary duty when it charged the Tribe's Employee Plan hidden fees. Third, and relatedly, the Tribe alleged that BCBSM breached its fiduciary duty when it charged the Tribe's Member Plan hidden fees. Finally, the Tribe alleged that BCBSM violated its fiduciary duty through the operation of PGIP. This claim was rejected at summary judgment.

If the Tribe's complaint had framed only the Employee Plan access fees claims, no motions for summary judgment would have been filed and significantly less discovery would have been conducted. At summary judgment, the Tribe asserted simply that BCBSM has conceded liability for this claim, assuming that the two plans were considered separately. The Tribe devoted two paragraphs of briefing to this claim and submitted no supporting evidence. The Tribe argued that they should be considered together, and that argument was rejected. Accordingly, the contested issues at summary judgment (and the manifest reason that summary judgment was necessary) are directly traceable to the Tribe's decision to advance certain claims and arguments which were rejected on their merits.

The Tribe contends that BCBSM refused to stipulate to liability on the Employee Plan claims early in the litigation and thus the Tribe was required to engage in substantial discovery and litigation. As explored throughout this opinion, however, the primary issue the parties disputed was how to characterize the two insurance plans at issue. Given the Tribe's attempt to package the Employee Plan and Member Plan together for purposes of liability, BCBSM's cannot be faulted for refusing to stipulate to liability for the Employee Plan claims. Rather, BCBSM correctly argued that the two plans should be separately considered for ERISA purposes.

BCBSM concedes that *some* discovery was necessary on the Employee Plan issue. *See* Def. Resp. Mot. Fees at 20 (arguing that any fee award should be reduced to an amount consistent with the work required for the Employee Plan claims and noting that it spent approximately $150,000 on those claims). Indeed, BCBSM advanced a statute of limitations affirmative defense until it was dismissed by stipulation in March 2017. ECF No. 75. Likewise, some (maybe all) of the depositions conducted likely produced information relevant to the Employee Plan claims.

In general, however, there can be no dispute that the vast majority of the discovery and motions practice was solely focused on claims on which the Tribe did not prevail. If the Tribe had advanced only the Employee Plan claim, Varnum would not have spent upwards of 2,600 hours (a number which Varnum contends already excludes hours spent solely on meritless claims). The Supreme Court has explained that, in determining the proper award of a fee award, "the most critical factor is the degree of success obtained." *Hensley*, 461 U.S. at 424. Here, the Tribe prevailed on only one of the four categories of claims it advanced. Assuming that the time spent by Varnum preparing for the claims produced equal value for each claim, the fee award should be reduced by 75% to account for the Tribe's limited success. *See Helfman v. GE Grp. Life Assur. Co.*, No. 06-13528, 2011 WL 1464678, at *10 (E.D. Mich. Apr. 18, 2011) (reducing fee award by

87.5% because the plaintiff sought benefits for a 48 month period but only obtained benefits for six months). This reduction is, if anything, conservative, because the one issue on which the Tribe prevailed was uncontested for much of the litigation, and thus would have necessitated minimal work.

For the reasons just articulated, the initial lodestar amount ($817,391.40) will be reduced by 75%. After that reduction, the reasonable fee award comes to $204,347.85.

**4.**

The final step is to consider twelve factors and determine whether any further reduction in the lodestar amount is necessary.

> These factors are: (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Reed v. Rhodes*, 179 F.3d 453, 471–72 n.3 (6th Cir. 1999) (citing *Johnson*, 488 F.2d at 717–19). Neither party has directly addressed the applicability of these additional factors. Given the significant reductions already imposed, no further reduction is appropriate. BCBSM will be directed to compensate the Tribe $204,347.85 for attorneys related to the Employee Plan claims.

**B.**

The final issue to resolve is the Tribe's request for costs it incurred related to the Employee Plan claims. Varnum seeks an award of nontaxable costs in the amount of $36,072.13. "As with attorney's fees, the Court has broad discretion to award costs to parties in ERISA action who have shown some degree of success on the merits." *Potter v. Blue Cross Blue Shield of Michigan*, 10 F. Supp. 3d 737, 753 (E.D. Mich. 2014). BCBSM objects to several categories of costs sought.

