UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE
OF MICHIGAN, el al.,

                Plaintiffs,                              Case No. 16-cv-10317

v.                                              Honorable Thomas L. Ludington

BLUE CROSS BLUE SHIELD OF MICHIGAN,

                Defendant.
_____/

**ORDER DENYING MOTION TO DISMISS AND DIRECTING DISCOVERY**

On January 29, 2016, Plaintiffs Saginaw Chippewa Indian Tribe of Michigan and the

Welfare Benefit Plan ("Plaintiffs" or "the Tribe" or "SCIT") brought suit against Blue Cross Blue

Shield of Michigan ("BCBSM"). The next month, Plaintiffs filed an amended complaint. ECF No.

7. Plaintiffs' allegations arose from BCBSM's administration of group health plans for employees

of the Tribe and members of the Tribe. Plaintiffs alleged that BCBSM was charging hidden fees,

overstating the cost of medical services, and failing to apply Medicare Like Rates ("MLR") for

medical services performed. *See generally* ECF No. 7.

On April 25, 2016, BCBSM filed a motion to dismiss Plaintiffs' first amended complaint.

ECF No. 14. The Court granted the motion and dismissed all counts except those allegations within

Counts I and II claiming that BCBSM utilized hidden access fees. ECF No. 22. The Court

concluded that because the MLR was a responsibility imposed by law extrinsic to the text of

ERISA, BCBSM's failure to charge MLR was not a violation of its fiduciary duty under ERISA.

*Id.*

On April 10, 2017, Plaintiffs and BCBSM each filed separate motions for partial summary

judgment. ECF No. 79, 81. The Court granted both motions in part, finding that two plans existed:

a Member Plan and an Employee Plan. ECF No. 112. Counts I and II were dismissed to the extent

they alleged claims related to payment of hidden access fees for the Member Plan or the Physicians

Group Incentive Program. *Id.* at 32. Counts I and II were granted in favor of Plaintiffs to the extent

they alleged claims related to payment of hidden access fees for the Employee Plan. *Id.*

Plaintiffs appealed the order to the Sixth Circuit. ECF No. 114. The Sixth Circuit affirmed

the Court's judgment with the exception of the dismissal of Plaintiffs' MLR claims. The Sixth

Circuit found that

> [T]he Tribe does not assert that the MLR regulations impose an *additional* duty on
> fiduciaries beyond what ERISA itself requires. Instead, the Tribe bases its claim on
> the text of ERISA itself, which requires fiduciaries to act prudently and solely in
> the interest of the plan's participants and beneficiaries. See 29 U.S.C. § 1104(a)(1).
> The Tribe alleges that BCBSM violated these duties by paying more than necessary
> for the Tribe's medical claims by failing to take advantage of the MLR regulations.
> That is enough to state a claim under ERISA.
>
> BCBSM presents an alternative reason for affirming the district court's dismissal,
> arguing that its administration of the Tribe's plan simply is not subject to the MLR
> regulations. These regulations, BCBSM contends, apply only to the expenditure of
> IHS funds and do not limit the payment that hospitals must accept from a third-
> party payor, such as BCBSM, which is not expending IHS funds. Although
> BCBSM asserts that the Tribe's MLR claim therefore fails as a matter of law,
> BCBSM's argument is better understood as contending that the Tribe cannot show,
> as a factual matter, that the regulations apply to its ERISA plan. But since the Tribe
> has alleged that the BCBSM was aware of the MLR regulations, that BCBSM failed
> to ensure that the Tribe paid no more than MLR for MLR-eligible services, and that
> all other conditions precedent to the MLR claim were met, the Tribe has sufficiently
> pleaded that the MLR regulations are applicable to BCBSM's administration of the
> Tribe's ERISA plan. We emphasize that we express no opinion on the ultimate
> merits of the Tribe's MLR claim, and we hold only that it would be premature to
> dismiss the Tribe's claim at this stage of the proceedings.

ECF No. 135 at 14–13 (emphasis in original).

On January 4, 2019, a stipulated order was filed reinstating Counts I, IV, and VI of

Plaintiffs' Amended Complaint "insofar as those Counts assert[ed] claims related to Medicare-

Like Rates ('MLR')." ECF No. 141. Specifically, Plaintiffs acknowledge that the federal law

requiring MLR intended to regulate "Medicare-participating hospitals" in order to benefit "Tribe[s] or Tribal organization[s] carrying out a CHS program of the IHS." ECF No. 7 at 29. Plaintiffs imply, but do not allege, that "Medicare-participating hospitals" charged Plaintiffs' groups more than MLRs and that BCBSM did not enforce the MLR pricing requirement imposed on the hospitals.

