UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE
OF MICHIGAN, et al.,

                Plaintiffs,                        Case No. 16-cv-10317

v.                                         Honorable Thomas L. Ludington

BLUE CROSS BLUE SHIELD OF MICHIGAN,

                Defendant.
_____/

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT,
DENYING AS MOOT MOTION FOR RECONSIDERATION OF ORDER DENYING
MOTION TO COMPEL, AND DISMISSING AMENDED COMPLAINT**

On January 29, 2016, Plaintiffs Saginaw Chippewa Indian Tribe of Michigan and the

Welfare Benefit Plan ("Plaintiffs" or "the Tribe" or "SCIT") brought suit against Blue Cross Blue

Shield of Michigan ("BCBSM"). The next month, Plaintiffs filed an amended complaint. ECF No.

7. Plaintiffs' allegations arose from BCBSM's administration of group health plans for employees

of the Tribe and members of the Tribe. Plaintiffs alleged that BCBSM was charging hidden fees,

overstating the cost of medical services, and violated its ERISA fiduciary duties by failing to

demand Medicare Like Rates ("MLR") from medical service providers. *See generally* ECF No. 7.

On April 25, 2016, BCBSM filed a motion to dismiss Plaintiffs' first amended complaint.

ECF No. 14. The Court granted the motion and dismissed all counts except those allegations within

Counts I and II claiming that BCBSM utilized hidden access fees. ECF No. 22. On April 10, 2017,

Plaintiffs and BCBSM each filed separate motions for partial summary judgment. ECF No. 79, 81.

The Court granted both motions in part. In its order, the Court determined that Plaintiffs had two

separate health care plans with BCBSM. ECF No. 112 at PageID.6210–6214. One plan was for

members of the Tribe and the other was for employees of the Tribe. The Court determined that

only the plan for the employees was governed by ERISA.

Plaintiffs appealed the order to the Sixth Circuit. ECF No. 114. The Sixth Circuit affirmed

the Court's judgment with the exception of the dismissal of Plaintiffs' MLR claims. The Sixth

Circuit found that

> [T]he Tribe does not assert that the MLR regulations impose an *additional* duty on
> fiduciaries beyond what ERISA itself requires. Instead, the Tribe bases its claim on
> the text of ERISA itself, which requires fiduciaries to act prudently and solely in
> the interest of the plan's participants and beneficiaries. See 29 U.S.C. § 1104(a)(1).
> The Tribe alleges that BCBSM violated these duties by paying more than necessary
> for the Tribe's medical claims by failing to take advantage of the MLR regulations.
> That is enough to state a claim under ERISA.
>
> BCBSM presents an alternative reason for affirming the district court's dismissal,
> arguing that its administration of the Tribe's plan simply is not subject to the MLR
> regulations. These regulations, BCBSM contends, apply only to the expenditure of
> IHS funds and do not limit the payment that hospitals must accept from a third-
> party payor, such as BCBSM, which is not expending IHS funds. Although
> BCBSM asserts that the Tribe's MLR claim therefore fails as a matter of law,
> BCBSM's argument is better understood as contending that the Tribe cannot show,
> as a factual matter, that the regulations apply to its ERISA plan. But since the Tribe
> has alleged that the BCBSM was aware of the MLR regulations, that BCBSM failed
> to ensure that the Tribe paid no more than MLR for MLR-eligible services, and that
> all other conditions precedent to the MLR claim were met, the Tribe has sufficiently
> pleaded that the MLR regulations are applicable to BCBSM's administration of the
> Tribe's ERISA plan. We emphasize that we express no opinion on the ultimate
> merits of the Tribe's MLR claim, and we hold only that it would be premature to
> dismiss the Tribe's claim at this stage of the proceedings.

ECF No. 135 at 14–15 (emphasis in original). The Sixth Circuit affirmed the Court's determination

that there were two separate insurance plans and that only the plan for employees (some of whom

are not members of the tribe) was governed by ERISA. *Id.* at 8–15.

On January 4, 2019, a stipulated order was filed reinstating Counts I, IV, and VI of

Plaintiffs' Amended Complaint "insofar as those Counts assert[ed] claims related to Medicare-

Like Rates ('MLR')." ECF No. 141. Specifically, Plaintiffs acknowledge that the federal law

requiring MLR intended to regulate "Medicare-participating hospitals" in order to benefit "Tribe[s] or Tribal organization[s] carrying out a CHS program of the IHS." ECF No. 7 at 29. Plaintiffs imply, but do not allege, that "Medicare-participating hospitals" charged Plaintiffs' groups more than MLRs and that BCBSM did not enforce the MLR pricing requirement imposed on the hospitals.

Count I alleges that BCBSM was a fiduciary pursuant to ERISA because "it exercised discretionary authority and control over management" of the Employee Plan and its assets as well as responsibility over its administration. ECF No. 7 at 31 (citations omitted). Plaintiffs contend that BCBSM breached its fiduciary duty by "[p]aying excess claim amounts to Medicare-participating hospitals for services authorized by a tribe or tribal organization carrying out a CHS program." *Id.* at 30.

