## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE
OF MICHIGAN, et al.,

                    Plaintiffs,                              Case No. 16-CV-10317

v.                                                           Honorable Thomas L. Ludington

BLUE CROSS BLUE SHIELD OF MICHIGAN,

                    Defendant.
_____/

### ORDER DENYING PLAINTIFFS' MOTION TO ALTER OR AMEND JUDGMENT

On January 29, 2016, Plaintiffs Saginaw Chippewa Indian Tribe of Michigan and the Welfare Benefit Plan ("Plaintiffs" or "the Tribe" or "SCIT") brought suit against Blue Cross Blue Shield of Michigan ("BCBSM"). ECF No. 1. The next month, Plaintiffs filed an amended complaint. ECF No. 7. The Tribe "is a federally recognized Indian tribe, pursuant to 25 U.S.C. [§] 1300k, with its Tribal Government headquarters located in Mt. Pleasant, Michigan." *Id.* at PageID.61. BCBSM is a health insurance provider. Plaintiffs' allegations arose from BCBSM's administration of two group health plans, one for employees of the Tribe and one for members of the Tribe. Plaintiffs alleged that BCBSM charged hidden fees, overstated the cost of medical services, and violated its ERISA fiduciary duties by failing to demand Medicare Like Rates ("MLR") from medical service providers. *See generally* ECF No. 7.

Subsequently, Defendant filed a motion to dismiss that was  granted in part (ECF Nos. 14, 22). Later cross motions for summary judgment were granted in part (ECF Nos. 79, 81, 112). The Sixth Circuit affirmed this Court's conclusion that the health care plan for employees was subject to ERISA but not the health plan for its Tribal members. The Sixth Circuit reversed and remanded

Plaintiffs' MLR claim (ECF No. 135). On August 7, 2020 this Court granted Defendant's Motion for Summary Judgment on remand and dismissed the Complaint. ECF Nos. 173, 197, 198.

Thereafter, Plaintiffs filed a motion to alter or amend judgment pursuant to FRCP 59(e). ECF No. 199. Upon direction of this Court, Defendant filed a response. ECF Nos. 200, 201. For the reasons explained below, Plaintiffs' Motion will be denied.

## I.

Rule 59(e) allows a party to file a "motion to alter or amend a judgment." Fed. R. Civ. P. 59(e). Motions under Rule 59(e) may be granted "if there is a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (internal citations omitted). "Rule 59(e) motions cannot be used to present new arguments that could have been raised prior to judgment." *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008). If a party is effectively attempting to "'re-argue a case' . . . the district court may well deny the Rule 59(e) motion on that ground." *Id.* (quoting *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998)).

## II.

A summary of the relevant statutes and regulations follow. A full recitation of the facts and underlying statutes at issue in this case can be found in the Opinion and Order Granting Defendant's Motion for Summary Judgment. ECF No. 197.

BCBSM has provided insurance for the Tribe since the 1990s. Sprague Decl., ECF No. 81-13 at PageID.4158–59. In 2004, the Tribe converted the Employee Plan to a self-funded arrangement by signing an Administrative Services Contract ("ASC"). *Id.* Instead of paying BCBSM in return for coverage, the Tribe directly paid the cost of health care benefits and paid

BCBSM a fee for administering the program. The ASC explains the Parties' general responsibilities. It provides in part,

> BCBSM shall administer Enrollees' health care Coverage(s) in accordance with BCBSM's standard operating procedures for comparable coverage(s) offered under a BCBSM underwritten program, any operating manual provided to the Group, and this Contract. In the event of any conflict between this Contract and such standard operating procedures, this Contract controls.

> The responsibilities of BCBSM pursuant to this Contract are limited to providing administrative services for the processing and payment of claims. BCBSM shall have no responsibility for: the failure of the Group to meet its financial obligations: to advise Enrollees of the benefits provided; and to advise Enrollees that Coverage has been terminated for any reason, including the failure to make any payments when due.

> If the Group's health care program is subject to the Employee Retirement Income Security Act of 1974 (ERISA), it is understood and agreed that BCBSM is neither the Plan Administrator, the Plan Sponsor, nor a named fiduciary of the Group's health care program under ERISA. The provisions of this paragraph, however, shall not release BCBSM from any other responsibilities it may have under ERISA.

ASC at 2–3, ECF No. 79–4. The ASC also addresses the process for dispute resolution between the parties.

## A.

> The Indian Health Service, an agency within the Department of Health and Human Services, is responsible for providing federal health services to American Indians and Alaska Natives. . . . This relationship, established in 1787, is based on Article I, Section 8 of the Constitution, and has been given form and substance by numerous treaties, laws, Supreme Court decisions, and Executive Orders. The IHS is the principal federal health care provider and health advocate for Indian people, and its goal is to raise their health status to the highest possible level.

*Agency Overview*, Indian Health Service, https://www.ihs.gov/aboutihs/overview [https://perma.cc/H4ER-MUWB] (last visited 1/11/2021). In 1921, Congress passed the Snyder Act which appropriated funding for the Indian Health Service ("IHS"). *History*, Indian Health Service, https://www.ihs.gov/prc/history/ [https://perma.cc/MR2J-8L78] (last visited 1/11/2021).

- 3 -

The IHS provides direct medical services to qualifying Native Americans, but it is not and was not intended to be a health insurance plan. Indeed, IHS encourages Native Americans to secure health insurance in addition to IHS services, as reflected in the brochure circulated by the Centers for Medicare and Medicaid Services providing:

> Fact #2. Even people eligible for IHS need insurance[.]
>
> Health insurance covers many things Indian Health Care programs do not provide. With health insurance you can:
>
> - Get in to see specialists
>
> - Get health care for covered services without IHS Purchase Referred Care authorization
>
> - Get health care when you are away from home

*10 Important Facts about Indian Health Service and Health Insurance for American Indians and Alaska Natives*, August 2016, [https://perma.cc/WAP3-56EY] https://www.cms.gov/Outreach-and-Education/American-Indian-Alaska-Native/AIAN/Downloads/10-Important-Facts-About-IHS-and-Health-Care-.pdf

**B.**

In 1975, Congress passed the Indian Self-Determination and Education Assistance Act ("ISDEAA") because it "recognize[d] the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of . . . Federal services to Indian communities." 25 U.S.C.A. § 5302(a). It committed to the "orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C.A. § 5302(b). Part of this transition included allowing tribal organizations to create and manage "self-determination contracts" as opposed to relying on direct service furnished through IHS.

> The Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof . . .

25 U.S.C.A. § 5321(a)(1). As explained by the 8th Circuit, "Under a self-determination contract, the federal government supplies funding to a tribal organization, allowing the tribal organization to plan, conduct and administer a program or service that the federal government otherwise would have provided directly." *FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995).

One way this has been accomplished is through the Contract Health Services Program ("CHS"). CHSs are "health services provided at the expense of the Indian Health Service from public or private medical or hospital facilities other than those of the Service." 42 C.F.R. § 136.21. CHS services are provided "when necessary health services by an Indian Health Service facility are not reasonably accessible or available." 42 C.F.R. § 136.23(a). In 2014 the Contract Health Services Program was renamed the Purchased/Referred Care Program, but "[a]ll policies and practices remain[ed] the same." *History*, Indian Health Service, https://www.ihs.gov/prc/history/ [https://perma.cc/MR2J-8L78] (last visited 1/11/2021). The acronym PRC will be used to refer to the program hereafter. IHS programs are not fully funded by Congress, therefore, "the PRC program must rely on specific regulations relating to eligibility, notification, residency, and a medical priority rating system." *History*, Indian Health Service, https://www.ihs.gov/prc/history [https://perma.cc/MR2J-8L78] (last visited 1/11/2021).

There are six eligibility requirements for Tribal members who wish to obtain PRC care, s/he:

- "[i]s of Indian and/or Alaska Native descent"

- "resides within his/her Tribal Purchases/Referred Care (PRC) delivery area,"

- received approval of payment for care from the PRC Program Administrator,[1]

- the medical need "at the time of services [was] within the medical priorities being funded at that time,"[2]

- "must apply for and use all alternate resources that are available and accessible, such as Medicare A and B, state Medicaid, state or other federal health program, private insurance, etc." because "IHS is the 'payor of last resort.'"[3]

---

[1] "The PRC program must be notified of requests for authorization of payment for health care services from a non-IHS provider. Notification requirements for non-emergency medical care and the requirements for emergency care are provided in the regulations. These requirements must be met before a authorization PRC authorizing official will be made for a purchase order to the provider. The patient, provider, hospital or someone on behalf of the patient must contact a PRC authorizing official of the need for PRC." *Requirements: Notification*, IHS, https://www.ihs.gov/prc/eligibility/requirements-notification [https://perma.cc/8C8S-WK3S] (last accessed 1/25/2021); *see also* CFR § 136.24.

[2] "Priorities of care and treatment for health care services will be determined on the basis of relative medical need. Medical procedures which are not funded by Federal medical care payment systems will not be considered as within IHS medical priorities. The IHS will not authorize Purchased/Referred Care (PRC) payment for such procedures not meeting this criteria. Because IHS resources are insufficient to meet-all the needs of the Indian people served, regulations at Code of Federal Regulations, at Title 42, section 136.23(e), 'Priorities for contract health services. Require that medical priorities be established governing authorization of PRC.

The application of medical priorities of care is necessary to ensure that the funds provided by Congress for the IHS/PRC funds are adequate to provide services that are authorized in accordance with IHS approved policies and procedures.

Under this authority such Area establishes the medical priority of care that set forth which health care services will be covered by PRC. The medical priority of care is determined as levels I, II, III, IV, and V. The funding and volume of need by the population have required that most Area can only provided PRC authorization the highest priority medical services – Level I. These medical services are generally only emergency care service, i.e., those necessary to prevent the immediate threat to life, limb, or sense.

The IHS Medical Priorities Levels are:
1. Emergent or Acutely Urgent Care Services
2. Preventative Care Services
3. Primary and Secondary Care Services
4. Chronic Tertiary Care Services
5. Excluded Services." *Requirements, Priorities of Care*, IHS, https://www.ihs.gov/prc/eligibility/requirements-priorities-of-care/ [https://perma.cc/4WQY-LMMW] (last accessed 1/25/2021) [sic throughout].

[3] The IHS is considered the payor of last resort, and as such, the use of alternate resources is required when such resources are available and accessible to the individual. The Indian Health Care Improvement Act Amendments (P.L. 100-713) include the following explicit requirements:
Establish a procedure that will ensure no payment shall be made from the Fund to any provider of treatment to the extent that such provider is eligible to receive payment for the treatment from any other Federal, State, local, or private source of reimbursement for which the patient is eligible.
To ensure compliance with the requirement for the use of alternate resources, Service Unit Directors, and their tribal counterparts, will be required to follow PRC rules and regulations governing such procedures.

*Requirements: Eligibility*, Indian Health Service, [https://perma.cc/E9RE-EYGV] www.ihs.gov/prc/eligibility/requirements-eligibility/ (last visited 1/11/2021).

**C.**

The Tribe created and administers a PRC Program under the ISDEAA that is funded by the IHS and supplemented with Tribal dollars. ECF No. 173 at PageID.8899. Native Americans who seek care from the PRC must meet the above requirements. *See id.* at PageID.8899–901. In addition, in order to obtain PRC funded care,

> (1) the CHS-eligible patients must first obtain a 'purchase order' or 'referral' from the Tribe's CHS program . . . (2) the patient must then provide the referral to the off-site provider at the time of service . . . (3) the provider must then present its bill, or 'claim,' to any payer the Tribe designates as an 'alternate resource' for payment before seeking payment from the Tribe's CHS program . . . and, finally (4) if the patient still owes a balance, including a co-pay, deductible, etc., the patient may present to the CHS program his or her bill for payment of that balance.

*Id.* at PageID.8900–01. According to BCBSM, the Tribe "ensured that the [BCBSM] Plans would always pay first, before the Tribe expended any CHS funds through its CHS Program, thereby stretching its CHS Funds as far as possible." *Id.* BCBSM also explained that "the Tribe never provided to BCBSM any 'referral' documents, or identified for BCBSM those individuals enrolled in the Tribe's CHS program." *Id.* at PageID.8903. "[T]he Tribe never used CHS Funds to reimburse BCBSM for any healthcare claims paid by BCBSM." *Id.* at PageID.8903–04. Further,

---

Funds expended for medical cases later reimbursed by alternate resources must be returned to the facility program account.

An individual must apply for and use all alternate resources that are available and accessible, such as:

- Medicare A and B,
- State Medicaid,
- State or other federal health program,
- Private insurance, etc.
- HIS or Tribal health facilities.

*Requirements: Alternate Resources*, IHS, https://www.ihs.gov/prc/eligibility/requirements-alternate-resources/ [https://perma.cc/6WD5-E7DK] (last accessed 1/25/2021); *see also* 42 CFR § 136.61(c).

- 7 -

"[n]ot all participants in the Employee Plan are even American Indian, let alone CHS, or MLR, eligible." *Id.* at PageID.8925.

## D.

In 2003 Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"). PL 108-173 (HR 1). Specifically, Section 506(a) of the MMA includes a provision granting the Secretary of Health and Human Services (the "Secretary") the authority to require Medicare pricing from hospitals providing services on behalf of the Indian Health Service, an Indian tribe, or a tribal organization. The MMA became law on December 8, 2003. Among other amendments to the Social Security Act, the MMA amended 42 U.S.C. §1395cc by inserting subparagraph (U) as follows:

> (a) Filing of agreements; eligibility for payment; charges with res/pect to items and services
> (1) Any provider of services...shall be qualified to participate under this subchapter and shall be eligible for payments under this subchapter if it files with the Secretary an agreement—
>
>> (U) in the case of hospitals which furnish inpatient hospital services for which payment may be made under this title, to be a participating provider of medical care both—
>>
>>> (i) *under the contract health services program funded by the Indian Health Service and operated by the Indian Health Service, an Indian tribe, or tribal organization...with respect to items and services that are covered under such program and furnished to an individual eligible for such items and services under such program*; and
>>>
>>> (ii) under any program funded by the Indian Health Service and operated by an urban Indian organization with respect to the purchase of items and services for an eligible urban Indian...
>>
>> in accordance with regulations promulgated by the Secretary regarding admission practices, payment methodology, and rates of payment (including the acceptance of no more than such payment rate as payment in full for such items and services [sic],

42 U.S.C. §1395cc (emphasis added).

Section 506(c) of the MMA required the Secretary to publish rules implementing section 506(a) of the MMA. PL 108-173 (HR 1) ("The Secretary shall promulgate regulations to carry out the amendments made by subsection (a)."). Accordingly, on April 28, 2006, the Indian Health Service ("IHS") and the Contract Health Services (PRC) Program published proposed rules in the Federal Register. 71 FR 25124-02.

On June 4, 2007, the IHS issued a final rule implementing the regulations. The day after publishing the final rule, the IHS implemented the regulations. Consistent with the final rule, a new subpart D was added which provides in part:

> (a) Scope. All Medicare-participating hospitals . . . that furnish inpatient services must accept no more than the rates of payment under the methodology described in this section as payment in full for all items and services authorized by IHS, Tribal, and urban Indian organization entities.

> (b) Applicability. The payment methodology under this section applies to all levels of care furnished by a Medicare-participating hospital, whether provided as inpatient, outpatient, skilled nursing facility care, as other services of a department, subunit, distinct part, or other component of a hospital (including services furnished directly by the hospital or under arrangements) *that is authorized under part 136, subpart C by a contract health service (CHS) program of the Indian Health Service (IHS); or authorized by a Tribe or Tribal organization carrying out a CHS program of the IHS under the Indian Self–Determination and Education Assistance Act...or authorized for purchase under § 136.31 by an urban Indian organization*.

42 C.F.R. §136.30(a)–(b) (emphasis added).

Additionally, 42 CFR 136.61 provides,

> (a) The *Indian Health Service is the payor of last resort* for persons defined as eligible for contract health services under the regulations in this part, notwithstanding any State or local law or regulation to the contrary.
> (b) Accordingly, *the Indian Health Service will not be responsible for or authorize payment for contract health services to the extent that: (1) The Indian is eligible for alternate resources*, as defined in paragraph (c) of this section . . .
> (c) Alternate resources means health care resources other than those of the Indian Health Service. *Such resources include* health care providers and institutions, and health care programs for the payment of health services including but not limited to programs under titles XVIII or XIX of the Social Security Act (i.e., Medicare, Medicaid), State or local health care programs, *and private insurance*.

(emphasis added). "While some treaties mention health care, the Indian Health Service is not an

entitlement program, and therefore funding for PRC . . . is not guaranteed by the Federal

Government. AR (Alternate Resource) allow PRC . . . funds to be conserved, thereby providing

health care for more Indian beneficiaries." *Frequently Asked Questions*, Indian Health Service,

www.ihs.gov/prc/frequently-asked-questions-faq-s, [https://perma.cc/6ZCC-PMKU]  (last visited

1/13/2021). Frequently asked questions authored by IHS with assistance from the CA Rural Indian

Health Board include the following question and answers,

> **10. We use Third Party funds to pay costs for certain members who do not qualify for CHS funding. Do the Medicare-like rates apply for these services?**
> No. Medicare-like rates only apply for services payable through the CHS program, for individuals who are eligible for CHS coverage, as defined by 42 CFR Part 136.
> . . .
> **28. Does my local hospital have to accept these rates?**
> Yes, if the local hospital is a Medicare participating hospital, and if your CHS program has authorized payment for the services.
> . . .
> **38. A primary insurer pays more than the Medicare-like rate. As an IHS, what am I responsible for paying the hospital?**
> The Medicare-like rates serve as a cap on the amount for which IHS can be held responsible. It is not a cap on the amount that a provider may charge.
> A provider, first, submits a bill to any primary insurer. IHS is liable for any remaining balance up to the Medicare-like rate, including any patient responsibility such as co-payments, deductibles, and coinsurance.
> If the provider has no remaining balance after receipt of the primary insurer's payment, IHS is not liable for any amount. In other words, the primary insurer's payment paid the bill in full.
> **39. We need to know how to figure the payment if the patient has another insurance.**
> There may or may not be an outstanding amount when other health insurance is involved. The process to determine this would be to apply the Medicare like rate (MLR) amount to the billed charge to determine the amount owed by the patient. With the payment from the health insurance, if there is a difference between their paid amount and the MLR amount that would be the amount to pay through the CHS program.
> . . .
> **46. Can we put a cap on the reimbursement we pay to the hospital?**
> No. Your program must pay the full cost of the service or hospitalization – or the lesser of the patient portion of the bill after another insurance has paid OR the

amount remaining after subtracting the insurance payment from the Medicare-like rate.

**47. My program has contracted with the local hospital at a lower cost than the Medicare-like rate. Do I have to pay the higher rate?**

No. The regulation allows your contract to continue and for your program to pay the lesser of the contract amount or the Medicare-like rate.

*MEDICARE-LIKE RATES for CHS SERVICES (Consolidated) FAQ*, Indian Health Service, https://www.ihs.gov/sites/prc/themes/responsive2017/display_ objects/documents/mlri/MLR%20FAQs.pdf, [https://perma.cc/Q7VA-2ENH] (last visited 1/2/2021).

### III.

In their Motion to Alter or Amend the Judgment, Plaintiffs contend that this Court committed both factual and legal error.

### A.

First, Plaintiffs argue "[t]his Court assumed, incorrectly, that the Tribal Member Plan is funded in the same manner as the Employee Plan. Thus, it only analyzed the funding of the Employee Plan and ignored the Member Plan's funding source, which is different than the Employee Plan's funding source." ECF No. 199 at PageID.12672. They argue that "[i]f funding sources matter for MLR eligibility, the judgment must be altered or amended." *Id.* at PageID.12674.

In response, Defendant reminds Plaintiffs that they previously conceded BCBSM does not manage the PRC funds received by the Tribe from IHS and is not a fiduciary of the funds. ECF No. 201 at PageID.12706–07. That is, "(a) BCBSM never had access to [PRC] funds; and (b) [PRC] funds were never used to pay for claims processed by BCBSM." *Id.*

In the earlier Opinion and Order, this Court concluded "BCBSM was not authorized nor did it pay for services using funds from [PRC]." ECF No. 197 at PageID.12655. Plaintiffs do not

- 11 -

offer any evidence to dispute this conclusion. Indeed, BCBSM was entirely a stranger to the program that was managed by the Tribe. Instead, the Tribe argues that only the funding of the Employee Plan was analyzed, asserts that the funding for the Employee and Tribal Member Plans are different, and then concludes that accordingly, "[i]f funding sources matter for MLR eligibility, the judgment must be altered or amended." ECF No. 199 at PageID.12674.

Plaintiffs misinterpret the Court's previous decision. This Court does not dispute that the Employee and Tribal Member Plans were funded differently. That fact, however, is irrelevant to this Court's decision. What is relevant is that BCBSM did not receive or manage PRC funds for either the Member or Employee plans. *See* ECF No. 201 at PageID.12706–07. The Plaintiffs' PRC plan administrator did. Eligibility for PRC funding could only legally occur after all reserves for payment, including that managed by BCBSM were fully exhausted. Therefore, because this Court concluded MLR only apply to PRC funded services, BCBSM did not violate the Health Care False Claims Act or breach a common law fiduciary duty to the Tribe when managing the Tribal Member Plan.

**B.**

Second, Plaintiffs allege this Court committed two legal errors—adding a new condition for Tribes to access MLR for healthcare services and undermining the Tribe's self-determined status.

**i.**

Plaintiffs argue that "[t]he MLR regulations are unambiguous" and "the only requirements for MLR to apply to healthcare services are: (1) authorization by a Tribe or Tribal organization carrying out a PRC program; and (2) the healthcare provider's participation in Medicare." ECF

No. 199 at PageID.12675. In support, Plaintiffs contend the Sixth Circuit "set forth" the two

requirements and cite to Judge Lawson's *Little River Band* opinion.

> Plaintiffs argue that the Sixth Circuit's language, which provides that 42 CFR § 136.30
>
> requires Medicare-participating hospitals to accept payment for services at a rate that is no more than what those services would cost under Medicare, provided that the services are authorized by a Tribe that is carrying out a Contract Health Service ('CHS') program on behalf of the Indian Health Services ('IHS')[,]

demonstrates that CHS funds are not required for MLR to apply. ECF No. 199 at PageID.12675-

76 (quoting *SCIT v. BCBSM*, 748 Fed. App'x 12, 20 (6th Cir. 2018)). Defendant disagrees.

Defendant argues the Sixth Circuit only found the Tribe had alleged sufficient facts to state a claim

and that "BCBSM's argument is better understood as contending that the Tribe cannot show, as a

factual matter, that the regulations apply to its ERISA plan." ECF No. 201 at PageID.12712

(quoting *SCIT v. BCBSM*, 748 Fed. App'x 12, 21–22 (6th Cir. 2018)). It also references the Sixth

Circuit's quote, "We emphasize that we express no opinion on the ultimate merits of the Tribe's

MLR claim, and we hold only that it would be premature to dismiss the Tribe's claim at this stage

of the proceeding." *SCIT v. BCBSM*, 748 Fed. App'x 12, 21–22 (6th Cir. 2018).

Defendant is correct that the Sixth Circuit did not address whether MLR applied to medical

expenses that were not paid by a PRC Program with PRC funds. The Court of Appeals simply held

that the Tribe had alleged sufficient facts to defeat a motion to dismiss. The Court's caveat

regarding the merits of the claim applies to both the facts and the legal analysis of the MLR claim.

*SCIT v. BCBSM*, 748 Fed. App'x 12, 21–22 (6th Cir. 2018) ("But since the Tribe has alleged that

. . . BCBSM failed to ensure that the Tribe paid no more than MLR for MLR-eligible services, and

that all other conditions precedent to the MLR claim were met, the Tribe has sufficiently pleaded

that the MLR regulations are applicable to BCBSM's administration of the Tribe's ERISA plan.").

The fact that Plaintiffs alleged sufficient facts to allege a violation of the MLR claim does not

- 13 -

mean the Sixth Circuit concluded that MLR were extended by the MMA beyond the scope of PRC claims.

Next, Plaintiffs assert that "This Court's decision conflicts with the Eastern District of Michigan's prior published decision in *Little River Band v. BCBSM*, where the court rejected BCBSM's identical position." ECF No. 199 at PageID.12676 (citation omitted). In response, Defendant explains it "believes that the only reason this Court cited to the 2008 IHS FAQs is because Plaintiffs relied on Judge Lawson's opinion in [*Little River Band v. BCBSM*]." ECF No. 201 at PageID.12715. In addition, Defendant argues that Little River Band rooted its analysis in the FAQs and not the text of the regulations. *Id.*

In *Little River Band*, Judge Lawson quoted from the PRC FAQs to support his conclusion that any health service a patient could seek to qualify for payment by a PRC Program must be capped at MLR, regardless of whether a PRC Program was consulted, approved, or paid the medical expenses with PRC funds. *Little River Band of Ottawa Indians v. BCBSM*, 183 F. Supp. 3d 835, 843–44 (E.D. Mich. 2016) ("the governing regulations plainly require that payments be capped at 'Medicare-Like Rates' for *all* qualifying services, regardless of the source of funds, as long as the services were authorized by the rules of the federally-funded Indian Health Services 'Direct Care' or 'Contract Health Services' programs." (emphasis in original)). However, as this Court discussed in its August 7, 2020 Opinion and Order, Judge Lawson did not reference questions 10, 11 or 29 in the FAQs, and notably, neither did Plaintiffs in their response to Defendant's Motion for Summary Judgment or even their Motion to Alter or Amend Judgment. This Court explained the existence of the additional FAQ passages and how it reached the opposite conclusion from Judge Lawson. Plaintiffs do not explain why Judge Lawson was correct; they only cite his conclusion. This is insufficient to alter or amend the judgment.

Plaintiffs also argue that the regulation itself is unambiguous and as such, rules of statutory interpretation require that outside sources not be consulted.  ECF No. 199 at PageID.12677–78. Even if the regulation were ambiguous, Plaintiffs argue that any ambiguity should be resolved in favor of the Tribe. *Id.* In response, Defendant proffers that

> Plaintiffs still do not reconcile their position with the fact that MLR regulations require coordination of benefits with third-party payers (like BCBSM), such that a [PRC] program's payment 'will not exceed' MLR. If Plaintiffs were indeed correct that MLR applies regardless of the source of funds, then the coordination provisions that define when a payment 'will not exceed' MLR would be impermissibly superfluous. Put another way, if a third-party payer must pay first, and at no more than MLR, then there need be no need to require coordination so that a CHS program's payment (the payer of last resort) 'will not exceed' MLR because the payment by the third-party payer would already, and every time, 'not exceed' MLR.

ECF No. 201 at PageID.12713 (citations omitted).

Plaintiffs' argument that only the text of the regulation can be considered is inconsistent with its response to Defendant's Motion for Summary Judgment. In their response, Plaintiffs argued that the plain meaning of the regulation is that the actual qualifications for funding by a PRC Program are irrelevant. They quoted *Little River Band* in support. ECF No. 175 at PageID.9480. Plaintiffs however, did not include the citation following the quoted sentence. In support of his conclusion, Judge Lawson referenced the CHS FAQs. *See Little River Band*, 183 F. Supp. 3d at 843. Plaintiffs cite the same *Little River Band* case in the instant Motion in support of their reading of the regulation. *See* ECF No. 199 at PageID.12676. This Court is not the first court to look beyond the regulatory text alone to decide the question of applicability of MLR for CHS services.

In addition, it is not legal error to review agency guidance in this case. The regulation at issue provides,

> (b) Applicability. The payment methodology under this section *applies to all levels of care furnished by a Medicare-participating hospital*, . . . *authorized by a Tribe*

- 15 -

> *or Tribal organization carrying out a CHS [PRC] program of the IHS under the*
> *Indian Self-Determination and Education Assistance Act . . .*

42 C.F.R. § 136.30 (b) (emphasis added). The term "Contract Health Services" was defined

elsewhere in the regulation as "health services provided at the expense of the Indian Health Service

from public or private medical or hospital facilities other than those of the Service." 42 C.F.R. §

136.21. No further explanation regarding the source of IHS funding is given in the definitional or

the MLR sections of the regulation. As such, as this Court previously held, it is appropriate to

review agency guidance. *See Bank of New York v. Janowick*, 470 F.3d 264, 269 (6th Cir. 2006).

Plaintiffs also argue that the Sixth Circuit's opinion in *United States v. Havis* "reaffirm[s]

th[e] fundamental principle that agency commentary cannot expand statutory or regulatory

provisions." ECF No. 199 at PageID.12680. In this case, even if the FAQs altered the regulation,

which they do not, *Havis* is not binding. *Havis* stands for the proposition that the U.S. Sentencing

Commission cannot expand the definition of a term defined in the U.S.S.G. through application

notes. Those changes may only occur in the Sentencing Guidelines themselves. *United States v.*

*Havis*, 927 F.3d 382 (6th Cir. 2019). With the exception of a string citation reference included in

a United States Supreme Court case,[4] this Court is not aware of a civil[5] case where the rationale

from *Havis* was applied. This is not a criminal case and there are no concerns about "institutional

constraints that make the Guidelines constitutional in the first place—congressional review and

notice and comment" in this case. *Id.* at 386–87.

Plaintiffs further contend that the FAQs do not demonstrate "thoroughness" in

"consideration" of its position and therefore should not be consulted. ECF No. 199 at

---

[4] The United States Supreme Court cited to *Havis* in a Board of Veterans' Appeals case to support the proposition that lower courts "have questioned Auer's validity and pleaded with this Court to reconsider it." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2430 n.38 (2019) (J. Gorsuch concurrence).
[5] The Court only found criminal, habeas, or custodial civil rights cases applying the principle.

PageID.12681 (citing *Gonzales v. Oregon*, 546 U.S. 243, 268 (2006)). They assert "BCBSM's interpretation of the FAQs reflects the opposition of reasoned consideration because it flies in the face of Congress' intentions." ECF No. 199 at PageID.12681. Presumably Plaintiffs are referring to their own belief about Congress' general intention "to expand tribal access to federal resources, programs, and benefits." *See* ECF No. 199 at PageID.12683–84. However, Plaintiffs view the expansion of access too narrowly. As this Court previously explained, "adopting the interpretation proposed by Plaintiffs (that actual [PRC] qualification and payment [by a PRC Program] is not required for MLR to apply) would not always further the intent of the legislation, specifically to conserve IHS funds." ECF No. 197 at PageID.12655. That is, the process as described in the FAQs actually results in the conservation of PRC funds, allowing PRC dollars to be stretched further, and therefore expanding Native Americans' access to healthcare. As an example, the Redding Rancheria Tribe created a healthcare program that minimizes costs and maximizes the use of PRC funds. ECF No. 197 at PageID.12652–53.

As for the self-determination argument, the Tribe has the authority to manage its own plan to maximize the use of PRC dollars as well as any other resource available to the Tribe. The Tribe could create a system similar to Redding Rancheria where the insurance plan "paid for medical services through whichever source of funds could obtain the lowest rate, either [PRC] or [the Tribal Self-Insurance Program]." ECF No. 197 at PageID.12653. The Tribe's self-determination status does not require this Court to interpret the MMA and its regulations to be an expansion of MLR beyond its application to PRC services.

Plaintiffs also argue that

No evidence suggests the FAQs at issue are IHS's words, much less its formal position. The FAQs' title contains an acknowledgement to the California Rural Indian Health Board for 'developing this document,' which suggests IHS did not write the passages.

ECF No. 199 at PageID.12681. Plaintiffs selectively read the sub-title to the FAQs to support their position. The full sub-title reads "IHS acknowledges the contribution made by CA Rural Indian Health Board in developing this document." ECF No. 173-27 at PageID.9274. The sub-title does not suggest that the California Rural Indian Health Board authored the document, but rather that the California board supported its creation. It is an acknowledgement of assistance, not an admission that IHS did not author the document.

Plaintiffs also state that "the ISDEAA expressly exempts tribal contractors (like the Tribe) from being bound by IHS guidance unless they specifically agree to it." ECF No. 199 at PageID.12681. This argument was not raised in the briefing for the Motion for Summary Judgment. In fact, it was Plaintiffs themselves who cited a case that in turn cited the relevant IHS FAQs in their Summary Judgment Briefing. Plaintiffs cannot now, in a motion to alter or amend judgment, argue for the first time that the Tribe is not bound by IHS guidance.

Finally, Plaintiffs argue that BCBSM's interpretation of the FAQs "contradicts its own prior position." ECF No. 199 at PageID.12682–83. In support Plaintiffs explain that the Blue Cross Blue Shield Association (of which BCBSM is a member) has a policy that "authorization (not payment) by a tribe's CHS [PRC] program is the only condition for application of MLR pricing to claims for services rendered by a Medicare-participating facility to a Native American member." *Id.* They also state BCBSM admitted the MLR pricing applies to PRC claims and BCBS of Minnesota interprets the regulations to include all members, regardless of other coverage. *Id.* None of these facts are dispositive on the question of whether PRC Program funding is required for the application of Medicare-like rates. First, the document cited by Plaintiffs simply repeats the regulation language itself. It also outlines a process to apply MLR, including a statement that MLR applies when the member is Native American, the service was provided at a non-IHS facility, the

member received a PRC purchase order, and the facility accepts Medicare. ECF No. 177-9 at PageID.11217–18. However, BCBS' internal guidance or independent business decisions are not relevant to this case. What is relevant is whether BCBSM's management of the Tribe's account is in line with federal law and regulations. Second, the "admission" by BCBSM is from an email that provides, "The non-employed tribal groups (CHS – Contract Health Services) are unquestionable [sic] entitled to Medicare Like Rates" and then continues "and act as the tribes insurer of last resort . . ." ECF No. 177-31 at PageID.11699. The sentence is not internally consistent and certainly is not dispositive of the question whether PRC funds administered by a PRC Program are required for the MLR to apply.

### ii.

Plaintiffs' second legal argument is that this Court's "new condition for MLR eligibility is inconsistent with Congress' intent to expand tribal access to federal resources, programs, and benefits; and it subverts the Tribe's self-determined status." ECF No. 199 at PageID.12683–84. Plaintiffs spend three pages arguing that the statutory framework is not designed to conserve IHS funds, but rather to expand Tribes' ability to spend federal dollars on healthcare. Plaintiffs even state that "This Court's interpretation of the MLR regulations disqualifies from MLR eligibility hospital services provided to an individual covered under a self-insurance plan funded in part by [PRC] dollars." *Id.* at PageID.12685. However, the facts in Redding Rancheria demonstrate that this assertion is inaccurate. The Tribe would have to create a different reimbursement model if it wanted to utilize PRC funds through a BCBSM administered plan. This Court's decision does not "disqualify" them from doing so.

Plaintiffs also argue that this Court "failed to properly consider the statutory and regulatory text concerning the Tribe's self-determination and self-government rights." ECF No. 199 at PageID.12686. They cite a law review article which provides,

> As a statutory initiative, self-governance (1) expands the types of programs and responsibilities that participating tribes can take over; (2) places greater emphasis on minimizing oversight by federal agencies; and (3) maximizes flexibility for tribes to redesign programs and reallocate resources in their agreements.

ECF No. 199 at PageID.12687 (quoting Strommer & Osborne, *The History, Status, and Future of Tribal Self-Governance Under the Indian Self-Determination and Education Assistance Act*, 39 Am. Ind. L. Rev. 1, 30–31 (2014)). In response, Defendant emphasizes that the purpose of the regulation is to conserve and maximize the use of PRC funds, "not the funds of third-party payers" and that the Tribe could have coordinated benefits as the Redding Rancheria Tribe did in order to pay the lowest rate possible, either the MLR or BCBSM's negotiated rate. ECF No. 201 at PageID.12714–15.

The ISDEAA expanded the Tribe's authority to expand the number of programs it manages with less oversight from the federal government and with greater flexibility. The Tribe is given the authority to create and manage the program in a way it sees fit—whether that results in savings or additional expenditures. As the Redding Rancheria Tribe demonstrated, it is possible to obtain the lower cost of either the MLR or BCBSM's negotiated rates. It simply requires a different process than the one created by the Tribe to manage its PRC Program. Plaintiffs have not demonstrated a clear error of law and their Motion to Alter or Amend Judgment will be denied.

**III.**

Accordingly, it is **ORDERED** that Plaintiffs' Motion to Alter or Amend Judgment, ECF No. 199, is **DENIED**.

Dated: February 1, 2021                              s/Thomas L. Ludington
                                                     THOMAS L. LUDINGTON
                                                     United States District Judge