# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: April 25, 2022

Mr. Phillip J. DeRosier
Dickinson Wright
500 Woodward Avenue, Suite 4000
Detroit, MI 48226-3425

Ms. Tacy Fletcher Flint
Ms. Abigail Behr Molitor
Ms. Rebecca B. Shafer
Sidley Austin
One S. Dearborn Street
Chicago, IL 60603

Mr. Herman Daniel Hofman
Mr. Perrin Rynders
Varnum
P.O. Box 352
Grand Rapids, MI 49501-0352

Mr. James Nichols
Jacobson, Magnuson, Anderson & Halloran
180 E. Fifth Street
Suite 940
St. Paul, MN 55101

Re:   Case No. 21-1226, *Saginaw Chippewa Indian Tribe, et al v. BCBS of Mich.*
      Originating Case No. : 1:16-cv-10317

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0079p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SAGINAW CHIPPEWA INDIAN TRIBE OF MICHIGAN;
WELFARE BENEFIT PLAN,

     *Plaintiffs-Appellants*,

  *v.*

BLUE CROSS BLUE SHIELD OF MICHIGAN,

     *Defendant-Appellee.*

No. 21-1226

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:16-cv-10317—Thomas L. Ludington, District Judge.

Argued: October 26, 2021

Decided and Filed: April 25, 2022

Before ROGERS, STRANCH, and DONALD, Circuit Judges.

---

## COUNSEL

**ARGUED:** Perrin Rynders, VARNUM LLP, Grand Rapids, Michigan, for Appellants. Tacy F. Flint, SIDLEY AUSTIN LLP, Chicago, Illinois, for Appellee. **ON BRIEF:** Perrin Rynders, Herman D. Hofman, VARNUM LLP, Grand Rapids, Michigan, for Appellants. Tacy F. Flint, Abigail B. Molitor, Rebecca B. Shafer, SIDLEY AUSTIN LLP, Chicago, Illinois, for Appellee. James K. Nichols, THE JACOBSON, LAW GROUP, Saint Paul, Minnesota, for Amici Curiae.

  STRANCH, J., delivered the opinion of the court in which DONALD, J., joined. ROGERS, J. (pp. 21–26), delivered a separate opinion joining in Parts I and II, except Part II.B, of the majority opinion, and in the judgment for the reasons stated in his opinion.

No. 21-1226                    *Saginaw Chippewa Indian Tribe, et*                    Page 2
                               *al. v. Blue Cross Blue Shield of Mich.*

————————————

## OPINION

————————————

JANE B. STRANCH, Circuit Judge. The Saginaw Chippewa Indian Tribe and its Benefit Plan brought federal and common law claims against Blue Cross Blue Shield of Michigan (BCBSM or Blue Cross) for failing to fulfill its fiduciary duties in administering tribal health insurance plans. When we first encountered this dispute three years ago, we reversed the district court's dismissal of the Tribe's claims based on Blue Cross's alleged failure to insist on "Medicare-like rates" for care authorized by the Tribe's Contract Health Services[1] program and provided to tribal members by Medicare-participating hospitals. On remand, the district court granted summary judgment to Blue Cross, concluding that the Tribe's payments for qualified CHS care through the Blue Cross plans were not eligible for Medicare-like rates. The district court interpreted the relevant federal regulations as limiting the requirement of Medicare-like rates to payments for care that was authorized by CHS, provided to tribal members by Medicare-participating hospitals, and directly paid for with CHS funds. Based on the plain wording of the applicable regulations, we REVERSE and REMAND the case to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Federal Law Regulating Tribal Healthcare Plans

The two health insurance plans at the heart of this appeal—both authorized by the Saginaw Chippewa Indian Tribe and administered by Blue Cross Blue Shield of Michigan—sit against a backdrop of federal law providing for American Indian healthcare. Persons of American Indian descent have access to federally funded healthcare through the Indian Health Service (IHS), an agency within the Department of Health and Human Services. IHS funds and

---

[1] The Consolidated Appropriation Act of 2014 renamed the Contract Health Services program "the Purchased/Referred Care program" (PRC). *See Purchased/Referred Care (PRC)*, Indian Health Service (June 2016), https://www.ihs.gov/newsroom/factsheets/purchasedreferredcare/. Because the lower court and parties use the terms "CHS" and "Contract Health Services," we have also adopted that terminology for this opinion.

operates direct healthcare facilities for tribes and funds Contract Health Services (CHS) programs. *See* 25 U.S.C. §§ 1603(5), (12); 42 C.F.R. § 136.23.

CHS programs are "health services provided at the expense of the Indian Health Service from public or private medical or hospital facilities other than those of the [Indian Health] Service," 42 C.F.R. § 136.21. CHS care is provided "when necessary health services by an Indian Health Service facility are not reasonably accessible or available." *Id.* § 136.23(a). Federal regulations require pre-approval for CHS care:

> In nonemergency cases, a sick or disabled Indian, an individual or agency acting on behalf of the Indian, or the medical care provider shall, prior to the provision of medical care and services notify the appropriate ordering official of the need for services and supply information that the ordering official deems necessary to determine the relative medical need for the services and the individual's eligibility.

42 C.F.R. § 136.24(b). After the ordering official approves an eligible individual for CHS care, the CHS program issues a purchase order to the medical-care provider authorizing the eligible individual to receive the specific medical services described on that order. *Id.* § 136.24(a).

The federal government does not act alone in this endeavor to provide healthcare to American Indians. The tribes themselves play a vital role in managing, funding, and providing healthcare to their members. In recognition of "the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of . . . Federal services to Indian communities," 25 U.S.C. § 5302, Congress enacted the Indian Self-Determination and Education Assistance Act of 1975, *id.* § 5301, *et seq.* To promote the "orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services," *id.* § 5302(b), the law empowers tribes to enter self-determination contracts with the federal government, *id.* § 5321(a)(1). These contracts shift the federal government's role from direct service provider to funder of tribal organizations that will administer and organize the necessary services. *See FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995). Tribes can manage and staff

their own IHS facilities, contract with private insurers for tribal healthcare coverage, and operate their own CHS programs for eligible American Indians.

This framework, however, has not always ensured that healthcare is accessible or fully funded for those of American Indian descent. "The provision of health care for American Indians has historically been, and remains, plagued by chronic funding shortages and ineffective provision of services." *Rancheria v. Hargan*, 296 F. Supp. 3d 256, 259 (D.D.C. 2017). To combat financial constraints, IHS health programs—whether operated by the IHS itself or a tribe—are "the payer of last resort" for healthcare costs. 25 U.S.C. § 1623 ("Health programs operated by the Indian Health Service, Indian tribes, tribal organizations, and Urban Indian organizations . . . shall be the payer of last resort for services provided by such Service, tribes, or organizations to individuals eligible for services through such programs. . . ."). Therefore, Medicare, Medicaid, or private insurance must pay before IHS reimbursement is available. 42 C.F.R. § 136.30; *see also* 42 C.F.R. § 136.61 (defining these funding sources as "alternate resources").

CHS funding has faced particularly significant financial constraints, which amendments to federal law and regulation have sought to address. *See Section 506 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003—Limitation on Charges for Services Furnished by Medicare Participating Inpatient Hospitals to Indians*, 71 Fed. Reg. 25124, 25125 (Apr. 28, 2006) ("[H]istorically, purchase orders for CHS services have been for amounts at full billed charges that substantially exceeded the Medicare allowable rates and this problem could recur in the future."). The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 authorized the Secretary of the Department of Health and Human Services to demand Medicare pricing from hospitals providing services to tribes through the CHS program. Pub. L. No. 108–173. Specifically, the law inserted a new subparagraph into 42 U.S.C. § 1395cc requiring Medicare-participating hospitals that agree to provide medical care "under the contract health services program funded by the Indian Health Service and operated by the Indian Health Service, an Indian tribe, or tribal organization" to accept Medicare-like rates (MLR) as payment. 42 U.S.C. § 1395cc(a)(1)(U)(i). The law instructed the Secretary to publish rules implementing this new language. *Id.* § 1395cc(a)(1)(U). Accordingly, the Indian Health

Service issued a final rule on June 4, 2007, which was codified in relevant part at 42 C.F.R. § 136.30. *See Section 506 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003—Limitation of Charges for Services Furnished by Medicare Participating Inpatient Hospitals to Individuals Eligible for Care Purchased by the Indian Health Programs*, 72 Fed. Reg. 30706 (June 4, 2007).

These federal regulations set a ceiling on payments that Medicare-participating hospitals receive for CHS care "authorized by IHS, Tribal, and urban Indian organization entities." 42 C.F.R. § 136.30(a). Providers must accept Medicare-like rates as payment for "all levels of care furnished by a Medicare-participating hospital . . . that is authorized under part 136, subpart C by a contract health service program of the Indian Health Service (IHS)[ ] or authorized by a Tribe or Tribal organization carrying out a CHS program of the IHS. " *Id.* § 136.30(b).

The MLR regulations extend payor-of-last-resort status to include an "I/T/U" that "has authorized payment for items and services provided to an individual who is eligible for benefits under Medicare, Medicaid, or another third party payor." 42 C.F.R. § 136.30(g). An I/T/U is an IHS contract health service program, a "Tribe or Tribal organization carrying out a CHS program of the IHS under the Indian Self-Determination and Education Assistance Act," or "an urban Indian organization." *Id.* § 136.30(b).

These regulations further identify the steps that an eligible tribal member must take to get CHS care and cause the provider to accept a Medicare-like rate for that care. In most situations, there must be notification of the proposed CHS care to "the appropriate ordering official" to determine the individual's eligibility and the necessity of the care. *Id.* § 136.24(b). MLR payment for CHS is allowed only after the ordering official receives this notice and issues a purchase order to the medical care provider. *Id.* § 136.24(a).

## B.  The Tribe's Contract Health Services Program

The Saginaw Chippewa Indian Tribe of Michigan is a federally recognized Indian Tribe. The Tribe administers a CHS program under the Indian Self-Determination and Education Assistance Act using IHS and tribal funds. Pursuant to federal regulations, the Tribe requires individuals requesting CHS care to (1) show that they are a member of a federally recognized

Indian tribe or a direct descendant of the Saginaw Chippewa Indian Tribe and (2) show proof of residency in one of the five counties that the Tribe's program covers. The Tribe explained to the district court:

> [i]f the patient met the above criteria and the CHS program determined that the medical services being sought were deemed necessary, the Tribe's CHS program (as the "ordering official") issued a "purchase order" or "referral," authorizing the service in accordance with 42 C.F.R. 136.24(a). The patient was then required to present the purchase order/referral from the CHS program to the provider at the time of service.

(R. 177, Plaintiffs' Response in Opp. to Summary Judgment, PageID 10832) The Tribe did not inform Blue Cross which employees covered under its self-funded health insurance plan for employees were members eligible for the CHS program. However, the Tribe asserts that its CHS program provided referrals authorizing the care for all claims at issue in this case.

### C. The Tribe's Contracts with Blue Cross Blue Shield of Michigan

In 2002, the Tribe contracted to have Blue Cross administer a self-funded health insurance policy for Tribe members (the "Member Plan"). Under the Administrative Services Contract (ASC), Blue Cross would receive a fee for its administrative work, including submitting healthcare claims, while the Tribe would pay directly for the healthcare services. Only enrolled members of the Saginaw Chippewa Tribe were eligible to participate in the Member Plan. In 2004, the Tribe executed another ASC with Blue Cross, this time for a self-funded plan for tribal employees (the "Employee Plan"). The Employee Plan covered Tribe employees regardless of their tribal membership status.

The administrative service contracts had substantially similar terms. The Member Plan ASC and the Employee Plan ASC both provided that Blue Cross "shall administer Enrollees' health care Coverage(s) in accordance with BCBSM's standard operating procedures for comparable coverage(s) offered under a BCBSM underwritten program, any operating manual provided to the Group, and this Contract." (R. 79-3, Admin. Servs. Contract, PageID 3163) The contracts limited Blue Cross's responsibilities "to providing administrative services for the processing and payment of claims." (*Id.*, PageID 3163) Blue Cross and the Tribe stated in their contracts that, to the extent ERISA applies, Blue Cross was "neither the Plan Administrator, the

Plan Sponsor, nor a named fiduciary of the Group's health care program under ERISA."[2]  (*Id.*, PageID 3163–64)

As our court explained in the earlier appeal in this case, the Employee and Member Plans were separate and had separate funding sources.  *Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich.*, 748 F. App'x 12, 15 (6th Cir. 2018).  The Tribe originally funded the Member Plan with its Government Trust and later transitioned the funding to the Tribe's Gaming Trust.  The Tribe used its Fringe Internal Service Fund to fund its Employee Plan.  Over 98% of the Fringe Trust funds came from the Tribe's gaming revenue.  Jacqueline Reger, the Tribal Controller, explained in a 2019 deposition that the Tribe's ledgers kept IHS funds "completely separate from anything used to fund the employee plan or the member plan." (R. 173-4, Reger Depo. Excerpts, PageID 8985)  The Tribe allocated its IHS funds "specifically to the clinic and its needed resources to run efficiently and then behavioral health to run efficiently."  (R. 79-22, Reger Depo., PageID 3631)

### D.  Procedural History

The Tribe sued Blue Cross in January 2016.  Its amended complaint alleges that Blue Cross charged hidden fees, overstated the cost of medical services, and violated its fiduciary duties under ERISA by not demanding MLR from medical providers for eligible costs.  The Tribe alleges that BCBSM knew that it was supposed to pay MLR to hospitals participating in Medicare, but instead chose to pay standard contractual rates for MLR-eligible services using Plan assets.  According to the Tribe, Blue Cross's failure to insist on MLR from providers cost the Tribe millions of dollars.

In April 2016, the district court granted in part Blue Cross's motion to dismiss the Tribe's first amended complaint, concluding that the MLR regulations do not create a substantive fiduciary duty under ERISA.  Accordingly, it dismissed the Tribe's counts alleging state and

---

[2]We note ERISA fiduciaries cannot contract away their fiduciary status.  *See* 29 U.S.C. 1110; *Phahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 836 (6th Cir. 2007).  "The word 'named' in this provision leaves open the possibility that [Blue Cross] may be an unnamed fiduciary" because ERISA draws a distinction "between a 'named fiduciary,' under 29 U.S.C. § 1102(a), and a 'fiduciary' under 29 U.S.C. § 1002(21)(A)," with "[n]amed fiduciaries [as] a subset of fiduciaries."  *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1419 (9th Cir. 1997).

federal claims based on Blue Cross's failure to seek MLR.  A year later, the Tribe and Blue Cross each moved for partial summary judgment.  In granting both motions in part, the district court concluded that the Member and Employee Plans were separate for purposes of its ERISA analysis.  The district court also ruled that ERISA is inapplicable to the Member Plan.

On appeal, we reversed the district court's dismissal of the Tribe's MLR claims.  We concluded that the Tribe's allegations that Blue Cross's failure to take advantage of MLR for eligible claims violated its fiduciary duties was sufficient to state an ERISA claim.  *Saginaw Chippewa Indian Tribe of Mich.*, 748 F. App'x at 21.  Our court rejected Blue Cross's argument that "its administration of the Tribe's plan simply is not subject to the MLR regulations" because those regulations "apply only to the expenditure of IHS funds," explaining that:

> Although BCBSM asserts that the Tribe's MLR claim therefore fails as a matter of law, BCBSM's argument is better understood as contending that the Tribe cannot show as a factual matter, that the regulations apply to its ERISA plan.  But since the Tribe has alleged that the BCBSM was aware of the MLR regulations, that BCBSM failed to ensure that the Tribe paid no more than MLR for MLR-eligible services, and that all other conditions precedent to the MLR claim were met, the Tribe has sufficiently pleaded that the MLR regulations are applicable to BCBSM's administration of the Tribe's ERISA plan.  We emphasize that we express no opinion on the ultimate merits of the Tribe's MLR claim, and we hold only that it would be premature to dismiss the Tribe's claim at this stage of the proceedings.

*Id.* at 21–22.  We affirmed the district court's conclusions that the healthcare plans were separate and that ERISA is inapplicable to the Member Plan.  *Id.* at 19.

On January 4, 2019, the district court entered a stipulated order reinstating the Tribe's three MLR claims.  Count I alleges that Blue Cross breached its fiduciary duty pursuant to ERISA by "[p]aying excess claim amounts to Medicare-participating hospitals for services authorized by a tribe or tribal organization carrying out a CHS program."  Count IV alleges that the Tribe is a "health care insurer" pursuant to the Michigan Health Care False Claims Act and that Blue Cross violated the act by not seeking the Medicare-like rate for MLR-eligible claims under the Member Plan.  Count VI alleges that Blue Cross breached its common law fiduciary duty under the Member Plan by not seeking MLR for MLR-eligible claims.

After discovery, Blue Cross moved for summary judgment. The district court granted the motion, concluding that the insurer had no duty to seek MLR under either plan because "MLR is only applicable for those services funded by CHS" and "BCBSM was not authorized nor did it pay for services using funds from CHS." The district court denied the Tribe's motion to alter or amend the judgment. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

We review a district court's grant of summary judgment de novo. *Carter v. Univ. of Toledo*, 349 F.3d 269 (6th Cir. 2003). Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Courts must consider the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so-one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### B. Contract Health Services and Medicare-Like Rates

The Tribe's three MLR claims—breach of a fiduciary duty under ERISA, violation of the Michigan Health Care False Claim Act, and breach of a fiduciary duty under common law—are premised on the argument that Blue Cross, in administering both the Employee and Member Plans, should have demanded Medicare-like rates for CHS care provided to eligible Tribe members at Medicare-participating hospitals and pre-authorized by the Tribe's CHS program. The primary question on appeal, therefore, is whether Medicare-like rates were even available for services authorized by the Tribe's CHS program and billed through the Blue Cross plans. The district court granted Blue Cross summary judgment on these claims based on its determination that the regulation defining the applicability of Medicare-like rates does not extend those rates to payments made through insurance plans like the Member and Employee Plans. Instead, Medicare-like rates apply only to CHS-funded services. The district court reached this

conclusion through its interpretation of some regulatory history, a few IHS guidance documents, and analysis of select district court cases.

We start at a different point because courts "begin [their] interpretation of the regulation with its text." *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016). "[A] fundamental canon of statutory construction is that 'when interpreting statutes, the language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear.'" *Thompson v. Greenwood*, 507 F.3d 416, 419 (6th Cir. 2007) (quoting *United States v. Boucha*, 236 F.3d 768, 774 (6th Cir. 2001)). The same logic applies to interpretation of regulatory language. *See Kisor v. Wilke*, 139 S. Ct. 2400, 2414 (2019). We therefore deploy the standard tools of interpretation. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 688–69 (2007) (invoking the canon against surplusage in the interpretation of regulatory language); *Long Island Care Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007) (using the canon that the specific controls the general in construing regulatory language). If a regulation's meaning is plain, the court must give the "it effect, as the court would any law," *Kisor*, 139 S. Ct. at 2415, and the court's inquiry into the regulatory meaning is over, *In re Laurain*, 113 F.3d 595, 597 (6th Cir. 1997); *cf. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020). We may look to agency guidance if the language is ambiguous, but typically, "before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Kisor*, 139 S. Ct. at 2415 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).

The disputed regulatory language concerns § 136.30, which sets a ceiling on the payments that Medicare-participating hospitals can receive for authorized CHS care. These hospitals must accept Medicare-like rates as payment in full for:

> all levels of care . . . that is authorized under part 136, subpart C by a contract health service (CHS) program of the Indian Health Service (IHS); **or authorized by a Tribe or Tribal organization carrying out a CHS program of the IHS under the Indian Self-Determination and Education Assistance Act,** as amended, Pub. L. 93–638, 25 U.S.C. 450 *et seq.*; or authorized for purchase under § 136.31 by an urban Indian organization (as that term is defined in 25 U.S.C. 1603(h)) (hereafter "I/T/U").

*Id.* § 136.30(b) (emphasis added).  In short, our concern is with "care . . . that is authorized by a Tribe or Tribal organization carrying out a CHS program."  *Id.*  Subsections (c) and (d) explain the reimbursement calculation in relation to the Medicare reimbursement rate.  *Id.* § 136.30(c)–(d).

Although the parties parse various parts of the regulatory language, the focus of our analysis is on what it means for a Tribe to be "carrying out a CHS program of the IHS." According to the Tribe, this language unambiguously does not require the use of CHS or IHS *funds* for authorized care to qualify for the Medicare-like rate.  The Tribe's construction of § 136.30 identifies only two preconditions to the application of MLR: "(1) the healthcare provider's participation in Medicare; and (2) authorization by a Tribe or Tribal organization carrying out a CHS program."  The Amici—a group consisting of American Indian Tribes, tribal organizations, and Shasta Administrative Services[3]—offer a similar reading, arguing that a tribe's CHS program could be entirely separate from the healthcare plan paying for the MLR-eligible service as long as the tribe operates a CHS program as well.  Ultimately, both argue that it is the authorization from the Tribe's CHS program for the CHS care that triggers the availability of Medicare-like rates under the regulatory language.

In contrast, Blue Cross insists that the regulation unambiguously requires payment from tribal CHS funds for MLR discounts to apply.  Blue Cross points to subsections (e), (f), and (g), which discuss how MLR payments to Medicare-participating hospitals are calculated.

---

[3]The Amici are Agua Caliente Band of Cahuilla Indians, Alaska Native Health Board, Bois Forte Band of Chippewa Indians, Chickasaw Nation, Chippewa Cree Tribe of the Rocky Boy Reservation, Chitimacha Tribe of Louisiana, Choctaw Nation, Coquille Indian Tribe, Eastern Band of Cherokee Indians, Gila River Indian Community, Grand Traverse Band of Ottawa and Chippewa Indians, Hopi Tribe, Jamestown S'Klallam Tribe, Keweenaw Bay Indian Community, Lower Sioux Indian Community, Mashantucket Pequot Tribal Nation, Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan, Menominee Indian Tribe of Wisconsin, Miami Tribe of Oklahoma, Midwest Alliance of Sovereign Tribes, Mississippi Band of Choctaw Indians, Mohegan Tribe of Indians of Connecticut, National Congress of American Indians, National Indian Health Board, Nisqually Indian Tribe, Northwest Portland Area Indian Health Board, Nottawaseppi Huron Band of the Potawatomi, Oneida Nation, Pechanga Band of Luiseño Indians, Poarch Band of Creek Indians, Prairie Island Indian Community, Puyallup Tribe of Indians, Redding Rancheria, Saint Regis Mohawk Tribe, Salt River Pima-Maricopa Indian Community, San Pasqual Band of Mission Indians, Santa Rosa Rancheria Tachi Yokut Tribe, Santa Ynez Band of Chumash Mission Indians, Sault Ste. Marie Tribe of Chippewa Indians, Seminole Tribe of Florida, Shasta Administrative Services, Suquamish Tribe, Swinomish Indian Tribal Community, Table Mountain Rancheria, Tohono O'odham Nation, United South and Eastern Tribes Sovereignty Protection Fund, Ute Mountain Ute Tribe, and Winnebago Tribe of Nebraska.

*See* 42 C.F.R. § 136.30(e) ("The calculation of payment by I/T/Us will be based on determinations under paragraphs (c) and (d) . . . ."); *id.* § 136.30(f) ("[I]f an amount has been negotiated with the hospital or its agent by the I/T/U, the I/T/U will pay the lesser of" the amount determined under subsection (e) or the negotiated amount.); *id.* § 136.30(g)(1)("The I/T/U shall be the payor of last resort under § 136.61 . . . ."). Blue Cross argues that in these subsections, a "Tribe or Tribal organization carrying out a CHS program" is always the payor and concludes that this means it must be the Tribe's CHS program that actually provides the money for CHS services.

Neither argument provides a satisfactory answer as neither approach clearly defines "carrying out." Implicitly, the Tribe argues that a "Tribe or Tribal organization carrying out a CHS program" is satisfied whenever there is authorization by the CHS program. In contrast, Blue Cross asserts that "carrying out" a CHS program must entail the use of that program's funds, but it offers no case law or other evidence to support that "carrying out" is typically construed that way. Neither the Tribe nor Blue Cross explains how they reached these constructions.

The proper beginning point is the text of the regulation. We apply the traditional tools of construction to decipher the meaning of the regulation. We first examine definitions of "carrying out." The term is undefined in the regulation. As with statutory language, we therefore must "give the term its ordinary meaning." *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The Oxford English Dictionary offers as a relevant definition of "carry out": "To bring (something) to completion or fruition; to bring to a conclusion" and "to put (something) into action or practice; to cause (something) to be implemented; to undertake." *To carry out*, *Oxford English Dictionary*, https://www.oed.com/view/Entry/28252?rskey =kjPfNF&result=1&isAdvanced=false#eid1333136834 (last visited Apr. 20, 2022). Merriam-Webster provides a similar entry, defining to "carry out" as "to put into execution" or "to bring to a successful issue." *Carry out*, *Merriam-Webster's Unabridged Dictionary*, https://unabridged.merriam-webster.com/unabridged/carry%20out (last visited Apr. 20, 2022). Notably, neither definition suggests that "executing" or "undertaking" something requires the expenditure of funds, as the district court did in construing § 136.30(b). Instead, "a Tribe or

Tribal organization carrying out a CHS program" may be a Tribe taking actions to implement its CHS program, whether through authorizing care or expending funds allocated from the IHS.

A comparison to the first clause in § 136.30(b) is instructive. The regulatory language states that MLR will apply to care "authorized . . . by a contract health service (CHS) program of the Indian Health Service." 42 C.F.R. § 136.30(b) In contrast, the second and disputed clause—"a Tribe or tribal organization carrying out a CHS program of the IHS"—does not mirror this language emphasizing the direct role of the CHS program. *Id.* Instead of stating that the authorizing authority is a "CHS program of a Tribe or tribal organization" in keeping with the pattern of the first clause, the language states that the authorizing group is a "Tribe or tribal organization." *Id.* "[C]arrying out a CHS program" is employed as a descriptor of the tribe or tribal organization. *Id.* "When an agency includes a requirement in only one section of a regulation, we presume the exclusion from the remainder of the regulation to be intentional." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). Other provisions in 42 C.F.R. § 136.30 undermine a reading that CHS funds are necessary to receiving Medicare-like rates. The payment methodology sections refer to "payment[s] by I/T/Us" and what an I/T/U shall pay, rather than what CHS program funds or a Tribal CHS program itself must pay. *Id.* § 136.30(e). Given that the regulation makes a "*Tribal or Tribal organization*" the primary actor, rather than the Tribe's CHS program itself, a direct tie to the CHS program—such as the exclusive use of funds earmarked for CHS expenses—is not required.

The statutory authority on which the regulation rests does not challenge this construction. The Medicare Modernization Act requires Medicare-participating hospitals to participate in "the contract health services program funded by the Indian Health Service and operated by the Indian Health Service, an Indian Tribe, or tribal organization" and accept Medicare-like rates as payment for "items and services that are covered under such program and furnished to an individual eligible for such items and services under such program." 42 U.S.C. § 1395cc(a)(1)(U)(i). The language identifies the Contract Health Services program as "funded by the Indian Health Service," but it does not predicate the eligibility for Medicare-like rates on a Tribe or its CHS program using IHS funds. Within the greater framework of American Indian healthcare, this makes good sense. Federal law authorizes tribes to go beyond IHS funding to

cover CHS care.  *See, e.g.*, 25 U.S.C. § 1621f(a)(1) (allowing the use of other sources of income for coverage of contract health services); 25 U.S.C. § 1641(d)(2)(A) (permitting tribes to use Medicare and Medicaid income for "coverage for a service or service [sic] within a contract health service delivery area"); 25 U.S.C. § 5325(m) (authorizing tribes to use income earned through a self-determination contract "to further the general purposes of the contract").

An "authorization" trigger also fits within the regulatory regime more obviously than a CHS funding requirement.  Federal regulations contemplate that a tribe's CHS program might authorize a service before determining the source of payment for that service.  The CHS program is a payor of last resort, meaning that a provider must exhaust alternative sources of payment before the CHS program is required to pay.  25 U.S.C. § 1623(b); 42 C.F.R. § 136.61.  As the Amici point out, an authorization trigger for MLR allows tribes to coordinate benefits to conserve tribal funds.  If private health insurance covers only part of the cost of CHS authorized care, for example, regulations require the tribe to pay only for the remaining amount.  42 C.F.R. § 136.30(g)(2).  With self-funded plans like those at issue here, an MLR cap helps preserve tribal assets and, ultimately, CHS funds.[4]

The district court's conclusion that the regulatory language mandates use of CHS funds was in error.  Instead, "carrying out," understood within the context of the regulation, the statute, and ordinary meaning, means that the Tribe or Tribal organization must be authorizing the care in furtherance of its Contract Health Services program.

Although arguing that the plain language of the regulation supports its interpretation, Blue Cross also relies on selected parts of guidance documents that it argues support its narrower

---

[4]The concurring opinion asserts that the Tribe's counsel argued in rebuttal that the Tribe sought MLR pricing only "for care for tribal members, authorized by CHS, *and paid for from a bucket of funding that included some CHS dollars*."  Conc. at 24 (emphasis added).  That is not the only plausible interpretation of counsel's argument.  The Tribe's counsel explained that the money given to Blue Cross for the claims at issue "came from [his] client for the CHS program," which could mean that the Tribe was allocating its funds—regardless of source—to pay for CHS care, not necessarily that there was funding earmarked as "CHS dollars."  Oral Argument at 1:11:40.  The Tribe's counsel stated that these were "tribal funds related to the CHS program," which included some federal funding.  *Id.* at 1:04:30; *see also id.* 1:02:45 ("Because our source of funding is not other than CHS funds.  CHS takes advantage of one of these trusts that was set up by the tribe to pay for services for their members.  The CHS program exists to provide purchased referred care. . . . And we pay for it out of these trust funds that have been established by the tribe, which include federal dollars.  They're not exclusively federal dollars but they include federal dollars.").

reading of "a Tribe or Tribal organization carrying out a CHS program." In particular, Blue Cross emphasizes the IHS's answers in a 2008 "FAQ" document that address a connection between CHS funds and the MLR payments. Under a section on Contract Health Services, question 10 of the 2008 FAQ states:

> **We use Third Party funds to pay costs for certain members who <u>do not qualify</u> for CHS funding. Do the Medicare-like rates apply to these services?**
>
> No. Medicare-like rates only apply for services payable through the CHS program, for individuals who are eligible for CHS coverage, as defined by 42 CFR Part 136.

(R. 173-27, CHS Services FAQs, PageID 9276) A later question explains that the services "payable at Medicare-like rates . . . must be provided to a CHS eligible individual and paid by an IHS or tribal CHS program or by an Urban Indian program." (*Id.*, PageID 9278)

As a threshold matter, because we conclude that the plain meaning of the regulatory language does not impose a requirement for the exclusive use of CHS funds for MLR payment eligibility, we need not consider agency guidance. However, it is worth noting that the agency guidance is not as clear cut as Blue Cross claims.

Indeed, some of the 2008 FAQs support the Tribe's argument. FAQ No. 17 explains that if a tribe uses tribal funds to pay for patients outside its designated area, it may still pay Medicare-like rates "as long as they meet CHS eligibility requirements within the regulations and services are authorized by the CHS program." (R. 173-27, PageID 9277) Similarly, FAQ No. 28 states that a local hospital must accept MLR "if the local hospital is a Medicare participating hospital and if [the Tribal] CHS program has authorized payment for the services." (*Id.*, PageID 9278) The FAQ states that the CHS program must "authorize" the payment, but it does not state that the payment must come directly from the CHS program itself. Other FAQ answers follow this pattern of explaining that Medicare-like rates apply as long as the individual seeking treatment is eligible for CHS and the CHS program authorizes the care. These guidance documents do not provide a definitive answer, nor can they overcome the plain language of the regulation.

We offer a final word about the reach of this holding. One of the healthcare plans at issue in this case, the Employee Plan, covers Tribal employees regardless of whether they are members of the Saginaw Chippewa Indian Tribe. Our holding should not be construed as saying that MLR is available for care to all Employee Plan participants. The plain language of § 136.30 does not extend MLR to those non-tribal employees simply because other participants in that healthcare plan are eligible for CHS care. Nor is MLR available for all care that a Tribe or Tribal organization authorizes. Instead, as discussed above, that authorized care must be limited to care involved in "carrying out a CHS program." Put simply, MLR payments are available only for authorized CHS care. "Authorization" carries a specific meaning in the regulatory language, *see* 42 C.F.R. § 136.24. Care is "authorized" only after the medical care provider "notif[ies] the appropriate ordering official of the need for services" and gives "information necessary to determine the relative medical need for the services and the individual's eligibility." *Id.* § 136.24(b). Eligibility, in turn, is determined according to 42 C.F.R. § 136.12. Those eligible for IHS programs—including CHS care—are "persons of Indian descent belonging to the Indian community serviced by the local facilities and program," usually shown through evidence that an individual is "regarded as an Indian by the community," such as tribal membership, enrollment, ownership of tribal property, and participation in tribal affairs. *Id.* § 136.12(a). Also covered are non-Indian women who are pregnant with "an eligible Indian's child" during their pregnancies and postpartum periods and "non-Indian members of an eligible Indian's household" if deemed "necessary to control acute infectious disease or a public health hazard." *Id.* These related sections limit the availability of MLR only to healthcare services provided to eligible individuals with the requisite authorization. Even if it may be administratively difficult to parse out those eligible for such rates under the Employee Plan, the plain regulatory language requires it. Although the parties' briefing was not a model of clarity on this point, the Tribe explained at oral argument that it does not and cannot seek MLR for non-member employees. *See, e.g.,* Oral Argument at 14:32. Our opinion is consistent with that limitation.

We offer a final note on the parties' debate over the role of the Indian canon of construction. The Supreme Court has instructed that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v.*

*Blackfeet Tribe*, 471 U.S. 759, 766 (1985). The canon is also embodied in the Indian Self-Determination and Education Assistance Act of 1975, which instructs that all provisions of the statute and agreements entered under it are to "be liberally construed for the benefit of the Indian Tribe" and "any ambiguity shall be resolved in favor of the Indian Tribe." 25 U.S.C. §§ 5321(g), 5324(b), 5392(f). The circuits are split on whether and how the Indian canon of construction applies to regulatory interpretation. *Compare Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1462 (10th Cir. 1997) ("[T]he canon of construction favoring Native Americans controls over the more general rule of deference to agency interpretations of ambiguous statutes.") *and Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 144–45 (D.C. Cir. 1988), *cert. denied*, 488 U.S. 1010 (1989) (construing legislation in favor of a tribe rather than adopt an agency's interpretation), *with Haynes v. United States*, 891 F.2d 235, 239 (9th Cir. 1989) (applying *Chevron* deference over the canon favoring native tribes). We have not clarified how this "directive to favor tribes" is prioritized with respect to other canons of statutory or regulatory authority. *Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 921 (6th Cir. 2009). We have explained, though, that "[t]he force of this interpretative canon can be overcome only when 'other circumstances evidencing congressional intent' demonstrate that 'the statute is "fairly capable" of two interpretations . . . [or] that the [conflicting] interpretation is fairly "possible."'" *Grand Traverse Band of Ottawa & Chippewa Indians v. Off. of U.S. Atty. for W. Div. of Mich.*, 369 F.3d 960, 971 (6th Cir. 2004) (alterations in original) (quoting *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001)). Given that the plain language of the regulation controls our construction, we need not rely on the Indian canon of construction to conclude that the regulatory language plainly favors the Tribe's interpretation that no CHS funding requirement exists.

## C. The Remaining Legal and Factual Disputes

Our conclusion that the district court erred in reading into the regulatory text a requirement that the Tribe use CHS funds to pay for MLR-eligible care does not resolve this appeal. Blue Cross argues that there are several alternative grounds on which we should affirm the district court's judgment. We group these arguments according to relevant issue.

In the prior appeal in this case, we recognized that the Tribe had stated a fiduciary duty claim under ERISA against Blue Cross regarding the Employee Plan and a common law fiduciary duty claim for the Member Plan. ERISA was enacted "to protect contractually defined benefits," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989), and creates a fiduciary relationship between the plan provider and the insured group. Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). "An ERISA fiduciary must discharge his responsibility 'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble v. Edison Inst.*, 135 S. Ct. 1823, 128 (2015) (citations omitted). This duty "derive[s] from the common law of trusts." *Id.*

Three primary duties attach to fiduciaries: "(1) the duty of loyalty, which requires 'all decisions regarding an ERISA plan . . . be made with an eye single to the interests of the participants and beneficiaries'; (2) the 'prudent person fiduciary obligation,' which requires a plan fiduciary to act with the 'care, skill, prudence, and diligence of a prudent person acting under similar circumstances,' and (3) the exclusive benefit rule, which requires a fiduciary to 'act for the exclusive purpose of providing benefits to plan participants.'" *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 867 (6th Cir. 2013) (omission in original) (quoting *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 349, 448–49 (6th Cir. 2002)). Our prior decision explained that "[f]ailing to preserve assets can be actionable under ERISA," which the Tribe had alleged. *Saginaw Chippewa Indian Tribe of Mich.*, 748 F. App'x at 20–21 (citing *DeLuca v. Blue Cross Blue Shield of Mich.*, 628 F.3d 743, 747–48 (6th Cir. 2010)).

Although Blue Cross may have violated a fiduciary duty in failing to seek MLR, significant questions of law and material fact remain as to whether Blue Cross's decision not to seek MLR amounted to "failing to preserve assets" of the Member and Employee Plans or a breach of its other fiduciary duties. Blue Cross asserts that its actions merely amounted to adherence to the terms of the Member and Employee Plans' contracts, which it argues means

there was no fiduciary act. Similarly, Blue Cross raises factual issues—such as "it lacked the necessary information to pursue MLR for any Employee Plan claims"—that it asserts show it could not have breached a fiduciary duty. The district court did not address this issue in the first instance, and the record before us suggests that the analysis of how the Administrative Services Contract defined Blue Cross's duties, what information was necessary for Blue Cross to insist on Medicare-like rates, and which party had the responsibility to seek or provide that information is best accomplished below.

Similar disputes of law and material fact as to whether Blue Cross violated the Michigan Health Care False Claim Act (HCFCA) exist. The district court did not fully consider whether Blue Cross is or could be liable under the HCFCA because it concluded that Blue Cross had no obligation to seek MLR under the Member and Employee Plans. Blue Cross and the Tribe dispute whether Blue Cross "presented" false claims as required under the Act or whether the claims were even false. Again, the district court did not address this issue, and a remand is necessary for the district court to consider it in the first instance.

A final dispute of material fact exists as to the application of statutes of limitations to the Tribe's claims. Blue Cross argues that the statutes of limitations applicable to both ERISA and Michigan HCFCA provide a separate basis for rejecting the Tribe's claims under those laws. ERISA requires that a plaintiff file suit within three years of acquiring "actual knowledge of the breach or violation." 29 U.S.C. § 1113; *Durand v. Hanover Ins. Grp., Inc.*, 806 F.3d 367, 376 (6th Cir. 2015) ("[A]n accelerated three-year limitations period is triggered as of 'the earliest date on which the plaintiff had actual knowledge of the breach.'" (quoting 29 U.S.C. § 1113)). However, a plaintiff will have until "six years after the date of discovery of such breach or violation" if there was "fraud or concealment." *Id.* Michigan law imposes a similar statute of limitations. A breach of fiduciary duty claim "accrues when the beneficiary knew or should have known of the breach." *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, 698 N.W. 2d 900 (Mich. App. Ct. 2005) (per curiam) (quoting *Bay Mills Indian Cmty. v. Michigan*, 626 N.W. 2d 169 (Mich. Ct. App. 2001)).

Resolving the statute of limitations issue requires significant analysis of the record and application of the law to the facts. Blue Cross asserts that the record supports concluding that the Tribe was aware of Blue Cross's decision not to insist on MLR to Medicare-participating hospitals as far back as 2008, which would put the Tribe's claims outside of the statute of limitations. The Tribe points to other parts of the record to support its argument that Blue Cross's actions amount to "fraud or concealment" such that the relevant date for the statute of limitations is substantially later. The district court did not reach this issue in its opinion below because it concluded that the MLR regulations were inapplicable to services under the Employee and Member Plans. Given the need to parse the complicated factual record to determine when the Tribe had actual knowledge of the breach and whether Blue Cross's actions amounted to fraud or concealment, we remand this issue to the district court to decide in the first instance.

On remand, the district court must proceed with the triable and threshold factual question of whether the Tribe's CHS program authorized the care for which they assert they were entitled to pay Medicare-like rates. If the record shows that the Tribe's CHS program authorized this care, the court should then move on to consider Blue Cross's alternative arguments discussed in this section.

## III. CONCLUSION

For the reasons stated above, we **REVERSE** the district court's grant of summary judgment to Blue Cross Blue Shield of Michigan and **REMAND** for further proceedings consistent with this opinion.

---

## CONCURRING IN PART AND IN THE JUDGMENT

---

ROGERS, Circuit Judge, concurring in the judgment. I concur in the judgment and in Parts I and II of the majority opinion except for Part II.B. Remand is warranted, but not for the reasons given in Part II.B of the majority opinion.

## I.

SCIT's opening brief is limited to a single argument that, with respect, simply does not hold up. SCIT's brief argues that the MLR regulation, 42 C.F.R. § 136.30(b), requires that payments made under its Blue Cross-administered plans must be subject to the MLR payment limits. It is a plain-meaning argument, and while SCIT supplements the argument with contextual analysis and canons of construction, all of the secondary arguments are made in support of SCIT's primary assertion regarding the meaning of § 136.30(b). Although SCIT's factual statement makes various contentions concerning Blue Cross's practices, these practices do not affect the meaning of the regulation. The district court treated the case as turning entirely on the rejection of SCIT's interpretation of § 136.30(b).

On that one specific question of the meaning of the regulation in question, the district court was correct in holding that the regulation does not extend MLR to payments owed to hospitals for *care* that was not *authorized* by CHS. The relevant language is as follows:

> The payment methodology under this section applies to all levels of care furnished by a Medicare-participating hospital . . . that is authorized . . . by a Tribe or Tribal organization carrying out a CHS program of the IHS under the Indian Self-Determination and Education Assistance Act.

42 C.F.R. § 136.30(b). Even shorter, the language states, "The payment methodology under this section applies to . . . care furnished by a . . . hospital . . . that is authorized . . . by a Tribe . . . carrying out a CHS program." In context, this language can fairly be read only to refer to "care . . . that is authorized . . ." by a Tribe rather than "a . . . hospital . . . that is authorized" by a Tribe. This is because "by a Tribe" is limited by the immediately following words "carrying out

a CHS program."  The Tribe in carrying out the CHS program is not authorizing a *hospital* to do anything; instead it is authorizing *care* furnished by a hospital.  If the language had been intended to refer to authorizing a hospital to do something, the regulation would have stated "care furnished by a hospital that is authorized by a Tribe *to carry out* a CHS program."  In contrast, we have what the regulation says here: care authorized "by a Tribe . . . carrying out a CHS program."  Consequently, "authorized" in the regulation must necessarily refer to "care" that is authorized by a Tribe, not a "hospital" authorized by a Tribe.

The text at issue is also cabined by limiting language:  the regulation does not apply to any and all care authorized by a Tribe.  Instead, the care to which the payment methodology applies is limited to care authorized by a Tribe *carrying out a CHS program*.  The natural reading of "a Tribe . . . carrying out a CHS program" is that the relevant care was undertaken as part of a Tribe's CHS program.  If the regulation was intended to grant MLR pricing to a Tribe while it executes *any* healthcare program, there would be no reason to include the limiting language that specifically states that the regulation only applies to the CHS program.  In short, the regulatory language at issue in this case simply cannot be parsed to apply the payment methodology to care that is not authorized by a Tribe in carrying out a CHS program, such as care authorized by a Tribe carrying out some other program.

Nothing in the context of the promulgation of the regulation suggests any broader or unusual meaning of the language.  For instance, the title of the regulation is "Payment to Medicare-participating hospitals for authorized Contract Health Services."  42 C.F.R. § 136.30.  As the district court explained, the Conference Report for the legislation explained that:

> The amendment would prohibit hospitals that participate in Medicare and that provide Medicare covered inpatient hospital services under the contract health services program funded by the Indian Health Services from charging more than the Medicare established rates for these services.  This provision would apply to contract health services programs operated by the Indian Health Service, an Indian tribe or tribal organization or an urban Indian organization.

H.R. Rep. No. 108-391, at 656 (2003).  Furthermore, the district court noted that a post-promulgation letter from the Surgeon General's office announcing the regulation stated that the MLR rule "includes all *IHS-funded* health care programs," and that the regulation "will reduce

*contract health expenses* for hospital services and enable Indian health programs to use the resulting savings to increase services to their beneficiaries." Letter to Tribal Leaders and Urban Program Directors (July 19, 2007), https://www.ihs.gov/sites/prc/themes/responsive2017/display_objects/documents/mlri/Tribal%20Leader%20Letter.pdf (emphasis added).

In response to the reliance by a different district court on certain FAQs that the other court used to apply MLR to non-CHS plans, the district court in this case referred to other FAQs in the same IHS document that clearly limited the application of MLR to CHS-funded care. For example, the response to several questions emphasized that MLR only applies if CHS pays for the relevant care:

> 10. We use Third Party funds to pay costs for certain members who do not qualify for CHS funding. Do the Medicare-like rates apply for these services?
>
> No. *Medicare-like rates only apply for services payable through the CHS program, for individuals who are eligible for CHS coverage*, as defined by 42 CFR Part 136.
>
> 11. We use Third Party funds to add to our CHS funds. Do Medicare-like rates apply for these services?
>
> Yes, *as long as the CHS pays for the services* and follows the regulations that apply to CHS and client eligibility (42 CFR Part 136).
>
> . . .
>
> 29. What services are payable at Medicare-like rates?
>
> . . . [T]he service or supply must be *provided to a CHS eligible individual and paid by an IHS or tribal CHS program* or by an Urban Indian program.

Medicare-Like Rates for CHS Services (Consolidated) FAQ (updated May 10, 2008), https://www.ihs.gov/sites/prc/themes/responsive2017/display_objects/documents/mlri/MLR%20 FAQs.pdf (emphasis added). Even if we generously interpret the FAQs in SCIT's favor, the FAQ document taken as a whole has, at best, elements that support both parties' arguments.

Because the meaning of the regulation is plain, we need not resort to canons of construction such as the canon in favor of an agency's interpretation of its own regulation or the canon of construction in favor of Indian tribes.

## II.

At oral argument, however, SCIT focused on a different argument instead of on its interpretation of the regulation. Although the regulatory interpretation urged in SCIT's brief would appear logically to extend MLR to all employees under the employee plan, including employees who are not members of the tribe, SCIT counsel at argument emphasized that its case concerned only healthcare for tribal members. SCIT counsel repeatedly stated that he was "not seeking MLR" for non-member employees, and also added that non-member employees have "nothing to do with this case." *See, e.g.*, Oral Argument at 14:32. Then, in response to a question during rebuttal about the strength of SCIT's plain-meaning argument, SCIT counsel argued that it made no difference, because SCIT was arguing that it was entitled to MLR only for care for tribal members, authorized by the CHS program, and paid for from a bucket of funding that included some CHS dollars. *See* Oral Argument at 1:11:40.[1] SCIT counsel stated that "that verb, 'authorized by,' makes it necessary that the person has gone to the CHS program to get approval in the first place, and so that means the person is a member, they are entitled to be part of the CHS program . . . ." Oral Argument at 1:11:43. In response to the follow-up question of whether the regulation also required the use of at least some CHS funding, counsel responded "yes," and explained that "every dollar that went to Blue Cross, that Blue Cross then took custody and control of [to pay claims] . . . came from my client for the CHS program."[2] Oral Argument at 1:12:03.

SCIT later argued in its rebuttal that the district court disregarded this factual argument by denying all relief based on a legal determination that did not entirely dispose of the case— namely, the district court's assumption that SCIT was seeking MLR pricing for claims paid for using non-CHS funding, when in reality all the relevant claims were claims for care for tribal members, authorized by CHS, and paid for from a bucket of funding that included CHS dollars. *See* Oral Argument at 1:11:40. SCIT counsel stated that if the case were remanded, at trial he

---

[1] Our judgment today should not be read to reject these concessions.

[2] Similarly, SCIT counsel also stated that "the people we're talking about are tribal members who went to a Medicare-participating hospital after they were authorized by the CHS program," Oral Argument at 59:15, the relevant money is "controlled by the CHS program," Oral Argument at 59:55, and Blue Cross "was hired to administer" the relevant claims from a pool of money that includes federal CHS dollars, Oral Argument at 1:03:35.

would have to "prove that, in fact, each claim involved a tribal member who was authorized." Oral Argument at 1:14:05. In other words, according to SCIT, the district court's fundamental error was a *factual* one, not a legal one: the district court (according to SCIT at oral argument) denied relief even for tribal members whose care was authorized by the CHS program and whose care was paid for from a pool of money that included CHS dollars. Oral Argument at 1:14:38. If so, the argument goes, dismissal of SCIT's claims was not warranted even under Blue Cross's interpretation of the regulation, which limits MLR pricing to CHS-authorized care. If SCIT's factual argument is based on an accurate reading of the record, then SCIT has a strong argument that the district court erred in concluding that the court's interpretation of the regulation was sufficient to dismiss SCIT's case. Unfortunately, the parties have not provided sufficient briefing for us to resolve the factual issue. Remand is accordingly warranted so that the district court may address SCIT's factual argument, without relying on the rather questionable plain meaning contentions to which SCIT devoted the entirety of the argument portion of its brief on appeal.

The question, to be clear, is whether Blue Cross undertook the *administration of CHS-authorized coverage*, and if so, whether Blue Cross applied MLR to that coverage. This court's questioning at oral argument went directly to whether Blue Cross has undertaken in part to administer CHS coverage. If Blue Cross did so, then the district court's total dismissal of the case was unwarranted by its determination that MLR applied only to CHS-authorized coverage.

Thus on remand the district court must examine the facts that the parties still dispute—whether Blue Cross was in any way responsible for administering the CHS program, which was described by SCIT's counsel in its rebuttal argument as claims for care for tribal members, authorized by CHS, and paid for from a pool of money that included some CHS dollars. Even after oral argument, the parties cannot agree on the basic facts underlying SCIT's rebuttal argument. Counsel for Blue Cross submitted an additional citation after oral argument, stating that counsel for SCIT falsely "represented that BCBSM paid claims for the Employee and Member Plans using funds from the Tribe's CHS Program." Blue Cross asserted that "[t]he undisputed record is clear; BCBSM *did not use CHS or IHS* funds to pay claims for the Employee or Member plan." The factual murkiness here can be clarified on remand. If SCIT's

version of the facts is correct and Blue Cross did in fact administer CHS-authorized claims that were paid for from a pool of funding that included CHS dollars, then the court should proceed to address the alternative arguments by Blue Cross, including good faith and the statute of limitations.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-1226

SAGINAW CHIPPEWA INDIAN TRIBE OF MICHIGAN;
WELFARE BENEFIT PLAN,

    Plaintiffs - Appellants,

    v.

BLUE CROSS BLUE SHIELD OF MICHIGAN,

    Defendant - Appellee.

> **FILED**
> Apr 25, 2022
> DEBORAH S. HUNT, Clerk

Before:  ROGERS, STRANCH, and DONALD, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's grant of summary judgment to Blue Cross Blue Shield of Michigan is REVERSED and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk