**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

SAGINAW CHIPPEWA
INDIAN TRIBE OF MICHIGAN,
WELFARE BENEFIT PLAN,

    *Plaintiffs,*

*v.*

BLUE CROSS BLUE SHIELD
OF MICHIGAN,

    *Defendants.*

_____/

       CASE NO. 1:16-cv-10317

       DISTRICT JUDGE THOMAS L. LUDINGTON
       MAGISTRATE JUDGE PATRICIA T. MORRIS

## ORDER ON PLAINTIFFS' MOTIONS FOR SANCTIONS (ECF Nos. 233, 235) AND DEFENDANT'S MOTIONS FOR PROTECTIVE ORDERS (ECF Nos. 238, 242)

### I.  Introduction

  The Saginaw Chippewa Tribe offers health insurance programs to its members and employees. Although the Tribe funds these programs itself, it hired Blue Cross Blue Shield to administer the programs on the Tribe's behalf. Under federal law, members of the Tribe were entitled to discounted rates when receiving medical services at Medicare participating hospitals. However, the Tribe alleges that Blue Cross breached its fiduciary duties by allowing Medicare participating hospitals to charge normal rates for services it provided to tribal members.

  Two discovery orders are at issue. In the first order, the Court directed Blue Cross

1

to make its "best efforts" to produce data from every claim form Blue Cross received from hospitals during the relevant period.  This data would reveal information such as the amount billed, the procedures performed, and the name of the hospital.  Blue Cross did not provide data for each category for every claim at issue, and the parties dispute whether Blue Cross has produced a complete set of data.

In the second order, the Court instructed Blue Cross to produce the underlying claim forms.  In its order, the Court referred to the forms as "UB-04s"—what it believed to be the correct nomenclature.  However, only a printed claim forms is referred to as a UB-04—when the same form is submitted electronically, it is referred to as an "837."  Because the order directed Blue Cross to produce UB-04s, Blue Cross believes that it need not produce their electronic counterparts.

The Tribe moved the Court to sanction Blue Cross for violating both orders.  Blue Cross in turn, filed two motions for protective orders—one to relieve it from any duty to produce the electronic claim forms, and one to prevent a deposition of an employee who the Tribe believes to be an "expert" on claim forms.  For the following reasons, the Court **GRANTS** both motions for sanctions (ECF Nos. 233, 235), **DENIES** the first motion for a protective order (pertaining to the electronic claim forms) (ECF No. 238), and **GRANTS** the motion for a protective order related to the deposition (ECF No. 242).

## II.  Factual Background

### A.      Federal Tribal Healthcare Law

The Indian Health Service ("IHS") provides federally funded healthcare to

American Indians.[1]  The IHS funds and operates its own healthcare facilities for Indian

tribes, and it subsidizes Contract Health Service ("CHS") Programs, under which Indians

receive IHS funding for care received at non-IHS facilities.  *See* 25 U.S.C. § 1603(5), (12)

(2018); 42 C.F.R. §§ 136.21, 136.23.  Indians may only receive CHS care "when necessary

health services by an Indian Health Service facility are not reasonably accessible or

available," and they must obtain pre-approval from the healthcare facility to receive CHS

care.  42 C.F.R. § 136.23(a).  The regulations provide that:

> In nonemergency cases, a sick or disabled Indian, an individual or agency
> acting on behalf of the Indian, or the medical care provider shall, prior to the
> provision of medical care and services notify the appropriate ordering official
> of the need for services and supply information that the ordering official
> deems necessary to determine the relative medical need for the services and
> the individual's eligibility.

*Id.* § 136.24(b).  Once the ordering official approves the eligible individual for CHS care,

the CHS program sends a purchase order to the medical-care provider which lists the

medical services the eligible individual is authorized to receive.  *Id.* § 136.24(a).

The IHS does not bear the sole responsibility for providing healthcare to Indian

tribes.  Under the Indian Self-Determination and Assistance Act of 1975, tribes may "enter

self-determination contracts with the federal government" under which the tribes take on

the federal government's role in administering their healthcare service programs.  25

U.S.C. § 5302(a)(1), (b); *see also FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234

(8th Cir. 1995).  These contracts allow tribes to "manage and staff their own IHS facilities,

---

[1] Since the governing laws use the term "Indian" rather than Native American, so must the court.

contract with private insurers for tribal healthcare coverage, and operate their own CHS programs for eligible American Indians." *Saginaw Chippewa Indian Tribe v. BCBS*, 32 F.4th 548, 553 (6th Cir. 2022). Although tribes assume management of their healthcare programs when they enter self-determination contracts, the IHS continues to provide tribes with funding. *Id.*

Despite assistance from the IHS, CHS programs have faced "significant financial constraints" which prompted Congress to pass the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. *Id.* The Act requires all Medicare-participating hospitals that provide medical care pursuant to a CHS program "funded by the [IHS] and operated by the IHS, and Indian tribe, or tribal organization" to accept "Medicare-like rates" as payment. 42 U.S.C. § 1395cc(a)(1)(U)(i). In other words, the Act establishes a ceiling on the prices hospitals may charge for CHS participants. *Id.*

The regulations likewise explain that Medicare-participating hospitals must offer a "Medicare-like rate" ("MLR") when they provide CHS care that has been "authorized by" the IHS or "a Tribe or Tribal organization carrying out a CHS program of the IHS." 42 C.F.R. § 136.30(a)–(b). To receive CHS care and thus trigger the Medicare-like rate entitlement, "the appropriate ordering official" for the Tribe's CHS program must be notified of the individual's proposed CHS care. *Id.* § 136.24(b). If the ordering official determines that the individual is eligible for CHS care, then he or she will issue a purchase order to the medical care provider. *Id.* § 136.24(a). The medical care provider must receive the purchase order for the individual to be eligible for a Medicare like rate. *Id.*

4

### B.    The Tribe's Contracts with Blue Cross

The Saginaw Chippewa Indian Tribe administers its own CHS program using both tribal and IHS funds.  *Saginaw Chippewa Indian Tribe*, 32 F.4th at 554.  Only American Indians and direct descendants of the Saginaw Chippewas are eligible for CHS care, provided that they live in one of the five counties subject to the Tribe's program.  *Id.*

Apart from its CHS program, the Tribe provides two self-funded health insurance policies—one for its members, and one for its employees (the majority of whom are not members of the Tribe).  *Id.* at 555.  Only members of the Saginaw Chippewa Tribe were eligible for the member plan, whereas all employees, regardless of their membership status, were eligible for the employee plan.  *Id.*  The Tribe financed both plans using its own revenue rather than IHS funds.  *Id.*

The Tribe hired Blue Cross Blue Shield of Michigan to administer both plans on its behalf.  *Id.*  While the Tribe paid for healthcare services itself, it paid Blue Cross a fee to conduct administrative services "for the processing and payment of claims."  *Id.*  Both contracts provided that Blue Cross "shall administer Enrollees' health care Coverage(s) in accordance with [Blue Cross's] standard operating procedures for comparable coverage(s) offered under a [Blue Cross] underwritten program, any operating manual provided to the Group, and this Contract."  *Id.*

### III.    Discovery and Procedural History

The Tribe alleges that Blue Cross breached its fiduciary duties by neglecting to take advantage of the Medicare-like rates that were available for Tribal members, choosing

instead to pay standard rates with the Tribe's funds.  *Id.* at 555–56.  Although the Tribe

concedes that it did not inform Blue Cross which employees were eligible for Medicare-

like rates, it nonetheless asserts that its CHS program authorized care for all claims at issue,

which Blue Cross should have been aware of.  *Id.* at 554.

Although discovery closed on February 7, 2020, the Court entered the following

stipulated discovery order on August 2, 2022, following a remand from the Sixth Circuit:

> It is **ORDERED** that BCBSM will make best efforts to produce to Plaintiffs by August 31, 2022, the claims data relative to the Member Plan going back to July 2007, consistent with the claims data produced by BCBSM in the *Grand Traverse Band* litigation;
>
> Further, it is **ORDERED** that Plaintiffs will make best efforts to identify for BCBSM by August 31, 2022, the Tribal Members that participated in the Employee Plan ("Employee Tribal Members");
>
> Further, it is **ORDERED** that, after Plaintiffs identify for BCBSM the Employee Tribal Members, BCBSM will produce to Plaintiffs the claims data relative to those individuals, consistent with the claims data produced by BCBSM in the *Grand Traverse Band* litigation . . . .

(ECF No. 222, PageID.13297; *see also* ECF No. 232, PageID.13902).  Besides specifying

that the claims data was to be "consistent with the *Grand Traverse Band* litigation," the

order did not define the scope of the "claims data."  However, the parties appear to have

understood that the "claims data" referred to information supplied on insurance claims

forms sent from hospitals to Blue Cross.  (*See* ECF No. 233, PageID.13919–20 & n.1; ECF

No. 236, PageID.14050–52; ECF No. 236-6; ECF No. 238-9).  These forms provided

various information regarding the insurance claim, such as, for example, the services

provided, the rate billed by the provider, and the identity of the patient.  (ECF No. 233,

PageID.13919–20).

The Court issued a separate order on November 14 which compelled Blue Cross to produce "claim forms" for the "underlying healthcare claims at issue." (ECF No. 232, PageID.13903). After Blue Cross led the Court to believe that the correct name of these forms was "UB-04," the Court instructed Blue Cross "to produce all UB-04s related to this case" along with any corresponding "invoices and reports." (*Id.* at PageID.13905).

Consistent with the August 2 order, Blue Cross sent the Tribe a set of data corresponding to the member plan on the August 31 deadline, and on the same day, the Tribe identified the individuals on its employee plan who were also CHS-eligible tribal members. (ECF No. 236-7, PageID.14095). Within a few days, however, both parties realized that the claims data for the member plan was missing several categories of data. Counsel for both parties corresponded with each other regarding the issue at length over the following months, and Blue Cross updated the data set to account for many of the deficient categories. (*Id.* at PageID.14093–94). The parties still dispute whether this updated dataset satisfies the requirements of the discovery order.

In late November, Blue Cross sent the Tribe claims data for the employee-members the Tribe identified on August 31. (*Id.* at PageID.14095; *see also* ECF No. 236-8, PageID.14101). However, the Tribe believes that this data set is missing data in several of the same categories as the member plan, and the Tribe also complains that the dataset contains no information regarding the employees' dependents.

As for the November 14 order, Blue Cross provided all UB-04s in its possession.

However, just a week before the deadline set by the discovery order, Blue Cross informed the Court that it "learned" that most claims were submitted electronically on forms referred to as "837s." (ECF No. 245-2, PageID.14389; ECF No. 245-2, PageID.14400). Although 837s and UB-04s are substantively identical, Blue Cross maintains that the November 14 Order did not compel it to produce any 837s. (*See* ECF No. 235-2); *see also United States v. Intermountain Healthcare, Inc.*, No. 2:20-cv-00372, at *3 (D. Utah Jan. 8, 2022). The Tribe later served a deposition notice on a Blue Cross's employee who had previously sworn a declaration in which he claimed that "UB-04" was the correct name for claims forms submitted by hospitals. (ECF No. 242-2). The Tribe explained that it needed to depose this employee for information regarding the "identification and whereabouts of the relevant claims forms in BCBSM's possession." (ECF No. 247, PageID.14542).

The tribe filed two motions for sanctions, asserting that Blue Cross violated both discovery orders. In response, Blue Cross filed two motions for protective orders: one regarding the 837s and one regarding the deposition notice. The Undersigned held an in-person hearing with counsel for all parties on January 30, 2023.

## IV. Analysis

### A..   Blue Cross Violated both Orders and Sanctions are Warranted.

Federal Rule of Civil Procedure 37(b)(2)(A) grants district courts the authority to impose sanctions when a party disobeys an order compelling discovery. Pursuant to this rule, the Tribe argues that the Court should sanction Blue Cross for violating the Court's August 2 order compelling Blue Cross to produce claims data for both the Tribe's member plan and its employee plan. (ECF No. 233). Separately, the Tribe also argues that Blue

8

Cross violated the Court's November 14 order compelling Blue Cross to produce all claims forms in its possession for both plans.  (ECF No. 235).  For violating both orders, the Tribe argues that the Court should sanction Blue Cross by holding it in contempt and ordering it to pay attorney's fees.[2]

### 1.  Blue Cross Violated both the August 2 Order and the November 14 Order.

A court may only sanction a party after it enters a discovery order and the party disobeys the order.  *Burley v. Gagacki*, 729 F.3d 610, 618 (6th Cir. 2013).  But even where a party disobeys a discovery order, its noncompliance may be excused if it was unable to comply with the order.  *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir. 1991).  Once the moving party establishes a prima facie case that the nonmoving party disobeyed a court order, the nonmoving party carries the burden of establishing its inability to comply.  *In re Chase & Sanborn Corp.*, 872 F.2d 397, 400 (11th Cir. 1989).  To satisfy this burden, the nonmoving party cannot simply assert that it made a good faith effort to comply with the order; it must show, "categorically and in detail," that it took "all reasonable steps to comply" with the order.  *Glover*, 934 F.2d at 708; *see also United States v. Conces*, 507

---

[2] Counsel for the Tribe titles both motions as motions for the Court to issue a "show cause" order directing Blue Cross to explain why the Court should not impose sanctions.  (ECF Nos. 233, 235).  But because this is an issue raised by counsel, not the Court, a "show cause" order would serve no purpose.  *See generally SEC v. Hyatt*, 621 F.3d 687, 695–97 (7th Cir. 2010) (explaining that generally, show cause orders are superfluous when addressing matters already raised by motion).  Plaintiff's Counsel conceded as much at oral argument.  Blue Cross had—and took advantage of—an opportunity to file response briefs to both of the Tribe's motions, and they were able to further elaborate on their position at oral argument.  (ECF Nos. 236, 235).  There is no need for the Court to order Blue Cross to file yet another brief before it rules on the merits of the Tribe's motions, which ultimately seek discovery sanctions.

F.3d 1028, 1043 (6th Cir. 2007).  The nonmoving party may establish that it was not able to comply with a court order by showing that the order was so vague that it could not understand the order's requirements.  *See Salahuddin v. Harris*, 782 F.2d 1127, 1131 (2d Cir. 1986).

Here, Blue Cross was able, yet neglected, to comply with both discovery orders.  As to the August 2 order, Blue Cross failed to supply a full set of claims data pertaining to the member policy before the Court's deadline.  And as for the employee policy, Blue Cross has so far failed to provide any claims data pertaining to the employees' dependents.  Likewise, Blue Cross has also violated the Court's November 11 order by withholding the electronic "837" claim forms.

### 2..   Blue Cross Violated the Court's Order to Produce Claims Data Pertaining to the Member Policy, but it Cured these Deficiencies Before the Tribe Brought its Motion for Sanctions.

The Court's August 2 Order instructed Blue Cross to "make best efforts" to provide the Tribe with "claims data relative to the member plan  . . ., consistent with the claims data produced by [Blue Cross] in the *Grand Traverse Band* Litigation" by "August 31."  (ECF No. 222, PageID.13297).  On the final day to comply with the order, Blue Cross produced an excel spreadsheet containing the claims data for the member plan.  (ECF No. 236-8, PageID.14100).  But after the Tribe reviewed the dataset, it noticed that the spreadsheet missed various categories of data that were produced in the *Grand Traverse Band* litigation.  (ECF No. 236-7, PageID.14093–94).

Blue Cross appeared to admit that the spreadsheet did not contain all of the data that

it should have.  Indeed, after the Tribe brought these deficiencies to Blue Cross's attention, Blue Cross and the Tribe prepared joint statement in which they "agree[d]" that "several additional data fields must still be produced to be consistent with the claims data produced in the *Grand Traverse Band* litigation . . . ." (*Id.* at PageID.14087, 14093–94).  Moreover, Blue Cross later sent the Tribe an updated spreadsheet correcting the same fields that the Tribe found to be deficient.  (*Compare id.*, *with* ECF No. 233-9, PageID.13963).  Moreover, before even providing the Tribe with the initial production, Blue Cross admitted that at least the "facility name" data would be missing from the spreadsheet.  (ECF No. 236-8, PageID.14100).

Regardless, Blue Cross argues that it did not violate the Court's order because it made its "best efforts" to provide the data.  (*See* ECF No. 222, PageID.13297).  In support of this argument, Blue Cross points to efforts it made to correct these deficiencies after the Tribe brought them to Blue Cross's attention.  (ECF No.  236).  But these efforts did not come until *after* the Court's August 31 deadline.  (*See id.*)  So by the time the Tribe brought these missing data categories to Blue Cross's attention, Blue Cross had already violated the August 2 order.  The Tribe made a prima facie case of noncompliance with the Order by establishing that Blue Cross missed the deadline, and it is Blue Cross, not the Tribe, who carries the burden of establishing that it was unable to comply with the August 2 order.  Yet the only efforts Blue Cross discusses in its brief came after the it missed the August 31 deadline.

The closest Blue Cross comes to describing its pre-August 31 efforts is in an email

it attaches to its Response brief.  In that email, counsel for Blue Cross explained to Plaintiff's Counsel that he did not receives the data sets for the members from Blue Cross until "late" in the "night" on August 30.  (ECF No. 236-8, PageID.14100).  But wholly missing from Counsel's briefing is any explanation of (1) why it took Blue Cross until August 30 to produce this data, and (2) why the efforts it took were reasonable (particularly since Blue Cross was later able to recover much of this missing data).  (*See id.*)  True, Blue Cross does provide a short declaration from one of the employees assigned to produce this data, in which the employee explains that he undertook "exhaustive efforts, sometimes working 15-plus hour days, to meet the demands of producing the claims data in this case." (ECF No. 236-10, PageID.14113).  But he does not explain whether the "exhaustive efforts" he refers to came before or after the deadline, and more to the point, he fails to walk the Court through "all reasonable steps" he and other employees took "to comply" with the order "categorically and in detail."  (*Id.*); *Glover*, 934 F.2d at 708.  Apparently, Blue Cross was eventually able to provide the missing data, so there may have been additional, or more effective, means by which Blue Cross could have attempted to obtain this data before the deadline.  (*See* ECF No. 236-9, PageID.14103).  In any event, Defendant's scant explanation of its pre-August 31 efforts to comply with the order falls short of its burden of proof.[3]

---

[3] Defense Counsel also neglected to detail Blue Cross's efforts at oral argument.   Apart from some vague and brief references to the data collection process, Defense Counsel did not explain how Blue Cross searches for data, nor did he mention the amount of time Blue Cross spent on this task (before August 31), or the amount resources and labor Blue Cross allocated to retrieving this data.  In sum, he did not show "categorically and in detail" that

But although Blue Cross violated the August 2 order as it related to the Tribe's member policy, Blue Cross has apparently cured these deficiencies.  When the Tribe initially brought the missing fields to Blue Cross's attention, it identified fourteen categories of data, but when the Tribe filed its motion for sanctions, it alleged that only seven of these categories (plus one additional category) remained incomplete.  (*Compare* ECF No. 233-2, PageID.13941, *with* ECF No. 233, PageID.13926–27).[4]  The Tribe argues that each of these categories are still missing data for several claims.  However, the Court's order did not require Blue Cross to provide data corresponding to each category for every claim—it ordered Blue Cross to make its "best efforts" to produce data "consistent" with that produced "in the *Grand Traverse Band* Litigation."  (ECF No. 222, PageID.13297). And while not every category had data for each claim, Blue Cross establishes that it produced data at essentially the same rate as it did in the *Grand Traverse Band* litigation. (ECF No. 236, PageID.14050–52; *see also* ECF No. 236-5; ECF No. 236-6).  The Tribe does not contest this point.  (*See* ECF No. 241).  Moreover, Blue Cross explained that not all categories are applicable for every claim, and that certain datapoints (of the millions at issue) simply may not have been provided to Blue Cross.  For example, the category titled "procedure code" would only be provided for a claim if the patient had a surgical

---

Blue Cross took all reasonable efforts to retrieve all of the required data before the August 31 deadline.

[4] In its reply brief, the Tribe also argues that the financial data provided in these spreadsheets is inaccurate.  (ECF No. 241, PageID.14288).  But because the Tribe did not raise this issue in its principal brief, the issue has been waived.  *Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019) ("[A]rguments raised for the first time in reply briefs are waived . . . .").

procedure; if the patient did not have a procedure, then that datapoint would be missing for that particular claim.  (ECF No. 233-10, PageID.13968; *see also* 236-4, 14073, 14076). For that reason, one of the Blue Cross employees tasked with retrieving this data explained that Blue Cross would "never be able to produce a 100% population-rate for the tens of millions of cells at issue."  (ECF No. 236-10, PageID.14112–13).  Indeed, "none of the population percentages for the claims data produced by [Blue Cross] . . . fell outside the range of what [he] would" have expected "to see."  (*Id.* at PageID.14113).  Accordingly, while Blue Cross did initially violate the Court's order, causing Plaintiff's counsel to expend time and resources to retrieve the full dataset, Blue Cross has since provided all of the claims data in its possession pertaining to the member plan.

### 3.    Blue Cross Violated the Court's Order to Produce Claims Data Pertaining to the Employee Plan.

The August 2 order directed the Tribe to provide Blue Cross with a list of employees who were members of the Saginaw Chippewa Tribe and therefore eligible for Medicare-like rates.  (ECF No. 222, PageID.13297).  Once the Tribe provided this list to Blue Cross (which it did on August 31, the deadline set by the Court) Blue Cross was to provide its claims data for these individuals.  (*Id.*)  Defense Counsel sent this data to the Tribe on November 23.  (ECF No. 233-13, PageID.13977; ECF No. 236-9, PageID.14104–07).[5]

After conducting a "manual search" for the claims data with the names provided by

---

[5] To the extent the Tribe might argue that Blue Cross violated the order by not providing this information in a timely manner, the Court rejects this argument.  The August 2 order did not set any deadline for compliance, and as set forth above, the Court may not sanction Defendants for failing to comply with vague orders.

the Tribe, Blue Cross discovered claims data for 130 of the 136 member-employees identified by the Tribe. (ECF No. 236-9, PageID.14109). It explained that it could not find these remaining six employees and asked the Tribe to supply their birthdates to assist Blue Cross in its efforts. (ECF No. 236-4, PageID.14076). The Tribe initially refused to do so, but at the January 30 hearing, Counsel for both parties informed the Court that Plaintiff's Counsel recently supplied these birthdates to Defense Counsel, and that Defense Counsel is attempting, again, to produce data for these six employees.

Notwithstanding the six individuals for whom Blue Cross's search is ongoing, the Tribe advances three arguments for why Blue Cross's production of the employee claims data was deficient. First, the Tribe argues that claims data spreadsheets for the employee plan are missing the same datapoints as the member plan. But as explained above, the Tribe complied with the Court's order because it produced this data at a rate similar to the *Grand Traverse Band* litigation. This argument lacks merit.

Second, the Tribe argues that Blue Cross actually failed to produce claims data for fifty-seven employees (not counting the six for whom the Tribe recently supplied birthdates). But Blue Cross explains in the joint statement of resolved and unresolved issues that it would only have claims data to produce for these individuals if they visited a hospital while on the employee plan. (ECF No. 252, PageID.14628–29). Blue Cross successfully located the records for 130, and of those 130 employees, only seventy-three visited a hospital and thus had corresponding claims data that Blue Cross could produce. (*Id.*) That is an adequate explanation for why Blue Cross did not produce claims data for

each Tribal-member employee.

But just days before the hearing, Plaintiff's counsel filed a supplemental brief in which he argues that many of the fifty-seven Tribal employees whom Blue Cross contends did not visit a hospital actually did so. (ECF No. 253). And in support, he attaches an exhibit listing twenty-nine referrals from the CHS program and concludes, in a sworn declaration, that "some of the [57]/136 tribal employees at issue—for which [Blue Cross] has not produced any Employee Plan claims data—did receive hospital care during the relevant time period. (ECF No. 254-2, PageID.14655 (emphasis removed)). But Counsel does not persuasively rebut Blue Cross's contention that those fifty-seven individuals have no hospital records, and therefore no claims data. First, Plaintiff's Counsel exaggerates the scope of this issue. Defense Counsel provided the underlying referral forms to the Court at the hearing, along with a list of the six individuals for which Plaintiff provided birthdates, and an exemplar Form 1500. Taken together, these documents indicate that eight of the referrals concerned employees from the group of six individuals for whom Blue Cross is attempting to locate claims information using birthdates, and seven other individuals were not referred to a hospital at all (and therefore ineligible for Medicare-like rates).[6] (*See* ECF No. 253-3). The remaining fourteen referrals only concern six unique individuals.

However, Plaintiff's Counsel does not clearly explain how he surmised that these six individuals belong to the group of fifty-seven employees Blue Cross maintains it does

_____

[6] Defense Counsel located Form 1500s for five of these individuals, further establishing that these individuals did not receive care at a hospital. (*See generally* ECF No. 229-4, PageID.13716).

not have data for, and not the seventy-three employees for which Blue Cross already produced data.  True, Plaintiff has a list of the Tribal-member employees, and he could have cross referenced that list against the referrals he provided to the Court, but he did not provide that list to the Court so that the Undersigned could verify his assertions.  Instead, he merely documents twenty-nine referrals and asks the Court to take his word that he did not already receive data for these employees.  I do not find that persuasive, and I conclude that this argument also lacks merit.

Yet the Tribe picks up steam on its third and final argument. The Tribe asserts that Blue Cross violated the Court's order by failing to provide any claims data for the dependents of the member-employee participants.  On August 2, the Court ordered Defendants to produce "the claims data relative to" the "employee tribal members" who "participated in the Employee Plan."  (ECF No. 222, PageID.13297).  Although the order does not explicitly reference the dependents of these participants, a commonsense reading of the order would suggest that Blue Cross was to produce data for *all* claims under each employee's plan, which would include claims arising from care provided to the employee's dependents.  There appears to be no reason why the Tribe would only desire claims data for care provided to the policyholders.  And although Defense Counsel argued at the hearing that the August 2 order did not encompass dependents, briefing and emails from both parties indicate that they apparently understood that claims arising from care provided to dependents fell under the scope of the Court's order.  (*See* ECF No. 233; ECF No. 236, PageID.14047 n.3; ECF No. 236-4, PageID.14077).  Indeed, except for information

17

relevant to the August 2 and November 14 orders, discovery is now closed.  (ECF No. 242, PageID.14296–309).   So by agreeing to produce this data, Defense Counsel tacitly conceded that the data fell within the scope of these orders.   (*See* ECF No. 236-4, PageID.14077).

Even so, Blue Cross argues that it need not produce claims data for the dependents until Blue Cross identifies which dependents were tribal members.  That is so, Blue Cross argues, because nonmember dependents of tribal employees are not eligible for Medicare like rates, so if Blue Cross were to produce claims data for all dependents, it might produce some irrelevant claims data regarding nonmember dependents.  But it is too late for Blue Cross to attack the propriety of the Court's Order.  *See Maness v. Meyers*, 419 U.S. 449, 458 (1975).  If Blue Cross was concerned that the stipulated order would compel it to produce irrelevant or unduly burdensome information, then it should have raised this issue before consenting to the order, and, if necessary, it could have moved for a protective order. But once the Court enters an order and a party moves for sanctions "pursuant to Rule 37(b)," the "propriety of the underlying order generally will not be considered."  7 Moore's Federal Practice-Civil § 37.42(6); *cf. Loop Al Labs Inc. v. Gatti*, No. 15-cv-00798, 2017 WL 934599, at *9 (N.D. Cal. Mar. 9, 2017); *see also American Rock Salt Co., LLC v. Norfolk Southern Corp.*, 371 F. Supp. 2d 358, 360–61 (W.D.N.Y. 2005).  The *only* way a party may avoid sanctions for disobeying a discovery order is by establishing its inability to comply with the order.  At bottom, the Court issued an order, and Blue Cross was obligated to obey it; Blue Cross cannot skirt this obligation simply because it believes the

Court "was wrong."  *See Loop*, 2017 WL 934599, at *9.

### 4.    Blue Cross Violated the Court's November 14 Discovery Order.

In September, the Tribe moved the Court to compel Blue Cross to produce "the Health Insurance Claim Forms 1500s for the underlying claims at issue . . . ."  (ECF No. 225, PageID.13314).  According to the Tribe, these forms contained two boxes which would indicate whether the patient was eligible or CHS care.  (ECF No. 232, PageID.13903–04).  One box identified the payor, and in many instances it indicated that the payor was the Nimkee Contract Health Service program.  (*Id.*; *see also* ECF No. 238-9).  The other field supplied a referral code that would further indicate whether the patient was eligible for CHS care and a Medicare-like rate.  (ECF No. 238-9).

In its response brief, Blue Cross explained that the Tribe meant to request "Form UB-04," not "Form 1500," because Form 1500 is the claim for used by practitioners, whereas hospitals utilize UB-04s.  (ECF No. 229, PageID.13675).  Blue Cross further argued that nothing in the UB-04 form would identify whether a patient was eligible for a Medicare like rate, but the Court rejected that argument.  (ECF No. 232, PageID.13903–04).

> If the Tribe referred or authorized the claimed care, then the UB-04s would identify "the Tribe's Nimkee Contract Health Program" in Box 38 as the "Responsible Party," in Box 50 with Defendant as the "Payer," and in Box 80 as the "authorized agent"—and the UB-40s have a designated blank for "Treatment Authorization Codes." . . . Although correlation does not equal causation, it is more likely than not that this consistent use of the forms and explanation of what treatment if any was "authorized" demonstrates "the healthcare claims [that] were referred/authorized by the Tribe's Contract Health Services Program," which Defendant stipulated to provide to

19

Plaintiffs.

(*Id.*)  Accordingly, the Court "directed [Blue Cross] to produce all UB-04s related to this case . . . ."  (*Id.* at PageID.13905).

Apparently, "UB-04" is not the term hospitals use for all of their claim forms.  When a hospital submits an electronic claim form, that form is called an "837."  (ECF No. 235, PageID.14001).  But apart from their names, and the fact that a UB-04 is printed, while an 837 is electronic, there is no difference between a UB-04 and an 837.  *Intermountain Healthcare*, 2022 WL 271760, at *3; *United States ex rel. Zaldonis v. U. of Pittsburgh Med. Ctr.*, No. 2:19-CV-01220-CCW, 2021 WL 1946661, at *2 (W.D. Pa. May 14, 2021); *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 441 (E.D. Pa. 2020); (ECF No. 235-2).  UB-04s and 837s are substantively identical.  Indeed, Defense Counsel admitted at the hearing that UB-04s and 837s were "synonymous."

Blue Cross did not produce any 837s, and it maintains that it need not do so.  According to Blue Cross, the Court's order only compelled it to produce UB-04's, and because it produced all of the UB-04s in its possession, Blue Cross fully complied with the order.  (ECF No. 245).  That argument puts form over substance.  The essence of the District Judge's order was that Blue Cross was to produce the underlying claim forms.  The Court only referred to the claims forms as "UB-04s" because Blue Cross led the Court to believe that was the correct term for the forms.  (*See* ECF No. 229).  The Tribe articulated no special need for only paper forms, so as a matter of commonsense, the Court's order for Blue Cross to produce "UB-04s" also included their electronic counterparts—whatever

20

their name may be.  Blue Cross should have been aware of this, and their continuing refusal to provide these forms (as evidenced by their motion for a protective order (ECF No. 238)) violates the November 14 order.[7]

**B.    The Court will Sanction Blue Cross by Ordering It to Pay Attorney's Fees and Costs, by Assuming Facts to be Provisionally Established, and by Warning Blue Cross that Further Noncompliance will Result in more Severe Sanctions, Potentially Including Default Judgment.**

Having found that Blue Cross violated the Court's previous orders, the Court's next task is to determine the appropriate sanctions.  Rule 37(b) allows courts to sanction parties who violate discovery orders.  Fed. R. Civ. P. 37(b)(2)(A).  Although parties may move the Court to impose a particular sanction, the Court has wide discretion to impose any sanction it finds appropriate.  *Fields v. Trinity Food Serv.*, No. 1:17-cv-01190-SHM-cgc, 2022 WL 662321, at *1 (W.D. Tenn. Mar. 24, 2022) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 n.8 (1991)).  And in doing so, the Court can impose a broad range of sanctions: the sanctions listed in Rule 37 (such as staying proceedings and rendering a

---

[7] Blue Cross points out that while "locating the Form UB-04s" it "realized that the majority of hospital claims in this case were likely submitted not on paper (Form UB-04), but electronically via 837 electronic claims" and that it then, one week before the deadline, "proactively advised the Court of same and requested a status conference about how best to address it." (ECF No. 245, PageID.14374–75).  But Blue Cross was not as cooperative as it would have the Court believe. First, Blue Cross does not state that it was unaware that 837 forms existed until one week before its deadline; Blue Cross only states that it took until late-November for it to realize how prolific the use of 837 forms was.  So Blue Cross should have understood that the November 14 Order encompassed 837s and begun searching for these claims immediately.  Moreover, once Blue Cross learned about the widespread use of 837s, it did not make any efforts to mitigate its inadequate search; instead, it doubled-down and moved for a protective order on the 837 claim forms.

default judgment) are illustrative, not exhaustive. *Jaen v. Coca-Cola Co.*, 157 F.R.D. 146, 149–50 (D.P.R. 1994).

To determine the appropriate sanctions for a violation of a discovery order, district courts weigh four factors: (1) "whether a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault"; (2) "whether the adversary was prejudiced by the party's failure to cooperate in discovery"; (3) "whether the party was warned that failure to cooperate could lead to the sanction"; and (4) "whether less drastic sanctions were first imposed or considered." *Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir.1997). These factors are applied more "stringently" where counsel, rather than the party, is responsible for the discovery violation. *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 367 (6th Cir. 1997).

The Tribe proposes two specific sanctions: holding Blue Cross in contempt and requiring Blue Cross to pay for the Tribe's attorney's fees and costs in bringing their motions.

The Court must impose the latter. Under Federal Rule of Civil Procedure 37(b)(2)(C) courts "must order" either the "disobedient party," its "attorney," or both, "to pay the reasonable expenses, including attorney's fees, caused by the failure" to comply with the discovery order. *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 382 (6th Cir. 2022). The disobedient party may only avoid payment of expenses if its "failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C); *see also Tech. Recycling Corp. v. City of Taylor*, 186 F. App'x 624,

638 (6th Cir. 2006).  But that is not the case here: Blue Cross willfully violated the orders and there is no apparent reason why this sanction would otherwise be "unjust."

The court finds that additional sanctions are necessary to encourage Blue Cross to comply with the orders.  As to Blue Cross's failure to supply the claims forms, the Court will assume facts to be provisionally established until Blue Cross produces all of the forms in its possession.  Specifically, the Court will assume what the Tribe seeks to prove: that each 837 form identifies the Nimkee Contract Health Service Program, and that each form contains the relevant authorization code for the CHS program.[8]

But taking facts to be provisionally established would not be an effective tool to coerce compliance with the August 2 order.  Instead, the Court reminds Blue Cross that it must produce claims data for all dependents—regardless of whether they are tribal members.  Moreover, Blue Cross is warned that a second violation of this order may result in monetary fines or default judgment.

### C.   The Court Will Issue a Protective Order Prohibiting the Tribe from Deposing the Blue Cross's employee, and It Will not Issue a Protective Order Regarding the Electronic Claims Forms.

That largely resolves the parties' disputes, but there are two remaining motions for protective orders that the Court must address.  First, Blue Cross moves for a protective order to prohibit the Tribe from deposing Kelvin Besant, a Blue Cross employee who swore a declaration describing Blue Cross's efforts to collect claims data which also provided

---

[8] Because Blue Cross believes this information to be irrelevant, or at least of little probative value, they should have no objection to curing this violation via stipulation.

23

some information UB-04 Forms.  (ECF No. 242).  The Tribe maintains that they must depose Besant so that they can identify the claim forms they seek to discover.  (ECF No. 247, PageID.1541–43).

But as discussed above, the Court's November 14 order encompassed all claim forms irrespective of their label, so it is not necessary for Blue Cross to identify the name of the forms it wishes to discover.  And even if the November 14 order did only compel the production of printed claim forms, Blue Cross establishes that the deposition is not likely to lead to the discovery of relevant evidence.  The Tribe describes Besant as Blue Cross's "purported . . . expert regarding claims forms."  (*Id.* at PageID.1543).  But there is nothing in the record to support this conclusion.  Blue Cross made no such assertion, and the Tribe infers that Besant is an "expert" on all things related to "claims forms" based solely on his brief statement that "Hospitals" use "Form UB-04" rather than "Form 1500s." (*Id.* (citing (ECF No. 229-4, PageID.13716)).  But Besant can be aware UB-04s exist without being an "expert" on all claim forms.  And Besant has since sworn out a second declaration in which he clarifies that his "knowledge is limited to the simple fact that Form UB-04s are paper forms used by hospitals to submit claims for payment" and that he has "no knowledge about 837 electronic claims . . . ."  (ECF No. 242-4, PageID.14322). Because the Tribe seeks information Blue Cross was already ordered to produce, and because the deposition would not lead to the discovery of relevant evidence, the Court should grant this motion for a protective order.  *See Mayes v. City of Oak Park*, No. 05-CV-74386, 2007 WL 187941, at *1–2 (E.D. Mich. Jan. 22, 2007).

Blue Cross filed a separate motion for a protective order seeking to avoid production of the 837 forms.  But again, the Court's November 14 order applied to all claim forms, whatever they may have been labeled.  So it is too late for Blue Cross challenge the relevance of these forms.  *See Loop*, 2017 WL 934599, at *9.

Even if the Court's November 14 order applied only to printed, UB-04 claims forms, Blue Cross's motion would fail on its merits.  Both parties concede that UB-04s and 837s are substantively identical, and the Court already considered the relevance of the UB-04s, as well as the burden of their production, in its November 14 order.  (ECF No. 232, PageID.13903–04).  Blue Cross did not move for a protective order before the Court decided this issue.  Blue Cross did not move for reconsideration of the order.  And Blue Cross did not attempt to file an appeal.  The Court will not disregard the District Judge's findings on the same issue that is once again before the Court.

Moreover, Blue Cross's critique of the November 14 order is not persuasive.  In essence, Blue Cross maintains that although the 837s, like the UB-04s, contain a box that identifies the payor, and although the Tribe has supplied six UB-04 forms indicating that the Tribe's CHS program is often listed as the payor, the forms are irrelevant because they do not explicitly specify that the CHS program authorized the care "via a purchase order." (*See* ECF No. 250, PageID.14592–96).  That matters because only care authorized "via a purchase order" would be eligible for a Medicare-like rate.  (*Id.*; *see also* ECF No. 238). In support, Blue Cross cites a deposition of a Tribal Employee who states that most

members seek CHS authorization "after" they receive care, and that hospitals send claims forms before they even receive purchase orders.  (ECF No. 250, PageID.14596–97).

Blue Cross makes legitimate arguments against the probative value of the 837s, but not against their relevance.  Relevant evidence is that which "has any tendency to make a fact [of consequence] more or less probable . . . ."  Fed. R. Evid. 401; *see also* Fed. R. Civ. P. 26(b).  Blue Cross's assertion that the Tribe receives claims forms before it receives purchases orders is contradicted by the six claims forms provided by the Tribe which all list the CHS program as the payor.  (ECF No. 246-2).  And while the claims forms do not specify whether the authorization came "via purchase order," a factfinder could infer that if the CHS program was listed as the payor then it had, or likely would, authorize the care via a purchase order.  (*See id.*)

True enough, Defense Counsel established at the hearing that the mere fact that a claim form names the CHS Program does not necessarily mean that there was an underlying purchase order.  However, compared to a claim form that does not list the CHS program, the listing of the CHS Program or the Nimkee Clinic certainly makes it more likely (even if not by much) that there was an underlying purchase order.  Indeed, a referral from the CHS program is one of the prerequisites for Medicare like rates, as are, according to Blue Cross, purchase orders.  No doubt, there is at least some *correlation* between CHS referrals and CHS purchase orders.  *See Duby v. Shirley*, No. 16-11443, 2017 WL 5022639, at *3 (E.D. Mich. Nov. 3, 2017) (citing Fed. R. Evid. 401) (explaining the "low threshold"

for relevance during discovery).  At best, Blue Cross challenges the degree—not the existence—of the 837s' probative value.

Accordingly, the Court denies this motion for a protective order.

## V.  CONCLUSION

For these reasons, **IT IS ORDERED** that Plaintiff's motions for sanctions (ECF Nos. 233, 235) are **GRANTED**.  Further, it is **ORDERED** that Defendant shall pay Plaintiffs their reasonable expenses from Defendant's noncompliance.  Plaintiffs' have two weeks from the issuance of this order to identify their expenses via a bill of costs and fees to the Court and Defendant will have two weeks from that date to either pay these expenses or raise any issues with Plaintiff's calculations before the Court.

In addition, **IT IS ORDERED** that until Defendant produces each 837, the Court will also assume that each 837 not provided to Plaintiffs identifies CHS Program/Nimkee Health Clinic as both the "payer" and the "responsible party," and that each 837 contains an authorization code from the CHS Program.  Defendants are also warned that further noncompliance with the August 2 Order may result in harsher sanctions.

Last, **IT IS FURTHER ORDERED** that Defendant's first motion for a protective order (ECF No. 238) is **DENIED**, and that Defendant's second motion for a protective order (ECF No. 242) is **GRANTED**.

Date: February 1, 2023                              S/ PATRICIA T. MORRIS
                                                    Patricia T. Morris
                                                    United States Magistrate Judge