UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE
OF MICHIGAN and WELFARE BENEFIT PLAN,

        Plaintiffs,

v.

BLUE CROSS BLUE SHIELD OF MICHIGAN,

        Defendant.
_____/

Case No. 1:16-cv-10317

Honorable Thomas L. Ludington
United States District Judge

Honorable Patricia T. Morris
United States Magistrate Judge

**OPINION AND ORDER OVERRULING DEFENDANT'S OBJECTIONS TO SANCTIONS ORDER, OVERRULING DEFENDANT'S OBJECTION TO BILL OF COSTS, DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT, AND DIRECTING COMPLETION OF DISCOVERY**

For nearly a year, the parties have sought to learn what the difference was between the healthcare prices that Blue Cross negotiated and the prices that are charged to Medicare patients. The process has not gone smoothly. The source of the problem is at least significantly attributable to the lack of a meeting of the minds between counsel when they cowrote a single-page stipulation governing their respective discovery obligations in identifying nearly 100,000 insurance claims.

The parties' initial point of contention? Whether Blue Cross was obliged to produce insurance-claims forms for the covered healthcare received by members and employees of the Saginaw Chippewa Indian Tribe. The Tribe alleged that Blue Cross willfully violated court orders by producing physical forms but not the electronic versions, leading to sanctions issued by Judge Morris. Blue Cross countered that the sanctions and the associated costs were issued in error because the electronic version has a different name than the physical version that it was directed to produce. Their objections, however, find little traction; the distinction between physical and

electronic format is of little significance. As a result of additional motion practice, Judge Morris also resolved that the Tribe was to furnish Blue Cross with the birthdates of beneficiaries and to identify the beneficiaries' dependents.

Yet, the story doesn't end there. The Tribe's motion for default judgment, stemming from the very same stipulation, will be denied.

### I.

### A.

The two health-insurance plans at issue in this case are governed by two contracts between the Saginaw Chippewa Indian Tribe of Michigan (SCIT) and Blue Cross Blue Shield of Michigan. SCIT has a plan for its members ("Member Plan") and a policy for its employees[1] ("Employee Plan"). *See SCIT v. BCBSM*, 32 F.4th 548, 554 (6th Cir. 2022). These plans operate within the complex tapestry of federal-healthcare law.

American Indians[2] access federally funded healthcare through the Indian Health Service (IHS), a wing of the United States Department of Health and Human Services. The IHS funds and operates healthcare facilities for tribes. 42 C.F.R. § 136.23. The IHS separately funds programs for Contract Health Services[3] (CHS), administered by SCIT. *Id.* § 136.21; 25 U.S.C. § 1603(5), (12). The CHS programs are the focus of this case.

---

[1] Some employees are also members of SCIT, but it is a rare circumstance. *See SCIT v. BCBSM*, 32 F.4th 548, 555 (6th Cir. 2022) ("The Employee Plan covered Tribe employees regardless of their tribal membership status.").
[2] Throughout this opinion, the term "American Indian" refers to the indigenous peoples of the United States. While this term might be viewed as outdated or offensive, its usage here stems from the historical context and continued use by the United States Government, not an intent to offend or to perpetuate stereotypes. This Court recognizes the evolving nature of language and the importance of respecting diverse cultural identities.
[3] The Consolidated Appropriation Act of 2014 renamed the Contract Health Services program as "the Purchased/Referred Care program" (PRC). *See Purchased/Referred Care (PRC)*, INDIAN HEALTH SERVICE (June 2016), https://www.ihs.gov/newsroom/factsheets/purchasedreferredcare/

The CHS programs are essentially safety nets, providing access to health services that are not available at the IHS facilities. 42 C.F.R. § 136.23(a). Such services come from "public or private medical or hospital facilities other than those of the IHS." *Id.* § 136.21. Before receiving CHS care in nonemergency situations, the regulations require a preapproval process: the person's medical provider or representative must inform an ordering official that the services are necessary, providing relevant information to determine the medical necessity and the person's eligibility. *Id.* § 136.24(b). If approved, then the CHS program issues a referral or purchase order, which authorizes the eligible person to receive the requested medical services from a third-party provider. *Id.* § 136.24(a).

Each tribe plays the crucial role of administering, funding, and providing healthcare to its members. Congress, with concern for the tribes' sovereignty, enacted the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 5301 *et seq.* Under this law, tribes may opt to receive money from the federal government for managing their own IHS facilities, contracting private insurers for healthcare, and operating their own CHS programs. *See FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995).

Yet there remain difficulties in providing accessible and fully funded healthcare to American Indians. *Rancheria v. Hargan*, 296 F. Supp. 3d 256, 259 (D.D.C. 2017). To overcome these financial barriers, the CHS programs are deemed the "payer of last resort" for healthcare costs, 25 U.S.C. § 1623. Medicare, Medicaid, or private insurance may furnish funding first. 42 C.F.R. §§ 136.30, 136.61.

---

[https://perma.cc/NLK5-LH8U]. Yet throughout this litigation, every court and the parties have used the terms "CHS" and "Contract Health Services." The same is true here.

Significant financial constraints on CHS funds have led to amendments to federal law and regulations. The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 authorized the United States Department of Health and Human Services to demand Medicare pricing from hospitals that provide services to tribes under the CHS program. Pub. L. No. 108–173. And it did so by setting a ceiling on payments that Medicare-participating providers may seek for providing CHS-authorized care. 42 C.F.R. § 136.30.

SCIT operates its CHS program through the Nimkee Medical Clinic. *See* SAGINAW CHIPPEWA INDIAN TRIBE OF MICH., *Nimkee Memorial Wellness Center* (2023), http://www.sagchip.org/nimkee/medicalclinic/index.aspx [https://perma.cc/22EW-D9M9]. If the Nimkee Clinic cannot provide certain care, then it authorizes third-party care, which SCIT must approve with a purchase order that refers the patient to a third-party provider. *See* 42 C.F.R. § 136.24. Blue Cross's only involvement in this part of the process is issuing insurance cards for patients to present to third-party providers. *See* ECF No. 173 at PageID.8901.

SCIT funds the two healthcare plans from several sources. *SCIT v. BCBSM*, 32 F.4th 548, 554 (6th Cir. 2022). In addition to the availability of CHS funds, SCIT covers some expenses with funds from the Soaring Eagle Casino & Resort. *Id.* And SCIT has arranged a Medigap[4] insurance policy to fund expenses for other eligible beneficiaries.

Both healthcare plans are administered by Blue Cross under separate contracts. *Id.* at 555. The contracts limit Blue Cross's responsibilities "to providing administrative services for the processing and payment of claims." *Id.* Such services included Blue Cross receiving a "claim"

---

[4] Medicare recipients can "expand" their coverage "beyond [Medicare's] basic limits" by purchasing "private supplemental insurance plans, commonly referred to as 'Medigap policies.'" Edwin Caldie, Note, *Medigap: Should Private Insurers Pay Public Rates and Who Should Make the Decision?*, 30 AM. J.L. & MED. 69, 69 (2004) (citing 42 U.S.C. §§ 1395d, 1395ss(g)(1) (2000)).

from a third-party provider for any services provided to the plan member,[5] paying the bill from one of two SCIT-funded accounts, and providing quarterly or monthly reports of the remaining account balances to SCIT, which SCIT would use to determine how much additional funds to deposit into the accounts for future medical services. *See id.* at 567–68 (Rogers, J., concurring the judgment).

### B.

In January 2016, SCIT and its Welfare Benefit Plan ("Plaintiffs") sued Blue Cross under federal and state law, alleging it breached its fiduciary duty under Employee Retirement Income Security Act (ERISA) by paying excess claim amounts to Medicare-participating hospitals for authorized services, violated the Michigan Health Care False Claims Act by not seeking Medicare-like rates for eligible claims under the Member Plan, and breached its common-law fiduciary duty by not seeking Medicare-like rates for eligible claims under the Member Plan.

On its most recent trip to the Sixth Circuit, the case was reversed and remanded based on an interpretation of the applicable regulations. *SCIT v. BCBSM*, 32 F.4th 548 (6th Cir. 2022) (holding that Medicare-participating healthcare providers must accept Medicare-like rates as full payment for any care authorized by an American Indian tribe that is "carrying out" a CHS program), *en banc reh'g denied*, No. 21-1226, 2022 WL 2286404, at *1 (6th Cir. June 7, 2022). Based on numerous "legal and factual disputes" that were either "not address[ed]" or "not fully consider[ed]" the majority opinion instructed this Court to determine (1) whether SCIT's CHS program authorized the care that it asserts was subject to Medicare-like rates; (2) whether Blue

---

[5] The claims forms come in either electronic or physical format. *See SCIT v. BCBSM*, No. 1:16-CV-10317, 2023 WL 1452062, at *9 (E.D. Mich. Feb. 1, 2023) ("UB-04s and 837s are substantively identical." (citations omitted)).

Cross breached its fiduciary duty by not seeking Medicare-like rates; (3) whether Blue Cross violated the Michigan Health Care False Claim Act; and (4) whether the claims are barred by the statute of limitations based on when the Tribe had actual knowledge of the breach and whether Blue Cross's actions amounted to fraud or concealment. *Id.* at 563–65. And the concurring opinion instructed this Court to determine "whether Blue Cross undertook the *administration of CHS-authorized coverage*, and if so, whether Blue Cross applied [Medicare-like rates] to that coverage." *Id.* at 568 (Rogers, J., concurring the judgment).

On remand, the parties decided to conduct discovery on nearly 100,000 insurance claims. Their goals were to assess the scope of the CHS services that SCIT carried out and to quantify the monetary difference between Medicare-like rates and the rates that Blue Cross negotiated and paid to the third-party providers. To that end, the Parties entered the following "Stipulation as to Certain Discovery" in August 2022:

> Under the Parties' Stipulation, through their counsel of record, and consistent with the issues addressed during the July 20, 2022 Status Conference, the Parties agree to an Order recognizing that:
> (i) BCBSM will make best efforts to produce to Plaintiffs, by August 31, 2022, the claims data relative to the Member Plan going back to July 2007, consistent with the claims data produced by BCBSM in the *Grand Traverse Band* litigation;
> (ii) Plaintiffs will make best efforts to identify for BCBSM, by August 31, 2022, the Tribal Members that participated in the Employee Plan ("Employee Tribal Members");
> (iii) after Plaintiffs identify for BCBSM the Employee Tribal Members, BCBSM will produce to Plaintiffs the claims data relative to those individuals going back to July 2007, consistent with the claims data produced by BCBSM in the *Grand Traverse Band* litigation; and
> (iv) the Parties will report to this Court, by September 2, 2022, the status of the foregoing discovery, and another status conference will follow that report.

ECF No. 222. The Stipulation, breathtaking in its simplicity and narrow scope, has caused months of discovery issues to dominate the merits of the case. In relevant part, Plaintiffs filed two motions for sanctions, Blue Cross was sanctioned by the magistrate judge, Blue Cross objected to the

sanctions, Plaintiffs filed a motion for default judgment, and a hearing was held to address the issues.

Blue Cross's objections will be resolved *infra* Part II, followed by Plaintiff's Motion for Default Judgment *infra* Part III.

## II.

### A.

Blue Cross first objects that Judge Morris clearly erred in ordering sanctions because the Stipulation did not require the production of the electronic claims forms ("837s") or any claims data for the dependents of SCIT employees who have the Employee Plan. ECF No. 272. The Parties disagreed over whether the Stipulation required Blue Cross to produce physical forms containing claims data ("UB-04s"). So Plaintiffs filed a motion to compel production of the UB-04s, and Blue Cross was directed to produce them. *SCIT v. BCBSM*, No. 1:16-CV-10317, 2022 WL 16920410, at *2–3 (E.D. Mich. Nov. 14, 2022). As it turned out, there is an electronic version of the UB-04s ("837s"), which Blue Cross was unwilling to produce under the Stipulation. *SCIT v. BCBSM*, 2023 WL 1452062, at *4 (E.D. Mich. Feb. 1, 2023) ("837s and UB-04s are substantively identical."). Plaintiffs filed two motions for sanctions, arguing Blue Cross violated the Stipulation and this Court's order. ECF Nos. 233; 235. On referral, United States Magistrate Judge Patricia T. Morris agreed that "Blue Cross willfully violated the orders" and sanctioned Blue Cross with attorney's fees and costs. *SCIT v. BCBSM*, 2023 WL 1452062, at *9–10.

"The Magistrate Judge's order resolved a nondispositive discovery dispute." *Cratty v. City of Allen Park*, No. 2:17-CV-11724, 2018 WL 3983806, at *1 (E.D. Mich. June 14, 2018) (citing *Baker v. Peterson*, 67 F. App'x 308, 311 (6th Cir. 2003) (per curiam) (unpublished)). So, this Court "must consider timely objections and modify or set aside any part of the order that is clearly

erroneous or is contrary to law." FED. R. CIV. P. 72(a); *accord* 28 U.S.C. § 636(b)(1)(A). But the bar is high. 12 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3069 (3d ed. 2022) ("In sum, it is extremely difficult to justify alteration of the magistrate judge's nondispositive actions by the district judge."). "A finding is 'clearly erroneous' [if] the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Mabry*, 518 F.3d 442, 449 (6th Cir. 2008) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 398 (1948)). Legal conclusions are reviewed *de novo* and contrary to law only if it "fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Bisig v. Time Warner Cable*, Inc., 940 F.3d 205, 219 (6th Cir. 2019) (quoting *United States v. Winsper*, No. 3:08-CV-00631, 2013 WL 5673617, at *1 (W.D. Ky. Oct. 17, 2013)).

But Judge Morris did not make a clear error in sanctioning Blue Cross. Any distinction between UB-04s and 837s, she noted, "puts form over substance" because "Blue Cross was to produce the underlying claim forms" under the Stipulation, and "837s and UB-04s are substantively identical" claims forms. *SCIT v. BCBSM*, No. 1:16-CV-10317, 2023 WL 1452062, at *4, 9 (E.D. Mich. Feb. 1, 2023). And true, she explained, the Stipulation "does not explicitly reference the dependents," but "a commonsense reading of the [Stipulation] would suggest that Blue Cross was to produce data for all claims under each employee's plan, which would include claims arising from care provided to the employee's dependents." *Id.* at *8 (noting the "briefing and emails from both parties" agreeing "that claims arising from care provided to dependents fell under the scope of the [Stipulation]").

Because Judge Morris applied the correct law and drew reasonable inferences in ordering sanctions, Blue Cross's objections to her decisions will be overruled. *See Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence . . . [the]

choice between them cannot be clearly erroneous."); *see also* Matthew N. Preston II, *The Tweet Test: Attributing Presidential Intent to Agency Action*, 10 BELMONT L. REV. 1, 5 (2022) (explaining that "[i]nconsistent review" of governmental decisionmaking can "devolve[] into an endless morass of discovery and policy disputes" (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2576 (2019) (Thomas, J., concurring in part and dissenting in part))).

**B.**

Blue Cross's objections hold no sway against Plaintiffs' Bill of Costs either. First, Blue Cross suggests no fee should be awarded if Judge Morris's sanctions order is overturned. ECF No. 267 at PageID.15012–14. But the sanctions will stand, *see* discussion *supra* Section II.A, and so will the fees. Next, Blue Cross insinuates that Plaintiffs did not exercise good judgment in their billing. *Id.* at PageID.15014–16 (citing ECF Nos. 260 at PageID.14784; 260-1). Not so.

Apart from numerous conclusory statements, Blue Cross protests that Plaintiffs put too many cooks in the kitchen, three attorneys and three other staff, to file two discovery motions. *Id.* at PageID.15015. But Blue Cross has not substantiated its argument with any benchmark or comparative analysis to prove that Plaintiffs colored outside the lines. Considering the unique complexity of the case—which weaves in nearly 100,000 insurance claims and a novel data analysis—multiple minds were required. Indeed, the parties have repeatedly acknowledged the need for expert opinions just to understand the insurance claims. Without specific evidence of excessive or redundant hours, Blue Cross's argument remains speculative.

Yet Plaintiffs bear the burden of "documenting [their] work" to justify their entitlement to attorney's fees and costs. *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 617 (6th Cir. 2007). To that end, they must "submit evidence supporting the hours worked and rates claimed," or "the . . . court may reduce the award accordingly." *Perry v. AutoZone Stores, Inc.*, 624 F. App'x 370, 372 (6th

Cir. 2015) (per curiam) (unpublished) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "This burden is generally satisfied through the submission of invoices and billing records," *Hardy v. United States*, 157 Fed. Cl. 464, 470 (2021) (citation omitted), containing "sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation," *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) (citation omitted). They must also prove that the hours invested in the case were reasonable, *Granzeier v. Middleton*, 173 F.3d 568, 577 (6th Cir. 1999) (citing *Hensley*, 461 U.S. at 433), and make a genuine effort to exclude hours that are "excessive, redundant, or otherwise unnecessary," *Hensley*, 461 U.S. at 434.

Plaintiffs have done their homework here. Their Bill of Costs spans from the day before they filed their first successful motion to compel, September 1, 2022, to the day before their successful oral argument on two motions seeking sanctions for Blue Cross's failure to compel, January 30, 2023. ECF No. 260 at PageID.14760–84. Each entry lucidly underscores it necessity vis-a-vis Blue Cross's violations and the ensuing sanctions. *See generally id.*

And Plaintiffs' fees and costs are well within reason. Plaintiffs request $91,672.00 for 239.85 hours of work, averaging $382.21 per hour. *See* ECF No. 260 at PageID.14784–85. Applying the required "lodestar method," *see Naji v. Lincoln*, No. 2:13-CV-10738, 2014 WL 6669278, at *1 (E.D. Mich. Nov. 24, 2014) (first citing FED. R. CIV. P. 37(a)(5); and then citing *Ellison v. Balinski*, 625 F.3d 953, 960 (6th Cir. 2010)), the hourly rate for plaintiffs' counsel in insurance law in Michigan is $350 per hour for the 25th percentile, $550 for the 75th percentile, and $750 for the 95th percentile, STATE BAR OF MICH., ECONOMIC OF LAW PRACTICE IN MICHIGAN 10 (2020), https://www.michbar.org/file/pmrc/articles/0000156.pdf [https://perma.cc/8KLR-DD8D]. Plaintiffs' counsel, billing slightly above the 25th percentile, have earned their due. Their

work throughout the discovery process—clear and cogent briefings, patient pursuits of discovery disputes, and averaging less than 1.6 hours of work per day on uniquely complex issues—has demonstrated efficiency, diligence, and competence such that $382.21 per hour is well deserved.

For those reasons, Blue Cross's objections to Plaintiffs' Bill of Costs will be overruled, and Blue Cross will be directed to pay $91,672.00 in attorney's fees and costs to Plaintiffs. But this does not quite tie up all the loose ends stemming from the Stipulation, ultimately leading to the motion for default judgment resolved in the next Part.

### III.

The next part of this story began three weeks after Judge Morris ordered sanctions, when Plaintiffs sought a default judgment for Blue Cross's slow and unresponsive discovery. ECF No. 266; *see also* ECF Nos. 276; 277. The parties' relevant disagreements were many, persisting through nine status conferences and two hearings. At the most recent hearing, the parties' discussed everything from the meaning of the Sixth Circuit's remand order to the discovery disputes as issue here. For brevity, this Part will only focus on the key issues relevant to this Order.

### A.

Four factors govern the determination of the appropriate sanctions for discovery violations:

(1) Was the party's lack of cooperation in discovery due to willfulness, bad faith, or fault?
(2) Was the adversary prejudiced as a result of the lack of cooperation?
(3) Was the party forewarned that failing to cooperate could trigger the sanction?
(4) Did the court first consider or impose milder sanctions?

*Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997) (citations omitted) ("In regard to the first factor, the Sixth Circuit has held that absent a clear record of delay or contumacious conduct, an abuse of discretion occurs if the district court dismisses an action with prejudice."). When Blue Cross was sanctioned with an order compelling discovery and the payment of fees and costs, it

was warned about possibly being sanctioned with a default judgment. *SCIT v. BCBSM*, No. 1:16-CV-10317, 2023 WL 1452062, at *10 (E.D. Mich. Feb. 1, 2023). So only the first factor warrants discussion.

The baffling Stipulation caused the relevant quagmires. The main problem, causing months of delay, was whether the Stipulation obligated Plaintiffs to supply Blue Cross with the birthdates of the SCIT members and employees so that it could more accurately search its database for pertinent claims. The hearing revealed that the parties could have unraveled this knot had they put their heads together. Although Plaintiffs showed that Blue Cross had the information earlier in the case, it was lost in translation when both sides played musical chairs with counsel. Plaintiffs later gave Blue Cross a list of names without birthdates. Why remove the birthdates? They don't say. Equally puzzling, Blue Cross, which could have mined its database to discover the respective birthdates, didn't do so. There remains another mystery.

A smattering of other issues still clutter the path. For example, Plaintiffs argue they have received thousands of claims for procedures performed by healthcare professionals that lack a corresponding facility claim from the hospital where the procedures were performed. If a SCIT member underwent an operation by a professional at a facility, and Blue Cross has produced the related professional claim, then where is the expected facility claim? Blue Cross's response: Plaintiffs can learn the information about the remaining claims data by serving its subpoenas on the third-party providers. Why haven't Plaintiffs served the subpoenas? They don't say.

Another sticking point is whether Blue Cross could have conducted a comprehensive search of its database for all relevant claims data but refused to do so. In the most recent hearing, counsel mentioned that Blue Cross's database has a searchable field showing whether a claim was referred by the Nimkee Clinic, indicating CHS authorization. *See also SCIT v. BCBSM*, 2022 WL

16920410, at *2 (E.D. Mich. Nov. 14, 2022) ("[T]he UB-04s would identify 'the Tribe's Nimkee Contract Health Program' in Box 38 as the 'Responsible Party.'"); ECF No. 271 at PageID.15079 (stipulating that "[e]ach Claim Form identifies the Tribe's 'Nimkee Clinic Contract Health Program' in Box 38 as the 'Responsible Party' . . . and each Claim Form identifies the Tribe's 'Nimkee Clinic Contract Health Program' in Box 80 as the 'authorized agent'"). If Blue Cross could indeed run such a search, then why the delay? Once again, Blue Cross is silent.

But these loose ends should not stall the case's progression on the merits. True, Plaintiffs cry prejudice, arguing Blue Cross is sitting on undisclosed claims data. But, as explained above, the parties appear to have exchanged most of the necessary information. So why the inaction? The Stipulation. Its lack of clarity has the parties lodged in a stalemate. Yet their intransigence is not defiance—it is a classic standoff in the face of confusion. *See Agarwal v. Morbark, LLC*, 585 F. Supp. 3d 1026, 1030 (E.D. Mich. 2021) ("With all the injustices in today's world, it can be easy to assume the worst in others. But we would all benefit from a bit more grace."), *aff'd*, No. 2022-1348, 2022 WL 2092774 (Fed. Cir. June 10, 2022).

For those reasons, Plaintiffs' Motion for Default Judgment will be denied. All that remains then is how to manage the case among the lingering discovery disputes—a topic on which the parties do not agree.

B.

During the most recent hearing, the parties claimed that the Sixth Circuit's remand order is too ambiguous to guide their actions on remand. Although the majority opinion directs "the district court [to] proceed with the triable and threshold factual question of whether the Tribe's CHS program authorized the care for which they assert they were entitled to pay Medicare-like rates," *SCIT v. BCBSM*, 32 F.4th 548, 565 (6th Cir. 2022), it is undisputed that SCIT's CHS

program authorized *some* care, *see* discussion *supra* Section III.A. This confusion, no doubt, contributed to the Sixth Circuit's clarification that "[t]he question, to be clear, is whether Blue Cross undertook the *administration of CHS-authorized coverage*, and if so, whether Blue Cross applied MLR to that coverage." *SCIT v. BCBSM*, 32 F.4th at 568 (Rogers, J., concurring in judgment) (directing the district court to determine "whether Blue Cross was in any way responsible for administering the CHS program, which was described by SCIT's counsel in its rebuttal argument as claims for care for tribal members, authorized by CHS, and paid for from a pool of money that included some CHS dollars").

During the hearing, the parties also covered the factual questions that the Sixth Circuit outlined pertaining to the case's merits. *See* discussion *supra* Section I.B. For instance, Plaintiffs suggested that Blue Cross, being in the business of administering other tribal plans, should have known about the requirement for Medicare-like rates since it was enacted—a point they say is supported by the testimony of Connie Sprague, who heads the Member Plan and the Employee Plan. Blue Cross countered that Plaintiffs should have acted sooner, so many or most of the ERISA claims are barred by the statute of limitations. Even if true, Plaintiffs argued, Blue Cross could have honored its obligation sooner but instead chose to follow the contract it had with SCIT. The parties also discussed the funding of claims in relation to the Nimkee Clinic, with Plaintiffs explaining the process and Blue Cross confirming it: SCIT deposits money into an account owned by Blue Cross, subject to a quarterly settlement where SCIT determines its next contribution.

Despite the discovery process generating this unnecessary conflict, Plaintiffs have enough information to assess the value of their claims. Nearly 100,000 claims are already on the table, and Plaintiffs' unsubstantiated speculation of lurking claims would not significantly affect the math, at least at this juncture. That is, the remaining discovery disputes mostly concern damages, not

liability. Meanwhile, the Sixth Circuit has remanded a well-briefed motion for summary judgment ripe for resolution. *See* ECF Nos. 173; 175; 177; 178. Hence, the parties will be directed to put forth their best efforts to complete the remaining discovery, which is necessary for the experts to complete their calculations. *See* Zakary A. Drabczyk, Note, *Share with Caution: The Dangers Behind Sharing Orders*, 65 WAYNE L. REV. 401, 435 (2020) ("The costly and inefficient state of discovery requires that courts and practitioners make reasonable efforts to streamline the exchange of information."). The motion for summary judgment will be addressed in a future order.

## IV.

Accordingly, it is **ORDERED** that Defendant's Objections to Judge Morris's Sanctions Order, ECF No. 272, is **OVERRULED**.

Further, it is **ORDERED** that Defendant's Objections to Plaintiffs' Bill of Costs, ECF No. 267, is **OVERRULED**.

Further, is it **ORDERED** that Defendant is **DIRECTED** to pay $91,672.00 in attorney's fees and costs to Plaintiffs **on or before August 15, 2023**.

Further, it is **ORDERED** that Plaintiffs' Motion for Default Judgment, ECF No. 266, is **DENIED WITHOUT PREJUDICE**.

Further, it is **ORDERED** that the parties are **DIRECTED** to put forth their best efforts to resolve the remaining discovery disputes while the pending motion for summary judgment is resolved.

Further, it is **ORDERED** that the parties are **DIRECTED** to complete expert discovery with respect to Lynda Myrick and Dawn Cornelis **on or before September 18, 2023**.

- 16 -

Further, it is **ORDERED** that a TEAMS Video/Telephone status conference is **SCHEDULED** for **September 25, 2023, at 3:00 pm**. Counsel will receive a TEAMS Invite in a separate email.

**This is not a final order and does not close the above-captioned case**.

Dated: July 19, 2023             s/Thomas L. Ludington
                                                                 THOMAS L. LUDINGTON
                                                                 United States District Judge