UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE
OF MICHIGAN and WELFARE BENEFIT PLAN,

|  |  |
|---|---|
| Plaintiffs, | Case No. 1:16-cv-10317 |
| v. | Honorable Thomas L. Ludington<br>United States District Judge |
| BLUE CROSS BLUE SHIELD OF MICHIGAN, | |
| Defendant. | Honorable Patricia T. Morris<br>United States Magistrate Judge |

_____/

**OPINION AND ORDER DENYING PLAINTIFFS' RENEWED MOTION FOR
DEFAULT JUDGMENT**

Plaintiffs Saginaw Chippewa Indian Tribe of Michigan (the "Tribe") is a federally recognized Indian Tribe with its Tribal Government headquarters in Mt. Pleasant, Michigan. ECF No. 7 at PageID.61. The Tribe has thousands of members and employs thousands of people—both members and nonmembers—to work at casinos and other commercial entities. *Id.* at PageID.61, 64. The Tribe created two health care plans—one for its Employees and one for its Members— and retained Blue Cross Blue Shield of Michigan (BCBSM) to administer these plans through separate, annual administrative service contracts. *Id.* at PageID.62; *see also Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 32 F.4th 548, 554 (6th Cir. 2022) [hereinafter *SCIT II*].

BCBSM has been the subject of numerous lawsuits concerning their "Hidden Fee System" in which BCBSM would inflate the fees it charged clients with hidden mark-ups to hospital charges. *See, e.g., Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan,* 722 F.3d 861 (6th Cir. 2013); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014); *Bd. of Trustees of the Michigan Reg'l Council of Carpenters Emp. Benefit*

*Fund v. Blue Cross Blue Shield of Michigan*, No. 13-CV-10416, 2013 WL 12184249 (E.D. Mich. Aug. 13, 2013) (noting twenty pending related cases in this District). Indeed, in 2014, the Sixth Circuit Court of Appeals "conclusively establish[ed] BCBSM's liability as an ERISA fiduciary for charging the hidden fees" to its clients, like the Tribe. ECF No. 112 at PageID.6201–02; *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014). And, as the Sixth Circuit has explained in this case, had the Tribe only alleged that BCBSM inflated the Tribe's medical bills with undisclosed administrative fees, "this would be a relatively simple case." *Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan,* 748 F. App'x 12, 14 (6th Cir. 2018) [hereinafter *Saginaw Chippewa I*]. But this case has become anything but.

This case has been pending for over seven years, has made two trips to the Sixth Circuit Court of Appeals and, since the most recent remand in April 2022, Counsel for *both* Parties have been talking past one another, letting a single, developing discovery dispute dominate their attention to the merits. The dispute? As explained by the Sixth Circuit, the Parties and this Court must resolve the "triable and factual question of whether the Tribe's CHS program authorized the care for which [the Tribe] asserts they were entitled to pay [only] Medicare-like rates." *SCIT II* at 565. Resolution has proved tedious. Since the Sixth Circuit's instructions on remand, the Parties have filed a total of 54 pleadings—including 16 motions—spanning nearly 4,000 pages within the record. Yet, a year-and-a-half after the Sixth Circuit's remand, the Parties are still pointing fingers.

The Tribe claims BCBSM has not produced all claims data, in violation of this Court's discovery orders, and moves for default judgment, even though this Court denied the Tribe's previous and nearly identical motion for default judgment four months ago. BCBSM claims it has furnished enough data for the Tribe to assess the value of its reaming claims and for the Parties to address the outstanding summary judgment motion; and blames its incomplete disclosure on the

- 2 -

Tribe's failure to identify its members within the Employee Plan. For reasons discussed hereinafter, the Tribe's Renewed Motion for Default Judgment, ECF No. 287, will be denied without prejudice.

## I.

### A. Regulatory and Factual Background

### i. The Indian Health Service

The federal government's provision of health care to American Indians[1] dates to the early 1800s, when American Indians living near military forts were provided "episodic care" from U.S. military physicians. INDIAN HEALTH SERV., THE FIRST 50 YEARS OF THE INDIAN HEALTH SERVICE: CARING & CURING 7 (2005), https://www.ihs.gov/sites/newsroom/themes/responsive2017/displa y_objects/documents/GOLD_BOOK_part1.pdf. [https://perma.cc/E5QF-ART8]. The first explicit provision of health care to American Indians by the federal government occurred in 1832, when Congress appropriated $12,000 to fund smallpox immunizations for American Indians. BRETT LEE SHELTON, LEGAL AND HISTORICAL ROOTS OF HEALTH CARE FOR AMERICAN INDIANS AND ALASKA NATIVE IN THE UNITED STATES 5 (2004), https://www.kff.org/wp-content/uploads/2013/01/legal-and-historical-roots-of-health-care-for-american-indians-and-alaska-natives-in-the-united-states.pdf [https://perma.cc/M3EU-38JV]. Four years later, the federal government created a program that provided health care services and physicians to the Ottawa and, notably, Chippewa Tribes. INDIAN HEALTH SERV., THE FIRST 50 YEARS OF THE INDIAN HEALTH SERVICE: CARING

---

[1] Throughout this Opinion, the term "American Indian" refers to the indigenous peoples of the United States. The use of this term stems from historical context, continued use by the U.S. Government, and modern guidance. *See Teaching and Learning about Native Americans: Terminology*, NAT'L MUSEUM OF THE AM. INDIAN, https://americanindian.si.edu/nk360/faq/did-you-know#:~:text=In%20the%20United%20States%2C%20Native,would%20like%20to%20be%20addressed (last visited Nov. 21, 2023) [https://perma.cc/ESX3-L3US]. This term is no way intended to offend or to perpetuate stereotypes.

& CURING 7 (2005), https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_object
s/documents/GOLD_BOOK_part1.pdf. [https://perma.cc/E5QF-ART8].

Although the War Department was initially charged with governing Indian Affairs,
Congress transferred this responsibility to the newly-formed Department of the Interior in 1849.
*Id.* In 1921, by passing the Snyder Act, 25 U.S.C.A. § 13, Congress authorized healthcare funding
to federally recognized tribes. And in 1955, Congress created the Indian Health Service (IHS)
within the U.S. Public Health Service—the precursor to the Department of Health and Human
Services (HHS)—and vested in IHS the responsibility of governing tribal healthcare. *See id.* at 8.
The IHS continues to govern tribal healthcare today. *SCIT II* at 552. Indeed, the IHS is the
"principal federal health care provider and health advocate for Indian people, and its goal is to
raise their health status to the highest possible level." *Agency Overview*, INDIAN HEALTH SERVS.,
https://www.ihs.gov/aboutihs/overview/ (last visited Nov. 27, 2023) [https://perma.cc/78S7-
6UR6]. The IHS funds and operates healthcare facilities for tribes, 42 C.F.R. § 136.23, and
separately funds Contract Health Service (CHS)[2] Programs. *Id*. § 136.21; 25 U.S.C. § 1603(5),
(12).

### ii. Contract Health Service

IHS funding for CHS is subject to annual Congressional appropriations. *See* INDIAN
HEALTH SERV., INDIAN HEALTH MANUAL § 2-3.3 (2019). As such, CHS is not an entitlement
program and cannot guarantee payment for tribal members. *Id.* Instead, CHS Programs operate as
safety nets by providing access to health services that are not available at direct-care IHS facilities.

---

[2] The Consolidated Appropriation Act of 2014 renamed the Contract Health Services Program as
"the Purchased/Referred Care program" (PRC). *See Purchased/Referred Care (PRC)*, INDIAN
HEALTH SERVICE (June 2016), https://www.ihs.gov/newsroom/factsheets/purchasedreferredc
are/ [https://perma.cc/NLK5-LH8U]. But throughout this litigation, every court and the parties
have used the terms "CHS" and "Contract Health Services." The same is true here.

*See* 42 C.F.R. § 136.23(a). Such services come from "public or private medical or hospital facilities other than those of the IHS." 42 C.F.R. § 136.21. Indeed, the IHS emphasizes that CHS is "for medical[] care provided *away from* an IHS or tribal health care facility[,]" *Purchased/Referred Care (PRC)*, INDIAN HEALTH SERVS., https://www.ihs.gov/prc/ (last visited Nov. 27, 2023) [https://perma.cc/VRY5-WDBY], and that CHS Programs are intended "to supplement and complement other health care resources available to eligible Indian people." *History*, INDIAN HEALTH SERVS., https://www.ihs.gov/prc/history/ (last visited Nov. 27, 2023) [https://perma.cc/ HU9L-2BF7].

In simple terms, CHS funds may be expended when "(1) no IHS direct care facility exists, (2) the direct care [facility] is incapable of providing required emergency and/or specialty care, (3) the direct care [facility] has an overflow of medical care workload, and (4) supplementation of alternate resources (i.e., Medicare, private insurance) is required to provide comprehensive care[.]" *Id.* But to be eligible for CHS, a tribal member must obtain preapproval—their medical provider or representative must inform an ordering official that the services are necessary and provide relevant information to determine medical necessity and the member's eligibility. *Id.* § 136.24(b). If approved, then the CHS Program issues a referral or purchase order, which authorizes the eligible member to receive the requested medical services from a third-party provider. *Id*. § 136.24(a).

### iii. The Indian Self-Determination and Education Assistance Act of 1975

In stark contrast to early tribal health care regulation discussed above, U.S. policy on American Indian healthcare since the 1960s has focused on tribal sovereignty and self-determination. BRETT LEE SHELTON, LEGAL AND HISTORICAL ROOTS OF HEALTH CARE FOR AMERICAN INDIANS AND ALASKA NATIVE IN THE UNITED STATES 2, 10 (2004),

https://www.kff.org/wp-content/uploads/2013/01/legal-and-historical-roots-of-health-care-for-american-indians-and-alaska-natives-in-the-united-states.pdf (describing this policy as a swinging pendulum) [https://perma.cc/M3EU-38JV]. For example, Congress enacted the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5301 *et seq*, in 1975.[3] Under this Act, tribes may opt to receive federal funding to (1) manage their own IHS facilities, contracting private insurers for healthcare, and (2) operate their own CHS Programs, funded by IHS. *See FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995). *See also SCIT II* at 554 (noting the Tribe "administers a CHS program under the Indian Self-Determination and Education Assistance Act[.]") Importantly, if a tribe chooses to operate its own CHS Program, it may also fund the Program using sources of income in addition to funds received by IHS for CHS care. *SCIT II* at 560 (citing 25 U.S.C. §§ 1621f(a)(1), 1641(d)(2)(A), 5325(m)).

### iv. Medicare-like Rate Regulation

In 2003, faced with significant financial constraints on CHS funds, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 which authorized HHS to demand no more than Medicare-like rates (MLRs) from hospitals that provide services to tribes under a CHS Program, including those CHS Programs which tribes themselves orchestrate. *See* Pub. L. No. 108–173 § 506. And HHS did so by setting a ceiling on payments that Medicare-

---

[3] In passing this Act, Congress recognized "the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of . . . Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities" and committed to "to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C. § 5302.

participating providers may seek for providing CHS-authorized care. 42 C.F.R. § 136.30. As explained by the then Acting Director of the IHS, MLRs "will reduce contract health expenses for hospital services and enable Indian health programs to use the resulting savings to increase services to their beneficiaries." Letter from Charles W. Grim, Assistant Surgeon General and Acting Director of IHS to Tribal Leaders and Urban Program Directors (July 19, 2007), https://www.ihs. gov/sites/prc/themes/responsive2017/display_objects/documents/mlri/Tribal%20Leader%20Lett er.pdf) [https://perma.cc/2CKH-9T8R]. MLR regulations went into effect on July 5, 2007. *Medicare-Like Rates Information*, INDIAN HEALTH SERV., https://www.ihs.gov/prc/medicare-like-rates-information/ (last visited Nov. 27, 2023) [https://perma.cc/TSV2-F4EU].

### v. The Tribe's Contracts with BCBSM, Nimkee Clinic, and CHS Program

In accordance with the Indian Self-Determination and Education Assistance Act of 1975, the Tribe established its own healthcare facility—the Nimkee Medical Clinic—and its own CHS Program in 1999. *See* SAGINAW CHIPPEWA INDIAN TRIBE OF MICH., *Nimkee Memorial Wellness Center* (2023), http://www.sagchip.org/nimkee/medicalclinic/index.aspx [https://perma.cc/22EW -D9M9]. If the Nimkee Clinic cannot provide certain care, then it authorizes third-party care through CHS, which the Tribe must explicitly approve with a purchase order that refers the member-patient to a third-party provider. *See* 42 C.F.R. § 136.24. This is where BCBSM comes in. *See* ECF No. 173 at PageID.8900.

The Tribe also created two separate healthcare plans governed by separate, annual administrative service contracts with BCBSM. *SCIT II* at 554. In the 1990s, the Tribe created the *Employee Plan* for Tribal employees, regardless of whether an employee was a member of the Tribe. ECF No. 112 at PageID.6202. In 2002, the Tribe created a separate *Member Plan* for all members of the Tribe, regardless of employment status. *Id.* As of 2004, both the Employee and

the Member Plan were self-funded or self-insured—the Tribe directly paid for the cost of health care benefits and paid BCBSM an administrative fee.[4] ECF Nos. 7 at PageID.64; 112 at PageID.6202. Importantly, the Tribe sought out and selected BCBSM to administer both plans. The plans were governed by "administrative service contracts" (ASCs) entered into by both the Tribe and BCBSM, and each ASC "was renewed year after year by the [P]arties." *See* ECF No. 7 at PageID.65–67. The first ASC for the Member Plan was effectuated in 2002 and the first ASC for the Employee Plan was effectuated in 2004. *Id.* at PageID.66. The ASCs for both the Member and Employee Plans limited BCBSM's responsibilities "to providing administrative services for the processing and payment of claims." *SCIT II* at 555. Such services included (1) BCBSM 's receipt of claims from third-party providers for any services provided to the plan member, (2) paying the bill from one of two accounts funded by the Tribe, (3) and reporting to the Tribe—monthly, quarterly, and annually—the remaining account balances, which the Tribe would then use to determine how much additional funds to deposit into the accounts for future medical services. *See id.* at 567–68 (Rogers, J., concurring the judgment).

### B.  Procedural Posture and *SCIT II*

Over seven years ago, in January 2016, the Tribe filed a nine-count Complaint against BCBSM alleging violations of the Employee Retirement Income Security Act (ERISA) (Counts I and II); violations of two Michigan statutes (Counts III and IV); common law contract and tort claims (Counts V, VI, VII); and fraud claims (Counts VIII and IX). *See generally* ECF No. 7. The

---

[4] The self-funded model provides the Tribe flexibility to customize benefits but increases the Tribe's financial risk, as the Tribe is liable for all health claims. ECF No. 112 at PageID.6202. Accordingly, to offset this risk, the Tribe purchases "stop loss" insurance from BCBSM which capped the Tribe's financial liability. *See id.*; ECF No. 7 at PageID.64.

Complaint focuses on (1) BCBSM's "Hidden Fee System;"[5] (2) BCBSM's Physicians Group Incentive Program (PGIP);[6] and, relevant to Plaintiffs' Renewed Motion for Default Judgment, (3) BCBSM's failure to screen for and only charge Medicare-like Rates (MLRs).

After the Parties' first round of summary judgment motions in 2017, this Court granted summary judgment in favor of the Tribe on its ERISA claims against BCBSM, but only as to the Hidden Fee System within the Tribe's Employee Plan. ECF No. 112. at PageID.6231–32. All other claims were dismissed in favor of BCBSM. *See* ECF Nos. 14, 22, 112. The Sixth Circuit Court of Appeals affirmed in all respects except one, and held that this Court erred in dismissing the Tribe's MLR claims because the Tribe sufficiently alleged that BCBSM failed to preserve plan assets and paid more than necessary for the Tribe's claims by failing to take advantage of the MLRs; and this is "actionable under ERISA." *SCIT I* at 20–21. On remand, in accordance with the Sixth Circuit's holding and the Parties' stipulation, this Court reinstated Counts I, IV, and VI of Plaintiffs'

---

[5] BCBSM's Hidden Fee System has been extensively litigated. *See, e.g., Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan,* 722 F.3d 861 (6th Cir. 2013); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014); *Bd. of Trustees of the Michigan Reg'l Council of Carpenters Emp. Benefit Fund v. Blue Cross Blue Shield of Michigan*, No. 13-CV-10416, 2013 WL 12184249 (E.D. Mich. Aug. 13, 2013) (noting twenty pending related cases in this District). But this Hidden Fee System is irrelevant to Plaintiffs' Renewed Motion for Default Judgment, as this Court already awarded summary judgment to Plaintiffs on their claims that that BCBSM's hidden fees within the Employee Plan violated ERISA. *See* ECF No. 112 at PageID.6225. This holding was affirmed on appeal. *SCIT I.* For a robust description of BCBSM's hidden fee system, *see id.* at PageID.6201–04; *Hi-Lex Controls Inc. v. Blue Cross & Blue Shield of Michigan*, No. 11-12557, 2013 WL 2285453, *3-8 (E.D. Mich. May 23, 2013), *amended*, No. 11-12557, 2013 WL 3773364 (E.D. Mich. July 17, 2013), *and aff'd sub nom. Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014), *and aff'd sub nom. Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014).

[6] BCBSM's PGIP is also irrelevant to Plaintiffs' Renewed Motion for Default Judgment. In July 2017, this Court granted BCBSM summary judgment on the PGIP issue, holding that "BCBSM's creation and administration of PGIP did not violate its fiduciary duty" because BCBSM did not receive any financial benefit. ECF No. 112 at PageID.6225–31. This holding was affirmed on appeal. *See SCIT I* at 22–24. For a description of BCBSM's PGIP, *see* ECF No. 112 at PageID.6204–08; *SCIT I* at 15.

Amended Complaint, ECF No. 7, insofar as those Counts assert claims related to MLR. ECF No. 141.

After some discovery disputes[7]—BCBSM filed a motion for summary judgment on the outstanding MLR claims. ECF No. 173. In its motion, BCBSM argued, as a threshold matter, that MLR regulations "only apply for services *payable* through" CHS Programs and, therefore, "MLR applies only to care *funded* by a CHS [P]rogram." *Id.* at PageID.8910 (emphasis added). Beyond this threshold, BCBSM argued that the Tribe's ERISA-MLR claims fail because (1) the claims are time-barred under the applicable statute of limitations, *id.* at PageID.8915–18; (2) BCBSM did not authorize or control CHS funds, *id.* at PageID.8921–23, (3) BCBSM's negotiation of network rates and the Tribe's ultimate network selection are not fiduciary decisions, *id.* at PageID.8923–24, and (4) BCBSM did not know "which (if any) Employee Plan participants, or claims, were eligible for MLR" and, therefore, "lacked the necessary information to administer claims in the manner [the Tribe] suggest[s]." *Id.* at PageID.8926. BCBSM argued that the Health Care False Claim Act and common law claims fail for similar reasons. *See id.* at PageID.8926–30.

After additional discovery disputes,[8] this Court granted BCBSM's motion for summary judgment on August 8, 2020, agreeing with BCBSM that relevant regulations limited MLRs to only "those services *funded* by [a] CHS" Program. ECF No. 197 at PageID.12655. Since the Tribe

---

[7] *See* ECF Nos. 154 (Defendant's Motion to Deem Admitted Requests for Admission); 157 (Plaintiffs' Response); 159 (Defendant's Reply in support); 161 (Statement of Resolved and Unresolved Issues); 163 (Defendant's Motion to Compel Plaintiffs' Full and Complete Production of Documents); 167 (Plaintiffs' Response); 168 (Defendant's Reply in Support); 170 (Statement of Resolved and Unresolved Issues).

[8] *See* ECF Nos. 179 (Defendant's Second Motion to Compel Plaintiffs' Full and Complete Production of Documents); 183 (Plaintiffs' Response); 184 (Defendant's Reply in Support); 185 (Statement of Resolved and Unresolved Issues); 192 (Order Denying Second Motion to Compel); 193 (Defendant's Motion for Reconsideration).

funded its CHS program, this Court dismissed all outstanding MLR claims. *Id.* at PageID.12655–56; *see also* ECF No. 198.

Plaintiffs appealed again. ECF No. 203. And the Sixth Circuit reversed, again, finding that this Court erred in narrowly interpreting the relevant MLR regulations to limit the rates' applicability to services paid for using CHS funds. *SCIT II.* Instead, the Sixth Circuit concluded that the relevant regulations only require that the Tribe *authorize* the care in furtherance of its CHS Program, not necessarily pay for the care using CHS funds, because, importantly, some tribes may pay for CHS care with funds external to those provided by IHS. *Id.* at 560–61 (noting the relevant regulatory language "means that the Tribe . . . must be authorizing the care in furtherance of its [CHS] program."). Accordingly, the Sixth Circuit instructed this Court, on remand, to "proceed with the triable and threshold factual question of whether the Tribe's CHS program authorized the care for which they assert they were entitled to pay [MLRs]." *Id.* at 565. If so, the Sixth Circuit instructed, this Court should "then move on to consider" BCBSM's alternative summary judgment arguments. *Id.* Notably, the Sixth Circuit clarified the narrow nature of its holding:

> We offer a final word about the reach of this holding. One of the healthcare plans at issue in this case, the Employee Plan, covers Tribal employees regardless of whether they are members of the . . . Tribe. Our holding should not be construed as saying that MLR is available for care to all Employee Plan participants. [MLR is not extended] to those non-tribal employees simply because other participants in that healthcare plan are eligible for CHS care. Nor is MLR available for all care that a Tribe . . . authorizes. Instead . . . that authorized care must be limited to care involved in "carrying out a CHS [P]rogram." Put simply, MLR payments are available only for authorized CHS care. "Authorization" carries a specific meaning in the regulatory language, *see* 42 C.F.R. § 136.24. Care is "authorized" only after the medical care provider "notif[ies] the appropriate ordering official of the need for services" and gives "information necessary to determine the relative medical need for the services and the individual's eligibility." *Id.* § 136.24(b). Eligibility, in turn, is determined according to 42 C.F.R. § 136.12. Those eligible. . . are "persons of Indian descent belonging to the Indian community serviced by the local facilities and program," usually shown through evidence that an individual is "regarded as an Indian by the community," . . . *Id.* § 136.12(a). Also covered are non-Indian women who are pregnant with "an eligible Indian's child" during their pregnancies

and postpartum periods and "non-Indian members of an eligible Indian's household" if . . . "necessary to control acute infectious disease or a public health hazard." *Id*. **These . . . sections limit the availability of MLR only to healthcare services provided to eligible individuals with the requisite authorization. Even if it may be administratively difficult to parse out those eligible for such rates under the Employee Plan, the plain regulatory language requires it.**

*Id.* at 562. (emphasis added). On remand, the Parties began to "parse out those eligible" for MLR under the Tribe's Employee Plan because, in simple and general terms, only the Employee Plan is actionable under ERISA but only Tribal Members within this plan may be eligible for MLRs. And, as predicted by the Sixth Circuit, this parsing out has proved difficult.

## C. Discovery Since *SCIT II*

As discovery resumed on remand, so too did the discovery disputes.[9] On August 2, 2022, the Parties' stipulated and this Court ordered (the "August 2022 Discovery Order") that:

1.  BCBSM will make best efforts to produce to Plaintiffs by August 31, 2022, the claims data relative to the Member Plan going back to July 2007, consistent with the claims data produced by BCBSM in the *Grand Traverse Band* litigation;
2.  Plaintiffs will make best efforts to identify for BCBSM, by August 31, 2022, the Tribal Members that participated in the Employee Plan ("Employee Tribal Members");
3.  After Plaintiffs identify for BCBSM the Employee Tribal Members, BCBSM will produce to Plaintiffs the claims data relative to those individuals, consistent with the claims data produced by BCBSM in the *Grand Traverse Band* litigation[.]

ECF No. 222 at PageID.13297. It is important to emphasize that, per the Parties' stipulation, the onus was on *the Tribe* to first identify its members that participated in the Employee Plan and

---

[9] *See* ECF Nos. 209 (Plaintiffs' Motion to Compel Defendant to Produce Documents Withheld Under Purported Attorney Client Privilege); 210 (Plaintiffs' motion to file exhibits in public record); 217 (Defendant's Response); 220 (Defendant's Response); 221 (Plaintiffs' Reply in support); 223 (Statement of Resolved and Unresolved Issues); 225 (Plaintiffs' Motion to Compel Defendant to Supplement its Document Production); 226 (Defendant's Motion to Strike Plaintiffs' Supplemental Witness Disclosure); 228 (Plaintiffs' Response to 226); 229 (Defendant's Response to 225); 230 (Defendant's Reply in support of 226); 231 (Plaintiffs' Reply in Support of 225).

provide a list of these individuals to BCBSM, to allow BCBSM to then produce the claims data for these individuals.[10] *See id.* Although not stated in this Order,[11] "claims data" includes (1) the name and location of healthcare providers who administered services to Tribal employees and members; (2) patient identities; (3) the specific services provided; (4) the dates of service; (5) rates billed by the providers; (6) rates BCBSM paid; (7) the identity and address of the parties responsible for payment (8) the identity of the payer(s); and (9) the signature of the authorizing entity or person. ECF Nos. 233 at PageID.13918–19; 235 at PageID.13994.

This Court issued another discovery order the following month (the "November 2022 Discovery Order"), directing BCBSM to "provide Plaintiffs with all UB-04 forms . . . on or before November 28, 2022." ECF No. 232 at PageID.13906 (emphasis omitted). A UB-04 form is "a universally accepted billing form for services rendered by [healthcare] facilities." *Malibu Behav. Health Servs. Inc. v. Magellan Healthcare, Inc.*, No. 220CV1731ODWPVCX, 2021 WL 2457155, at *2 (C.D. Cal. June 16, 2021). In other words, UB-04 forms are used by healthcare facilities when billing an insurer and contain the "claims data" called for in the August 2022 Discovery Order. *See* ECF No. 235 at PageID.13993-94. There are 81 fields within a UB-04 form. And this Court specifically stated that fields 38 (Responsible Party Name and Address), 50 (Payer Code), 63 (Treatment Authorization Code),[12] and 80 (Remarks and Signature) would, relevant to the

---

[10] Notably, the Sixth Circuit has also implied the Tribe's responsibility to identify for BCBSM its member-employees. *See SCIT II* at 555 (noting "[t]he Tribe did not inform [BCBSM] which employees covered under its [Employee Plan] were members eligible for the CHS program.")

[11] This Court has opined that much of the Parties' discovery disputes stemmed from this Order because the Parties' stipulation was "breathtaking in its simplicity and narrow scope[.]" *See* ECF No. 283 at PageID.15613, 15619 ("The baffling [s]tipulation caused the relevant quagmires.").

[12] Treatment Authorization Codes are numbers that designate whether the treatment billed has been authorized by the payer indicated in Field 50. *UF-04 Instructions and Sample Claim Form*, SECURITYHEALTHPLAN (last updated Sep. 15, 2021), https://www.securityhealth.org/providers/provider-manual/shared-content/claims-processing-policies-and-procedures/ub-04-instructions-and-sample-claim-form?claims-processing-policies-and-procedures-group--direct-pay

- 13 -

outstanding MLR issues and consistent with the Sixth Circuit's mandate, reflect if a given claim was *referred* or *authorized* by the Tribe's CHS Program.[13] ECF No. 232 at PageID.13903.

Within a span of two weeks in November 2022, the Tribe filed two motions for sanctions.[14] ECF Nos. 233; 235. The first alleged that BCBSM had not produced all claims data relative to the Member Plan and the Tribal members participating in the Employee Plan and, thus, was in violation of the August 2022 Discovery Order. ECF No. 233. BCBSM responded that "there is nothing left for BCBSM to produce" because it already produced "over 24-million unique cells of claims data" and it "will never be able to produce a 100% population-rate for the tens of millions of cells" called for. ECF No. 236 at PageID.14041–42, 14050. The Tribe's second motion for sanctions alleged that BCBSM violated this Court's November 2022 Discovery Order. ECF No. 235. Specifically, the Tribe argued "none of the UB-04s produced by BCBSM to-date (158 of ~505,000 claims) relate to the claims at issue[,]" *id.* at PageID.13990 n. 3, and that BCBSM has "selectively produced irrelevant UB-04 forms . . . while simultaneously continuing to withhold relevant forms." *Id.* at PageID.13991 n. 4. BCBSM responded that it provided "all Form UB-04s in its possession" but, while searching, it realized that a majority of claims were submitted not via UB-04s but via 837I forms.[15] ECF No. 245 at PageID.14369.

---

[https://perma.cc/RV9V-YKYG]. In other words, the code "designates that treatment has been authorized" by the payer. *See* ECF No. 231-6 at PageID.13892.

[13] Specifically, if a claim was authorized by the Tribe's CHS Program, the Tribe's Nimkee Contract Health Program would be identified in fields 38, 50, 63, and 80. *See* ECF No. 232 at PageID.13903.

[14] Although these motions were titled Motions "for Order to Show Cause," *see* ECF Nos. 233; 235, as Magistrate Judge Patricia T. Morris noted, these motions are best classified as motions for sanctions because a show cause order "would serve no purpose" as BCBSM "had—and took advantage of—an opportunity to file response briefs to both of the Tribe's motions, and they were able to further elaborate on their position at oral argument." ECF No. 255 at pageID.14667 n. 2.

[15] Importantly, 837I forms are the electronic equivalent of UB-04s and contain the same 81 data fields. Medicare Learning Network, Medicare Billing: Form CMS-1450 and the 837 Institutional 3 (2018) https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documen

On February 1, 2023, Magistrate Judge Patricia T. Morris granted Plaintiffs' motions for sanctions, ECF Nos. 233; 235, holding that BCBSM violated both the August 2022 Discovery Order and the November 2022 Discover Order. ECF No. 255 at PageID.14666–81. Judge Morris found that BCBSM did not make its best efforts to disclose the *Member Plan* claims data, noting the efforts it argued were its "best" came only *after* the deadline to disclose. ECF No. 255 at PageID.14668–70. However, Judge Morris found that BCBSM "cured these deficiencies" by producing, after the deadline, "all of the claims data in its possession pertaining to the [M]ember [P]lan." *Id.* at PageID.14670–72. Judge Morris also repeatedly emphasized that BCBSM "produced data at essentially the same rate as it did in the *Grand Traverse Band* litigation[,]" consistent with the August 2022 Discovery Order. *Id.* at PageID.14671, 13673. Judge Morris found BCBSM's *Employee Plan* disclosure lacking because, although the August 2020 Discovery Order did not reference employee-dependents, a "commonsense reading of the [O]rder [suggested] that [BCBSM] was to produce data for *all* claims under each employee's plan, which would include claims arising from care provided to the employee's dependents." *Id.* at PageID.14675. Because BCBSM did not produce any claims data for the dependents of Employee Plan participants, Judge Morris concluded BCBSM violated this Court's August 2022 Discovery Order. *See id.*

Turning to the November 2022 Discovery Order, Judge Morris found that BCBSM should have produced the 387Is because they are the electronic equivalent of the UB-04s. *Id.* at PageID.14677–79. Judge Morris noted that BCBSM "should have understood that the November [2022 Discovery] Order encompassed the 387[I]s and begun searching for these claims immediately. Moreover, once [BCBSM] learned about the widespread use of the [387s], it did not

---

ts/006926_2018-06_MedicareBillingFormCMS-1450andthe837I_Final.pdf [https://perma.cc/G3 2Q-H4RA].

make any efforts to mitigate[;] instead, it doubled-down and moved for a protective order[.]" *Id.*

at PageID.14679; *see also* ECF No. 238.

Accordingly, Judge Morris ordered that:

> [U]ntil [BCBSM] produces each 837, the Court will . . . assume that each 837 not
> provided to Plaintiffs identifies [the Tribes'] CHS Program/Nimkee Health Clinic
> as both the "payer" and the "responsible party," and that each 837 contains an
> authorization code from the [Tribe's] CHS Program. Defendants are also warned
> that further noncompliance with the August 2 Order may result in harsher sanctions.

ECF No. 255 at PageID.14685. BCBSM promptly raised six objections to Judge Morris's Order,

ECF No. 261, but these objections were overruled. ECF No. 283.

One month after Judge Morris's Order, the Parties stipulated to and this Court ordered the

following as judicially established:

1. For each hospital claim for healthcare services provided to a [CHS]-eligible
   member of the Tribe in this case, there is a corresponding claim form in either
   UB-04 form or 837 file [("Claim Form")].
2. Each Claim Form identifies the Tribe's "Nimkee Clinic Contract Health
   Program" in [Field] 38 as the "Responsible Party;" each Claim Form identifies
   the Tribe's "Nimkee Clinic Contract Health Program," along with BCBSM, in
   [Field] 50 as the "Payer;" and each Claim Form identifies the Tribe's "Nimkee
   Clinic Contract Health Program" in [Field] 80 as the "authorized agent."
3. Before administering and paying (using tribal plan assets) a hospital claim for
   healthcare services provided to a CHS-eligible tribal member on behalf of the
   Tribe and its plans, BCBSM received from the relevant hospital a Claim Form
   in the form described above, with the information described above, relative to
   that hospital claim.
4. Exemplar Claims Forms are attached as Exhibit 1 [ECF No. 271-1] and are
   admissible at any hearing or trial for purposes of demonstrating what is being
   stipulated in this Order.
5. By contrast, for hospital claims relating to non-CHS-eligible participants in the
   Tribe's plans, the claim form received by BCBSM prior to BCBSM's
   administration and payment of the claim would not identify the Tribe's Nimkee
   Contract Health Program in the above-described fields.
6. An exemplar claim form for this type of hospital claim is attached as Exhibit 2
   [ECF No. 271-2] and is admissible at any hearing or trial in this case for
   purposes of what is being stipulated in this Order.

ECF No. 271 at PageID.15082–83. This Court further ordered that "BCBSM is **RELIEVED** of its

obligation to produce UB-04 and 837 Claim Forms in this case." *Id.* (emphasis in original).

On February 23, 2023, the Tribe filed its first motion for default judgment arguing that

BCBSM's production of the member-employee claims data was lackluster. *See generally* ECF

Nos. 266; 277. BCBSM responded that the data sought by the Tribe pertained to damages and,

cyclically, blamed the Tribe for not providing it with the data BCBSM needed to, in turn, provide

the data sought by the Tribe. *See generally* ECF No. 276. Nine status conferences and two hearings

later, this Court denied the Tribe's first motion for default. ECF No. 283 at PageID.15618. This

Court noted, despite the significant time, energy, and resources spent by the Parties and this Court,

at the core of the discovery dispute were birthdates needed to conduct the most accurate searches

for claims data.[16] Specifically, this Court noted:

> The main problem, causing months of delay, was whether the [Parties' August
> 2022] Stipulation obligated [the Tribe] to supply [BCBSM] with the birthdays of
> the [Tribal] members and employees so that it could more accurately search its
> database for pertinent claims. The hearing revealed that the parties could have
> unraveled this knot had they put their heads together. Although [the Tribe] showed
> that [BCBSM] had the information earlier in the case, it was lost in translation when
> both sides played musical chairs with counsel. [The Tribe] later gave [BCBSM] a
> list of names without birthdates. Why remove the birthdates? They don't say.
> Equally puzzling, [BCBSM], which could have mined its database to discover the
> respective birthdates, didn't do so. There remains another mystery.

*Id.* at PageID.15619. This Court's order also addressed two other "sticking point[s]" between the

Parties. *Id.* The first was the Tribe's contention that thousands of claims provided by BCBSM

lacked a facility claim or code from the hospitals where procedures were performed. *Id.* BCBSM

responded that the Tribe could learn this information by subpoenaing the third-party providers. *Id.*

---

[16] BCBSM noted "[t]he import of birthdates" in its Response to the Tribe's first motion for default
judgment, explaining that, if the Tribe did not provide the birthdates for the relevant member-
employees, BCBSM could not quickly produce the relevant claims data. ECF No. 276 at
PageID.15194, 15196.

- 17 -

But the Tribe had not done so and did not explain why. *Id.* The second sticking point was why, despite evidence that its database had a searchable field, BCBSM had not searched its database for the claims referred by the Nimkee Clinic, which would reveal the claims authorized by CHS to which MLR pricing may apply. *Id.* On this issue, BCBSM was silent. *Id.* at PageID.15620.

Ultimately, this Court denied the Tribe's motion for default judgment without prejudice because the Parties "exchanged most of the necessary information." *Id.* Indeed, this Court held that the Tribe had "enough information to assess the value of their claims" because "[n]early 100,000 claims are already on the table[.]" *Id.* at PageID.15621. This Court also noted that the Tribe's allegation that BCBSM was sitting on undisclosed claims data is "unsubstantiated speculation" and that any remaining claims would "mostly concern damages, not liability." *Id.* at PageID.15621–22. Accordingly, this Court ordered *both* Parties to "put forth their best efforts to resolve the remaining discovery disputes[.]" *Id.* at 15622.

But the Tribe contends that BCBSM has not put forth its best efforts and, on October 9, 2023, filed a Renewed Motion for Default Judgment. ECF No. 287. BCBSM responded on November 6, 2023. The Tribe replied on November 27, 2023.

## II.

"A district court may sanction parties who fail to comply with discovery orders in a variety of ways, including dismissal of their lawsuit or entry of default judgment against them." *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990) (citing FED. R. CIV. P. 37(b)(2)(C)). But entering a default judgment is a "drastic" remedy "which should be [awarded] only in the most extreme cases[.]" *Stooksbury v. Ross*, 528 F. App'x 547, 552 (6th Cir. 2013) (quoting *United Coin Meter Co. v. Seaboard Coastline R.R.*, 705 F.2d 839, 845 (6th Cir.1983)).

Indeed, a default judgment may be imposed *only* if the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault. *Abbe*, 916 F.2d at 107. Additional factors include whether the adversary was prejudiced as a result of the lack of cooperation; whether the party was forewarned that failing to cooperate could trigger the sanction; and whether milder sanctions should be first considered. *See Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997); *see also Victor v. Reynolds*, 649 F. Supp. 3d 499, 506 (E.D. Mich. 2023), *reconsideration denied,* No. 1:20-CV-13218, 2023 WL 4157616 (E.D. Mich. June 23, 2023). And these four factors are applied more "stringently" where counsel, rather than the party, is responsible for the discovery violation*. Harmon v. CSX Transp., Inc.,* 110 F.3d 364, 367 (6th Cir. 1997). Thus, dismissal is "usually inappropriate" if, as here, a party's attorney, rather than the party itself, is at fault. *Vinci v. Consol. Rail Corp.*, 927 F.2d 287, 287 (6th Cir. 1991) (per curiam) (quoting *Carter v. City of Memphis*, 636 F.2d 159, 161 (6th Cir. 1980)).

### III.

The Tribe's Renewed Motion for Default fails at the first step: the Tribe has not shown that BCBSM's failure to comply with discovery is motivated by bad faith, willfulness, or fault. "To show that a party's failure to comply was motivated by bad faith, willfulness, or fault, the conduct must display either intent to thwart judicial proceedings or a reckless disregard for the effect of [its] conduct on those proceedings." *Mager v. Wis. Central Ltd.*, 924 F.3d 831, 837 (6th Cir. 2019) (citation omitted). But BCBSM's challenged conduct displays neither.

Most of the Tribe's Renewed Motion raises the same arguments already raised in its first motion, and already rejected by this Court as failing to show bad faith on BCBSM's behalf. *See* ECF Nos. 266; 283. For example, the Tribe argues that BCBSM violated this Court's August 2022 and November 2022 Discovery Orders. ECF No. 287 at PageID.16028-31. But that much is

known—and, as the Tribe recognizes, BCBSM was already sanctioned for this conduct in the form of adverse inferences and attorney's fees. ECF No. 255. The Tribe also argues, again, that BCBSM "lied" when it represented that 57 tribal members never visited a hospital because the Tribe later discovered that 33 of the 57 had. *Compare* ECF No. 287 at PageID.16031–33 *with* ECF No. 266 at PageID.14918–19, 14924–28; *see also* ECF No. 266-10 at PageID.1464. The birthdates were brought up again, too. The Tribe argues that BCBSM "lied" when it claimed to lack knowledge of the birthdates for certain member-employees. ECF No.287 at PageID.16033–34. But this Court already found that the birthday dispute did not demonstrate bad faith on BCBSM's behalf because, although BCBSM had been provided with the birthdates, the dates had reasonably been "lost in translation when both sides played musical chairs with counsel" for over a year-and-a-half, ECF No. 283 at PageID.15619. Indeed, the Tribe could have just as easily provided BCBSM with the birthdates again upon BCBSM's numerous requests for such information,[17] instead of refusing to do so—only to then turn around and file two motions for default judgment claiming that BCBSM failed to disclose the very claims data that BCBSM told the Tribe it needed the birthdates in question to produce.

---

[17] BCBSM indicated that, as early as July 2022, the Tribe agreed to "identify tribal members that participated in the Employee Plan so BCBSM could produce corresponding claims data[;]" acknowledged the BCBSM's need for more than "just names[;]" and "expressly agreed" to provide birthdates or social security numbers. ECF Nos. 276 at PageID.15194; 276-2 at PageID.15219–20. But on August 31, 2022, the Tribe only provided the names of 136 member-employees, with no accompanying birthdates or social security numbers. *See* ECF No. 276 at PageID.15195. In response, on November 18, 2022, BCBSM Counsel emailed the Tribe's Counsel and "renewed its request for birthdates[,]" explaining, again, that knowing the birthdates of the relevant member-employees would significantly expedite BCBSM's disclosure of the claims data. *Id.* at PageID.15196; *see also* ECF No. 236-9 at PageID.14107.

The Tribe only raises two *new* arguments in support of its Renewed Motion, referring to an ongoing email exchange between counsel spanning from July 24, 2023 through September 14, 2023. *See generally* ECF No.288. But neither new argument shows that BCBSM acted in bad faith.

## A.

First, the Tribe argues that BCBSM admitted, in these emails, "that it was sitting on undisclosed data" and invented yet another "lie"—that BCBSM "needed Plaintiffs to re-identify the tribal members enrolled in the Employee Plan." ECF No. 287 at PageID.16035 (emphasis omitted). But the emails the Tribe cite show nothing of the sort. In an email sent on September 5, 2023, counsel for the Tribe's emailed BCBSM's Counsel asking "[w]hy hasn't BCBSM turned over all the Employee Plan claims data when it can do so easily?" ECF No. 288-3 at PageID.16187. Counsel for BCBSM's responded, consistent with the Sixth Circuit's mandate, that:

> Only claims data for *tribal members* [within the Employee Plan] is relevant, and only a small percentage of employees were actually tribal members. . . . And again, that is why Plaintiffs were obligated to identify for BCBSM the tribal members on the Employee Plan. [*See* ECF No. 222] They failed to do that. And without explanation, Plaintiffs refuse to revisit doing that after having identified just 136, so BCBSM is doing that for them."

*Id.* at PageID.16186–87. The Tribe's counsel responded, referencing a prior conference call:

> We also discussed BCBSM's forthcoming production of additional claims. You indicated that BCBSM will be producing additional claims by way of a rolling production. You were not able to identify for me how many claims BCBSM still needs to produce. You also were unable to identify the date(s) on which BCBSM would be making its rolling productions. You also were unable to identify for me the date on which BCBSM expects to complete its claims data production.

*Id.* at PageID.16185. BCBSM's counsel responded on September 8, 2023. True, as the Tribe notes in its Renewed Motion, BCBSM agreed that it could not identify the precise date it would "be done going through the purchase orders one-by-one and producing claims data for the tribal

member employees[.]" ECF No. 288-3 at PageID.16184. But the Tribe's selected quotation cuts

BCBSM's Counsels' sentence short and does not provide full context. The quote reads, in full,

> As to when BCBSM will be done going through the purchase orders one-by-one
> and producing the claims data for the tribal member employees *that Plaintiffs failed
> to identify*, I do not have a date certain. But BCBSM continues to work hard *to
> remedy Plaintiffs' violations* of court orders, and BCBSM will be seeking sanctions
> for *Plaintiffs' unwillingness to simply identify for BCBSM the tribal member
> employees on the Employee Plan*. I cannot identify for you the number of additional
> claims that will be produced on a rolling basis, but that is *only because I do not yet
> know the number of tribal member employees that Plaintiffs failed to identify*. That
> is on Plaintiffs, not BCBSM.

*Id.* (emphasis added).

The Tribe calls BCBSM's need for the Tribe to identify member-employees a "lie"

because, in 2019, the Tribe provided BCBSM and former counsel with two separate lists—one

identifying tribal members and one identifying tribal employees. ECF No. 287 at PageID.16036.

According to the Tribe, "all BCBSM had to do was cross-reference those lists."[18] *Id.* But, in 2022,

the Tribe was ordered, *based on their own stipulation*, to "make its best efforts to identify for

BCBSM . . . the Tribal Members that participated in the Employee Plan[,]" so that BCBSM could

then produce the relevant claims data. ECF No. 222 at PageID.13297. Once again, the August

2022 stipulation rears its overly-simplistic head. And although it may have been the Tribe's best

efforts at the time, the Tribe's first disclosure of 161 members on its Employee Plan missed at least

200 people. ECF No. 289 at PageID.16265. Its second disclosure of 561 missed at least 120.[19] *Id.*

Far from a "lie," BCBSM's requests that the Tribe identify its members within the Employee Plan

---

[18] Notably, BCBSM responded that these lists do not, in fact, contain a full list of Tribal members
from 2007-2019. ECF No. 289 at PageID.16264.
[19] Indeed, although the Tribe argues that BCBSM's request for member-employee identification
is grounds for a default judgment, the Tribe complied with BCBSM's request for identification on
September 14, 2023 and attached a list of 561 individuals. *See* ECF No. 288-3 at PageID.16182;
*see also* ECF No. 288-4.

reflects this Court's August 2022 Discovery Order, which was based on the Tribe's own stipulation. Far from bad faith, BCBSM's "sitting on undisclosed data" reflects the fact that the Tribe did not identify all its member-employees.[20] This argument is not a sufficient ground for default judgment.

## B.

Second, the Tribe claims that BCBSM continues to withhold "4,322/4,806 claims Plaintiffs identified for BCBSM in June" 2023 and that BCBSM is doing so selectively, withholding the "most significant claims, namely those with a greater difference between its usual rates and" MLR. ECF No. 287 at PageID.16039–40 (emphasis omitted). But how these claims are being withheld, the Tribe does not say and the record does not show.

During a June 27, 2023 hearing, counsel for BCBSM confirmed they received 4,806 purchase orders.[21] Despite having received these orders only four days before the hearing, BCBSM had already analyzed the first set of 1,000. ECF No. 289 at PageID.16253–54. And the emails the Tribe attached to its Renewed Motion confirm BCBSM's good faith. By August 11, BCBSM had analyzed the first 2,000 purchase orders and emailed the Tribe's counsel with preliminary findings. *See* ECF No. 288-3 at PageID.16195. On September 8, 2023, BCBSM's counsel informed the

---

[20] The Tribe also suggests (1) that "BCBSM could have complied with [discovery] by simply producing all the claims data; it has not done so[,]" ECF No. 287 at PageID.16037; and (2) that BCBSM has the ability to, but has not, searched its database for claims authorized by the Tribe's CHS Program. *Id.* at PageID.16046. But BCBSM does not need to turn over "all" Employee Plan claims data, as only the Tribal members participating in this plan are relevant to the outstanding MLR issues. ECF No. 288-3 at PageID.16183; *see also* ECF No. 222. And BCBSM already indicated to the Tribe's counsel that BCBSM *did* search its database for mentions of the Nimkee Clinic "for both the Member Plan and the Employee Plan from 2007-present, and there were *zero* hits." ECF No. 288-3 at PageID.16183 (emphasis added).

[21] As discussed *supra* Section I.A., "purchase orders" accompany a CHS Program's authorization to bill MLR. 42 C.F.R. § 136.24(a). Here, if the Nimkee Clinic cannot provide certain care, it authorizes third-party care, which the Tribe must approve with a purchase order, referring the patient to the third-party provider. *See* ECF No. 283 at PageID.15611.

Tribe's counsel that the purchase orders did not reveal any missed Member Plan claims. *Id.* at PageID.16183. And, although these purchase orders claims did reveal *some* missing Employee Plan claims, all missing claims concerned individuals not yet identified by the Tribe nor provided to BCBSM. ECF No. 289 at PageID.16255 (emphasis in original). Indeed, after a back and forth between the parties, and in response to BCBSM's claim that the Tribe's initial disclosure of member-employees was incomplete, the Tribe produced a list of 561 member-employees and their birthdates. ECF No. 288-3 at PageID.16182. But BCBSM claims that there are at least 120 more member-employees missing from the list. ECF No. 289 at PageID.16256. The Tribe's assertion that BCBSM has not disclosed "thousands" of claims is unsupported and the Tribe has not shown that BCBSM's failure to provide the full claims data for the outstanding member-employees is willful or attributable to bad faith or fault. Indeed, the record suggests that the Tribe is also at fault.

### C.

Ultimately, two facts were true when this Court denied the Tribe's first motion for default judgment—and both remain true today: (1) "Plaintiffs have enough information to assess the value of their [remaining] claims" as "[n]early 100,000 claims are already on the table[;]" and (2) any additional claims, at this point, "would not significantly affect the math" and would pertain only to the Tribe's potential damages, not BCBSM's liability as to the outstanding MLR issues. ECF No. 283 at PageID.15621–22. The Tribe has not shown that BCBSM has demonstrated bad faith in discovery and, thus, its Renewed Motion for Default Judgment will be denied.

Turning to what remains of this discovery dispute, the Parties' pleadings, taken together, suggest that there are at least 681 Tribal *members* within the Employee Plan whose charges may have been eligible for a MLR ceiling. *See* ECF No. 289 at PageID.16265 (noting that BCBSM identified "120+" member-employees not provided on Plaintiffs' most recent list of 561). At the

upcoming status conference scheduled for December 4, 2023, this Court and the Parties will confirm the number of Tribal members who participated in the Employee Plan and will inquire as to BCBSM's analysis and disclosure of these members' claims data. Additionally, this Court and the Parties will establish a trajectory for the ultimate resolution of the outstanding MLR issues and will discuss dates to include in a final scheduling order, setting a firm motion cutoff.

Although this Court recognizes the growing number of stipulations, discovery orders, status conferences, and discovery pleadings within this case, this Court will continue to try to narrow the scope of discovery to avoid the "drastic" remedy of default judgment to the Tribe— particularly when the record suggests that the Tribe has been just as obstinate throughout discovery as they allege BCBSM has.

**IV.**

Accordingly, it **ORDERED** that Plaintiffs' Renewed Motion for Default Judgment, ECF No. 287, is **DENIED WITOUT PREJUDICE.**

**This is not a final order and does not close the above-captioned case**.

Dated: December 1, 2023                         s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge