UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE
OF MICHIGAN and WELFARE BENEFIT PLAN,

　　　　　　　　　　Plaintiffs,　　　　　　　　Case No. 1:16-cv-10317

v.　　　　　　　　　　　　　　　　　　　　　Honorable Thomas L. Ludington
　　　　　　　　　　　　　　　　　　　　　　United States District Judge

BLUE CROSS BLUE SHIELD OF MICHIGAN,

　　　　　　　　　　　　　　　　　　　　　　Honorable Patricia T. Morris
　　　　　　　　　　Defendant.　　　　　　　United States Magistrate Judge
_____/

**OPINION AND ORDER DENYING PLAINTIFFS' THIRD MOTION FOR DEFAULT
JUDGMENT; DENYING DEFENDANT'S MOTION FOR SANCTIONS; AND
DIRECTING SUPPLEMENTAL MERITS BREIFING**

　　　　Since the most recent remand from the Sixth Circuit, discovery disputes have dominated

the merits of this now eight-year-old case in which Plaintiff Saginaw Chippewa Indian Tribe (the

"Tribe") alleges, in part, that Defendant Blue Cross Blue Shield of Michigan ("BCBSM") failed

to ensure that Tribal member-employees paid only Medicare-Like rates for certain healthcare

services. Although this Court has denied the Tribe's first *two* motions for a default judgment, the

Tribe tries again and seeks—for the third time—a default judgment against BCBSM for their

alleged withholding of relevant insurance claims. In response, BCBSM filed its own motion for

sanctions, arguing the Tribe has not employed "best efforts" throughout discovery and, to the

contrary, has engaged in vexatious litigation.

　　　　For the reasons explained below, both Parties' motions will be denied. More importantly,

to facilitate the Parties' focus on the merits of the Tribe's remaining claims, this Court will direct

the Parties to file supplemental briefing on the arguments raised in BCBSM's 2020 Motion for

Summary Judgment.

**I.**

To understand the central dispute in this case, and the ancillary discovery outlined below, it is important to first understand the history and modern requirements of federal tribal healthcare legislation and regulation.

**A.  IHS, CHS, and Background on Tribal Healthcare**

In 1955, Congress created the Indian Health Service (IHS) to govern tribal healthcare. The IHS, now a sub-agency within the U.S. Department of Health and Human Services (HHS), continues to govern tribal healthcare today. Indeed, the IHS is the "principal federal health care provider and health advocate for Indian people, and its goal is to raise their health status to the highest possible level." *Agency Overview*, INDIAN HEALTH SERVS., https://www.ihs.gov/aboutihs/overview/ (last visited Aug. 8, 2024) [https://perma.cc/78S7-6UR6]. The IHS fulfils this mandate in two ways. First, IHS funds and operates healthcare facilities—such as hospitals and clinics—which provide direct care to American Indians.[1] 42 C.F.R. § 136.23. Second, IHS separately funds Contract Health Service (CHS) Programs,[2] which operate as a referral safety net such that, if an American Indian seeks a healthcare service that is *unavailable* at their direct-care IHS tribal facility, CHS Programs may refer that American Indian to a non-IHS healthcare provider or facility. *Id.* §§ 136.21(e), 136.23(a); 25 U.S.C. § 1603(5).

---

[1] Throughout this Opinion, the term "American Indian" refers to the indigenous peoples of the United States. The use of this term stems from historical context, continued use by the U.S. Government, and modern guidance. *See Teaching and Learning about Native Americans: Terminology*, NAT'L MUSEUM OF THE AM. INDIAN, https://americanindian.si.edu/nk360/faq/did-you-know#:~:text=In%20the%20United%20States%2C%20Native,would%20like%20to%20be%20addressed (last visited Aug. 8, 2024) [https://perma.cc/ESX3-L3US]. The use of this term is not intended to offend or to perpetuate stereotypes.

[2] The CHS Program has been renamed as the Purchased/Referred Care program. *See* Consolidated Appropriations Act, Pub. L. No.  113-76, 128 Stat. 328 (2014). But this Court, the Sixth Circuit, and the Parties have consistently used the terms "CHS" and "Contract Health Services" throughout this litigation. This Opinion and Order is no exception.

Central to this case, the practical provision of healthcare services through tribal CHS Programs is best broken down into three stages: eligibility, approval, and payment.

In general, only tribal *members* are eligible to receive healthcare services through a CHS Program. 42 C.F.R. §§ 136.12, 136.23; *see also Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 32 F.4th 548, 554 (6th Cir. 2022).

A tribe's CHS Program will only approve an eligible member's healthcare referral when (1) the sought-after healthcare service is medically necessary; (2) the service is *not* available at the tribe's IHS direct-care facility; (3) the tribe's IHS direct-care facility determines that the eligible member's medical need is sufficiently serious;[3] and (4) CHS funds—subject to annual Congressional appropriation—are sufficient to pay for the service. 42 C.F.R. §§ 136.23, 136.24(b); *Can CHS Pay for Your Referral Medical Care? Find Out in 3 Stages.*, INDIAN HEALTH SERVS., https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/CHSProcessHandout1.pdf (last visited Aug. 7, 2024) [https://perma.cc/8YC5-9VZJ]. If approved, a tribe's CHS program will issue to the external healthcare provider a "purchase" or "referral" order which authorizes the tribe's payment for the referred healthcare service. 42 C.F.R. § 136.24(a). Importantly, the purchase order identifies (1) the "purpose" of the referral or the specific healthcare service the tribal member needs, (2) the specific external healthcare provider the tribal member is being referred to; and (3) the tribal member's insurance coverage, if any. ECF No. 238-3 at PageID.14162 (reflecting an example purchase order). Once the external provider receives a

---

[3] As the IHS explains, "CHS funds are often [in]sufficient to pay for all needed services. When this happens, the [IHS facility] committee considers each [eligible tribal member's] medical condition to rank cases in relative medical priority." *Can CHS Pay for Your Referral Medical Care? Find Out in 3 Stages.*, INDIAN HEALTH SERVS., https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/CHSProcessHandout1.pdf  (last visited Aug. 7, 2024) [https://perma.cc/8YC5-9VZJ]

purchase order, that provider seemingly has the responsibility of contacting the tribal-member-patient to schedule the referred appointment or service. *See Referrals Process*, NISQUALLY TRIBAL HEALTH DEPARTMENT, https://www.nisqually-nsn.gov/files/9614/8157/3397/Referrals Process.pdf  (last visited August 7, 2024).

Onto payment. As part of ensuring their eligibility for referrals, tribal members musts periodically notify  their tribe's CHS Program of any "alternate resources" he or she has, including any healthcare insurance coverage. 42 C.F.R. § 136.61(c) (defining "alternate resources" as any "health care resources other than those of [IHS]" including Medicare, Medicaid, or any private healthcare insurer); *see also Can CHS Pay for Your Referral Medical Care? Find Out in 3 Stages.*, INDIAN HEALTH SERVS., https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_ob jects/documents/CHSProcessHandout1.pdf  (last visited Aug. 7, 2024) [https://perma.cc/8YC5-9VZJ]; *see also* U.S. DEP'T OF HEALTH AND HUM. SERVS., INDIAN HEALTH MANUAL § 2-3.8(B)(1). After a tribal member receives the referred care, the external healthcare provider first bills and collects payment from any "alternate resource" the tribal member may have, and then bills any remaining balance directly to the tribe's CHS Program—which serves as a "payer of last resort." 42 C.F.R. § 136.61(a).

### B.  Modern American Indian and Medicare-Like Rate Regulation

In 1975, Congress enacted the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5301 *et seq*. This Act allowed, but did not require, tribes to (1) manage their own IHS facilities by contracting with private insurers for healthcare, and (2) operate their own CHS Programs. *See FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995); *Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 32 F.4th 548, 554 (6th Cir. 2022).

Central to this case, in 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act which authorized HHS to demand *no more than Medicare-like rates* (MLRs) from external healthcare providers who provide referred healthcare services to tribal members through a CHS Program, including those CHS Programs which tribes themselves operate. *See* Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108–173, § 506 (2003). HHS implemented this Congressional mandate by capping the payments that Medicare-participating external providers may seek for providing CHS-authorized care. 42 C.F.R. § 136.30. This specific MLR regulation went into effect on July 5, 2007. *SCIT v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *3 (E.D. Mich. Dec. 1, 2023).

### C.  Saginaw Chippewa Tribe's Nimkee Clinic and CHS Program

Plaintiff Saginaw Chippewa Indian Tribe of Michigan (the "Tribe") is a federally recognized Indian Tribe with its Tribal Government headquarters in Mt. Pleasant, Michigan. ECF No. 7 at PageID.61. The Tribe has thousands of members and employs thousands of people—members and nonmembers alike. *Id*. at PageID.61, 64.

To provide healthcare for its members and employees, the Tribe created two separate healthcare plans. *SCIT II* at 554. In the 1990s, the Tribe created the *Employee Plan* for Tribal employees, regardless of whether an employee was a member of the Tribe. ECF No. 112 at PageID.6202. In 2002, the Tribe created a separate *Member Plan* for all members of the Tribe, regardless of employment status. *Id.* "Importantly, the Tribe sought out and selected" Defendant Blue Cross Blue Shield of Michigan (BCBSM) "to administer both plans." *SCIT v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *4 (E.D. Mich. Dec. 1, 2023). As of 2004, both the Employee and the Member Plan were self-funded or self-insured, such that

the Tribe directly paid for the cost of health care benefits and paid BCBSM an administrative fee. ECF Nos. 7 at PageID.64; 112 at PageID.6202.

Moreover, in 1999, in accordance with the Indian Self-Determination and Education Assistance Act, the Tribe established its own direct-care facility, the Nimkee Medical Clinic. *SCIT v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *4 (E.D. Mich. Dec. 1, 2023). The Tribe also established its own CHS Program such that, if the Nimkee Clinic could not provide a specific healthcare service to a member-patient, the Clinic could refer the patient to a third-party healthcare provider. *See Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 32 F.4th 548, 554 (6th Cir. 2022); 42 C.F.R. § 136.24.

In January 2016, the Tribe sued BCBSM alleging, among other things, that BCBSM failed to ensure that Tribal members paid no more than MLRs for authorized healthcare services provided through the Tribe's CHS Program and that, as a result, the Tribe has been overpaying for eligible healthcare services since 2007. ECF No. 7 at PageID.88. Eight years later, the case is still pending,[4] due in large part to a discovery-dispute stalemate, involving nearly thirty motions, which has dominated the merits for far too long.[5]

---

[4] For a thorough summary of this case's eight-year procedural posture, *see SCIT v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *4–5 (E.D. Mich. Dec. 1, 2023) (internal citations and quotations omitted).

[5] *See* ECF Nos. 28 (Plaintiffs' Motion for Protective Order); 37 (Defendant's Motion to Compel); 39 (Plaintiffs' Motion to Compel); 41 (Plaintiffs' Motion to Compel); 45 (Plaintiffs' Motion to Compel); 47 (Defendant's Motion to Preclude Plaintiffs from Deposing Witnesses); 58 (Defendant's Motion to Compel); 63 (Defendant's Motion to Compel); 66 (Plaintiffs' Motion to Compel); 86 (Plaintiffs' Motion to Compel); 154 (Defendant's Motion to Deem Admitted Requests for Admission); 163 (Defendant's Motion to Compel); 179 (Defendant's Motion to Compel); 193 (Plaintiffs' Motion for Reconsideration); 209 (Plaintiffs' Motion to Compel); 225 (Plaintiffs' Motion to Compel); 233 (Plaintiffs' Motion for Sanctions); 235 (Plaintiffs' Motion for Sanctions); 238 (Defendant's Motion for Protective Order); 242 (Defendant's Motion for Protective Order); 266 (Plaintiffs' First Motion for Default Judgment); 285 (Plaintiffs' Motion for Reconsideration); 287 (Plaintiffs' Second Motion for Default Judgment); 295 (Plaintiffs' Third Motion for Default Judgement); 299 (Defendant's Motion for Sanctions).

### D.  Discovery Disputes

All remaining claims turn, at least in part, on whether BCBSM paid Tribal members' CHS Program claims in excess of MLRs. *See Saginaw Chippewa Indian Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *5 (E.D. Mich. Dec. 1, 2023) (noting this Court "reinstated Counts I, IV, and VI of Plaintiff's Amended Complaint, ECF No. 7, insofar as those Counts assert claims related to MLR").

In the case's most recent trip to the Sixth Circuit in 2022, the Panel remanded and identified the needles within the haystack of discoverable claims data that the Parties needed to find, explaining that the *only* claims entitled to MLRs were those claims received by BCBSM for referred healthcare services through the Tribe's CHS Program by Tribal *members* enrolled in the Tribe's *Employee* Plan. *Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 32 F.4th 548, 562 (6th Cir. 2022) (predicting "it may be administratively difficult to parse out" these claims); *see also Saginaw Chippewa Indian Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *6 (E.D. Mich. Dec. 1, 2023) ("[I]n simple and general terms, only the Employee Plan is actionable under ERISA but only Tribal [m]embers within this plan may be eligible for MLRs."). Although the Parties had discovery disputes before the Sixth Circuit's 2022 opinion, these disputes only intensified as discovery resumed on remand.

### 1.  August 2022 Discovery Order

On August 2, 2022, the Parties' stipulated and this Court Ordered that:

1. BCBSM will make best efforts to produce to Plaintiffs by August 31, 2022, the claims data relative to the Member Plan going back to July 2007, consistent with the claims data produced by BCBSM in the *Grand Traverse Band* litigation;

2. Plaintiffs will make best efforts to identify for BCBSM, by August 31, 2022, the Tribal Members that participated in the Employee Plan ("Employee Tribal Members");

3. [A]fter Plaintiffs identify for BCBSM the Employee Tribal Members, BCBSM will produce to Plaintiffs the claims data relative to those individuals, consistent with the claims data produced by BCBSM in the *Grand Traverse Band* litigation[.]

ECF No. 222 at PageID.13297. It is important to emphasize that, per the Parties' Stipulation (the "August 2022 Discovery Order"), the onus was on the *Tribe* to first identify its members that enrolled in its Employee Plan, to allow BCBSM to then produce the claims data for these individuals. *See id.* Although not stated in this Order,[6] "claims data" includes (1) the name and location of healthcare providers who administered services to Tribal employees and members; (2) patient identities; (3) the specific services provided; (4) the dates of service; (5) rates billed by the providers; (6) rates BCBSM paid; (7) the identity and address of the parties responsible for payment (8) the identity of the payer(s); and (9) the signature of the authorizing entity or person. ECF Nos. 233 at PageID.13918–19; 235 at PageID.13994.

### 2. November 2022 Discovery Order

This Court issued another discovery order the following month (the "November 2022 Discovery Order"), directing BCBSM to "provide Plaintiffs with all UB-04 forms . . . on or before November 28, 2022." ECF No. 232 at PageID.13906 (emphasis omitted). A UB-04 form is "a universally accepted billing form for services rendered by [healthcare] facilities." *Malibu Behav. Health Servs. Inc. v. Magellan Healthcare, Inc.*, No. 220CV1731ODWPVCX, 2021 WL 2457155, at *2 (C.D. Cal. June 16, 2021). In other words, UB-04 forms are used by healthcare facilities

---

[6] This Court has opined that much of the Parties' discovery dispute stemmed from this Order because the Parties' Stipulation was "breathtaking in its simplicity and narrow scope[.]" *See* ECF No. 283 at PageID.15613, 15619 ("The baffling [s]tipulation caused the relevant quagmires.").

when billing an insurer and contain the "claims data" called for in the August 2022 Discovery Order. *See* ECF No. 235 at PageID.13993-94. Although there are 81 fields within a UB-04 form, this Court recognized that fields 38 (Responsible Party Name and Address), 50 (Payer Code), 63 (Treatment Authorization Code),[7] and 80 (Remarks and Signature) would reflect if a given claim was *referred* or *authorized* by the Tribe's CHS Program.[8] ECF No. 232 at PageID.13903.

### 3.   The Tribe's November 2022 Motions for Sanctions

Within a span of two weeks in November 2022, the Tribe filed two motions for sanctions. ECF Nos. 233; 235. The first alleged that BCBSM had not produced all claims data relative to the Member Plan and the Tribal members participating in the Employee Plan and, thus, was in violation of the August 2022 Discovery Order. ECF No. 233. The second alleged that BCBSM violated this Court's November 2022 Discovery Order by producing only irrelevant UB-04s while withholding relevant ones. *See* ECF No. 235. BCBSM responded that it provided "all Form UB-04s in its possession" but, while searching, it realized that a majority of claims were submitted not via UB-04s but via 837I forms—the "electronic equivalent" of UB-04s. ECF No. 245 at PageID.14369. On February 1, 2023, Magistrate Judge Patricia T. Morris granted Plaintiffs' motions for sanctions, ECF Nos. 233; 235, holding that BCBSM violated both the August 2022 Discovery Order and the November 2022 Discovery Order. ECF No. 255 at PageID.14666–81.

Judge Morris concluded BCBSM violated the August 2022 Discovery Order because its production of *Member* Plan data was untimely. ECF No. 255 at PageID.14668–70. However,

---

[7] "Treatment Authorization Codes are numbers that designate whether the treatment billed has been authorized by the payer indicated in Field 50." *Saginaw Chippewa Indian Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *7, n. 12 (E.D. Mich. Dec. 1, 2023). "In other words, the code 'designates that treatment has been authorized' by the payer." *Id.* (citing ECF No. 231-6 at PageID.13892).
[8] Specifically, if a claim was authorized by the Tribe's CHS Program, the Tribe's Nimkee Contract Health Program would be identified in fields 38, 50, 63, and 80. *See* ECF No. 232 at PageID.13903.

Judge Morris found that BCBSM "cured" its violation by producing, after the deadline, "all of the claims data in its possession pertaining to the [M]ember [P]lan." *Id.* at PageID.14670–72. Judge Morris also repeatedly emphasized that BCBSM "produced data at essentially the same rate as it did in the *Grand Traverse Band* litigation[,]" consistent with the August 2022 Discovery Order. *Id.* at PageID.14671, 14673. Judge Morris found BCBSM's *Employee Plan* disclosure lacking because, although the August 2020 Discovery Order did not reference employee-dependents, a "commonsense reading of the [O]rder [suggested] that [BCBSM] was to produce data for *all* claims under each employee's plan, which would include claims arising from care provided to the employee's dependents." *Id.* at PageID.14675.

Turning to the November 2022 Discovery Order, Judge Morris found that BCBSM "should have understood that the November [2022 Discovery] Order encompassed the 387[I]s and begun searching for these claims immediately. Moreover, once [BCBSM] learned about the widespread use of the [387s], it did not make any efforts to mitigate[;] instead, it doubled-down and moved for a protective order[.]" *Id.* at PageID.14679 n.7; *see also* ECF No. 238.

Accordingly, Judge Morris ordered that:

> [U]ntil [BCBSM] produces each 837, the Court will . . . assume that each 837 not provided to Plaintiffs identifies [the Tribes'] CHS Program/Nimkee Health Clinic as both the "payer" and the "responsible party," and that each 837 contains an authorization code from the [Tribe's] CHS Program. Defendants are also warned that further noncompliance with the August []Order may result in harsher sanctions.

ECF No. 255 at PageID.14685.

One month after Judge Morris's Order, this Court judicially established the following, based on the Parties' stipulation:

1. For each hospital claim for healthcare services provided to a [CHS]-eligible member of the Tribe in this case, there is a corresponding claim form in either UB-04 form or 837 file [("Claim Form")].

2. Each Claim Form identifies the Tribe's "Nimkee Clinic Contract Health Program" in [Field] 38 as the "Responsible Party;" each Claim Form identifies the Tribe's "Nimkee Clinic Contract Health Program," along with BCBSM, in [Field] 50 as the "Payer;" and each Claim Form identifies the Tribe's "Nimkee Clinic Contract Health Program" in [Field] 80 as the "authorized agent."

3. Before administering and paying (using tribal plan assets) a hospital claim for healthcare services provided to a CHS-eligible tribal member on behalf of the Tribe and its plans, BCBSM received from the relevant hospital a Claim Form in the form described above, with the information described above, relative to that hospital claim.

4. Exemplar Claims Forms are attached as Exhibit 1 [ECF No. 271-1] and are admissible at any hearing or trial for purposes of demonstrating what is being stipulated in this Order.

5. By contrast, for hospital claims relating to non-CHS-eligible participants in the Tribe's plans, the claim form received by BCBSM prior to BCBSM's administration and payment of the claim would not identify the Tribe's Nimkee Contract Health Program in the above-described fields.

6. An exemplar claim form for this type of hospital claim is attached as Exhibit 2 [ECF No. 271-2] and is admissible at any hearing or trial in this case for purposes of what is being stipulated in this Order.

ECF No. 271 at PageID.15082–83. This Court further ordered that BCBSM was relieved of its obligation to product UB-04s or 837s. *Id.*

### 4.   The Tribe's First Motion for Default Judgment

On February 23, 2023, the Tribe filed its *first* motion for default judgment arguing that BCBSM was withholding claims data. *See generally* ECF Nos. 266; 277. Specifically, the Tribe pointed to 464 CHS Program purchase orders it contended identified "unique hospital visits" that *should* have generated claims data, but that the Tribe had not received such data from BCBSM. ECF No. 266 at PageID.14917, 14926. Notably, the Tribe did *not* explain how it reached this conclusion, beyond attaching a declaration of a purported—and since withdrawn—expert who broadly opined that she identified these missing claims by "cross-referencing the referral data" from CHS purchase orders "with the claims data" produced by BCBSM. ECF No. 266-7 (Declaration of Lynda Myrick); *see also* No. 290-4 at PageID.16484 ("As to Ms. Myrick, Plaintiffs

do not intend to call her as a witness at trial in this case."). But what was her cross-referencing criteria? She did not explain. Nor did the Tribe.

Nine status conferences and two hearings later, this Court denied the Tribe's first motion for default in July 2023. ECF No. 283 at PageID.15618. This Court noted, despite the significant time, energy, and resources spent by the Parties and this Court, at the core of the discovery dispute were birthdates needed to conduct the most accurate searches for claims data. Specifically, this Court noted:

> The main problem, causing months of delay, was whether the [Parties' August 2022] Stipulation obligated [the Tribe] to supply [BCBSM] with the birthdates of the [Tribal] members and employees so that it could more accurately search its database for pertinent claims. The hearing revealed that the parties could have unraveled this knot had they put their heads together. Although [the Tribe] showed that [BCBSM] had the information earlier in the case, it was lost in translation when both sides played musical chairs with counsel. [The Tribe] later gave [BCBSM] a list of names without birthdates. Why remove the birthdates? They don't say. Equally puzzling, [BCBSM], which could have mined its database to discover the respective birthdates, didn't do so. There remains another mystery.

*Id.* at PageID.15619. This Court's order also addressed two other "sticking point[s]" between the Parties. *Id.* The first was the Tribe's contention that thousands of claims provided by BCBSM lacked a facility code from the external healthcare providers where services were rendered. *Id.* BCBSM responded that the Tribe could learn this information by subpoenaing the third-party providers. *Id.* But the Tribe had not done so and did not explain why. *Id.* The second sticking point was why, despite evidence that its database had a searchable field, BCBSM had not searched its database for the claims referred by the Nimkee Clinic, which would reveal the claims authorized by CHS to which MLRs may apply. *Id.* On this issue, BCBSM was silent. *Id.* at PageID.15620.

Ultimately, this Court denied the Tribe's motion for default judgment without prejudice because the Parties "exchanged most of the necessary information." *Id.* Indeed, this Court held, notably over one year ago, that the Tribe had "enough information to assess the value of their

claims" because "[n]early 100,000 claims are already on the table[.]" *Id.* at PageID.15621. This

Court also rejected Tribe's allegation that BCBSM was sitting on 464 undisclosed hospital claims

as "unsubstantiated speculation" and noted that forthcoming claims would "mostly concern

damages, not liability." *Id.* at PageID.15621–22. Accordingly, this Court ordered *both* Parties to

"put forth their best efforts to resolve the remaining discovery disputes" and turn to the merits of

the remaining claims. *Id.* at PageID.15622.

### 5.  The Tribe's Second Motion for Default Judgment

But Counsel "for *both* Parties [continued to] talk[] past one another, letting [this] single,

developing discovery dispute dominate their attention to the merits." *Saginaw Chippewa Indian*

*Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-

10317, 2023 WL 8313270, at *1 (E.D. Mich. Dec. 1, 2023). Three months after this Court denied

the Tribe's first motion for default judgment, the Tribe filed a second motion seeking the same

relief, for largely the same reasons. ECF No. 287. In December 2023, this Court denied the Tribe's

second motion for default, explaining:

> Most of the Tribe's Renewed Motion raises the same arguments already raised in
> its first motion, and already rejected by this Court as failing to show bad faith on
> BCBSM's behalf.  For example, the Tribe argues that BCBSM violated this Court's
> August 2022 and November 2022 Discovery Orders. But that much is known—
> and, as the Tribe recognizes, BCBSM was already sanctioned for this conduct in
> the form of adverse inferences and attorney's fees. The Tribe also argues, again,
> that BCBSM "lied" when it represented that 57 tribal members never visited a
> hospital because the Tribe later discovered that 33 of the 57 had.  The birthdates
> were brought up again, too. The Tribe argues that BCBSM "lied" when it claimed
> to lack knowledge of the birthdates for certain member-employees. But this Court
> already found that the birthday dispute did not demonstrate bad faith on BCBSM's
> behalf because, although BCBSM had been provided with the birthdates, the dates
> had reasonably been "lost in translation when both sides played musical chairs with
> counsel" for over a year-and-a-half. Indeed, the Tribe could have just as easily
> provided BCBSM with the birthdates again upon BCBSM's numerous requests for
> such information, instead of refusing to do so—only to then turn around and file
> two motions for default judgment claiming that BCBSM failed to disclose the very

claims data that BCBSM told the Tribe it needed the birthdates in question to produce.

*Saginaw Chippewa Indian Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *10 (E.D. Mich. Dec. 1, 2023). This Court noted that the Tribe only asserted "two *new* arguments in support of its Renewed Motion," and rejected both in turn.

First, the Tribe argued that emails with BCBSM's Counsel revealed that BCBSM was lying about its need for the Tribe to re-identify tribal members enrolled in the Employee Plan. ECF No. 288. But this Court concluded the emails cited by the Tribe "show nothing of the sort" and reminded the Tribe that, pursuant to *its own stipulation*, it was required to identify its members enrolled in the Employee Plan prior to BCBSM's obligation to produce claims data. *Saginaw Chippewa Indian Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *10 (E.D. Mich. Dec. 1, 2023) ("Once again, the August 2022 stipulation rears its overly-simplistic head.")

Second, the Tribe echoed its repetitive argument that BCBSM continues to withhold claims but added, for the first time, that BCBSM was doing so "selectively," withholding the "'most significant claims, namely those with a greater difference between [] usual rates and' MLR." *Id.* at *12 (citing ECF No. 287 at PageID.16039–40). But this Court rejected this argument as entirely unsupported, and noted that, of the 4,806 purchase orders at issue, BCBSM quickly and in good faith confirmed that these orders "did not reveal any missed Member Plan claims." *Id.*

Again, hoping to signal to the Parties this Court's desire to address the merits, this Court concluded:

> Ultimately, two facts were true when this Court denied the Tribe's first motion for default judgment—and both remain true today: (1) Plaintiffs have enough information to assess the value of their remaining]claims as nearly 100,000 claims

are already on the table and (2) any additional claims, at this point, would not significantly affect the math and would pertain only to the Tribe's potential damages, not BCBSM's liability as to the outstanding MLR issues.

*Id.* (internal quotations and citations omitted).

### 6. Pending Discovery Motions

Nevertheless, the Parties continue to point fingers and allege each other's bad faith. One month after this Court denied the Tribe's Renewed Motion for Default Judgment, the Tribe filed a *third* motion seeking the same relief, arguing BCBSM continues to withhold claims. ECF No. 295. Seemingly exhausted with the Tribe's allegations of bad faith and repeated motions for sanctions, BCBSM filed its own Motion for Sanctions, arguing that the Tribe has engaged in vexatious litigation. ECF No. 299. Each motion has been fully briefed, is ripe for resolution, and will be addressed in turn. *See* ECF Nos. 297, 298, 302, 303.

### II. The Tribe's Third Motion for Default Judgment

This Court begins by analyzing the Tribe's third Motion for Default Judgment, ECF No. 295. As explained below, because the Tribe has not shown BCBSM violated this Court's discovery orders, let alone willfully or in bad faith, the Tribe's Motion will be denied.

### A.

"A district court may sanction parties who fail to comply with discovery orders in a variety of ways, including dismissal of their lawsuit or entry of default judgment against them." *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990) (citing FED. R. CIV. P. 37(b)(2)(C)). But entering a default judgment is a "drastic" remedy "which should be [awarded] only in the most extreme cases[.]" *Stooksbury v. Ross*, 528 F. App'x 547, 552 (6th Cir. 2013) (quoting *United Coin Meter Co. v. Seaboard Coastline R.R.*, 705 F.2d 839, 845 (6th Cir.1983)).

Indeed, a default judgment may be imposed *only* if the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault. *Abbe*, 916 F.2d at 107. Additional factors include whether the adversary was prejudiced as a result of the lack of cooperation; whether the party was forewarned that failing to cooperate could trigger the sanction; and whether milder sanctions should be first considered. *See Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997); *see also Victor v. Reynolds*, 649 F. Supp. 3d 499, 506 (E.D. Mich. 2023), *reconsideration denied,* No. 1:20-CV-13218, 2023 WL 4157616 (E.D. Mich. June 23, 2023). And these four factors are applied more "stringently" where counsel, rather than the party, is responsible for the discovery violation. *Harmon v. CSX Transp., Inc.,* 110 F.3d 364, 367 (6th Cir. 1997). Thus, dismissal is "usually inappropriate" if, as here, a party's attorney, rather than the party itself, is at fault. *Vinci v. Consol. Rail Corp.*, 927 F.2d 287, 287 (6th Cir. 1991) (per curiam) (quoting *Carter v. City of Memphis*, 636 F.2d 159, 161 (6th Cir. 1980)).

## B.

The Tribe's *third* Motion for Default Judgment can be easily disposed of because the Tribe's two arguments are repetitive and have already been rejected by this Court as insufficient to warrant default judgment and not reflective of BCBSM's bad faith.

First, the Tribe repeats the same argument it has been making for over a year and a half: that BCBSM is "withholding claims data" in bad faith. ECF No. 295 at PageID.16977, 16995. This Court has rejected this argument on two prior occasions. *Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 683 F. Supp. 3d 645, 655 (E.D. Mich.), *reconsideration denied*, 685 F. Supp. 3d 525 (E.D. Mich. 2023) (referring to the Tribe's allegation of missing claims as "unsubstantiated speculation"); *Saginaw Chippewa Indian Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL

8313270, at *12 (E.D. Mich. Dec. 1, 2023) ("The Tribe's assertion that BCBSM has not disclosed 'thousands' of claims is unsupported and the Tribe has not shown that BCBSM's failure to provide the full claims data for the outstanding member-employees is willful or attributable to bad faith or fault. Indeed, the record suggests that the Tribe is also at fault.").

Undeterred, the Tribe argues that its expert has "cross-referenced" CHS Program purchase orders provided by BCBSM—which identify the specific tribal member seeking a healthcare service and the specific external provider that member is referred to—with BCBSM's claims data disclosure, and that this cross-reference revealed "3,100 documented instances" when BCBSM *should have* a claim but *has not* produced it, willfully and in bad faith. ECF No. 295 at PageID.16995. This argument is unpersuasive, for a few reasons.

First, the "expert" the Tribe relies on—Lynda Myrick—who opined that BCBSM is withholding claims based on the provided purchase orders has been *withdrawn* as an expert in this case. *Compare id.* at PageID.16995 (citing Lynda Myrick's declaration, ECF No. 292-3 at PageID.16791–829) *with* ECF No. 290-4 at PageID.16484 ("As to Ms. Myrick, Plaintiffs do not intend to call her as a witness at trial in this case[.]"). Indeed, in September 2023, *months* before the Tribe filed its third Motion for Default Judgment which largely relies on Myrick's opinions, the Tribe prevented BCBSM from deposing her. ECF No. 290-4 at PageID.16485 (replying to BCBSM's deposition notice for Lynda Myrick and Dawn Cornelis[9] by stating "Plaintiffs will be producing Dawn Cornelis from ClaimInformatics for her one and only deposition in this case").

---

[9] BCBSM filed a *Daubert* motion to preclude Dawn Cornelis's expert testimony at trial, arguing that, based on her own deposition testimony, she is not an expert in MLR repricing and simply "parroted" Linda Myrick's calculations and conclusions. ECF No. 290. In a separate Opinion and Order issued today, this Court agreed and granted BCBSM's *Daubert* Motion.

Second, the "cross-referencing" the Tribe relies on does not support the Tribe's contention that BCBSM is withholding claims in bad faith. Between the Tribe's *second* and *third* motions for default judgment, the Parties produced ClaimInformatics' expert report, which outlined—for the first time—Lynda Myrick's "cross-referencing" process in detail.[10] *See* ECF No. 290-5 at PageID.16500. As explained in that nearly one-year old report, BCBSM provided 37,945 CHS Program purchase orders to the Tribe, but ClaimInformatics could only match 18,791 of these purchase orders to corresponding claims produced by BCBSM, suggesting there were missing claims. *Id.* at PageID.16501. But ClaimInformatics would only "match" a CHS Program purchase order to a corresponding claim if both contained the patient's last name and date of birth, and if the claim was issued within 60-days of the CHS Program purchase order. *See id.* Why did ClaimInformatics select this 60-day cutoff? The Tribe and ClaimInformatics do not say. Evidence suggests it takes at least 14 days for a CHS referral to "be processed and coordinated" between the referring IHS facility and the external healthcare provider, which then needs time to contact the tribal member, schedule the service, and perform the service before a claim will be filed with BCBSM. *See Referrals Process*, NISQUALLY TRIBAL HEALTH DEPARTMENT, https://www.nisqually-nsn.gov/files/9614/8157/3397/ReferralsProcess.pdf (last visited August 7, 2024). Thus, the "missing claims" the Tribe continues to complain about may be the result of the Tribe's experts' own "cross-referencing" methodology rather than BCBSM's "bad faith" or lackluster production.

---

[10] Although Lynda Myrick is not mentioned within ClaimInformatics' expert report, Myrick served as ClaimInformatics' Director of Claim Analytics. ECF Nos. 288-7 at PageID.16237; 290-6 at PageID.16523. And Dawn Cornelis—ClaimInformatics' cofounder and the purported "author" of the ClaimInformatics report—testified that Myrick "was involved with" drafting ClaimInformatics' report. ECF No. 290-6 at PageID.16534-35.

Third, BCBSM avers it has begun the work of reviewing, one-by-one, the 3,100 purchase orders the Tribe maintains correspond to missing claims. ECF No. 297 at PageID.17182. Thus far, BCBSM has reviewed 342 purchase orders and concluded that *none* corresponded to a missing or unproduced claim. *Id.* (noting 42 of the purchase orders corresponded to a claim BCBSM already produced; 242 of the purchase orders were duplicative of purchase orders BCBSM already reviewed and concluded there were no corresponding missing claims data; 36 of the purchase orders did not have a matching date of service; 14 purchase orders corresponded to "professional claims . . . irrelevant to this matter;" and 8 purchase orders "were for different customers").  This suggests that, at least some of the claims the Tribe believes BCBSM has not produced do not move the goalposts in this litigation whatsoever. On this point, this Court will echo, for a *third* time:

> (1) "Plaintiffs have enough information to assess the value of their [remaining] claims" as "[n]early 100,000 claims are already on the table[;]" and (2) any additional claims, at this point, "would not significantly affect the math" and would pertain only to the Tribe's potential damages, not BCBSM's liability as to the outstanding MLR issues.

*Saginaw Chippewa Indian Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *12 (E.D. Mich. Dec. 1, 2023) (quoting *Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 683 F. Supp. 3d 645, 655 (E.D. Mich.), *reconsideration denied*, 685 F. Supp. 3d 525 (E.D. Mich. 2023)).

Because this Court is not convinced that BCBSM is withholding claims, the Tribe's repeated ancillary argument that BCBSM is selectively withholding claims with the greatest financial difference when compared to MLRs is without merit. Indeed, when dismissing the Tribe's *second* motion for default judgment, this Court expressly rejected the Tribe's argument that BCBSM is selectively withholding "dialysis and skilled nursing claims" as unsupported. *Saginaw Chippewa Indian Tribe of Michigan*, 2023 WL 8313270, at *12 ("But how these claims

are being withheld, the Tribe does not say and the record does not show."). Nothing has changed. The *only* evidence the Tribe points to in support of its selective withholding argument is Lynda Myrick's declaration that it is "highly unusual" for dialysis or skilled nursing claims not to be produced based on her work in similar cases. ECF No. 295 at PageID.16997–98 (citing ECF No. 288-7 at PageID.16240). This, without more, does not evidence BCBSM's willful discovery violations.

At bottom, this Court has rejected the Tribe's argument that BCBSM is willfully withholding claims on two separate occasions. For the Tribe, the third time is not a charm. The Tribe has not shown that BCBSM has violated discovery orders willfully or in bad faith. The severe remedy of default judgment is not warranted, and the Tribe's *third* Motion seeking this relief will be denied.

### III. BCBSM's Motion for Sanctions

This Court turns next to BCBSM's Motion for Sanctions, ECF No. 299. BCBSM seeks sanctions—in the form of costs incurred and attorney's fees—under both (1) Civil Rule 37, arguing that the Tribe has willfully refused to put forth its "best efforts' throughout discovery; and (2) 28 U.S.C. § 1927, arguing the Tribe has engaged in vexatious litigation by filing numerous, largely repetitive motions for sanctions. *See generally id.* Each argument will be addressed in turn.

### A.

If a party violates or fails to comply with discovery orders, Civil Rule 37(b) authorizes district courts to sanction the party "in a variety of ways." *See Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990) (citing FED. R. CIV. P. 37(b)(2)(C)); *see also Kucinskas v. Fleetwood Motor Homes of Indiana, Inc.* No. 06-12195, 2008 WL 4378105, at *1 (E.D. Mich. Sept. 23, 2008). Indeed, although the entry of a default judgment, as discussed above, is the most

drastic form of Rule 37 sanction, the standard applied to BCBSM's request for Rule 37 sanctions is largely the same as the Tribe's request for a default judgment, such that this Court must assess, among other factors, (1) whether a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault; and (2) whether the adversary was prejudiced by the party's failure to cooperate in discovery. *Victor v. Reynolds*, 649 F. Supp. 3d 499, 505 (E.D. Mich. 2023), *reconsideration denied*, No. 1:20-CV-13218, 2023 WL 4157616 (E.D. Mich. June 23, 2023); *Doe v. Lexington-Fayette Urb. Cnty. Gov't*, 407 F.3d 755, 766 (6th Cir. 2005).

Here, BCBSM's request for Rule 37 sanctions fails at the first step, because it has not shown that the Tribe failed to cooperate in discovery, let alone willfully or in bad faith. BCBSM argues that the Tribe violated the August 2022 Discovery Order—which required the Tribe to make "best efforts" to identify its members that participated in the Employee Plan—and violated the July 2023 Discovery Order—which required both Parties to make "best efforts" to resolve remaining discovery disputes, generally. ECF No. 299 at PageID.17312 (referring to ECF Nos. 222 at PageID.13297; 283 at PageID.15622). According to BCBSM, the Tribe violated these "best efforts" orders because its list of identified member-employees grew from 136 in August 2022 to 1,049 in December 2023. ECF No. 299 at PageID.17291,17297 (citing ECF No. 284 at PageID.15662 (noting the Tribe's concession that it "missed people")). But neither discovery order required the Tribe to produce a definitive, all-encompassing list of its member-employees. The orders required the Tribe's "best efforts" to do so. And this Court is not persuaded that the Tribe did not put its "best" foot forward when identifying its member employees. *See Agarwal v. Morbarck, LLC*, 585 F. Supp. 3d 1026, 1030 (E.D. Mich. 2021), *aff'd sub nom. Agarwal v. Morbark*, LLC, No. 2022-1348, 2022 WL 2092774 (Fed. Cir. June 10, 2022) ("With all the

injustices in today's world, it can be easy to assume the worst in others. But we would all benefit from a bit more grace.").

And even if BCBSM had shown that the Tribe violated discovery orders in bad faith, it has not identified *any* resulting prejudice. *See* ECF No. 299. Nor could it. As reflected in the August 2022 Discovery Order, the Tribe's identification of member-employees triggered BCBSM's obligation to disclose corresponding claims. ECF Nos. 222 at PageID.13297. So, if the Tribe dragged its feet in identifying member-employees, it would only reduce or delay BCBSM's obligations to identify relevant claims data, which—if anything—would prejudice the *Tribe*, not BCBSM.

In sum, BCBSM has not shown that the Tribe violated discovery orders in bad faith, nor has it shown sufficient prejudice. Rule 37 sanctions are not warranted.

**B.**

Sanctions under 28 U.S.C. § 1927 are similarly unwarranted. A district court may impose sanctions under § 1927 in the form of reasonable costs, expenses, and attorney's fees when an attorney "unreasonably and vexatiously" "multiplies proceedings" in any given case. 28 U.S.C. § 1927; *Agarwal*, 585 F. Supp. 3d at 1029. But a movant's hurdle to show such vexatious litigation is high. Employing an objective standard, reviewing courts assess whether "an attorney reasonably should know that a claim pursued is frivolous." *Id.* (internal quotations omitted). "[S]imple inadvertence or negligence" will not do. *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987). Instead, § 1927 sanctions are only warranted when an attorney "abuses the judicial process or knowingly disregards the risk that he will needlessly multiply proceedings." *Carter v. Hickory Healthcare Inc.*, 905 F.3d 963, 968 (6th Cir. 2018) (internal quotations omitted).

Here, BCBSM correctly notes the Tribe has filed *three*, largely repetitive, motions for default judgment, ECF Nos. 266; 287; 295, all of which have been denied. ECF Nos. 283; 294; *see supra* Section II. But this Court expressly denied the Tribe's *first* and *second* motions for default judgment *without prejudice*. ECF Nos. 283; 294. Moreover, although this Court denied the Tribe's motions for default judgment, concluding that such a severe sanction was not warranted, this Court recognized the validity of Tribe's discovery frustrations. Indeed, this Court has *repeatedly*—in both published opinions and status conferences—told *both Parties*—including BCBSM—that they are being "obstinate," problematically "pointing fingers" instead of focusing their attention on worthier pursuits, such as the merits of the unresolved claims first raised *four years ago* in BCBSM's motion for summary judgment. *Saginaw Chippewa Indian Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *1, 13 (E.D. Mich. Dec. 1, 2023). This Court does not agree with BCBSM that the Tribe has abused the judicial process by *needlessly* multiplying the proceedings in this case,[11] so BCBSM's request for § 1927 sanctions will be denied.

---

[11] The Parties dispute what occurred during a status conference on December 5, 2023. The Tribe repeatedly suggests that this Court "invited" or "gave [it] leave" to file its *third* motion for default judgment—thus the filing cannot be vexatious. ECF No. 302 at PageID.17368, 17370, 17388. BCBSM argues to the contrary, explaining, in its view, "[n]ot once did this Court 'invite' or 'direct' Plaintiffs to file a third motion. [The Tribe's Counsel] instead insisted that he would be filing a third motion. And when [he] asked about whether he could file a reply brief, this Honorable Court quickly told him 'no.' He filed one anyway." ECF No. 299 at PageID.17314. This Court's recollection of the December 5, 2023 status conference is consistent with BCBSM's recollection. Indeed, this Court recalls telling the Parties—in no uncertain terms—to focus on the merits of the remaining issues on summary judgment—just like this Court has noted in its last two opinions. *See* ECF Nos. 283; 294. Moreover, this Court recalls Counsel for the Tribe *agreeing* to do just that, conceding that any further claim data disclosure disputes could be resolved at trial, as part of the Tribe's potential damage recovery. But, perhaps unwisely, the December 5 status conference was off the record, so this Court will not consider any undocumented representations the Parties believe were made throughout this conference in resolving any of the pending discovery motions.

As a passing note, although this Court sincerely hopes Counsel for both Parties come together throughout whatever discovery remains,[12] this Court will no longer allow the Parties' well-documented discovery "stalemate" to "dominate the merits of the case." *See Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 683 F. Supp. 3d 645, 653–54 (E.D. Mich.), *reconsideration denied*, 685 F. Supp. 3d 525 (E.D. Mich. 2023). The Parties will be directed to file supplemental briefing on the remaining summary judgment arguments which are now *beyond* ripe for resolution.

## IV.

Accordingly, it is **ORDERED** that Plaintiffs' Third Motion for Default Judgment, ECF No. 295, is **DENIED.**

Further, it is **ORDERED** that Defendant's Motion for Sanctions, ECF No. 299, is **DENIED.**

Further, it is **ORDERED** that the Parties are **DIRECTED** to file supplemental briefing on all claims unresolved by this Court and the Sixth Circuit's prior decisions, pursuant to the briefing schedule and page limits outlined below:

| Filing: | Page Limit (Excluding Exhibits) | Deadline |
|---|---|---|
| Defendant's Supplemental Brief in Support of its Motion for Summary Judgment, ECF No. 173: | 30 Pages | September 9, 2024 |
| Plaintiffs' Supplemental Response: | 30 Pages | October 7, 2024 |
| Defendant's Supplemental Reply: | 15 Pages | October 21, 2024 |

---

[12] The Tribe and this Court recall, during the off-the-record December 5, 2023 status conference, BCBSM indicated it does not need anything further from the Tribe to produce outstanding claims data. BCBSM agrees, but notes that, at the time of the conference, it had no way of knowing that the Tribe would produce a list of 1,049 tribal members sixteen days later. ECF No. 297 at PageID.17188-89, n. 2.

**This is not a final order and does not close the above-captioned case.**

Dated: August 14, 2024                              s/Thomas L. Ludington
                                                    THOMAS L. LUDINGTON
                                                    United States District Judge