UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE
OF MICHIGAN and WELFARE BENEFIT PLAN,

    Plaintiffs,      Case No. 1:16-cv-10317

v.              Honorable Thomas L. Ludington
                United States District Judge
BLUE CROSS BLUE SHIELD OF MICHIGAN,
                Honorable Patricia T. Morris
    Defendant.      United States Magistrate Judge
_____/

**OPINION AND ORDER STRIKING DECLARATION OF DAWN CORENLIS AND GRANTING DEFENDANT'S MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF DAWN CORENLIS'S**

  Two questions are posed by Defendant Blue Cross Blue Shield of Michigan in its Motion to exclude Plaintiff Saginaw Chippewa Indian Tribe's proffered expert testimony. Is someone who—by her own admission—is not an "expert" on a topic nevertheless qualified to testify as an expert? And, if so, is her testimony nevertheless reliable if it merely "parrots" another expert's calculations and conclusions? For the reasons explained below, the answer to both questions is no.

**I.**

  To understand the central dispute in this case, and the relevance of the proposed expert testimony challenged by the instant *Daubert* motion, it is important to first understand, at least generally, the history and modern requirements of tribal healthcare regulation.

**A. Tribal Healthcare History**

  In 1955, Congress created the Indian Health Service (IHS) to govern tribal healthcare. The IHS, now a sub-agency within the U.S. Department of Health and Human Services (HHS), continues to govern tribal healthcare today. Indeed, the IHS is the "principal federal health care

provider and health advocate for Indian people, and its goal is to raise their health status to the highest possible level." *Agency Overview*, INDIAN HEALTH SERVS., https://www.ihs.gov/aboutihs/overview/ (last visited Aug. 1, 2024) [https://perma.cc/78S7-6UR6]. The IHS fulfils this mandate in two ways. First, IHS funds and operates healthcare facilities—such as hospitals and clinics—which provide direct care to American Indians.[1] 42 C.F.R. § 136.23. Second, IHS separately funds Contract Health Service (CHS) Programs,[2] which operate as a referral safety net such that, if an American Indian seeks a healthcare service that is *unavailable* at their direct-care IHS tribal facility, CHS Programs may refer that American Indian to a non-IHS healthcare facility. *Id.* §§ 136.21(e), 136.23(a); 25 U.S.C. § 1603(5). Indeed, the IHS emphasizes that CHS is "for medical [] care provided away from an IHS or tribal health care facility[,]" *Purchased/Referred Care (PRC)*, INDIAN HEALTH SERVS., https://www.ihs.gov/prc/ (last visited Aug. 1, 2024) [https://perma.cc/VRY5-WDBY], and that CHS is intended "to supplement and complement other health care resources available to eligible Indian people." *History*, INDIAN HEALTH SERVS., https://www.ihs.gov/prc/history/ (last visited Aug. 1, 2024) [https://perma.cc/ HU9L-2BF7].

---

[1] Throughout this Opinion, the term "American Indian" refers to the indigenous peoples of the United States. The use of this term stems from historical context, continued use by the U.S. Government, and modern guidance. *See Teaching and Learning about Native Americans: Terminology*, NAT'L MUSEUM OF THE AM. INDIAN, https://americanindian.si.edu/nk360/faq/did-you-know#:~:text=In%20the%20United%20States%2C%20Native,would%20like%20to%20be%20addressed (last visited Aug. 1, 2024) [https://perma.cc/ESX3-L3US]. The use of this term is not intended to offend or to perpetuate stereotypes.

[2] The Consolidated Appropriation Act of 2014 renamed the Contract Health Services Program as "the Purchased/Referred Care program" (PRC). *See* Purchased/Referred Care (PRC), INDIAN HEALTH SERVICE (June 2016), https://www.ihs.gov/newsroom/factsheets/purchasedreferredcare/ [https://perma.cc/NLK5-LH8U]. But this Court, the Sixth Circuit, and the Parties have consistently used the terms "CHS" and "Contract Health Services" throughout this litigation. This Opinion and Order is no exception.

In simple terms, CHS Program funding—which is subject to varying, annual Congressional appropriations—may be expended when "(1) no IHS direct care facility exists, (2) the direct care [facility] is incapable of providing required emergency and/or specialty care, (3) the direct care [facility] has an overflow of medical care workload, and (4) supplementation of alternate resources (i.e., Medicare, private insurance) is required to provide comprehensive care[.]" *Id*. But to be eligible for CHS, a tribal member must obtain preapproval—their medical provider or representative must inform an ordering official that the services are necessary and provide relevant information to determine medical necessity and the member's eligibility. 42 C.F.R. § 136.24(b). If approved, then the CHS Program issues a "referral order" or a "purchase order," which authorizes the eligible tribal member to receive the requested medical service from a third-party provider. *Id*. § 136.24(a).

In 1975, Congress enacted the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5301 *et seq*., to bolster tribal self-determination and governance. Under this Act, tribes could opt to (1) manage their own IHS facilities by contracting with private insurers for healthcare, and (2) operate their own CHS Programs. *See FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995). *See also* Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan, 32 F.4th 548, 554 (6th Cir. 2022) [hereinafter *SCIT II*].

Central to this case, in 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act which authorized HHS to demand *no more than Medicare-like rates* (MLRs) from hospitals that provide services to tribes under a CHS Program, including those CHS Programs which tribes themselves orchestrate. *See* Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108–173, § 506 (2003). And HHS did so by setting a ceiling on payments that Medicare-participating providers may seek for providing CHS-

authorized care. 42 C.F.R. § 136.30. Specific "MLR regulations went into effect on July 5, 2007." *SCIT v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *3 (E.D. Mich. Dec. 1, 2023).

### B. Saginaw Chippewa Tribe's Nimkee Clinic, CHS Program, and Complaint

Plaintiff Saginaw Chippewa Indian Tribe of Michigan (the "Tribe") is a federally recognized Indian Tribe with its Tribal Government headquarters in Mt. Pleasant, Michigan. ECF No. 7 at PageID.61. The Tribe has thousands of members and employs thousands of people—members and nonmembers alike. *Id*. at PageID.61, 64.

To provide healthcare for its members and employees, the Tribe created two separate healthcare plans. *SCIT II* at 554. In the 1990s, the Tribe created the *Employee Plan* for Tribal employees, regardless of whether an employee was a member of the Tribe. ECF No. 112 at PageID.6202. In 2002, the Tribe created a separate *Member Plan* for all members of the Tribe, regardless of employment status. *Id.* "Importantly, the Tribe sought out and selected" Defendant Blue Cross Blue Shield of Michigan (BCBSM) "to administer both plans." *SCIT v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *4 (E.D. Mich. Dec. 1, 2023). As of 2004, both the Employee and the Member Plan were self-funded or self-insured, such that the Tribe directly paid for the cost of health care benefits and paid BCBSM an administrative fee. ECF Nos. 7 at PageID.64; 112 at PageID.6202.

Moreover, in 1999, in accordance with the Indian Self-Determination and Education Assistance Act, the Tribe established its own direct-care facility, the Nimkee Medical Clinic. *SCIT v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *4 (E.D. Mich. Dec. 1, 2023). The Tribe also established its own CHS Program such that, if the Nimkee Clinic could not provide a specific healthcare service to a member-patient, the Clinic could refer the

patient to a third-party healthcare provider, so long as the Tribe explicitly approved the referral as documented in a purchase or referral order. *See* 42 C.F.R. § 136.24. Importantly, the Tribe's CHS Program is only available to its *members*. *SCIT II*, at 554. The Tribe's non-member *employees* are ineligible. *Id.*

In January 2016, the Tribe sued BCBSM alleging, among other things, that BCBSM violated the Employee Retirement Income Security Act (ERISA) by failing to ensure that Tribal members paid no more than MLRs for authorized healthcare services provided through the Tribe's CHS Program and that, as a result, the Tribe has been overpaying for eligible healthcare services since 2007. ECF No. 7 at PageID.88. Eight years later, the case is still pending.[3] In its most recent decision in the above-captioned case, the Sixth Circuit Court of Appeals instructed the Parties and this Court to "parse out" which of the Tribe's claims were eligible for MLRs to get a better sense of the scope of BCBSM's potential liability. *SCIT II*, at 562.

### C.  Expert Discovery

Since that opinion, "the Parties began to 'parse out those eligible' for MLRs under the Tribe's Employee Plan because, in simple and general terms, only the *Employee* Plan is actionable under ERISA but only Tribal *Members* within this plan may be eligible for MLRs" for authorized CHS services. *SCIT v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *6 (E.D. Mich. Dec. 1, 2023) (emphasis added).

Specifically, the Tribe retained ClaimInformatics—a healthcare "payment integrity firm" based in Connecticut to identify which of the Tribe's claims were eligible for MLRs, and to "re-price" those eligible claims to determine if BCBSM applied MLRs and, if not, how much the Tribe

---

[3] For a thorough summary of this case's eight-year procedural posture, *see SCIT v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *4–5 (E.D. Mich. Dec. 1, 2023) (internal citations and quotations omitted).

overpaid. ECF No. 290-5 at PageID.16489. ClaimInformatics was co-founded in 2017 by Dawn Cornelis, who currently serves as ClaimInformatics' Chief Transparency Officer. ECF Nos. 291-3 at PageID.16754; 290-5 at PageID.16508. ClaimInformatics' current Director of Claims and Recovery is Lynda Myrick. ECF No. 291-3 at PageID.16694.

On June 20, 2022, the Tribe supplemented its expert disclosure and notified BCBSM and this Court that:

> Ms. Myrick and Mr. Cornelis (or just one of them) may testify about Medicare-Like Rates (MLR) for health care claims administered by [Defendant] on behalf of Plaintiffs, including the methodology used to determine the Medicare-Like Rate and the corresponding rate paid by [BCBSM] to the health care provider on behalf of [the Tribe] regarding those healthcare claims, the difference between MLR and what [BCBSM] paid to the healthcare provider using plan assets, and the total amount of paid claims that were subject to MLR but not priced at MLR.

ECF No. 290-2 at PageID.16475–76.

BCBSM filed a motion to strike this supplemental disclosure, arguing in part that the Tribe did not seek leave to supplement, ECF No. 226. But this Court denied that motion in November 2022, finding that the proposed substitution of Cornelis and Myrick was "justified and harmless." ECF No. 232 at PageID.13905. In September 2023, Counsel for BCBSM emailed Counsel for the Tribe with a deposition notice, ECF No. 290-3, for both Myrick and Cornelis, and asked Counsel for the Tribe to "let [BCBSM Counsel] know if [the Tribe] is using just one or the other." ECF No. 290-4 at PageID.16486. Counsel for the Tribe responded that the Tribe would *only* produce Dawn Cornelis for deposition. *Id.* at PageID.16485. In response, Counsel for BCBSM asked Counsel for the Tribe to "[p]lease confirm . . . that [the Tribe] is withdrawing Lynda Myrick as a [proposed] expert." *Id.* Tribal Counsel replied "[a]s to Mrs. Myrick, Plaintiffs do not intend to call her as a witness at trial in this case." *Id.* at PageID.16484.

On September 16, 2023, the Tribe produced the "Preliminary Expert Report of ClaimInformatics/Dawn Cornelis." ECF No. 290-5. The Report noted that ClaimInformatics "repriced a total of 6,6641 claims" out of the 93,104 claims produced by BCBSM at that time. *Id.* at PageID.16490. "Of the 6,641 claims repriced," the Report concluded, "BCBSM paid 3,622 claims (54%) at rates exceeding MLR, resulting in an aggregate overpayment by BCBSM (using [Tribe] assets) of $4,721,623." *Id.* The Report caveated this conclusion, however, by noting that, in ClaimInformatics' view, BCBSM's claim production was far from complete, and many of the claims BCBSM did produce contained missing data or inaccuracies.[4] *Id.* at PageID.16495–501. Notably, the Report does not mention Lynda Myrick, and was signed and attested to only by Dawn Cornelis. *See id.* at PageID.16508–09.

On November 6, 2023, BCBSM filed a *Daubert* motion seeking to exclude Cornelis's proffered expert testimony about MLR and ClaimInformatics' MLR repricing in this case. ECF No. 290. BCBSM argues (1) Cornelis lacks the training, education, and experience to testify as a

---

[4] Specifically, the Report noted that 2,933 claims produced by BCBSM had no "Facility NPI (National Provider Identification)," a unique 10-digit number "used to identify . . . the provider's classification and specialty" for reimbursement purposes. ECF No. 290-5 at PageID.16497–98. "Without the NPI number," the Report explains, ClaimInformatics was "unable to re-price the associated claim." *Id.* at PageID.16498. The Report also noted that many of the claims provided by BCBSM contained "millions of duplicated data cells" representing "financially implausible claim amounts." *Id.* at PageID.16498–99. Lastly, the Report noted that BCBSM's overall claim production was incomplete, because BCBSM provided 37,945 *referral documents* (authorizing referral from the Nimkee Clinic to external healthcare providers through the Tribe's CHS Program) but ClaimInformatics could only match 18,791 of these referrals to corresponding *claims*—within the 93,104 claims provided by BCBSM at the time. *Id.* at PageID.16501 (suggesting "19,154 missing claims"). Notably, however, these "missing claims" may be the result of ClaimInformatics' methodology rather than BCBSM's production. ClaimInformatics would only "match" a referral to a corresponding claim if both contained the patient's last name and date of birth, and *if the claim was issued within 60-days of the referral authorization*. *See id.* (noting the need for some temporal cutoff because the date on which a tribal member would be referred by the Nimkee Clinic through the Tribe's CHS Program does "not necessarily reflect the date of when an actual service was rendered"). Why did ClaimInformatics select this 60-day cutoff? This Court does not know because ClaimInformatics does not say.

MLR and re-pricing expert at trial under Federal Rule of Evidence 702, and (2) even if qualified, Cornelis's expert testimony would be unreliable because the testimony merely "parrots" or "bootstraps" the calculations and conclusions of Lynda Myrick. *Id.* at PageID.16460–70.

## II.

Federal Rule of Evidence 702 allows certain witnesses with specialized knowledge to testify about their opinions as experts at trial. FED. R. EVID. 702. But admitting expert testimony is not a decision a court should undertake lightly, as juries tend to place extra weight on expert opinions. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993). Accordingly, courts serve an important gatekeeping role when assessing proffered expert testimony, striving to admit qualified, reliable, and relevant opinions but exclude unreliable and misleading "junk science." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "This gatekeeper role involves three basic inquiries." *Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 868586, at *2 (S.D. Ohio Mar. 8, 2021).

First, a court must determine whether a proposed witness is qualified as an expert according to his or her "knowledge, experience, training, or education." FED. R. EVID. 702. Whatever the form, "[a]n expert's qualifications must provide a foundation for an expert to answer the specific questions in the expert report." *Thomas v. Lambert*, 606 F. Supp. 3d 592, 599 (E.D. Mich. 2022) (internal quotations and citations omitted). If satisfied that the proffered expert is sufficiently qualified, the court then turns to the expert's proffered testimony, asking whether such testimony is relevant and would assist the jury in understanding the evidence at trial or determining a genuine factual issue. FED. R. EVID. 702(a); *Daubert*, 509 U.S. at 587–89. Finally, a reviewing court considers whether the proffered expert testimony is reliable, by analyzing a non-exclusive list of factors including (1) whether the expert's theory or technique can or has been tested; (2) whether

the expert's theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error; and (4) whether the expert's theory or technique has been generally accepted within the relevant field or industry. *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 593–94 (1993)).

### III.

### A.

Dawn Cornelis is not qualified to offer expert testimony about MLR, generally, or the Tribe's MLR repricing, specifically.

First, Cornelis has no formal education in healthcare, insurance, tribal welfare, or any other study which would enable her to testify as an expert in MLR or MLR repricing. After graduating from high school, Cornelis attended two different community colleges, taking classes for "engineering, drawing, architecture," and "general ed." ECF No. 290-6 at PageID.16514. She did not graduate from either community college and does not have any undergraduate or graduate degree in any subject. *Id.* The Tribe does not dispute that Cornelis lacks the education necessary to qualify her as an expert on MLR repricing under Rule 702, and instead argues only that she is qualified based on her knowledge, experience, skill, and training. *See* ECF No. 291.

But the Tribe's argument is bellied by Cornelis's own deposition testimony. As explained in more detail below, Cornelis expressly testified—two days after submitting an expert report outlining the Tribe's MLR repricing—that (1) she is not an expert in MLR repricing, and instead only "knows enough to be dangerous;" (2) Lynda Myrick is an expert in MLR repricing; (3) Lynda Myrick was the only individual who actually re-priced the Tribe's claims using MLRs throughout ClaimInformatics' investigation; and (4) she does not know—and cannot testify—about Myrick's MLR repricing process, other than Myrick's overall conclusion. *See generally* ECF No. 290-6.

This Court does not discount Cornelis's substantial knowledge and experience related to healthcare insurance claim processing and auditing, generally. As reflected both by her CV and her deposition testimony, Cornelis first became a claim processor with Provident Life and Accident Company in the mid-1980s. ECF No. 290-6 at PageID.16515–16. In this role, Cornelis determined whether general healthcare claims should be approved and paid by her employer-insurer. *Id.* Around 1990, Cornelis began working in an "in-house customer service" role for Parker Hannifin—an automotive technology company—in which she would answer other employees' questions about their healthcare benefits and coverage. *See* id*.* at PageID.16519. In 1993, Cornelis created her own healthcare claim audit and recovery business—Claim Recovery Services. *Id*. Claim Recovery Services closed nearly twenty years later in 2010, and Cornelis worked the next seven years in various payment integrity roles. *Id.* at PageID.16524. In 2017, Cornelis cofounded ClaimInformatics and helped develop a payment integrity software known as "Claim Intelligence" which was used by ClaimInformatics to process and audit the Tribes claims with BCBSM in this case.[5] *Id.* at PageID.16521, 16524.

Despite Cornelis's knowledge, training, and experiencing in processing and auditing healthcare insurance claims, generally, she does not have comparable knowledge, training, and experience in auditing tribal healthcare claims involving MLR, specifically. Despite her expansive testimony about each of her professional roles throughout her career, Cornelis did not testify about *any* experience with "processing, pricing, auditing, recoupments and proper billing, coding and reimbursement *of Medicare-like rates*," as she attested to in her expert Report. *Compare* ECF No. 290-6 *with* ECF No. 290-5 at PageID.16509. And although her CV thoroughly describes her career

---

[5] Notably, Cornelis did not write the code for Claim Intelligence, and cannot describe it. ECF No. 290-6 at PageID.16521–22. Instead, Cornelis testified that she "ha[d] engineers . . . write the code" for her, but "g[a]ve[] them the vision." *Id.*

- 10 -

experience as a healthcare claim processor or auditor, no position description identifies any experience working with tribes or MLR repricing. ECF No. 290-5 at PageID.16510.

Cornelis had no experience with MLR repricing in this specific case, either, because, in Cornelis's own words "that was Lynda Myrick's job." ECF No. 290-6 at PageID.16533. Cornelis testified that her role in ClaimInformatics' investigation was that of a gatekeeper, such that other members of the ClaimInformatics team gave Cornelis a random sample of claims for her to screen to determine which specific claims were capable of repricing. *Id*. Notably, Cornelis conceded she has no "personal knowledge" about how the claims she received were randomly sampled. *Id*. Regardless, Cornelis testified that, after she screened the claims provided to her, she "put" the claims capable of being re-priced on "Lynda Myrick's lap," for Myrick to actually re-price. *Id*. And, when it comes to Lynda Myrick's re-pricing process, Cornelis repeatedly denied knowing any specifics.

MLR re-pricing necessarily requires a comparison between the rate BCBSM charged a healthcare servicer, and what the MLR was for that specific healthcare service, at that specific time, and at that specific servicer's location. When Cornelis was asked about the pricing information Myrick used to compared BCBSM's rates to, Cornelis testified as follows:

> **Counsel**: So ClaimInformatics downloaded pricing information from [Centers for Medicare & Medicate Services (CMS)] dating back to 2007?
> **Cornelis:** That's correct.
> **Counsel:** And that's available on CMS's website?
> **Cornelis:** It's available in different locations. You have to go hunt for it. It was not an easy task.
> **Counsel:** And where is it that ClaimInformatics actually secured it from?
> **Cornelis:** Ultimately, we secured it from CMS.
> **Counsel:** How?
> **Cornelis:** Different URLs. I'm not -- I wasn't in charge of that project. So I couldn't tell you verbatim exactly, you know, what our process was. I do know that all the tables were retained from CMS, because that's who issues those tables. So whether they had to make phone calls, go in the backdrop, or whether they were all available on URL, I couldn't tell you that.

> **Counsel:** You don't know?
> **Cornelis:** I don't know.
> **Counsel:** How could we find out?
> **Cornelis:** I can call up my -- my lead that did the pricing who was responsible for downloading the tables and she would know.
> **Counsel:** Is that Ms. Myrick?
> **Cornelis:** That would be Ms. Myrick, correct.
> **Counsel:** And so she was responsible for downloading the tables from CMS and ensuring the accuracy from 2007 to present; fair?
> **Cornelis:** That's fair, correct.

*Id.* at PageID.16528–29.

When asked about how regional differences in MLRs impacted Myrick's re-pricing, Cornelis testified as follows:

> **Counsel:** On the regional differences in terms of CMS, to find out how that was actually done, would Lynda Myrick be best suited to answer that?
> **Cornelis:** I would agree with that. She's more of the expert than I am. I know enough to be dangerous, I guess, and answer certain questions. But she knows every corner of re-pricing when it comes to Medicare like rates.

*Id.* at PageID.16536.

When asked about how specific surgical claim pricing models impacted the Myrick's MLR re-pricing, Cornelis could not explain how these pricing models impacted the Tribe's re-priced MLR claims, explaining her testimony was nothing but "assumption" and that, unlike her, Lynda Myrick was the expert on this subject. *Id.* at PageID.16530.

Cornelis also denied having any expertise in tribal healthcare regulation, CHS Programs, and CHS referral or purchase orders, all of which are at the very core of the Tribe's entitlement to MLRs in this case:

> **Counsel:** Let's talk about purchase orders. Do you have an understanding as to what purchase orders are?
> **Cornelis:** I do now.
> **Counsel:** And what do you mean by you do now?
> **Cornelis:** I wasn't—I don't claim to be an expert on, you know, the regulation that has to deal with the tribes and what their reimbursements are. I know enough

> because I read up on it . . . [b]ut I don't claim to be an expert with regard to the regulations. They're specific to the tribes.
> **Counsel:** Do you claim to be an expert as to the subject of a purchase order?
> **Cornelis:** I don't claim to be an expert for the purchase orders but I know enough. I know enough that's reasonable enough to probably answer questions that you may have.

*Id.* at PageID.16533.

As further proof of her lack of experience, Cornelis herself expressly denied her MLR repricing expertise on three separate occasions, noting that she only knows enough "to be dangerous," and that *Lynda Myrick* is the MLR expert within ClaimInformatics:

> **Counsel:** On the regional differences in terms of CMS, to find out how that was actually done, would Lynda Myrick be best suited to answer that?
> **Cornelis:** I would agree with that. She's more of the expert than I am. I know enough to be dangerous, I guess, and answer certain questions. But she knows every corner of re-pricing when it comes to Medicare-like rates. *Id.* at PageID.16536.
>
> . . .
>
> **Counsel:** And in terms of understanding how the [Tribe's] claims were actually re-priced, is . . . Ms. Myrick [] best to answer that?
> **Cornelis:** Ms. Myrick is one of our . . . re-pricing experts. She's been doing it for, well, probably two decades. So I refer to Ms. Myrick as our expert for Medicare-like rate pricing.
> **Counsel**: Okay. And do you refer to yourself as that?
> **Cornelis:** I do not refer to myself as a Medicare-like rate [expert].[6] I know enough to be dangerous. I can read something and explain it to you and tell you exactly what it means. But am I a know-all everything all with Medicare-like rate pricing? No, I do not claim that. *Id.* at PageID.16532.
>
> . . .
>
> **Cornelis:**. I'm not—I'm not an expert, per se, in the actual finite pricing of Medicare like rates. Lynda Myrick is. *Id.* at PageID.16530

---

[6] The word "expert" seems to have been accidently omitted from the deposition transcript, such that Cornelis's statement reads "I do not refer to myself as a Medicate-like rate." *Id.* at PageID.16532. However, this is the only plausible reading of Cornelis's answer to the specific question of whether she considered herself an MLR expert, and is consistent with Cornelis's deposition testimony as a whole, during which she denied MLR expertise three times. *See* ECF No. 290-6 at PageID.16530, 16532, 16536.

At bottom, Cornelis lacks the education, training, and experience to offer expert opinions on MLR repricing, both generally and as specifically applied to the Tribe's claims with BCBSM. Her testimony is thus barred by Rule 702.

**B.**

Even if Cornelis was qualified based on her training, education, and experience, her proffered opinion about BCBSM's rates and the Tribe's MLR repricing would be unreliable because this testimony does not concern *her* opinion. It would instead only concern Lynda Myrick's opinion.

The law governing expert testimony distinguishes between permissible reliance and impermissible "parroting." True, an expert may rely on the opinions and conclusions of other experts when forming their own independent conclusions throughout their own independent investigation. *See* FED. R. EVID. 703. But an expert may not simply "parrot," "echo," "regurgitate," or "bootstrap" the opinion or conclusion of another expert without any independent evaluation or analysis. *See, e.g.*, *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) (noting expert's "wholesale adoption" of another's opinions or estimates, without knowing or evaluating the basis for this opinion or estimate, "goes beyond relying on facts and data and instead cloaks unexamined assumption in the authority of expert analysis"); *In re Flint Water Cases*, No. 16-10444, 2023 WL 6147255, at *3 (E.D. Mich. Sept. 20, 2023) ("Experts are indeed not permitted to premise their opinion entirely on other experts without undertaking any of the necessary steps to form their open opinion." (internal quotations omitted)); *Gould Elecs. Inc. v. Livingston Cnty. Rd. Comm'n*, No. 17-11130, 2020 WL 6793335, at *9 (E.D. Mich. Nov. 19, 2020), *aff'd*, No. 20-2257, 2022 WL 1467650 (6th Cir. May 10, 2022) ("While an expert may rely on facts and data known to others in expressing what he thinks, he may not simply parrot what

someone else thinks." (internal quotations omitted)); *Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 868586, at *10 (S.D. Ohio Mar. 8, 2021) ("The bottom line is that [the proposed expert's opinion] amounts to little more than parroting back [another expert's] estimates, coupled with his stamp of approval, with no clear basis for explaining why that stamp was warranted. That is not an expert opinion."); *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, 546 F. Supp. 3d 666, 676 (S.D. Ohio 2021) (noting experts "may not simply parrot another expert's opinion" by "regurgitating" that other expert's findings without any independent analysis or opinion); *Craton v. Birds Eye Foods, Inc.*, No. 1:10-CV-541, 2013 WL 12421822, at *10 (W.D. Mich. Dec. 20, 2013) (noting experts can "base their opinions in part on facts, data, conclusions, or opinions from other experts" but cannot simply testify "about the conclusions of other experts"). Such "parroting" is impermissible and unreliable under *Daubert*. *Johnson v. Williams*, No. CV 15-13856, 2017 WL 11318160, at *9, n. 10 (E.D. Mich. Aug. 7, 2017).

However thin the line may be between permissible reliance and impermissible "parroting," Cornelis crossed it here. Cornelis conceded that all MLR re-pricing was conducted solely by Lynda Myrick. ECF No. 290-6 at PageID.16533 ("[O]nce it went to re-pricing Medicare-like rates, that was Lynda Myrick's job.") Although Cornelis testified that she independently assured the accuracy of some CMS pricing tables which Myrick may have relied on when comparing the rates BCBSM charged the Tribe to the applicable MLRs, *id.* at PageID.16529, nothing suggests that Cornelis independently evaluated Myrick's re-pricing calculations. On the contrary, Cornelis testified that Myrick authored the preliminary drafts of the relevant MLR-repricing sections of Cornelis's and ClaimInformatics' expert report, *id.* at PageID.16534, and Cornelis's anticipated trial testimony—that BCBSM overcharged the Tribe by over $4,000,000—would simply regurgitate Myrick's calculations and conclusions. *See Auto Indus. Supplier Emp. Stock Ownership Plan (ESOP) v.*

*Snapp Sys., Inc.*, No. 03-74357, 2008 WL 5383372, at *5 (E.D. Mich. Dec. 23, 2008) ("[Expert's] acceptance of [an]other's work and incorporating it into a report simply does not meet the reliability component necessary for expert testimony.")

This testimony is just as unreliable under *Daubert* as it is unfairly prejudicial under Rule 403. *See* FED. R. EVID. 403 (excluding evidence when its probative value is substantially outweighed by unfair prejudice). If *Cornelis* was permitted to testify about *Myrick's* re-pricing calculations and conclusions, BCBSM would have no meaningful opportunity for cross-examination. The Tribe has indicated it will not call Myrick as an expert witness. ECF No. 290-4 at PageID.16484. And Cornelis, as discussed, has no understanding of and cannot testify about numerous aspects of Myrick's re-pricing process. *See Craton v. Birds Eye Foods, Inc.*, No. 1:10-CV-541, 2013 WL 12421822, at *10 (W.D. Mich. Dec. 20, 2013) (noting unfair prejudice "when an expert effectively stands in the place of another expert and conveys the non-testifying expert's conclusions to the jury, or when their extensive reliance on the work of another expert renders the opinion of a mere copy or derivative of the non-testifying expert's work").

In sum, even if Cornelis had the necessary experience in MLR repricing to testify as an expert at trial, her proffered testimony would still be excluded as unreliable and unfairly prejudicial.

## C.

In response to BCBSM's meritorious Motion to Exclude Cornelis's testimony, the Tribe attempted to bolster Cornelis's qualifications and reliability by producing her "Declaration," dated November 15, 2023—notably executed after the Parties' *Daubert* deadlines and nearly one month after Cornelis's deposition. *See* ECF No. 291-4 at PageID.16761–68.

Instead of *clarifying* her prior testimony, Cornelis's declaration *contradicted* her deposition in several key respects:

(1) Despite not discussing *any* experience with MLRs in *any* of her prior roles throughout her expansive professional career, Cornelis now declares:
 (a) she has over "37 years of knowledge, experience, training, and expertise" in processing and auditing *MLRs*, specifically;
 (b) that she has "identified improper payments through benchmark analysis using MLR" in prior roles; and
 (c) has used the ClaimIntelligence software to "do MLR re-pricing for third-party Medicare plans on a monthly basis." *Id.* at 16762–64.

(2) Despite her deposition testimony that her only role in ClaimInformatics' investigation was to screen which of the Tribe's claims *could be repriced*, explaining that "once it went to re-pricing Medicare-like rate[s], that was Linda Myrick's job," ECF No. 290-6 at PageID.16533, Cornelis now declares:
 (a) "Ms. Myrick and I" collected the relevant data for "our" re-pricing work;
 (b) "Ms. Myrick and I together calculated the MLR for 6,641 claims;" and
 (c) "Ms. Myrick and I used math calculations to determine the difference between the amount BCBSM paid, using the Tribe's plan assets, for each claim, and the amount BCBSM should have paid if it applied MLR to each claim." ECF No. 291-4 at PageID.16766–67.

(3) Despite her deposition testimony denying responsibility for finding and downloading applicable CMS pricing tables to compare to BCBSM's rates throughout MLR repricing, explaining this, too, was Myrick's job, ECF No. 290-6 at PageID.16528, Cornelis now claims "we together downloaded the applicable tables used to reprice claims at the Medicare like rate." ECF No. 291-4 at PageID.16766.

(4) Despite her deposition testimony that Myrick authored the MLR re-pricing portion of ClaimInformatics' report, ECF No. 290-6 at PageID.16534-35, Cornelis now claims that she was the report's sole author. ECF No. 291-4 at PageID.16767.

To the extent Cornelis's declaration contradicts her prior deposition testimony, her declaration will be stricken and will not be considered when analyzing the propriety of her expert testimony at trial. "District Courts have broad discretion to exclude untimely disclosed expert-witness [declarations], particularly when" the declaration "serve[s] as a transparent attempt to reopen the *Daubert* inquiry after the weaknesses in the expert's prior testimony have been

- 17 -

revealed." *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 681 (6th Cir. 2011) (internal quotations omitted); *see also Terhune v. Cooksey*, No. 3:20-CV-611-DJH-CHL, 2022 WL 1644620, at *2 (W.D. Ky. May 24, 2022) (striking supplemental affidavit, and "refusing to consider [it] in evaluating the proper scope of" the purported expert's testimony); *Dinsmore & Shohl LLP v. Gray*, No. 1:14-CV-900, 2016 WL 11784514, at *3 (S.D. Ohio Apr. 5, 2016) ("An expert may not amend or alter his prior opinions to respond to the opposing party's attacks on the reliability of his opinion."); *Leahy v. Signature Engines, Inc.*, No. 1:10-CV-070, 2012 WL 1476072, at *12 (S.D. Ohio Apr. 24, 2012) (same).

### IV.

Accordingly, it is **ORDERED** Dawn Cornelis's November 15, 2023 Declaration, ECF No. 291-4 at PageID.16761–68, is **STRICKEN** to the extent it contradicts her prior deposition testimony.

Further, it is **ORDERED** that Defendant's Motion to exclude Dawn Cornelis's proffered expert testimony on Medicare-like Rate repricing, ECF No. 290, is **GRANTED**.[7]

Dated: August 14, 2024          s/Thomas L. Ludington
         THOMAS L. LUDINGTON
         United States District Judge

---

[7] Cornelis may, however, provide her expert opinion about why BCBSM's *claim disclosure* is incomplete or inaccurate. *See* ECF No. 290-5 at PageID.16491–501. Unlike MLR-repricing, Cornelis appears to have first-hand knowledge of BCBSM's disclosures throughout this litigation which, coupled with her experiencing in healthcare claim auditing, led her to conclude that BCBSM's claim disclosure was incomplete and inaccurate. In addition to her experience, this testimony is proper subject matter for expert opinions because the Parties have disputed, and continue to dispute, whether BCBSM is withholding claims, *see* ECF Nos. 294; 295; 299, and this is a complex issue Cornelis may be uniquely suited to address and explain to a trier of fact, the resolution of which directly impacts the Tribe's damages if successful at trial.