UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAGINAW CHIPPEWA INDIAN TRIBE
OF MICHIGAN, et. al.

                Plaintiffs,                          Case No. 1:16-cv-10317

v.                                        Honorable Thomas L. Ludington
                                                United States District Judge

BLUE CROSS BLUE SHEILD OF MICHIGAN,

                Defendant.

_____/

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFFS' COMPLAINT

It has been over three years since this case was returned on remand from the Sixth Circuit for the second time, and over nine years since this case began. On August 14, 2024, this Court denied both Plaintiffs' Third Motion for Default and Defendant's motions for sanctions. It then directed the Parties to file supplemental briefing on arguments from Defendant's 2020 Motion for Summary Judgment, which were "*beyond ripe*." ECF. No. 304 at PageID.17626 (emphasis in original). For the reasons below, the Defendant's Motion for Summary Judgment will be granted, and Plaintiffs' Amended Complaint will be dismissed.

## I.

### A. History and Modern Requirements of Federal Tribal Healthcare Legislation

To understand the central dispute in this case, it is important to first understand the history and modern requirements of tribal healthcare legislation and regulation.

### 1. HIS, CHS, and Background on Tribal Healthcare

In 1955, Congress created the Indian Health Service (IHS) to govern tribal healthcare. The IHS, now a sub-agency within the U.S. Department of Health and Human Services (HHS),

continues to govern tribal healthcare today. Indeed, the IHS is the "principal federal health care provider and health advocate for Indian people, and its goal is to raise their health status to the highest possible level."[1] *Agency Overview*, INDIAN HEALTH SERVS., https://www.ihs.gov/aboutih s/overview/ (last visited August 29, 2025) [https://perma.cc/78S76UR6].

The IHS fulfils this mandate in two ways. First, IHS funds and operates healthcare facilities—such as hospitals and clinics—that provide direct care to American Indians. 42 C.F.R. § 136.23. Second, IHS separately funds Contract Health Services (CHS) Programs,[2] which operates as a safety net, so that if an American Indian seeks a healthcare service that is unavailable at their direct-care IHS tribal facility, CHS Programs may refer that American Indian to a non-IHS healthcare provider or facility. *Id.* §§ 136.21(e), 136.23(a); 25 U.S.C. § 1603(5). The practical provision of healthcare services through tribal CHS Programs is best broken down into three stages: eligibility, approval, and payment.

In general, only tribal members are eligible to receive healthcare services through a CHS Program. 42 C.F.R. §§ 136.12, 136.23; *see also Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 32 F.4th 548, 554 (6th Cir. 2022) ("*SCIT II*").

A tribe's CHS Program must only approve an eligible member's healthcare referral when (1) the sought-after healthcare service is medically necessary; (2) the service is not available at the tribe's IHS direct-care facility; (3) the tribe's IHS direct-care facility determines that the eligible

---

[1] The term "American Indian" refers to the indigenous peoples of the United States. *See Teaching and Learning about Native Americans: Terminology*, NAT'L MUSEUM OF THE AM. INDIAN, https://tinyurl.com/AmericanIndianTermHistory (last visited August 29, 2025) [https://perma.cc/ESX3-L3US].

[2] The CHS Program has been renamed as the Purchased/Referred Care program. *See* Consolidated Appropriations Act, Pub. L. No. 113-76, 128 Stat. 328 (2014). But this Court, the Sixth Circuit, and the Parties have consistently used the terms "CHS" and "Contract Health Services" throughout this litigation. This Opinion and Order is no exception.

member's medical need is sufficiently serious,[3] and, importantly, (4) CHS can fund the referral—subject to annual Congressional appropriation. 42 C.F.R. §§ 136.23, 136.24(b); *Can CHS Pay for Your Referral Medical Care? Find Out in 3 Stages.*, INDIAN HEALTH SERVS., https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/CHSProcessHandout1.pdf (last visited Aug. 28, 2025) [https://perma.cc/8YC5-9VZJ]. If approved, a tribe's CHS program will provide an external healthcare provider with a "purchase" or "referral" order, which authorizes the tribe's payment for the referred healthcare service. 42 C.F.R. § 136.24(a). The purchase order, issued by the Tribe, identifies (1) the "purpose" of the referral or the specific healthcare service the tribal member needs, (2) the specific external healthcare provider the tribal member is being referred to, and (3) the tribal member's insurance coverage, if any. ECF No. 238-3 at PageID.14162. Once the external provider receives a purchase order, they are responsible for contacting the tribal-member patient to schedule the referred appointment or service. *See Referrals Process*, NISQUALLY TRIBAL HEALTH DEP'T, https://tinyurl.com/3jwvyct4 (last visited August 28, 2025).

Lastly, payment. As part of ensuring their eligibility for referrals, tribal members must periodically notify their tribe's CHS Program of any "alternate resources" he or she has, including any healthcare insurance coverage. 42 C.F.R. § 136.61(c) (defining "alternate resources" as any "health care resources other than those of [IHS]" including Medicare, Medicaid, or any private healthcare insurer); *see also Can CHS Pay for Your Referral Medical Care? Find Out in 3 Stages.*,

---

[3] As the IHS explains, "CHS funds are often [in]sufficient to pay for all needed services. When this happens, the [IHS facility] committee considers each [eligible tribal member's] medical condition to rank cases in relative medical priority." *Can CHS Pay for Your Referral Medical Care? Find Out in 3 Stages.*, INDIAN HEALTH SERVS., https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/CHSPro cessHandout1.pdf (last visited Aug. 28, 2025) [https://perma.cc/8YC5-9VZJ].

INDIAN HEALTH SERVS., https://tinyurl.com/yz335b98 (last visited Aug. 29, 2025) [https://perma. cc/8YC59VZJ]; *see also* U.S. DEP'T. OF HEALTH AND HUM. SERVS., INDIAN HEALTH MANUAL § 2-3.8(B)(1). After a tribal member receives the referred care, the external healthcare provider first bills and collects payment from any "alternate resource" the tribal member may have and then bills any remaining balance directly to the tribe's CHS Program—which serves as a "payer of last resort." 42 C.F.R. § 136.61(a).

### 2. Modern American Indian and Medicare-Like Rate Regulations

In 1975, Congress enacted the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5301 *et seq*. This Act gave tribes the discretion to (1) manage their own IHS facilities by contracting with private insurers for healthcare, and (2) operate their CHS Programs. *See FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995); *SCIT II* 32 F.4th at 554.

Most relevant to this case, in 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, which authorized HHS to limit healthcare pricing at no more than Medicare-like rates (MLRs) from external healthcare providers who provide referred healthcare services to tribal members through a CHS Program, including the CHS Programs that tribes themselves operate. *See* Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108173, § 506 (2003). HHS implemented this Congressional mandate by capping the payments that *Medicare-participating external providers* could charge for providing CHS-authorized care. 42 C.F.R. § 136.30. This specific MLR regulation went into effect on July 5, 2007. *Saginaw Chippewa Indian Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *3 (E.D. Mich. Dec. 1, 2023). "The regulations describe the payment methodologies and other requirements *covered providers must adhere to when processing claims* for services authorized for purchase by a [CHS] or urban Indian program. This applies to programs operated by the IHS, Tribes or Tribal organizations, and urban

Indian programs." *Medicare-Like Rates Information*, U.S. DEP'T. HEALTH & HUM. SERVS., https://www.ihs.gov/prc/medicare-like-rates-information/, (last accessed September 10, 2025), [https://perma.cc/95UC-PKYK] (emphasis added). HHS also provides a "Dear Provider Letter Sample" for parties to send to Medicare-participating hospitals, instructing them to "submit claims in accordance with the processing requirements and payment methodologies established" by the MLR regulations. *Dear Provider*, U.S. DEP'T. HEALTH & HUM. SERVS., [https://perma.cc/95UC-PKYK] (last accessed Sept. 10, 2025).

In a letter to Tribal Leaders dated July 9, 2007, the Department of Health & Human Services stated "[t]he 'Medicare-like' payment rate will constitute payment in full to Medicare-participating hospitals that deliver services to American Indians and Alaska Natives referred through IHS funded programs." *Tribal Leader Letter*, U.S. DEP'T. HEALTH & HUM. SERVS., https://perma.cc/95UC-PKYK (last visited September 10, 2025).  That letter reiterated HHS's position that MLR should apply to all Medicare-participating hospitals. *Id.*

Medicare itself is the largest single purchaser of healthcare in the U.S. *Health Care Spending and the Medicare Program*, MEDPAC 1, 3 (2025). Of the $4.1 trillion spent on personal health care in 2023, Medicare accounted for 23%. *Id.* While difficult to determine, rates for Medicare are determined administratively through laws and regulations. *See* CONG. BUDGET OFF., *The Prices That Commercial Health Insurers and Medicare Pay for Hospitals' and Physicians' Services* (2022). But prices paid by commercial insurers and Medicare notably differ, in part because the prices that commercial insurers pay for services from in-network healthcare providers result from negotiations between the insurers and providers. *Id.* Commercial insurers may try to obtain lower prices by excluding providers from their networks, but in many cases, their

ability to do so is limited. *Id.* Thus, there is a likelihood of difference between Medicare rates and rates determined between a commercial insurer and providers.

**C. Saginaw Chippewa Tribe's Nimkee Clinic, CHS Program, and Contracts with BCBSM**

The Tribe is a federally recognized Indian Tribe with its Tribal Government headquarters in Mt. Pleasant, Michigan. ECF No. 7 at PageID.61. The Tribe has thousands of members and employs thousands of people—members and nonmembers alike. *Id.* at PageID.61, 64.

In 1999, in accordance with the Indian Self-Determination and Education Assistance Act, the Tribe established its own direct-care facility, the Nimkee Medical Clinic. *Saginaw Chippewa Indian Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *4 (E.D. Mich. Dec. 1, 2023). The Tribe also established its own CHS Program such that, if the Nimkee Clinic could not provide a specific healthcare service to a member-patient, the Clinic could refer the patient to a third-party healthcare provider. *See SCIT II* 32 F.4th at 554; 42 C.F.R. § 136.24.

To provide healthcare for its members and employees, the Tribe created two separate healthcare plans. *SCIT II* 32 F.4th at 554. In the 1990s, the Tribe established the Employee Plan for all Tribal employees, regardless of their membership status. ECF No. 112 at PageID.6202. In 2002, the Tribe established a separate Member Plan for its members, regardless of whether they were employees or not. *Id.* "Importantly, the Tribe sought out and selected" BCBSM "to administer both plans." *Saginaw Chippewa Indian Tribe of Michigan & Welfare Benefit Plan v. Blue Cross Blue Shield of Michigan*, No. 1:16-CV-10317, 2023 WL 8313270, at *4 (E.D. Mich. Dec. 1, 2023). The plans were governed by "administrative service contracts" (ASCs) entered into by both the Tribe and BCBSM, and each ASC "was renewed year after year by the [P]arties." *See* ECF No. 7 at PageID.65–67. The first ASC for the Member Plan was effectuated in 2002, and the first ASC for the Employee Plan was effectuated in 2004. *Id.* at PageID.66. The ASCs for both the Member

and Employee Plans limited BCBSM's responsibilities "to providing administrative services for the processing and payment of claims." *SCIT II* 32 F.4th at 555. These services included (1) BCBSM's receipt of claims from, and at the price quoted by the, third-party providers for any services provided to the plan member, (2) paying the bill from one of two accounts funded by the Tribe, (3) and reporting to the Tribe—monthly, quarterly, and annually—the remaining account balances, which the Tribe would then use to determine how much additional funds to deposit into the accounts for future medical services. *See id.* at 567–68 (Rogers, J., concurring). As of 2004, both the Employee and the Member Plan were self-funded or self-insured, meaning the Tribe directly paid for the costs of health care benefits. ECF Nos. 7 at PageID.64. It is the administration of these two healthcare plans that has led to this longstanding litigation.

### B. Procedural History

On January 29, 2016, Plaintiffs Saginaw Chippewa Indian Tribe of Michigan ("Plaintiffs") sued Blue Cross Blue Shield of Michigan ("BCBSM"). The following month, Plaintiffs filed an Amended Complaint. ECF No. 7.

By this point, BCBSM had been much beleaguered by litigation stemming from lawsuits concerning its "Hidden Fees System," in which it was alleged that BCBSM would inflate the fees it charged clients by adding hidden mark-ups to hospital charges. *See, e.g., Pipefitters Loc. 636 Ins. Fund. V. Blue Cross & Blue Shield of Michigan*, 722 F.3d 861 (6th Cir. 2013); *Hi-Lex controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th Cir. 2014); *Bd. of Trs. of the Michigan Reg'l Council of Carpenters Emp. Benefit Fund v. Blue Cross Blue Shield of Michigan*, No. 13-CV-10416, 2013 WL 12184249 (E.D. Mich. Aug. 13, 2013) (noting that more than twenty pending related cases existed in this District as of 2013); *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross & Blue Shield of Michigan,* No. 14-CV-11349, 2015 WL 13892454 (E.D. Mich. Sept. 22, 2015). In 2014, the Sixth Circuit held that BCBSM was liable as an ERISA

fiduciary for charging hidden fees. *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740, 747 (6th Cir. 2014) ("Accordingly, the district court did not err in finding that BCBSM held plan assets of the Hi–Lex Health Plan and, in doing so, functioned as an ERISA fiduciary"). But this case has never been as simple as a dispute over hidden fees.

In its Amended Complaint, ECF No. 8, Plaintiffs not only alleged that BCBSM was charging hidden fees, but also that it violated its ERISA fiduciary duties by failing to demand MLRs from medical service providers. *See generally* ECF No. 7. On April 25, 2016, BCBSM moved to dismiss Plaintiffs' first Amended Complaint. ECF No. 14. This Court granted the motion and dismissed all counts except those allegations within Counts I and II, which alleged that BCBSM utilized hidden access fees. ECF No. 22.

On April 10, 2017, Plaintiffs and BCBSM each sought partial summary judgment. ECF Nos. 79; 81. This Court granted both motions in part. In so doing, this Court determined that Plaintiffs had two separate health care plans with BCBSM. ECF No. 112 at PageID.6210–14. One plan was for members of the Tribe, and the other was for employees of the Tribe. The Court determined that only the plan for the employees was governed by ERISA because the Member Plan was created for the purpose of providing coverage to tribal members. *Id.* at PageID.6216.

Plaintiffs appealed. ECF No. 114. The Sixth Circuit affirmed this Court's determination that there were two separate insurance plans and that only the plan for employees, some of whom are not members of the tribe, was governed by ERISA. ECF No. 135 at PageID.7634–41. But the Sixth Circuit also reversed the Court as to the Plaintiff's MLR claims, holding that, without further explanation, "it would be premature to dismiss the Tribe's claims at this stage in the proceedings." *Id.* at 7641. On January 4, 2019, a stipulated order was filed reinstating Counts I, IV, and VI of

Plaintiffs' Amended Complaint "insofar as those Counts assert[ed] claims related to" MLRs. ECF No. 141.

Count I alleges that BCBSM was a fiduciary under ERISA because "it exercised discretionary authority and control over management" of the Employee Plan and its assets, as well as responsibility over its administration. ECF No. 7 at PageID.89. Plaintiffs contend that BCBSM breached its fiduciary duty by failing to determine, on behalf of the Tribe, if the healthcare providers were billing more than MLR and likely "[p]aying excess claim amounts to Medicare participating hospitals for services authorized by a tribe or tribal organization carrying out a CHS program." *Id.* at PageID.90.

Count IV alleges that Plaintiffs are "health care insurers" as defined by the Michigan Health Care False Claims Act ("HCFCA"). *Id.* at PageID.94–95. Plaintiffs contend that BCBSM violated this act by not applying the MLR discount rate for medical services received by Plaintiffs under the Member Plan. *Id.* Plaintiffs reason that BCBSM's presentation of the allegedly illegal claim for services by the Medicare-participating hospital also constitutes BCBSM's presentation of a false claim.

Count VI alleges that BCBSM was in a fiduciary relationship with Plaintiffs as defined by common law. *Id.* at PageID.97–98. Plaintiffs contend that BCBSM violated its fiduciary duty by charging rates in excess of MLR. Plaintiffs reason that doing so was not in the best interest of Plaintiffs under the Plan. *Id.*

BCBSM filed a motion to dismiss Plaintiffs' Amended Complaint. ECF No. 142. The motion was denied without prejudice, and the Parties were directed to complete discovery. ECF No. 146.

BCBSM then filed a motion for summary judgment. ECF No. 173. It argued that it did not owe Plaintiffs a fiduciary duty under ERISA to verify that Medicare-participating hospitals were delivering services to Plaintiffs' employees at MLR. It contended that MLR is only available when services are sought out and paid for by a Tribe's Contract Health Service ("CHS"). *Id.* at PageID.8910. Because BCBSM paid for the services for the employees from an entirely different source, not Plaintiffs' CHS, the services were not eligible for MLR. *Id.* at PageID.8897. Alternatively, BCBSM alleges that Plaintiffs' ERISA claims are time-barred by the statute of limitations. *Id.* at PageID.8915. It further argues that it did not violate the HCFCA or breach a common law fiduciary duty because the services paid for by BCBSM from a different source were not eligible for MLR. *Id.* at PageID.8926 –29.

On August 7, 2020, the Court granted BCBSM's motion for summary judgment, concluding that BCBSM had no duty to seek MLR because "MLR is only applicable for those services funded by CHS" and "BCBSM was not authorized, nor did it pay for services using funds from CHS." ECF No. 197 at PageID.12655. Plaintiffs appealed. ECF No. 203. The Sixth Circuit reversed the Court's decision, holding that "the plain meaning of the regulatory language does not impose a requirement for the exclusive use of CHS funds for MLR payment eligibility." ECF No. 208 at PageID.12859. On remand, the Court was instructed to address the remaining legal questions and consider BCBSM's alternative arguments that remained from their initial motion for summary judgment. *Id.* at PageID.12864. The litigation was then bogged down by several rounds of discovery disputes between the Parties, which were initiated to determine the potential economic and legal consequences of the Parties' arguments. *See* ECF Nos. 209–309; 313.

In the Southern Division of the Eastern District of Michigan, a similar case involving BCBSM and the Grand Traverse Band of Ottawa and Chippewa Indians ("GTB") was also

decided. *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross Blue Shield of Michigan*, No. 14-CV-11349, 2017 WL 3116262 (E.D. Mich. July 21, 2017); *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross & Blue Shield of Michigan*, No. 14-CV-11349, 2017 WL 6594220 (E.D. Mich. Dec. 26, 2017). It was then appealed and decided by the Sixth Circuit. *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross Blue Shield of Michigan*, 146 F.4th 496 (6th Cir. 2025) ("*GTB*"). The Sixth Circuit decision in *GTB* provides controlling precedent that guides this Court in its decision concerning the remaining summary judgment arguments today.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party, who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.

### A. ERISA

Up front, Plaintiff's ERISA claims are barred by ERISA's three-year statute of limitations outlined in 29 U.S.C. § 1113(2). Under § 1113, an alleged breach of fiduciary duty "must be filed within one of three time periods, each with different triggering events*." Intel Corp. Inv. Pol'y*

*Comm. v. Sulyma*, 589 U.S. 178, 180, 140 S. Ct. 768, 774, 206 L. Ed. 2d 103 (2020). Section 1113(1) is a statute of repose, and states that a suit must be filed "six years after (A) the date of the last action which constituted part of the breach or violation, or (B) in the case of an omission the last date on which the fiduciary could have cured the breach or violation." Section 1113(2) accelerates the filing deadline; requiring plaintiffs to file within "three years after the earliest date on which [they] had actual knowledge of the breach or violation." "The third period, which applies 'in the case of fraud or concealment,' begins when the plaintiff discovers the alleged breach." *Intel Corp. Inv. Pol'y Comm.* 589 U.S. 178 at 181 (quoting § 1113).

BCBSM contends that Plaintiffs always had "actual knowledge" of the conduct giving rise to their ERISA claims, ECF No. 173 at PageID.8915, or, at the very least, had actual knowledge as of 2008, ECF No. 306 at PageID.17674, and so the three-year statute of limitations period had run by 2011 by the latest. "Although ERISA does not define the phrase 'actual knowledge,' its meaning is plain." *Intel Corp. Inv. Pol'y Comm.*, 589 U.S. 178 at 184. "To have 'actual knowledge' of a piece of information, one must in fact be aware of it." *Id.* Therefore, a plaintiff's knowledge must be more than "potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal." *Id.* at 185 (citing Black's Law Dictionary 53 (4th ed. 1951)). And "it is only the plaintiff's actual knowledge of the underlying conduct giving rise to the alleged violation that is required, rather than the knowledge that the underlying conduct violates ERISA." *Wright v. Heyne*, 349 F.3d 321, 331 (6th Cir. 2003) Importantly, "actual knowledge can be proved through 'inferences from circumstantial evidence.'" *Intel Corp. Inv. Pol'y Comm.*, 589 U.S. 178 at 189. "If a plaintiff's denial of knowledge is 'blatantly contradictory to the record', 'a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Id.* at 190 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

Plaintiffs allege that BCBSM breached its fiduciary duty of care under ERISA by failing to "preserve" Plan assets by either determining whether providers were billing no more than MLR or contracting a lower rate with hospitals. ECF No. 308 at PageID.17860. Plaintiffs contend that for the statute of limitations to run, they must have had actual knowledge that BCBSM failed to preserve Plan assets by not determining that Plaintiffs were receiving MLR discounts. *Id.* Plaintiffs contend that they did not know of any squandered plan assets until 2014, when Grand Traverse Band made allegations that they were overpaying hospital claims for tribal members administered by BCBSM, and then Grand Traverse Band switched to another third-party administrator who saved them money by pricing claims at MLR or lower. *Id.* at PageID.17860–61.

BCBSM argues that Plaintiffs have always known that it applied its own negotiated rates without ever applying MLR. ECF. No. 173 at PageID.8916; *see* ECF No. 173-11 at PageID.9112 ("You always understood that insurance companies did not obtain MLR, correct? . . . Yes, to my knowledge they did not seek it"). BCBSM also contends that Plaintiffs were aware that the negotiated rates were not always lower than MLR. ECF. No. 173 at PageID.8916; *see also* ECF No. 173-3 at PageID.8947. ("Could be more, could be less. That's all…based on the carrier and what they have negotiated with [the providers]"). Lastly, BCBSM points to a concession directly from Plaintiff's own reply brief to its Motion for Summary Judgment: "There is no question that SCIT understood within the first year after the MLR regulations went into effect that BCBSM did not have a system in place to determine the MLR price for a hospital claim." ECF No. 177 at PageID.10843.

After engaging the record, this Court concludes that Plaintiffs had actual knowledge of BCBSM's breach of fiduciary duty at least as early as 2008, so the statutes of limitations ran out in 2011, five years before the initial complaint was filed. To start, Plaintiffs' knowledge was not

"potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal." *Intel Corp. Inv. Pol'y Comm.*, 589 U.S. at 185. Plaintiffs' own CHS clerk acknowledged that she was aware that BCBSM did not seek MLRs from providers, and its Compensation and Benefits Manager acknowledges that she understood that "BCBSM did not have a system in place to price claims at MLR." ECF No. 173-11 at PageID.9112; ECF No. 177-50 at PageID.11787. These concessions paint a persuasive picture that Plaintiffs were both aware that BCBSM was not only failing to determine rates at MLR from the beginning, but also that BCBSM did not have a *system* to then process the government rates.

Plaintiffs argue that this knowledge fails to start the clock. Instead, Plaintiffs argue that they needed to have actual knowledge that BCBSM's negotiated rates were higher than MLR. ECF No. 308 at PageID.17860. But there are two things wrong with this argument. First, in *GTB*, the Grand Traverse Band asserted ERISA breach of fiduciary duty claims against BCBSM for its failure to preserve plan assets, similar to this case. *GTB*, 146 F.4th at 507. In *GTB*, the Sixth Circuit found that the only "relevant fact" in determining when the statute of limitations began to run was "[BCBSM]'s failure to pursue MLR discounts" because it formed the basis of Grand Traverse Band's ERISA claims. *Id.* at 509. Because the basis of the ERISA claims in both *GTB* and here are based on preserving plan assets, the same relevant facts initiate the statute of limitations— Plaintiffs' knowledge that BCBSM did not pursue rates at MLR.

Second, even if *GTB*'s underlying facts that formed the basis of the ERISA claims differ from this case's facts, Plaintiffs still knew that BCBSM could not *even begin* because they did not have the technical ability to access MLR rates when the Parties entered into the agreement. Without the ability to calculate MLRs, BCBSM could not have negotiated rates at or below MLRs as required by regulatory requirements. 42 C.F.R. § 136.30(f). With knowledge that BCBSM could

- 14 -

not calculate MLRs, Plaintiffs had actual knowledge that BCBSM was not capable of taking advantage of MLR discounts available to the Tribe; thus, at least some claims might have been negotiated at rates above MLR.

Plaintiffs further argue that ERISA's six-year "fraud or concealment" limitations period applies, rendering Plaintiffs' claims timely. ECF No. 308 at PageID.17861. Plaintiffs contend that BCBSM falsely represented to the Tribe that there was no meaningful difference between its payment rates and MLR, tricking Plaintiffs into believing that BCBSM was preserving Plan assets. *Id.* But again, there is a problem with this argument.

As discussed above, Plaintiffs were already on actual notice that BCBSM was not negotiating rates at MLR when the alleged fraud or concealment occurred. The fraud or concealment claim comes from the deposition of Daniel Brooks,[4] a former employee of the Tribes insurance broker, Gallagher Benefits Services. ECF No. 177-52. But the testimony from Mr. Brooks indicates that any possible fraud from BCBSM occurred in 2009, at least a year after Plaintiffs had actual knowledge that BCBSM was not obtaining MLR prices. *Id.* at PageID.11965 ("It's the email that had those notes from the February 2009 meeting"). BCBSM could not have engaged in fraud to conceal from the Tribe what the Tribe already knew. *See Brown v. Owens Corning Inv. Rev. Comm.*, 622 F.3d 564, 574 (6th Cir. 2010), *abrogated on other grounds*, *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178 (2020). So because Plaintiffs' claim is barred by

---

[4] Plaintiffs cite the deposition of Nicholas Kamai, another Gallagher Benefits Services employee, as another example of BCBSM's fraud. ECF No. 177-51. But Kamai's testimony does not corroborate that BCBSM ever represented to him that its rates were either at MLR or better. In fact, the opposite is true; Kamai affirms that he never received information from BCBSM that its negotiated rates were better than MLR. *Id.* at PageID.11870. Furthermore, even if he had, the evidence he identified demonstrating BCBSM's fraud is from October of 2012, several years after Plaintiffs were made aware that BCBSM was not negotiating rates at MLR. *Id.* at PageID.11869.

the three-year accelerated statute of limitations provision under 29 U.S. Code § 1113(2), its ERISA claims are time-barred.

## B. Common Law Fiduciary Duty

Plaintiffs contend that BCBSM violated its fiduciary duty by charging rates in excess of MLR, and, in turn, BCBSM was not conducting itself in Plaintiff's best interest. ECF No. 7 at PageID.97–98. BCBSM argues that Plaintiff's common-law breach of fiduciary duty claims also fail because the statute of limitations has run. ECF No. 173 at PageID.8929.

Michigan applies a three-year statute of limitations to claims involving fiduciary duties. MICH. COMP. LAWS § 600.5805(2). "A claim accrues 'when the beneficiary *knew or should have known* of the breach'—an objective standard that asks when the plaintiff reasonably should have learned of the existence of an injury and its potential cause." *GTB*, 146 F.4th at 510 (citing *The Meyer and Anna Prentis Fam. Found. v. Barbara Ann Karmanos Cancer Inst.*, 698 N.W.2d 900, 908–09 (2005) (emphasis in original)). Notably, the "knew or should have known" standard under state common law is more lenient than ERISA's "actual knowledge standard." *See GTB*, 146 F.4th at 510. It is an objective standard that asks when the plaintiffs reasonably should have learned of an injury. *Id.* Like the ERISA statute, there is also a fraudulent concealment limitations period:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim.

MICH. COMP. LAWS § 600.5855.

Because Plaintiffs' claims fail under ERISA's stricter statute of limitations, they also fail under the common law's. As made clear, the Plaintiffs have always known that BCBSM was not negotiating rates at MLR. *See, e.g.,* ECF No. 173-11 at PageID.9112; ECF No. 173-10 at PageID.9071; ECF No. 173-12 at PageID9131; ECF No. 173-3 at PageID.8947; *see also* ECF No.

177 at PageID.10843 ("There is no question that SCIT understood within the first year after the MLR regulations went into effect that BCBSM did not have a system in place to determine the MLR price for a hospital claim."). Thus, Plaintiffs had actual knowledge of the BCBSM's breach from when they began contracting with each other, and the statute of limitations effectively ran out long before Plaintiffs levied their claims in 2016.

Plaintiffs' fraudulent concealment arguments fail here for the same reasons they fail under ERISA: the Tribe had actual knowledge. *See Brown* 622 F.3d at 574 ("Defendants could not have engaged in fraud to conceal from the Plaintiffs what the Plaintiffs already knew.").

Furthermore, even if Plaintiffs didn't know of BCBSM's breach, it still does not identify facts that demonstrate fraudulent concealment. Michigan law requires more than a misstatement to delay the running of the statute of limitations. Instead, the fraud must be "manifested by an affirmative act or misrepresentation." *GTB*, 146 F.4th at 510 (citing *Prentis Fam. Found. v. Barbara Ann Karmanos Cancer*, 698 N.W.2d 900, 909 (2005)). "That is, the Tribe 'must show that [Blue Cross] engaged in some arrangement or contrivance of an affirmative character designed to prevent subsequent discovery.'" *Id.* (citing *Prentis*, 698 N.W.2d at 909).

Plaintiffs provide the testimony from Mr. Brook, *see supra* Section III, A, as an example of BCBSM fraudulently concealing that they were not negotiating rates at MLR.[5] ECF No. 177-52 at PageID.11966–68. However, Mr. Brooks never affirmatively states that there was intentional concealment on the part of BCBSM's representatives, just that they *thought* that the rates were similar:

---

[5] As stated before, Plaintiffs cite the deposition of Nicholas Kamai as another example of BCBSM's fraudulent misrepresentation that its rates were similar to MLR. ECF No. 177-51. But Kamai's testimony states the opposite —that he never received information from BCBSM that its negotiated rates were better than MLR. *Id.* at PageID.11870.

Q: Also, to clarify, this is a potentially a significant point, were you being told that in fact from Blue Cross that in fact there was not a significant savings difference between Medicare-like rates and Blue Cross's network rates or were you just being told that they didn't think there was a significant difference?

A: *I would say the latter is more correct, they didn't think,* because we never saw any reports one way or the other.

ECF No. 177-52 at PageID.11968. Because there is no evidence that BCBSM engaged in "an arrangement or contrivance of an affirmative character" to prevent Plaintiffs from discovering that it was not negotiating at MLR rates, there was no fraudulent concealment, and thus no tolling of the statute of limitations.

### C. HCFCA

### 1. The Competing HCFCA Theories

Plaintiffs argue that BCBSM violated Michigan's HCFCA under the "implied certification theory of liability." ECF No. 308 at pageID.17864. Under this theory, claims that contain "half-truths" or fail to disclose violations of statutory regulatory provisions violate the analogous "false claims" provision of the FCA. *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 186–188 (2016). But BCBSM counters that Plaintiffs have altered its HCFCA theory, and this is the first time that a breach under the implied certification theory is alleged. The Court agrees.

"A plaintiff may not shift its theory of liability at the summary judgment stage in a way that materially alters the pleaded factual basis of its claim and prejudices the opposing party." *GTB*, 146 F.4th at 511–12 (6th Cir. 2025). The opposing party must have "fair notice of the nature and basis or grounds for a claim," *see S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327–28 (6th Cir. 2013) (quoting *Colonial Refrigerated Trans., Inc., v. Worsham*, 705 F.2d 821, 825 (6th Cir. 1983)). "A party may not pivot to a new factual basis for liability after the close of discovery if that change would prejudice the opposing party." *GTB*, 146 F.4th at 512 (citing *Sierra Brokerage Servs., Inc.*, 712 F.3d at 327–28).

- 18 -

Like in *GTB*, the Amended Complaint alleged a narrow theory: that BCBSM violated the HCFCA by failing to determine MLR rates. ECF No. 7 at PageID.94. The Tribe alleged a specific factual basis for its claims:

> The amount charged by BCBSM for paying the claims was false because the actual claims were less than the amount charged by BCBSM, and because Plaintiffs were not required to pay more than MLR for MLR-eligible claims.

*Id.* Only now, on summary judgment, do Plaintiffs assert that BCBSM violated the HCFCA because it "misrepresented to the Tribe and its agents that there was no meaningful difference between its payment rates and MLR." ECF No. 308 at PageID.17865. This change materially alters the pleaded factual basis of the Plaintiff's HCFCA claims.

Again, like in *GTB*, BCBSM is prejudiced by the Plaintiffs' shift. First, BCBSM had no reason to make arguments regarding the implied certification theory's relationship to the HCFCA claim when that theory was absent from the HCFCA count. In fact, Plaintiffs didn't even present this theory in their Response to BCBSM's original motion for summary judgment. *See* ECF No. 177. Instead, it waited until the Court requested supplemental briefing after remand from the Sixth Circuit, a full eight years after the Amended Complaint was filed. ECF No.308 at PageID.17864–65. Second, BCBSM framed its own supplemental reply brief in support of its motion for summary judgment on the Plaintiff's original pleadings, and thus, never addressed Plaintiffs' new implied certification theory of liability. ECF No. 306. Therefore, Plaintiff's shift in legal theory on summary judgment materially altered the factual basis of its claim and prejudiced BCBSM. Thus, this Court will only assess the merits of the Plaintiff's pleaded HCFCA claim

### 2. The Merits of the HCFCA Theory in the Amended Complaint

As stated, Plaintiffs' pleaded HCFCA claims allege that BCBSM breached the act by failing to pay claims that were MLR-eligible at MLR. ECF No. 7 at PageID.94. Thus, to succeed on its HCFCA claim, Plaintiffs must show that Blue Cross violated the MLR regulations under 42 C.F.R.

§ 136.30. *GTB*, 146 F.4th at 513. But the Sixth Circuit concluded in *GTB* that "the plain language of § 136.30 unambiguously limits the regulations' scope to Medicare-participating hospitals, which are the only entities required to accept MLR as payment for qualifying care." *GTB*, 146 F.4th at 514. Because the regulations only apply to Medicare-participating hospitals, Plaintiffs cannot allege a violation under the theory that BCBSM failed to pay claims at MLR. Thus, the Defendant is entitled to summary judgment on the HCFCA claim.

**IV.**

On October 3, 2024, Plaintiffs moved to redesignate its previous expert witness as its current expert witness regarding MLR pricing and related matters. ECF No. 307. But because Plaintiffs' remaining claims have been disposed of on summary judgment, this Motion is moot. Thus, the Plaintiffs' Motion Regarding Expert Witnesses, ECF No. 7, will be denied as moot.

**V.**

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 173, is **GRANTED**.

Further, it is **ORDERED** that Plaintiffs' Motion Regarding Expert Witnesses, ECF No. 307, is **DENIED AS MOOT**.

Further, it is **ORDERED** that Plaintiffs' Amended Complaint, ECF No. 7, is **DISMISSED WITH PREJUDICE**.

**This is a final order and closes the case.**

Dated: September 29, 2025                              s/Thomas L. Ludington
                                                      THOMAS L. LUDINGTON
                                                      United States District Judge