First, BCBSM argues that the $24,657.50 in expert witness fees which the Tribe seeks are not recoverable. Pursuant to 29 U.S.C. § 1132(g)(1), the Court may "in its discretion . . . allow a reasonable attorney's fee and costs of action to either party." Some courts have held that this discretion is limited to the types of costs which are permitted in other statutory provisions, like 28 U.S.C. § 1920. *Agredano v. Mut. of Omaha Companies*, 75 F.3d 541, 544 (9th Cir. 1996) (holding in an ERISA action that the court was empowered "to award only the types of 'costs' allowed by 28 U.S.C. § 1920, and only in the amounts allowed by section 1920 itself . . . or by similar such provisions"). Because § 1920 does not permit fee shifting for expert witness fees, some courts have refused to award such fees in ERISA actions. *Id.* Although an award of costs for expert witness fees is not required, district courts appear to have discretion to award such fees. *Id.* ("[W]e note that the district court denied Agredano's motion for expert witness fees in its entirety, rather than considering whether to exercise its discretion and award her witness fees to the extent allowed by 28 U.S.C. §§ 1920(3) and 1821(b)."). *See also Antolik v. Saks Inc.*, 407 F. Supp. 2d 1064, 1082 (S.D. Iowa), rev'd and remanded on other grounds, 463 F.3d 796 (8th Cir. 2006) (explaining that expert witness were "not recoverable as costs in this action" but indicating that because the court reviewed the expert report and such expenses are normally passed on to clients, the fees would be permitted "as an addition" to the attorney fees but at a 15% discount).

The Sixth Circuit has not addressed this issue. But several courts in this district have awarded such costs. *See Potter v. Blue Cross Blue Shield of Michigan*, 10 F. Supp. 3d 737, 753 (E.D. Mich. 2014) (identifying four district courts which permitted recovery of fees not expressly contemplated in § 1920 and following their approach). In *Schumacher v. AK Steel Corp. Ret. Acc. Pension Plan*, the court explained that non-taxable costs which are *not* listed in § 1920 may be awarded "if such expenses are reasonable and necessary, and are typically billed to clients under

prevailing practice in the jurisdiction." 995 F. Supp. 2d 835, 853 (S.D. Ohio 2014) (citing *Northcross v. Bd. of Ed. of Memphis City Sch.*, 611 F.2d 624, 639 (6th Cir. 1979) and *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1036 (8th Cir. 2008)). The practice in the Eastern District appears to be for attorneys to bill expert fees to clients and for courts to permit recovery of those fees to the extent they are reasonable and necessary. *See, e.g., Huizinga v. Genzink Steel Supply & Welding Co.*, 984 F. Supp. 2d 741, 754 (W.D. Mich. 2013); *May v. Nat'l Bank of Commerce*, No. 03-2112 M1/P, 2006 WL 328144, at *1 (W.D. Tenn. Feb. 10, 2006). Accordingly, the Tribe's expert fees are recoverable to the extent they are reasonable.

BCBSM also challenges the $1,579.50 in mediator fees which the Tribe seeks. BCBSM relies upon the same statutory arguments regarding § 1132(g) which were rejected above. Such costs are of the type normally billed to clients, *see, e.g, May*, 2006 WL 328144. BCBSM argues that this request is "bizarre" because the Tribe "rejected a mediated settlement of their Employee Plan claim in excess of the judgment they ultimately claimed." Def. Resp. Mot. Fees at 22 n. 13. A similar argument was addressed above: BCBSM reasonably insisted on a global settlement of claims and, given the unresolved legal issues at the time of mediation, the Tribe's refusal to settle was also reasonable. Fees incurred in mediation are not per se unrecoverable.

However, the fact that all costs which the Tribe seeks to recover are potentially recoverable does not mean that the amount sought is reasonable. BCBSM argues that the Tribe should be permitted to recover only a quarter of its costs to reflect the limited recovery it received. As discussed above, the only issue on which the Tribe prevailed was uncontested for a significant portion of the litigation. For that reason, only a small portion of the costs the Tribe incurred during litigation can be reasonably attributed to that claim. Like the attorney fee award, the Tribe's request for costs will be reduced by 75% to approximate the amount of reasonable costs that could have

been incurred litigating just the Employee Plan issue. The Tribe will be awarded nontaxable costs in the amount of $9,018.03. In total, the Tribe will be awarded $213,365.88 in fees and nontaxable costs.

## V.

Accordingly, it is **ORDERED** that Defendant Blue Cross Blue Shield of Michigan's motion for fees and costs, ECF No, 118, is **DENIED.**

It is further **ORDERED** that Plaintiffs Saginaw Chippewa Indian Tribe of Michigan's and the Welfare Benefit Plan's motion for fees and costs, ECF No. 119, is **GRANTED in part.**

It is further **ORDERED** that Defendant Blue Cross Blue Shield of Michigan's motion for review of the taxed bill of costs, ECF No. 123, is **GRANTED in part.**

It is further **ORDERED** that Defendant Blue Cross Blue Shield of Michigan is **DIRECTED** to pay fees and nontaxable costs of **$213,365.88** to the Plaintiffs.

It is further **ORDERED** that Defendant Blue Cross Blue Shield of Michigan is **DIRECTED** to pay taxed costs of **$2,274.18** to the Plaintiffs.

Dated: January 17, 2018                    s/Thomas L. Ludington
                                           THOMAS L. LUDINGTON
                                           United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 17, 2018.

                              s/Kelly Winslow
                              KELLY WINSLOW, Case Manager