Count I alleges that BCBSM was a fiduciary pursuant to ERISA because "it exercised discretionary authority and control over management" of the Employee Plan and its assets as well as responsibility over its administration. ECF No. 7 at 31 (citations omitted). Plaintiffs contend that BCBSM breached its fiduciary duty by "[p]aying excess claim amounts to Medicare-participating hospitals for services authorized by a tribe or tribal organization carrying out a CHS program." *Id.* at 30.

Count IV alleges that Plaintiffs are "health care insurers" as defined by the Michigan Health Care False Claims Act ("HCFCA"). *Id.* at 35. Plaintiffs contend that BCBSM violated this act by not applying the MLR discount rate for medical services received by Plaintiffs under the Member Plan. *Id.* Plaintiffs reason that BCBSM's presentation of the illegal claim for services by the Medicare-participating hospital also constitutes BCBSM's presentation of a false claim.

Count VI alleges that BCBSM was in a fiduciary relationship with Plaintiffs as defined by common law. *Id.* at 38. Plaintiffs contend that BCBSM violated its fiduciary duty by charging rates in excess of MLR. Plaintiffs reason that doing so was not in the best interest of Plaintiffs under the Member Plan. *Id.* at 38–39.

# I.

BCBSM has now filed a motion to dismiss Plaintiffs' Amended Complaint. ECF No. 142. It contends that Count I should be dismissed because the statute of limitations for a claim of breach

of fiduciary duty under ERISA is six years. *Id.* at 1–2. BCBSM asserts that any alleged fiduciary duty would have arisen on the date the MLR regulations were enacted, July 5, 2007. It reasons that the claims under Count I (which it does not identify factually) are time-barred because Plaintiffs did not file their complaint until 2016. BCBSM next argues that Count IV should be dismissed because Plaintiffs are not health care insurers as defined by the Michigan Health Care False Claims Act. *Id.* at 2. It also contends that BCBSM did not "present or cause to be presented" any claims regulated by the HCFCA. *Id.* It further argues that holding BCBSM liable would be contrary to the intent of the HCFCA because "the Legislature enacted the HCFCA to *protect* BCBSM (a health care corporation) from unscrupulous providers, not to impose liability upon BCBSM." *Id.* at 14 (emphasis in original). Lastly, BCBSM argues that Count VI should be dismissed because the Parties' Administrative Services Contract expressly authorized BCBSM to charge Plaintiffs health care rates "in accordance with BCBSM's standard operating procedures" and does not address MLR. *Id.* at 2–3.

To address the Tribe's MLR claim and BCBSM's immediate motion requires a more focused review of "…the ultimate merits of the Tribe's MLR claim." *Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich.*, 748 Fed.Appx. 12, 22 (6th Cir. 2018). An overview of the Federal Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and Michigan's Health Care False Claims Act is also necessary.

## II.

The Tribe "is a federally recognized Indian tribe, pursuant to 25 U.S.C. [§] 1300k, with its Tribal Government headquarters located in Mt. Pleasant, Michigan." Am. Compl. ¶ 3, ECF No. 7. BCBSM is a large health insurance provider. BCBSM has provided insurance for the Tribe since the 1990s. Sprague Decl. at 2, ECF No. 81, Ex. 12.

# A.

## 1.

The Tribe has two separate health insurance group policies associated with BCBSM. In the 1990s, the Tribe purchased a comprehensive health care benefits plan from BCBSM for its employees. Sprague Decl. at 2. This arrangement was fully-insured, meaning the Tribe paid a premium to BCBSM for coverage and BCBSM in return had sole responsibility for paying claims from the plan's participants. That Group was identified as Group No. 52885. *Id.* When first created, Group No. 52885 was limited to Tribal employees, and the members of the group included individuals who were not members of the Tribe. *Id.*

In 2002, the Tribe decided to provide health insurance coverage for all members of the Tribe. Sprague Decl. at 2. Rather than purchasing a fully-insured plan, like the plan for Tribe employees, the Tribe chose a self-funded plan. This meant that instead of paying insurance to BCBSM in return for coverage, the Tribe directly paid the cost of health care benefits and paid BCBSM a fee for administering the program.[1] To initiate the program, the Tribe and BCBSM entered into an Administrative Services Contract ("ASC"). *See* Employee Plan Sch. A, ECF No. 81, Ex. 16. The ASC identified the group for tribal members as Group No. 61672. BCBSM asserts that, during the timeframe in question, the Member Plan contained between 91% and 95% non-employee members. *See* Anal. Mem. Plan Part., ECF No. 91, Ex. 2 (finding that the number of non-employee members in the member plan ranged from 1858 to 2152 and the number of employee member participants ranged from 100 to 218).

---

[1] Self-funded programs allow for employers to customize benefits and often lower costs. But because the employer also assumes direct liability for claims, the employer bears the financial risk of an extraordinarily high claim. To mitigate that risk, employers utilizing a self-funded plan can purchase "stop loss insurance" from BCBSM. Stop loss insurance caps the total liability exposure of an employer funding an employee health care plan.

In 2004, the Tribe's contract with BCBSM for the fully-insured employee plan expired. Sprague Decl. at 3. Instead of renewing the fully-insured plan, the Tribe opted to convert the Employee Plan to a self-funded arrangement by signing an ASC. *Id.* The group continued to be identified as Group No. 52885. *See* Member Plan Sch. A, ECF No. 79, Ex. 6.

Both the Employee Plan and the Member Plan have existed during the entire timeframe in question. Besides having different group numbers, both plans were assigned different BCBSM customer numbers. *See* Plan Profiles, ECF Nos. 79, Ex. 11, 12. The two plans were created by different ASCs, have their own Enrollment and Coverage Agreements, and issue separate Quarterly and Annual Settlements. *See* Member Plan Enrollment Agreement, ECF No. 79, Ex. 15; Employee Plan Enrollment Agreement, ECF No. 79, Ex. 16; Sample Quarterly and Annual Settlements, ECF No. 79, Ex. 17–20. The Tribe purchased different levels of stop-loss insurance for each plan. *See* Employee Plan Sch. A at 3 & Member Plan Sch. A at 3. Both plans had different eligibility requirements, benefits, co-pays, and deductibles. *See* Sprague Dep. at 12, 17–18, ECF No. 79, Ex. 4; Rangi Dep. at 118–19, ECF No. 79, Ex. 13; Pelcher Dep. at 11, ECF No. 79, Ex. 14. The two plans were negotiated, reviewed, and renewed separately by the Tribe. *See* Sprague Dep. at 19, 86, 151, Luke Dep. at 114, ECF No. 79, Ex. 4, Harvey Dep. at 105, ECF No. 79, Ex. 10.

The two groups are also funded from different sources. The Member Plan was originally funded by the Tribe's Government Trust and is currently funded by the Gaming Trust. Reger Dep. at 11, ECF No. 79, Ex. 21. When in use, the Government Trust funded all government programs aimed at tribal members and was financed by revenues from the Tribe's casino. *Id.* at 12. The Gaming Trust is also "generated from the revenue from the resort." *Id.* at 16. As explained by a tribe employer, "[i]t's the cash excess of flow in regards to depreciation." *Id.* Interest on that money

is used, among other things, to pay for the Member Plan expenses. *Id.* The Employee Plan, by contrast, is funded by the Fringe Trust, which is used for employee expenses. *Id.* at 9, 17.[2] The two plans are funded from different trusts expressly because one is for employees of the Tribe who are not all members of the Tribe and the other is solely for members of the Tribe. *Id.* at 17.

Despite these differences between the plans, both the Tribe and BCBSM treated the plans identically in a number of ways. Both groups were primarily administered for the Tribe by the same person: Connie Sprague. Sprague Dep. at 9. Sprague treated the two plans as one for most administrative purposes. *See id.* at 12–16, 151. When the Tribe sought bids for medical coverage, it solicited bids for the two groups simultaneously. *Id.* at 42–43. BCBSM's account representatives and managers always conducted meetings with the Tribe and executed documents regarding the groups at the same time. Cronkright Dep. at 26–27, 55–57, ECF No. 81, Ex. 13; Luke Dep. at 43–44; Harvey Dep. at 94. Cameron Cronkright, BCBSM's account representative for the Tribe, testified that he never remembered a meeting where only one of the plans was discussed. Cronkright Dep. at 57–58.

**2.**

Each plan is memorialized in its own ASC. The ASCs are nearly identical. The ASCs explain the Parties' general responsibilities and provide:

> BCBSM shall administer Enrollees' health care Coverage(s) in accordance with BCBSM's standard operating procedures for comparable coverage(s) offered under a BCBSM underwritten program, any operating manual provided to the Group, and this Contract. In the event of any conflict between this Contract and such standard operating procedures, this Contract controls.
>
> The responsibilities of BCBSM pursuant to this Contract are limited to providing administrative services for the processing and payment of claims. BCBSM shall have no responsibility for: the failure of the Group to meet its financial obligations: to advise Enrollees of the benefits provided; and to advise Enrollees that Coverage

---

[2] The record does not clearly explain why the Fringe Trust is identified as such or how it originated.

has been terminated for any reason, including the failure to make any payments when due.

If the Group's health care program is subject to the Employee Retirement Income Security Act of 1974 (ERISA), it is understood and agreed that BCBSM is neither the Plan Administrator, the Plan Sponsor, nor a named fiduciary of the Group's health care program under ERISA. The provisions of this paragraph, however, shall not release BCBSM from any other responsibilities it may have under ERISA.

Administrative Services Contract at 2–3, ECF No. 79-2, 79-3.

The ASCs also address resolution of the disputes between the Parties.

The Group will, within sixty (60) days of receipt of a claims listing, notify BCBSM in writing with appropriate documentation of any Disputed Claim(s) and will, upon request, execute any documents required for collection of amounts that third parties owe. BCBSM will investigate and within a reasonable time, respond to such Claim(s).

Additionally, BCBSM will,

1. following the recovery of an amount from a third party, due to Worker's Compensation or other provider/program/party responsibility or

2. following BCBSM's determination that any other disputed amount is not the Group's liability or that an amount shown on a claims listing and invoice is incorrect,

credit the recovered or corrected amount, reduced by any Stop Loss payments relating to such Claim(s) or any amounts currently overdue, on a subsequent monthly invoice.

BCBSM, as administrator under this Contract, is subrogated to all rights of the Group/Enrollees relating to Disputed Claim(s) but is not obligated to institute or become involved in any litigation concerning such Claim(s).

*Id.* at 3–4.

The ASCs also contain a section entitled "Group Audits" which granted the Tribe the option to conduct an audit once every twelve months of the expenses charged by BCBSM. *Id.* The ASCs specifically state that "[b]oth parties acknowledge that claims with incurred dates over two (2) years old may be more costly to retrieve and that it may not be possible to recover over-payments for these claims." *Id.* It later states that "BCBSM shall have no obligation to make any

payments to the Group unless there has been a recovery from the provider, Enrollee, or third-party carrier as applicable." *Id.*

## B.

### 1.

The Tribe's entitlement to Medicare-Like Rates originates from the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"). PL 108-173 (HR 1). The MMA was intended to provide a program for prescription drug coverage under the Medicare Program, to amend the Internal Revenue Code to permit certain deductions, and to make other changes to the Social Security Act. *See id.*

Specifically, Section 506(a) of the MMA amended 42 U.S.C. §1395cc to include a new provision granting the Secretary of Health and Human Services (the "Secretary") the authority to require Medicare payments to hospitals providing services on behalf of the Indian Health Service, an Indian tribe, or a tribal organization. As the bill was being debated, one of its cosponsors, House Representative William M. Thomas of California District 22, furnished a report which explained the amendment as follows:

> The amendment would prohibit hospitals that participate in Medicare and that provide Medicare covered inpatient hospital services under the contract health services program funded by the Indian Health Services from charging more than the Medicare established rates for these services. This provision would apply to contract health services programs operated by the Indian Health Service, an Indian tribe or tribal organization or an urban Indian organization.

Conference Report on H.R. 1, Medicare Prescription Drug, Improvement, and Modernization Act of 2003, p. H11877 at 579 (2003).

### 2.

The MMA became law on December 8, 2003. Among other amendments to the Social Security Act, the MMA amended 42 U.S.C. §1395cc by inserting subparagraph (U) as follows:

**(a) Filing of agreements; eligibility for payment; charges with respect to items and services**

**(1)** Any provider of services…shall be qualified to participate under this subchapter and shall be eligible for payments under this subchapter if it files with the Secretary an agreement--

> **(U)** in the case of hospitals which furnish inpatient hospital services for which payment may be made under this title, to be a participating provider of medical care both—
>
> > **(i)** under the contract health services program funded by the Indian Health Service and operated by the Indian Health Service, an Indian tribe, or tribal organization…with respect to items and services that are covered under such program and furnished to an individual eligible for such items and services under such program; and
> >
> > **(ii)** under any program funded by the Indian Health Service and operated by an urban Indian organization with respect to the purchase of items and services for an eligible urban Indian…
>
> in accordance with regulations promulgated by the Secretary regarding admission practices, payment methodology, and rates of payment (including the acceptance of no more than such payment rate as payment in full for such items and services [sic],

42 U.S.C. §1395cc.

## 3.

Section 506(c) of the MMA required the Secretary to publish rules implementing section 506(a) of the MMA. PL 108-173 (HR 1) ("The Secretary shall promulgate regulations to carry out the amendments made by subsection (a)."). Accordingly, on April 28, 2006, the Indian Health Service (IHS) and the contract health services program (CHS) published proposed rules in the Federal Register. 71 FR 25124-02. Interested persons were given until June 27, 2006 to submit written comments concerning the proposed regulation. *Id.*

On June 4, 2007, the IHS issued a final rule implementing the regulations. It summarized the final rule as follows:

> The Secretary of the Department of Health and Human Services (HHS) hereby issues this final rule establishing regulations required by section 506 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003

(MMA), (Pub. L. 108-173). Section 506 of the MMA amended section 1866 (a)(1) of the Social Security Act to add subparagraph (U) which requires hospitals that furnish inpatient hospital services payable under Medicare to participate in the contract health services program (CHS) of the Indian Health Service (IHS) operated by the IHS, Tribes, and Tribal organizations, and to participate in programs operated by urban Indian organizations that are funded by IHS (collectively referred to as I/T/Us) for any medical care purchased by those programs. Section 506 also requires such participation to be in accordance with the admission practices, payment methodology, and payment rates set forth in regulations established by the Secretary, including acceptance of no more than such payment rates as payment in full.

Rules and Regulations, Department of Health and Human Services, 72 FR 30706-01. Specifically, the proposed rule would

amend the IHS regulations at 42 CFR part 136, by adding a new subpart D to describe the payment methodology and other requirements for Medicare-participating hospitals and critical access hospitals (CAHs) that furnish inpatient services, either directly or under arrangement, to individuals who are authorized to receive services from such hospitals under a CHS program of the IHS, Tribes, and Tribal organizations, and IHS-funded programs operated by urban Indian organizations (collectively, I/T/U programs). As provided in the statute, we also proposed to amend CMS regulations at 42 CFR part 489 to require Medicare-participating hospitals and critical access hospitals (CAHs) that furnish inpatient hospital services to individuals who are eligible for and authorized to receive items and services covered by such I/T/U programs to accept no more than the payment methodology under 42 CFR part 136, subpart D as payment in full for such items and services.

*Id.* In response, the IHS received 35 comments and furnished responses to them. *Id.* One of these provided:

Comment: One commenter expressed concern that the proposed rule places an additional burden on hospitals by capping rates paid to public and private non-IHS funded hospitals, with no additional responsibility or accountability placed on I/T/U programs regarding payments to such hospitals.

Response: This rule would provide for rates that hospitals accept under the Medicare program. We do not believe these rates place an additional burden on hospitals.

*Id.* In a later response, the IHS emphasized that "Medicare-participating hospitals that furnish inpatient services must accept the rate methodology established under this regulation as a condition of participation in the Medicare program." *Id.*

The day after publishing the final rule, the HHS implemented the regulations. Consistent with the final rule, a new subpart D was added which provides in part:

> (a) Scope. All Medicare-participating hospitals…that furnish inpatient services must accept no more than the rates of payment under the methodology described in this section as payment in full for all items and services authorized by IHS, Tribal, and urban Indian organization entities.

> (b) Applicability. The payment methodology under this section applies to all levels of care furnished by a Medicare-participating hospital, whether provided as inpatient, outpatient, skilled nursing facility care, as other services of a department, subunit, distinct part, or other component of a hospital (including services furnished directly by the hospital or under arrangements) that is authorized under part 136, subpart C by a contract health service (CHS) program of the Indian Health Service (IHS); or authorized by a Tribe or Tribal organization carrying out a CHS program of the IHS under the Indian Self–Determination and Education Assistance Act…or authorized for purchase under § 136.31 by an urban Indian organization.

42 C.F.R. §136.30(a)–(b).[3]

The regulation also provided a mechanism for Indian organizations to recover from hospitals that did not apply the required MLR rates. 42 C.F.R. §136.32 provides:

> a) If it is determined that a hospital has submitted inaccurate information for payment, such as admission, discharge or billing data, an I/T/U may as appropriate—

---

[3] The regulation cites to 25 U.S.C. §13 as statutory authority which provides:

> The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes:…
>> For relief of distress and conservation of health.

25 U.S.C. §13. The regulations also cite to 42 U.S.C. §2001 for statutory authority which provides:

> (a) All functions, responsibilities, authorities, and duties of the Department of the Interior, the Bureau of Indian Affairs, Secretary of the Interior, and the Commissioner of Indian Affairs relating to the maintenance and operation of hospital and health facilities for Indians, and the conservation of the health of Indians, are transferred to, and shall be administered by, the Surgeon General of the United States Public Health Service, under the supervision and direction of the Secretary of Health and Human Services…

> (b) In carrying out his functions, responsibilities, authorities, and duties under this subchapter, the Secretary is authorized, with the consent of the Indian people served, to contract with private or other non-Federal health agencies or organizations for the provision of health services to such people on a fee-for-service basis or on a prepayment or other similar basis.

42 U.S.C. §2001. §2003 of the same subchapter provides that "[t]he Secretary of Health and Human Services is also authorized to make such other regulations as he deems desirable to carry out the provisions of this subchapter." 42 U.S.C. §2003.

(1) Deny payment (in whole or in part) with respect to any such services, and;

(2) Disallow costs previously paid, including any payments made under any methodology authorized under this subpart. The recovery of payments made in error may be taken by any method authorized by law.

(b) For cost based payments previously issued under this subpart, if it is determined that actual costs fall significantly below the computed rate actually paid, the computed rate may be retrospectively adjusted. The recovery of overpayments made as a result of the adjusted rate may be taken by any method authorized by law.

42 C.F.R. §136.32.

## 4.

On July 19, 2007, the Acting Director of the Assistant Surgeon General, Charles W. Grim, published a letter to Tribal Leaders and Urban Program Directors. It provided:

Dear Tribal Leader/Urban Program Director:

I am pleased to announce that on June 4 the Indian Health Service (IHS) and the Centers for Medicare & Medicaid Services (CMS) published the much anticipated final rule implementing "Medicare-like" payment rates. The "Medicare-like" payment rate will constitute payment in full to Medicare-participating hospitals that deliver services to American Indians and Alaska Natives referred through IRS-funded programs. The final rule, entitled "Section 506 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003-Limitation on Charges for Services Furnished by Medicare Participating Inpatient Hospitals to Individuals Eligible for Care Purchased by Indian Health Programs" (72 FR 30706), includes all IHS-funded health care programs, whether operated by the IHS, Tribes, Tribal organizations, or Urban Indian organizations. The effective date for the final rule was July 5. I have enclosed a copy of the rulemaking and a related press release for your review.

The June 4 final rule amends the regulations at Title 42, Code of Federal Regulations (CFR), Part 136, by adding a new Subpart D to describe the "Medicare-like" rate payment methodology. The payment methodology applies to all levels of care furnished by a Medicare-participating hospital, whether provided as inpatient, outpatient, skilled nursing facility care, as other services of a department, subunit, distinct part, or other component of a hospital (including services furnished directly by the hospital or under arrangements) that is authorized under Part 136, Subpart C by a contract health service (CHS) program of the IHS or authorized by a Tribe or Tribal organization carrying out a CHS program of the IHS under the Indian Self-Determination and Education Assistance Act, as amended, (Public Law 93-638) or authorized for purchase under Section 136.31 by an Urban Indian organization.

> The "Medicare-like" rates regulations will reduce contract health expenses for hospital services and enable Indian health programs to use the resulting savings to increase services to their beneficiaries. To ensure that Tribal and Urban programs get the information needed to make the most of the new regulations, IHS Headquarters CHS staff have developed a Web site to explain the regulations and provide notices about training opportunities. The Web site is located at www.ihs.gov/nonmedicalprograms/mlri/. Training will also be available on "CMS Day" at the Annual National Indian Health Board Consumer Conference, scheduled for September 27, in Portland, Oregon.

Letter to Tribal Leaders and Urban Program Directors, (July 19, 2007), https://www.ihs.gov/prc/includes/themes/responsive2017/display_objects/documents/mlri/Tribal%20Leader%20Letter.pdf.

### III.

### A.

Count I of the Amended Complaint alleges that BCBSM violated its fiduciary duties under ERISA by failing to secure the MLR discount for services obtained by the group members eligible for care purchased by Indian health care programs. ECF No. 7 at 30–32. 29 U.S.C. §1104 explains a fiduciary's duties under ERISA. It provides:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan;
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances *then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims*;

29 U.S.C. §1104 (emphasis added). The Supreme Court has held that "[a]n ERISA fiduciary must discharge his responsibility 'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use. We have often noted that an

ERISA fiduciary's duty is 'derived from the common law of trusts.'" *Tibble v. Edison Int.*, 135 S.Ct. 1823, 1828 (2015) (citations omitted).

The statute of limitations for bringing a claim of breach of fiduciary duty under ERISA is found in 29 U.S.C. §1113 which provides:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
>
> > (1) six years after (A) *the date of the last action which constituted a part of the breach or violation*, or (B) in the case of an omission *the latest date on which the fiduciary could have cured the breach or violation*, or
> >
> > (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> *except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery* of such breach or violation.

29 U.S.C. §1113 (emphasis added).

## B.

BCBSM contends that the statute of limitations for Plaintiff's claim of breach of fiduciary duty began to run on July 5, 2007 when the MLR regulation became effective. It argues that on that date, BCBSM allegedly committed an "original wrongful act" (without identifying any particular wrongful act) of not identifying the illegal claims submitted by providers. *See* ECF No. 142 at 4 (quoting *McGuire v. Metro. Life Ins. Co.*, 899 F. Supp. 2d 645, 662 (E.D. Mich. 2012)). It further contends that the statute of limitations did not "restart[] each time a plaintiff suffer[ed] incremental, additional injury flowing from the same event." *Id.*

Plaintiffs contend, accurately and importantly, that their Amended Complaint does not identify any specific date upon which Defendant first breached its fiduciary duty. They argue that though the MLR regulations were passed on July 5, 2007, this "does not prove that as of July 5, 2007, BCBSM acted imprudently or failed to use due care on the Tribe's behalf." ECF No. 144 at

6. For example, Plaintiffs suggest that perhaps "BCBSM needed time to understand the new regulations and develop policies and procedures, including computer algorithms, to allow BCBSM to identify claims for the Tribe using MLR methodology." *Id.* Plaintiffs emphasize that their Complaint "does not allege that BCBSM even knew about the MLR regulations on July 5, 2007," thus suggesting that the "original wrongful act" must have occurred at some later but unidentified period of time. *Id.*

Plaintiffs also argue that their claim falls within the Statute of Limitations fraud exception, but without identifying any particular fraudulent activity. *Id.* at 8–9. This exception provides "that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. §1113(2). Plaintiffs contend that they did not learn of BCBSM's failure apply to the MLR discount until 2015. Accordingly, their 2016 complaint would be well within the statute of limitations.

Plaintiffs further argue that their claim should not be dismissed because of the continuing violations doctrine. Plaintiffs contend that "the time period for which [Plaintiffs] could recover for BCBSM's breaches of fiduciary duty would be limited to health care claims during the three year period immediately preceding the filing of the original Complaint." ECF No. 144 at 9. Plaintiffs argue that they can recover for each individual health care claim that BCBSM processed in the three years prior to filing the complaint because "BCBSM's failure to implement a process to consider MLR in its claims administration process is not, standing alone, a breach of fiduciary duty." *Id.* at 10.

IV.

A.

Count IV of the Amended Complaint alleges that BCBSM violated the Michigan Health Care False Claims Act ("HCFCA") by not enforcing the MLR discount the group was entitled to from the providers. ECF No. 7 at 35–36. In 1985, the Michigan Legislature enacted the HCFCA to prevent fraud in relation to health care coverage and insurance. The Legislature "enacted the HCFCA because the MFCA [Medicaid False Claim Act] had not served its purpose…and to extend to private insurers and health care corporations the same protections against fraud that it afforded the Department of Social Services in the MFCA." *People v. Motor City Hosp. & Surgical Sup., Inc.* 575 N.W.2d 95, 98 (1997). One of the provisions specifically prohibits a party from submitting a fraudulent claim to a health insurance company. It provides:

> A person who receives a health care benefit or payment from a health care corporation or health care insurer which the person knows that he or she is not entitled to receive or be paid; or a person who knowingly presents or causes to be presented a claim which contains a false statement, shall be liable to the health care corporation or health care insurer for the full amount of the benefit or payment made.

M.C.L. §752.1009.

The HCFCA does not expressly provide for a private cause of action, but the Michigan Court of Appeals has determined that a private cause of action exists nonetheless. *State ex rel. Gurganus v. CVS Caremark Corp.*, 2013 WL 238552, *8 (Mich. Ct. App. Jan. 22, 2013) (finding that "M.C.L. 752.1009 creates a private cause of action for health care corporations and health care insurers.") (reversed on other grounds).

**B.**

BCBSM presents three independent reasons why Plaintiffs' HCFCA claim should be dismissed. ECF No. 142 at 2. First, Plaintiffs lack statutory standing. Second, BCBSM did not "present or cause to be presented" any "claims" to Plaintiffs. Third, the Legislature passed HCFCA to protect insurance companies like BCBSM.

**1.**

BCBSM contends that Plaintiffs lack standing under the HCFCA because they are not a health care corporation or insurer. ECF No. 142 at 8. The HCFCA defines a health care insurer as "any insurance company authorized to provide health insurance in this state or any legal entity which is self-insured and providing health care benefits to its employees." M.C.L. §752.1002(f). BCBSM argues that because Count IV only relates to the Member Plan, Plaintiffs do not qualify as a health care insurer because the employment status of those insured under the Member Plan is irrelevant. *See* ECF No. 142 at 10. It contends that because the Member Plan does not specifically service employees, Plaintiffs cannot be considered a health care insurer.

Plaintiffs contend that "[t]he Tribe obviously meets the statutory definition of a health care insurer. It is not disputed that (1) SCIT is a 'legal entity which is self-insured' and that (2) the Tribe provides 'health care benefits to its employees.'" ECF No. 144 at 12 (quoting Pl.'s Am. Compl. at  5, ECF No. 7).

**2.**

BCBSM also contends that Plaintiffs' claims under the HCFCA are untenable because Plaintiffs never "presented" a health care claim to BCBSM. *See* ECF No. 142 at 12–14. The HCFCA provides that "a person who knowingly presents or causes to be presented a claim which contains a false statement, shall be liable to the health care corporation or health care insurer for the full amount of the benefit or payment made." M.C.L. §752.1009. The HCFCA does not define the term "present."

Plaintiffs, seizing on their ASC right to review and dispute claims, argue that their actions qualify as presenting a claim. That is, BCBSM would provide Plaintiffs with a "monthly claims listing" displaying the services offered that month with the accompanying charges. ECF No. 144

at 16. Plaintiffs then had sixty days to review the list and object to or otherwise dispute the charges. *Id.* Though Plaintiffs had pre-authorized BCBSM to make these payments to the medical providers, Plaintiffs argue that they still had the right to dispute the charges. Plaintiffs argue that this constituted a "claim" by BCBSM because pursuant to the HCFCA, a claim is "any attempt to cause a health care corporation or health care insurer to make the payment of a health care benefit." M.C.L. §752.1002(a).

**3.**

BCBSM argues that the HCFCA was intended to protect rather than punish insurance companies like itself. *See* ECF No. 1420 at 14. Plaintiffs in turn argue that the HCFCA also seeks to protect health insurance providers, such as the Tribe. They contend that the HCFCA does not exclude insurance companies such as BCBSM from the class of people or entities that may be found liable for presenting false claims.

**V.**

Count VI of Plaintiffs' Amended Complaint alleges that BCBSM breached its common law fiduciary duty by failing to apply the MLR discount. The Amended Complaint provides

> BCBSM was in a fiduciary relationship with Plaintiffs because, among other things, it was reposed with trust and confidence by Plaintiffs under the ASC and was also entrusted with monies provided to it by Plaintiffs…BCBSM breached its fiduciary duty by, among other things…[f]ailing to ensure that the Plan paid no more than MLR for MLR-eligible claims.

ECF No. 7 at 38.

BCBSM contends that Plaintiffs' breach of common law fiduciary duty claim should be dismissed because the ASC "authorized BCBSM to process claims at something *other than* MLR, *i.e.*, by 'pay[ing] standard contractual rates.'" ECF No. 142 at 16 (emphasis in original) (quoting Plaintiffs' Amended Complaint at 29, ECF No. 7). In their response, Plaintiffs argue that the ASC

"does not inform the Tribe (or the Court) as to whether the contract includes or does not include MLR pricing." ECF No. 144 at 20.

## VI.

The factual allegations in the Amended Complaint addressing the illegal charges by Medicare-participating hospitals and BCBSM's administration of Plaintiffs' plans is less than a page in length. This is true despite the fact that Plaintiffs infer that the practice began sometime in 2007 and continued until 2015 when Plaintiffs first discovered that "BCBSM failed to ensure that Plaintiffs paid no more than MLR for MLR-eligible services." ECF No. 7 at 29.

The Amended Complaint does not identify any Medicare-participating hospitals engaged in the illegal pricing practice nor does it identify any particular illegal claims. There are no allegations about how the "Medicare-participating hospitals" engaged in the illegal pricing practice, why Plaintiffs believe the hospital's bills were "false," or how BCBSM would know that they were "false." It also does not address how or when "prudent" plan administrators, with the skill, prudence, and diligence of BCBSM, would have set about the administrative task of ensuring that Plaintiffs were paying no more than MLR. Additionally, it does not address whether the MLR claim extends to group members who are not members of the Tribe nor does it explain how BCBSM would know.

The Amended Complaint also neglects to address issues associated with the ASCs. For example, the ACSs do not articulate a requirement that BCBSM identify MLR offending claims or the appropriate pricing for such a service. The ASCs also contain provisions that permit Plaintiffs to address "Disputed Claims" and to obtain "Group Audits." The Amended Complaint does not address either of these provisions. It does not explain whether these provisions were ever utilized and whether they should be read out of the ASCs if BCBSM is an ERISA fiduciary.

In short, further factual development of the "merits of the Tribe's MLR claim" must occur before the arguments advanced by Defendant's motion to dismiss can reasonably be addressed. The motion will be denied without prejudice and a scheduling order entered providing for four months of discovery.

## VII.

Accordingly, it is **ORDERED** that Defendant's motion to dismiss, ECF No. 142, is **DENIED** without prejudice.

It is further **ORDERED** that the case manager is directed to enter a scheduling order providing for discovery until September 2, 2019.

Dated: April 26, 2019                    s/Thomas L. Ludington
                                         THOMAS L. LUDINGTON
                                         United States District Judge