Count IV alleges that Plaintiffs are "health care insurers" as defined by the Michigan Health Care False Claims Act ("HCFCA"). *Id.* at 35. Plaintiffs contend that BCBSM violated this act by not applying the MLR discount rate for medical services received by Plaintiffs under the Member Plan. *Id.* Plaintiffs reason that BCBSM's presentation of the allegedly illegal claim for services by the Medicare-participating hospital also constitutes BCBSM's presentation of a false claim.

Count VI alleges that BCBSM was in a fiduciary relationship with Plaintiffs as defined by common law. *Id.* at 38. Plaintiffs contend that BCBSM violated its fiduciary duty by charging rates in excess of MLR. Plaintiffs reason that doing so was not in the best interest of Plaintiffs under the Plan. *Id.* at 38–39.

BCBSM filed a motion to dismiss Plaintiffs' Amended Complaint. ECF No. 142. The motion was denied without prejudice and the parties were directed to complete discovery. ECF No. 146.

BCBSM has now filed a motion for summary judgment. ECF No. 142. It argues that it did not owe Plaintiffs a fiduciary duty under ERISA to verify that Medicare-participating hospitals that were delivering services to Plaintiffs' employees at MLR. It contends that MLR is only available when services are sought out and paid for by a tribe's Contract Health Service. Because BCBSM paid for the services for the employees from an entirely different source, not Plaintiffs' Contract Health Services, the services were not eligible for MLR. In the alternative, BCBSM alleges that Plaintiffs' ERISA claims are time-barred by the statute of limitations. It further argues that it did not violate the HCFCA or breach a common law fiduciary duty because the services paid for by BCBSM from a different source were not eligible for MLR.

## I.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## II.

The Tribe "is a federally recognized Indian tribe, pursuant to 25 U.S.C. [§] 1300k, with its Tribal Government headquarters located in Mt. Pleasant, Michigan." Am. Compl. ¶ 3, ECF No. 7. BCBSM is a large health insurance provider. BCBSM has provided insurance for the Tribe since the 1990s. Sprague Decl. at 2, ECF No. 81, Ex. 12.

### A.

In the 1990s, the Tribe purchased a comprehensive health care benefits plan from BCBSM for its employees. Sprague Decl. at 2. This arrangement was fully-insured, meaning the Tribe paid a premium to BCBSM for coverage and BCBSM in return had sole responsibility for paying claims from the plan's participants. In 2004, the Tribe's contract with BCBSM for the fully-insured employee plan expired. *Id.* at 3. Instead of renewing the fully-insured plan, the Tribe opted to convert the Employee Plan to a self-funded arrangement by signing an ASC. *Id.* This meant that instead of paying insurance to BCBSM in return for coverage, the Tribe directly paid the cost of health care benefits and paid BCBSM a fee for administering the program.[1]

The health insurance plan is memorialized in an Administrative Services Contract ("ASC") and explains the Parties' general responsibilities. It provides:

> BCBSM shall administer Enrollees' health care Coverage(s) in accordance with BCBSM's standard operating procedures for comparable coverage(s) offered under a BCBSM underwritten program, any operating manual provided to the Group, and this Contract. In the event of any conflict between this Contract and such standard operating procedures, this Contract controls.

> The responsibilities of BCBSM pursuant to this Contract are limited to providing administrative services for the processing and payment of claims. BCBSM shall have no responsibility for: the failure of the Group to meet its financial obligations: to advise Enrollees of the benefits provided; and to advise Enrollees that Coverage has been terminated for any reason, including the failure to make any payments when due.

---

[1] Self-funded programs allow for employers to customize benefits and often lower costs. But because the employer also assumes direct liability for claims, the employer bears the financial risk of an extraordinarily high claim.

If the Group's health care program is subject to the Employee Retirement Income Security Act of 1974 (ERISA), it is understood and agreed that BCBSM is neither the Plan Administrator, the Plan Sponsor, nor a named fiduciary of the Group's health care program under ERISA. The provisions of this paragraph, however, shall not release BCBSM from any other responsibilities it may have under ERISA.

Administrative Services Contract at 2–3, ECF No. 79–4.

The ASC also addresses resolution of the disputes between the Parties.

The Group will, within sixty (60) days of receipt of a claims listing, notify BCBSM in writing with appropriate documentation of any Disputed Claim(s) and will, upon request, execute any documents required for collection of amounts that third parties owe. BCBSM will investigate and within a reasonable time, respond to such Claim(s).

Additionally, BCBSM will,

1. following the recovery of an amount from a third party, due to Worker's Compensation or other provider/program/party responsibility or

2. following BCBSM's determination that any other disputed amount is not the Group's liability or that an amount shown on a claims listing and invoice is incorrect,

credit the recovered or corrected amount, reduced by any Stop Loss payments relating to such Claim(s) or any amounts currently overdue, on a subsequent monthly invoice.

BCBSM, as administrator under this Contract, is subrogated to all rights of the Group/Enrollees relating to Disputed Claim(s) but is not obligated to institute or become involved in any litigation concerning such Claim(s).

*Id.* at 3–4.

The ASC also contains a section entitled "Group Audits" which granted the Tribe the option to conduct an audit once every twelve months of the expenses charged by BCBSM. *Id.* The ASC specifically stated that "[b]oth parties acknowledge that claims with incurred dates over two (2) years old may be more costly to retrieve and that it may not be possible to recover over-payments for these claims." *Id.* It later states that "BCBSM shall have no obligation to make any

- 6 -

payments to the Group unless there has been a recovery from the provider, Enrollee, or third-party carrier as applicable." *Id.*

## B.

### 1.

In 1975, Congress passed the Indian Self-Determination and Education Assistance Act ("ISDEAA") because it "recognize[d] the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of…Federal services to Indian communities." 25 U.S.C.A. § 5302(a). It committed to the "orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C.A. § 5302(b). Part of this transition included allowing tribal organizations to create self-determination contracts.

> The Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof…

25 U.S.C.A. § 5321(a)(1). As explained by the 8th Circuit, "Under a self-determination contract, the federal government supplies funding to a tribal organization, allowing the tribal organization to plan, conduct and administer a program or service that the federal government otherwise would have provided directly." *FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995).

One way this has been accomplished is through CHSs. CHSs are "health services provided at the expense of the Indian Health Service from public or private medical or hospital facilities other than those of the Service." 42 C.F.R. § 136.21. CHS services are provided "when necessary health services by an Indian Health Service facility are not reasonably accessible or available." 42 C.F.R. § 136.23(a). According to federal regulation, these CHS services are services of "last

resort." 42 C.F.R. § 136.61 ("The Indian Health Service is the payor of last resort for persons defined as eligible for contract health services.").

In order to receive CHS services, an individual must first gain approval from the Tribe's CHS program. Federal regulation provides:

> In nonemergency cases, a sick or disabled Indian, an individual or agency acting on behalf of the Indian, or the medical care provider shall, prior to the provision of medical care and services notify the appropriate ordering official of the need for services and supply information that the ordering official deems necessary to determine the relative medical need for the services and the individual's eligibility.

42 C.F.R. § 136.24(b). Upon receiving approval from the ordering official, a purchase order is issued from the ordering official to the medical care provider. 42 C.F.R. § 136.24(a).

## 2.

At issue in this case is whether a medical service is eligible for Medicare-Like Rates when an employee health care plan engaged by the tribe uses a source of funding other than CHS funds to pay for the service. The Tribe's entitlement to Medicare-Like Rates originates from the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"). PL 108-173 (HR 1). The MMA was intended to provide a program for prescription drug coverage under the Medicare Program, to amend the Internal Revenue Code to permit certain deductions, and to make other changes to the Social Security Act. *See id.*

Specifically, Section 506(a) of the MMA amended 42 U.S.C. §1395cc to include a new provision granting the Secretary of Health and Human Services (the "Secretary") the authority to require Medicare payments to hospitals providing services on behalf of the Indian Health Service, an Indian tribe, or a tribal organization. As the bill was being debated, one of its cosponsors, House Representative William M. Thomas of California District 22, furnished a report which explained the amendment as follows:

> The amendment would prohibit hospitals that participate in Medicare and that provide Medicare covered inpatient hospital services under the contract health services program funded by the Indian Health Services from charging more than the Medicare established rates for these services. This provision would apply to contract health services programs operated by the Indian Health Service, an Indian tribe or tribal organization or an urban Indian organization.

Conference Report on H.R. 1, Medicare Prescription Drug, Improvement, and Modernization Act

of 2003, p. H11877 at 579 (2003).

The MMA became law on December 8, 2003. Among other amendments to the Social

Security Act, the MMA amended 42 U.S.C. §1395cc by inserting subparagraph (U) as follows:

> (a) Filing of agreements; eligibility for payment; charges with respect to items and services
>
> (1) Any provider of services…shall be qualified to participate under this subchapter and shall be eligible for payments under this subchapter if it files with the Secretary an agreement--
>
>> (U) in the case of hospitals which furnish inpatient hospital services for which payment may be made under this title, to be a participating provider of medical care both—
>>
>>> (i) under the contract health services program funded by the Indian Health Service and operated by the Indian Health Service, an Indian tribe, or tribal organization…with respect to items and services that are covered under such program and furnished to an individual eligible for such items and services under such program; and
>>>
>>> (ii) under any program funded by the Indian Health Service and operated by an urban Indian organization with respect to the purchase of items and services for an eligible urban Indian…
>>
>> in accordance with regulations promulgated by the Secretary regarding admission practices, payment methodology, and rates of payment (including the acceptance of no more than such payment rate as payment in full for such items and services [sic],

42 U.S.C. §1395cc.

### 3.

Section 506(c) of the MMA required the Secretary to publish rules implementing section

506(a) of the MMA. PL 108-173 (HR 1) ("The Secretary shall promulgate regulations to carry out

the amendments made by subsection (a).")." Accordingly, on April 28, 2006, the Indian Health

Service ("IHS") and the Contract Health Services program published proposed rules in the Federal

Register. 71 FR 25124-02. Interested persons were given until June 27, 2006 to submit written

comments concerning the proposed regulation. *Id.*

On June 4, 2007, the IHS issued a final rule implementing the regulations. It summarized

the final rule as follows:

> The Secretary of the Department of Health and Human Services (HHS) hereby
> issues this final rule establishing regulations required by section 506 of the
> Medicare Prescription Drug, Improvement, and Modernization Act of 2003
> (MMA), (Pub. L. 108-173). Section 506 of the MMA amended section 1866 (a)(1)
> of the Social Security Act to add subparagraph (U) which requires hospitals that
> furnish inpatient hospital services payable under Medicare to participate in the
> contract health services program (CHS) of the Indian Health Service (IHS) operated
> by the IHS, Tribes, and Tribal organizations, and to participate in programs
> operated by urban Indian organizations that are funded by IHS (collectively referred
> to as I/T/Us) for any medical care purchased by those programs. Section 506 also
> requires such participation to be in accordance with the admission practices,
> payment methodology, and payment rates set forth in regulations established by the
> Secretary, including acceptance of no more than such payment rates as payment in
> full.

Rules and Regulations, Department of Health and Human Services, 72 FR 30706-01. Specifically,

the proposed rule would

> amend the IHS regulations at 42 CFR part 136, by adding a new subpart D to
> describe the payment methodology and other requirements for Medicare-
> participating hospitals and critical access hospitals (CAHs) that furnish inpatient
> services, either directly or under arrangement, to individuals who are authorized to
> receive services from such hospitals under a CHS program of the IHS, Tribes, and
> Tribal organizations, and IHS-funded programs operated by urban Indian
> organizations (collectively, I/T/U programs). As provided in the statute, we also
> proposed to amend CMS regulations at 42 CFR part 489 to require Medicare-
> participating hospitals and critical access hospitals (CAHs) that furnish inpatient
> hospital services to individuals who are eligible for and authorized to receive items
> and services covered by such I/T/U programs to accept no more than the payment
> methodology under 42 CFR part 136, subpart D as payment in full for such items
> and services.

*Id.* In response, the IHS received 35 comments and furnished responses to them. *Id.* One of these

provided:

> Comment: One commenter expressed concern that the proposed rule places an additional burden on hospitals by capping rates paid to public and private non-IHS funded hospitals, with no additional responsibility or accountability placed on I/T/U programs regarding payments to such hospitals.
>
> Response: This rule would provide for rates that hospitals accept under the Medicare program. We do not believe these rates place an additional burden on hospitals.

*Id.* In a later response, the IHS emphasized that "Medicare-participating hospitals that furnish

inpatient services must accept the rate methodology established under this regulation as a condition

of participation in the Medicare program." *Id.*

The day after publishing the final rule, the HHS implemented the regulations. Consistent

with the final rule, a new subpart D was added which provides in part:

> (a) Scope. All Medicare-participating hospitals…that furnish inpatient services must accept no more than the rates of payment under the methodology described in this section as payment in full for all items and services authorized by IHS, Tribal, and urban Indian organization entities.
>
> (b) Applicability. The payment methodology under this section applies to all levels of care furnished by a Medicare-participating hospital, whether provided as inpatient, outpatient, skilled nursing facility care, as other services of a department, subunit, distinct part, or other component of a hospital (including services furnished directly by the hospital or under arrangements) that is authorized under part 136, subpart C by a contract health service (CHS) program of the Indian Health Service (IHS); or authorized by a Tribe or Tribal organization carrying out a CHS program of the IHS under the Indian Self–Determination and Education Assistance Act…or authorized for purchase under § 136.31 by an urban Indian organization.

42 C.F.R. §136.30(a)–(b).[2]

---

[2] The regulation cites to 25 U.S.C. §13 as statutory authority which provides:
> The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes:…
>> For relief of distress and conservation of health.

25 U.S.C. §13. The regulations also cite to 42 U.S.C. §2001 for statutory authority which provides:
> (a) All functions, responsibilities, authorities, and duties of the Department of the Interior, the Bureau of Indian Affairs, Secretary of the Interior, and the Commissioner of Indian Affairs relating to the maintenance

The regulation also provided a mechanism for Indian organizations to recover from hospitals that did not apply the required MLR rates. 42 C.F.R. §136.32 provides:

> a) If it is determined that a hospital has submitted inaccurate information for payment, such as admission, discharge or billing data, an I/T/U may as appropriate—
>
> > (1) Deny payment (in whole or in part) with respect to any such services, and;
> >
> > (2) Disallow costs previously paid, including any payments made under any methodology authorized under this subpart. The recovery of payments made in error may be taken by any method authorized by law.
>
> (b) For cost based payments previously issued under this subpart, if it is determined that actual costs fall significantly below the computed rate actually paid, the computed rate may be retrospectively adjusted. The recovery of overpayments made as a result of the adjusted rate may be taken by any method authorized by law.

42 C.F.R. §136.32. It is not apparent that BCBSM could utilize this provision to recover erroneously-billed claims. Furthermore, the parties' papers do not reflect whether the Plaintiffs ever utilized this right of action to recover erroneously-billed claims.

### 4.

On July 19, 2007, the Acting Director of the Assistant Surgeon General, Charles W. Grim, published a letter to Tribal Leaders and Urban Program Directors. It provided:

> Dear Tribal Leader/Urban Program Director:
>
> I am pleased to announce that on June 4 the Indian Health Service (IHS) and the Centers for Medicare & Medicaid Services (CMS) published the much anticipated final rule implementing "Medicare-like" payment rates. The "Medicare-like" payment rate will constitute payment in full to Medicare-participating hospitals that

---

and operation of hospital and health facilities for Indians, and the conservation of the health of Indians, are transferred to, and shall be administered by, the Surgeon General of the United States Public Health Service, under the supervision and direction of the Secretary of Health and Human Services…
(b) In carrying out his functions, responsibilities, authorities, and duties under this subchapter, the Secretary is authorized, with the consent of the Indian people served, to contract with private or other non-Federal health agencies or organizations for the provision of health services to such people on a fee-for-service basis or on a prepayment or other similar basis.
42 U.S.C. §2001. §2003 of the same subchapter provides that "[t]he Secretary of Health and Human Services is also authorized to make such other regulations as he deems desirable to carry out the provisions of this subchapter." 42 U.S.C. §2003.

deliver services to American Indians and Alaska Natives referred through IRS-funded programs. The final rule, entitled "Section 506 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003-Limitation on Charges for Services Furnished by Medicare Participating Inpatient Hospitals to Individuals Eligible for Care Purchased by Indian Health Programs" (72 FR 30706), includes all IHS-funded health care programs, whether operated by the IHS, Tribes, Tribal organizations, or Urban Indian organizations. The effective date for the final rule was July 5. I have enclosed a copy of the rulemaking and a related press release for your review.

The June 4 final rule amends the regulations at Title 42, Code of Federal Regulations (CFR), Part 136, by adding a new Subpart D to describe the "Medicare-like" rate payment methodology. The payment methodology applies to all levels of care furnished by a Medicare-participating hospital, whether provided as inpatient, outpatient, skilled nursing facility care, as other services of a department, subunit, distinct part, or other component of a hospital (including services furnished directly by the hospital or under arrangements) that is authorized under Part 136, Subpart C by a contract health service (CHS) program of the IHS or authorized by a Tribe or Tribal organization carrying out a CHS program of the IHS under the Indian Self-Determination and Education Assistance Act, as amended, (Public Law 93-638) or authorized for purchase under Section 136.31 by an Urban Indian organization.

The "Medicare-like" rates regulations will reduce contract health expenses for hospital services and enable Indian health programs to use the resulting savings to increase services to their beneficiaries. To ensure that Tribal and Urban programs get the information needed to make the most of the new regulations, IHS Headquarters CHS staff have developed a Web site to explain the regulations and provide notices about training opportunities. The Web site is located at www.ihs.gov/nonmedicalprograms/mlri/. Training will also be available on "CMS Day" at the Annual National Indian Health Board Consumer Conference, scheduled for September 27, in Portland, Oregon.

Letter to Tribal Leaders and Urban Program Directors, (July 19, 2007), https://www.ihs.gov/prc/includes/themes/responsive2017/display_objects/documents/mlri/Tribal %20Leader%20Letter.pdf.

## III.

According to Plaintiffs, "SCIT is a self-determined Indian tribe and has carried out a CHS program since 1997." ECF No. 177 at PageID.10828. In executing their CHS program, Plaintiffs require a requesting individual to 1) demonstrate that they are a member of a U.S. federally recognized Indian tribe or a direct descendant of the Saginaw Chippewa Indian Tribe and 2)

provide proof of residency in one of the five counties covered by SCIT (Clare, Isabella, Midland, Arenac, Missaukee). ECF No. 176-2. Plaintiffs explain that:

> If the patient met the above criteria and the CHS program determined that the medical services being sought were deemed necessary, the Tribe's CHS program (as the "ordering official") issued a "purchase order" or "referral," authorizing the service in accordance with 42 C.F.R. 136.24(a). The patient was then required to present the purchase order/referral from the CHS program to the provider at the time of service. SCIT's CHS program issued a purchase order/referral authorizing all of the claims at issue in this lawsuit.

ECF No. 176 at PageID.9520 (citations omitted). Plaintiffs note that "[n]ot all medical services were deemed necessary. In accordance with 42 C.F.R. 136.23(e), the Tribe prioritized care based on relative medical need to cover all authorized services." *Id.*

Plaintiffs funds its CHS program with money from the IHS and money from the Tribe. *See* ECF No. 173-4 at PageID.8986-87; ECF No. 173-10 at PageID.9065-66. As directed in 42 C.F.R. § 136.61, the Tribe's CHS program was a payor of last resort for medical services. BCBSM explains that:

> The Tribe ensured that the Plans would always pay first, before the Tribe expended any CHS Funds through its CHS program, thereby stretching its CHS Funds as far as possible. In fact, if a CHS-eligible patient obtained a referral but then failed to present his or her BCBSM insurance card to the provider, the Tribe would take the corresponding medical bill and "send that to [BCBSM] to ensure that [BCBSM] paid first.

ECF No. 173 at PageID.8901 (citations omitted). Plaintiffs required that payment through the Plan "first be exhausted before the CHS program paid for anything." *Id.* at PageID.8893. CHS would only pay for a service's remaining balance after BCBSM had made the initial payment.

Payment from BCBSM and payment from CHS were separate. BCBSM did not have the authority to distribute CHS funds. As explained by BCBSM:

> The Tribe contracted with BCBSM *not* to administer a CHS program, but to simply process and pay medical claims of the Tribe's two welfare benefit plans…at

- 14 -

BCBSM's discounted network rates. By the Tribe's own design, and as the Tribe knowingly intended, the Plans were completely separate from its CHS program.

*Id.* at PageID.8893 (emphasis in original).   Plaintiffs reimbursed BCBSM from its Fringe Internal Service Fund, a "fund that is created and established for the sole purpose of taking care of employee benefits." ECF No. 173-4 at PageID.8984. This fund was completely separate from the IHS funds used for the CHS program. *Id.* at PageID.8985.

BCBSM was not aware of which employees would be eligible for MLR because Plaintiffs did not inform BCBSM which of its employees were enrolled in the CHS program. *See* ECF No. 173 at PageID.8902–03. However, by contracting with BCBSM, Plaintiffs' employees had access to BCBSM network rates and network providers. *See* ECF No. 173-3 at PageID.8953.

## IV.

BCBSM argues that it had no fiduciary duty to ensure that Plaintiffs received MLR because MLR only applies to services funded by a CHS program. ECF No. 173 at PageID.8910. Because BCBSM always paid for medical services first and had no authority to disburse CHS funds, BCBSM could not have applied MLR to the medical services. The responsibility for ensuring the MLR was applied would fall solely with Plaintiffs because they controlled disbursement of the CHS funds.

Plaintiffs disagree, reasoning that only approval from a tribe's CHS program is necessary to access MLR. Their response brief provides:

Authorization of the hospital services by the Tribe's CHS program – not payment from CHS funds – is the regulatory predicate for services provided by a Medicare-participating hospital to be eligible for MLR pricing under the plain language of 42 C.F.R. 136.30(b).

ECF No. 173 at PageID.8901. They rely upon 42 C.F.R. 136.30(b) which provides:

The payment methodology under this section applies to all levels of care furnished by a Medicare-participating hospital, whether provided as inpatient, outpatient,

skilled nursing facility care, as other services of a department, subunit, distinct part, or other component of a hospital (including services furnished directly by the hospital or under arrangements) that is authorized under part 136, subpart C by a contract health service (CHS) program of the Indian Health Service (IHS); or *authorized by a Tribe or Tribal organization carrying out a CHS program of the IHS* under the Indian Self–Determination and Education Assistance Act, as amended, Pub.L. 93–638, 25 U.S.C. 450 et seq.; or authorized for purchase under § 136.31 by an urban Indian organization (as that term is defined in 25 U.S.C. 1603(h)) (hereafter "I/T/U").

42 C.F.R. § 136.30(b) (emphasis added). According to Plaintiffs, a plain reading of the regulation demonstrates that it is irrelevant whether the funds for the service come from the Tribe's CHS fund or from the Tribe's insurance policy. The only requirement is that the service was approved by the Tribe's CHS program, though Plaintiffs do not dispute BCBSM's assertion that none of the claims paid by BCBSM were paid by or through the Tribe's CHS program.

Plaintiffs further cite to Judge Lawson's opinion in *Little River Band of Ottawa Indians v. Blue Cross Blue Shield of Michigan*, 183 F. Supp. 3d 835 (E.D. Mich. 2016). Judge Lawson held that MLR applied to a service irrespective of the fund sources as long as a CHS program approved the service. He quotes an IHS document entitled "Medicare-Like Rates for CHS Services (Consolidated) FAQ" ("FAQ Document") which presents 62 questions and answers about the relationship between MLR and CHS. Though the FAQ Document is not binding, it is worthy of "some deference." *Bank of New York v. Janowick*, 470 F.3d 264, 269 (6th Cir. 2006) ("Interpretive guidance from administrative agencies that is not the product of formal, notice-and-comment rulemaking is entitled to respect to the extent that th[e] interpretations have the power to persuade.") (quotations omitted).

Judge Lawson's opinion provides:

[T]he governing regulations plainly require that payments be capped at "Medicare-Like Rates" for *all* qualifying services, regardless of the source of funds, as long as the services were authorized by the rules of the federally-funded Indian Health Services "Direct Care" or "Contract Health Services" programs. *See* Plf.'s Resp.,

> Ex. 3, Medicare-Like Rates for CHS Services FAQ ¶¶ 17, 28 (Pg ID 300-02) ("If a Tribe pays for services [ ] with Tribal funds can they pay using Medicare-like Rates? Yes, as long as they meet CHS eligibility requirements within the regulations and services are authorized by the CHS program."; "Does my local hospital have to accept these rates? Yes, if the local hospital is a Medicare participating hospital and if your CHS program has authorized payment for the services.").

*Id.* at 843–44 (emphasis in original).

BCBSM contends that Judge Lawson did not consider the entire FAQ Document when he determined that CHS funds were not a prerequisite for MLR. It argues that the references to "CHS programs" contemplated payment by the CHS programs, not solely claims that could be payable under the CHS programs. BCBSM cites to three of the FAQ Document questions to further support their proposition: Question 10, Question 11, and Question 29.

> 10. We use Third Party funds to pay costs for certain members who do not qualify for CHS funding. Do the Medicare-like rates apply for these services?
>
> No. Medicare-like rates *only apply for services payable through the CHS program, for individuals who are eligible for CHS coverage*, as defined by 42 CFR Part 136.
>
> ***
>
> 11. We use Third Party funds to add to our CHS funds. Do Medicare-like rates apply for these services?
>
> Yes, as long as the *CHS pays for the services* and follows the regulations that apply to CHS and client eligibility (42 CFR Part 136).
>
> ***
>
> 29. What services are payable at Medicare-like rates?
>
> …[T]he service or supply must be provided to a CHS eligible individual and *paid by an IHS or tribal CHS program* or by an Urban Indian program.

ECF No. 173-27 at PageID.9276, 9278 (emphasis added). Judge Lawson makes no mention of these other FAQ Document passages nor do Plaintiffs address them in their response brief.

It is unclear why neither Judge Lawson nor Plaintiff addressed these passages. The specific guidance of these three passages clarify the more general propositions presented in the two passages quoted by Judge Lawson. They explicitly state that CHS payment is necessary for the application of MLR. Claiming that CHS payment is not necessary for the application of MLR directly contradicts these passages. Though the FAQ Document is not federal regulation, it was promulgated by the IHS and accordingly provides guidance to the Court in interpreting 42 C.F.R. § 136.30(b). Specifically, it demonstrates that references to "CHS program" in 42 C.F.R. § 136.30(b) do not signify solely CHS program authorization, but additionally, CHS payment.

This is further supported by a case identified by BCBSM, *Rancheria v. Hargan*, 296 F. Supp. 3d 256 (D.D.C. 2017). In *Rancheria*, a Native American tribe had a self-insured policy just as Plaintiffs have a self-insured policy. However, unlike Plaintiffs, the tribe distinguished between services that it would pay for with its self-insured policy and services that it would pay for with its CHS funds. Certain services would be less expensive using its self-insured policy because it would receive lower rates from providers associated with the tribe's insurer, Anthem Blue Cross. Other services would be less expensive using the tribe's CHS funds because MLR applied to these other services. The court summarized the plan as follows:

> [T]he Tribe established its own Tribal Self–Insurance Program (referred to in the record as TSIP) to increase the availability of monies for health care for Tribal members. The Tribal Self–Insurance Program provides access to care at discounted rates through an arrangement with Anthem Blue Cross. In comparison, CHS reimburses health care providers at Medicare-like rates. For certain care needs, the Tribal Self–Insurance Program can purchase coverage at lower rates while for other needs, CHS is able to obtain a lower rate. To conserve resources so the Tribe pays the lowest possible rate, the Tribal Self–Insurance Program contains an exclusionary clause that excludes from coverage those services that are eligible for Medicare-like rates and those services eligible for CHEF reimbursements. The TSIP Coordination Policy further provides that the Tribal Self–Insurance Policy "will not be treated as an alternate resource" for purposes of the payor of last resort rule.

While the Tribe was sometimes able to secure the best rate by paying for care through the CHS program, for other care more favorable rates could be secured if the Tribe paid directly. To take advantage of the optimal rate, the Tribe also developed a Coordination of Benefits (referred to in the record as COB) program between the Tribal Self–Insurance Program and CHS, allowing the former to "pay any claim otherwise covered by the express terms of [TSIP] on a provisional basis pending a final determination under the COB." In the event that the Tribal Self–Insurance Program makes a provisional payment and "it is confirmed that IHS or CHS should have been primary under this COB…[TSIP] shall be entitled to reimbursement for the IHS or CHS program." *id.* If the provisional payment turns out to be for care eligible for Medicare-like rates under CHS, the Tribal Self–Insurance Program makes an immediate payment "on behalf of and as a distribution agent for the CHS program" in order to maintain eligibility for the Medicare-like rates. *id.* By having its self-insurance program make immediate, but provisional, payments on behalf of CHS, the Tribe increases the fiscal efficiency of its payment process and conserves resources by ensuring that it will always pay the lowest available rate.

*Id.* at 261–62.

As explained above, the tribe in *Rancheria* structured its plan so that it paid for medical services through whichever source of funds could obtain the lowest rate, either CHS or TSIP. This is consistent with federal regulation which provides that a tribe "will pay the *lesser* of the payment amount determined under [the MLR regulations] or the amount negotiated with the hospital or its agent." 42 C.F.R. 136.30(f) (emphasis added). For some services, CHS would could secure the lowest rate. For other services, TSIP could secure the lowest rate. It is presumed that this was also true for services eligible for MLR since the TSIP would make provisional payments for MLR-eligible services. For some MLR-eligible services, CHS may have been able to access the lowest rate by using MLR. However, TSIP may have been able to access a rate even lower than MLR. This possibility would account for why TSIP only made a provisional payment for MLR-eligible services. A provisional payment would allow for a later determination as to whether funding from CHS or TSIP would be the most cost effective.

In this case, it is unclear whether MLR was always lower than the rates obtained by BCBSM for MLR-eligible services. Plaintiffs claim that "MLR prices were *significantly lower* than BCBSM's network prices." ECF No. 176 at PageID.9518 (emphasis in original). They also provide an internal email from BCBSM in which an employee represented that MLR was "anywhere from 10 to 18% under [BCBSM] negotiated rates depending on the region etc." ECF No. 177-47. However, Plaintiffs furnish no specific or quantitative evidence demonstrating the instances in which BCBSM rates were higher than MLR. In fact, Plaintiffs indirectly acknowledge that BCBSM rates may have been lower than MLR rates for certain services. Plaintiffs' response brief provides:

> Because Medicare-participating hospitals are legally required to accept MLR pricing as "payment in full" for services authorized by a tribal CHS program under 42 C.F.R. § 136.31(j), in *circumstances where the MLR price was lower than BCBSM's network price negotiated with the hospital*, the hospital would be paid less than for the same services than other BCBSM insureds.

ECF No. 176 at PageID.9524, n. 7 (emphasis added). Such a statement would be unnecessary if BCBSM rates were *always* higher than MLR. Accordingly, it is possible that during the time in question, BCBSM paid for certain services at rates lower than those of MLR.

As explained by the court in *Rancheria*, the parties understood that MLR would only apply to CHS services that were funded by CHS, not services that were separately funded by the tribe's self-insurance plan. If the source of funds had been irrelevant, it would have made little sense for the tribe to have differentiated between the two sources as it did. The specific structuring of the self-insurance plan in relation to the CHS indicates that only services paid for by the CHS, not a self-insurance plan, are eligible for MLR.[3] The tribe's insurance policy in *Rancheria* is not legal authority, but the *Rancheria* court did not note anything unusual about it and presumed that it was

---

[3] Plaintiffs do not address this portion of the *Rancheria* opinion in their response brief.

structured specifically to comply with the laws governing MLR. This supports a finding that the use of CHS funds are necessary to obtain MLR.

BCBSM further argues that adopting the interpretation proposed by Plaintiffs (that CHS payment is not required for MLR to apply) would not always further the intent of the legislation, specifically to conserve IHS funds. ECF No. 178 at PageID.12130. For example, a policy may require a tribe to pay a premium and in return, the insurance company pays for any covered medical services. This is similar to the policy that Plaintiffs initially had with BCBSM. *See supra* Section II.A. In such a situation, the insurance company would benefit from the MLR because it would be paying less for the service than its estimate in setting the premium. The tribe would not benefit from the MLR because it would not be paying for the actual service. Such a result would be contrary to the intent of the statute.

Accordingly, MLR is only applicable for those services funded by CHS. BCBSM was not authorized nor did it pay for services using funds from CHS. Accordingly, MLR was not applicable to BCBSM's payments to medical providers.

**V.**

BCBSM did not have a fiduciary duty under ERISA to pay for Plaintiffs' medical services at MLR as alleged in Count I of Plaintiffs' amended complaint because only services funded by the Tribe's CHS program qualified for MLR. For that same reason, BCBSM could not have violated the Health Care False Claims Act as alleged in Count IV or breached a common law fiduciary duty as alleged in Count VI. For these reasons, BCBSM's Motion for Summary Judgment will be granted.

Additionally, BCBSM's Motion for Reconsideration of Order Denying Motion to Compel will be denied as moot. ECF No. 193. BCBSM's original Motion to Compel sought additional

emails related to the time at which Plaintiffs learned of MLR legislation. Magistrate Judge Morris denied the motion after concluding that BCBSM had been furnished sufficient emails. Because the case will be dismissed on the purely legal question of the applicability of MLR, resolving BCBSM's motion to reconsider Judge Morris' order will be denied as moot.

## VI.

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgement, ECF No. 173, is **GRANTED**.

It is further **ORDERED** that Defendant's Motion for Reconsideration of Order Denying Motion to Compel, ECF No. 193, is **DENIED AS MOOT**.

It is further **ORDERED** that Plaintiffs' Amended Complaint, ECF No. 7, is **DISMISSED WITH PREJUDICE**.

Dated: August 7, 2020                                    s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge